# EXHIBIT A

# W Colocation Services Agreement

# (Texas)

# GMO Internet Group

# CONTENTS

**Clause**                                                                                          **Page**

1    DEFINITIONS AND INTERPRETATION
2    CONSTRUCTION OF THE DATA CENTER
3    SERVICE DESCRIPTION
4    SERVICE SPECIFICATION AND PRICE OF POWER
5    OPERATIONS
6    INTERNET PROTOCOL ADDRESS
7    CHARGES AND PAYMENT
8    CONFIDENTIALITY
9    LIABILITY
10   ASSIGNMENT
11   INTELLECTUAL PROPERTY RIGHTS
12   FORCE MAJEURE
13   NOTICES
14   SUSPENSION OF SERVICES
15   TERMINATION
16   REPAYMENT AND INDEMNIFICATION
17   ANTI-BRIBERY AND CORRUPTION
18   APPLICABLE LAW
19   MISCELLANEOUS
20   ENTIRE AGREEMENT
21   COUNTERPARTS
22   THIRD PARTIES
23   FURTHER ASSURANCE
SCHEDULE: ACCEPTABLE USE POLICY

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

# W Colocation Services Agreement (Texas)

This W Colocation Services Agreement (this "**Agreement**") is entered into on 16<sup>th</sup>October, 2019,

**BY AND BETWEEN**

**Whinstone US, Corporation.**, a company established and existing under the laws of the state of Delaware and having its registered office located at 4304 Firestone Road, Metairie, LA 70001 ("**Whinstone**"),

**GMO GAMECENTER USA**, INC. a company established and existing under the laws of California and having its registered office located at 650 Poydras Street, Suite 1400, New Orleans, LA 70130, U.S.A., represented herein by Hirofumi Yamashita (the "**Customer**"),

AND

GMO INTERNET, INC. a company established and existing under the laws of Japan and having its registered office located at CERULEAN TOWER, 26-1, Sakuragaoka-cho, Shibuya-ku, Tokyo, JAPAN, represented herein by Masatoshi Kumagai ("GMO-I").

**WHEREAS**

Whinstone and GMO-I entered into the Original Agreements regarding the provision of data center services in the state of Louisiana, which resulted in a delay and suspension of the provision of such data center services.

Following discussions between the Parties, Whinstone wishes to construct a data center in the state of Texas and provide the Customer with the data center services, and the Customer wishes to purchase the data center services from Whinstone. All of Whinstone's shareholders will offer to the Customer and GMO-I all of their stocks in Whinstone as security for (i) the repayment by Whinstone of the deposit paid by GMO-I to Whinstone in connection with the Original Agreements and the investment by the Customer regarding this Agreement and (ii) the indemnification by Whinstone for the loss of profit of GMO-I regarding the Original Agreements.

**NOW THEREFORE,** the Parties hereby agree as follows:

# 1   DEFINITIONS AND INTERPRETATION

1.1   In this Agreement (except where the context otherwise requires) the following words and expressions shall have the meanings set out below. Additional terms may be defined in the context of particular provisions of this Agreement:

"**AUP**" or "**Acceptable Usage Policy**" means Whinstone Acceptable Usage Policy from time to time which, at the date of this Agreement, is set out in Schedule to this Agreement;

"**Basic Remote Hands Service**" means the service detailed in Clause 3.2 below;

"**Business Day**" means a day which is not a Saturday, Sunday or a public holiday in United States;

"**Canadian Location**" means the service detailed in Clause 15.1 below;

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1766CF64



Initial:

"**Charges**" means the installation and rental charges and all other amounts stated to be payable by the Customer to Whinstone for the Services;

"**Commencement Date**" means the date that this Agreement is entered into;

"**Confidential Information**" means the terms of this Agreement and all information whether in written or in any other form which has been or may be disclosed in the course of the discussions leading up to the entering into or performance of this Agreement and which is identified as confidential or is clearly by its nature confidential including information relating to this Agreement or the Services, data used or generated in the provision of the Services, or any of Customer's products, operations, processes, plans or intentions, know- how, trade secrets, market opportunities, customers and business affairs

"**Connection**" means the connection between the CPE and the Internet;

"**Control**" means the power of a person to secure (whether by the holding of shares, possession of voting rights or by virtue of any powers conferred by articles of association, constitution, partnership agreement or other document regulating such person) that the affairs of another are conducted in accordance with its wishes and "Controlled" shall be construed accordingly;

"**CPE**" means Whinstone Equipment located at the Data Center;

"**Customer Equipment**" means the Customer's equipment installed in the Data Center;

"**Data Center**" means the data center located at the Whinstone leased site at 2721 Charles Martin Hall Road, in Rockdale, Texas 76567, USA;

"**Data Center Rules**" means the rules applying to the Customer's use of the Data Center;

"**Data Protection Laws**" means the laws and regulations governing the use of personal data;

"**Defaulting Party**" shall have the meaning set out in Clause 15.2 below;

"**Extended Term**" shall have the meaning set out in Clause 15.1 below;

"**Force Majeure**" means any event beyond the reasonable control of either or both of the Parties including war, civil war, armed conflict or acts of terrorism or a public enemy or other catastrophes, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule or regulation or direction coming into force after the date of this Agreement, epidemics, pressure waves caused by devices travelling at supersonic speeds, nuclear accident, and acts of God and strikes, slowdowns, lockouts or other labor stoppages due to the employees other than the employees of Whinstone affecting third parties which in each case causes either party to be unable to comply with all or a material part of its obligations under this Agreement. For the avoidance of doubt, an event which could be prevented by security provided by Whinstone pursuant to this Agreement is not Force Majeure;

"**Hardware**" means any firewall supplied by Whinstone together with any other related equipment provided by Whinstone hereunder;

"**Initial Investment Costs**" shall have the meaning set out in Clause 2.2 below;

"**Initial Term**" shall have the meaning set out in Clause 15.1 below;

"**Intellectual Property**" means all intellectual property, including patents, utility models, trade and service marks, trade names, domain names, rights in designs, copyrights, moral rights, topography rights, rights in databases, trade secrets and know-how, in all cases whether or not registered or registrable and including registrations and applications for registration of any of these and rights to apply for the same, rights to receive equitable remuneration in respect of any of these and all rights and forms of protection of a similar nature or having equivalent or similar effect to any of these anywhere in the world;

"**IP Connection Service**" means the connection to the Customer Equipment permitting communication with the Internet;

"**Legislation**" shall have the meaning set out in Clause 1.3.3 below;

"**Licensed Area**" means the floor area for the Customer Equipment being 1 square feet per 1.6KW of power;

"**Loss of Profit by Power Shortage**" shall have the meaning set out in Clause 16.3 below;

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

**"Loss of Profit by Power Suspension"** shall have the meaning set out in Clause 16.2 below;

**"Maintenance"** means any work carried out by Whinstone in order to upgrade, improve or maintain the Service including any modification, change, addition or replacement which does not detract from, reduce or impair the overall quality or performance of the Service;

**"Non-Defaulting Party"** shall have the meaning set out in Clause 15.2 below;

**"Original Agreements"** means the W Colocation Services Agreement between the Parties entered into on November 28, 2018, the Whinstone Colocation Order Form issued by the Customer to Whinstone on the same date, and the Amendment to the W Colocation Services Agreement between the Parties entered into on the same date;

**"Original Deposit"** shall have the meaning set out in Clause 16.1 below;

**"Owners"** shall have the meaning set out in Clause 11 below;

**"Parallel Transactions"** means transactions between Whinstone and third parties other than the Customer regarding the provision of data center services in the state of Texas;

**"Party"** means Whinstone and the Customer (as the case may be) and shall include their permitted assignees and **"Parties"** shall mean both of them;

**"Personal Data"** shall have the meaning as defined under the Data Protection Laws;

**"Renewal Term"** is that the Initial Term of the contract will renew automatically for an additional 24 month period.

**"Representatives"** means, in relation to any Party, its officers, employees and agents;

**"RFU Date"** shall have the meaning set out in Clause 7.3 below;

**"Scheduled Maintenance"** means Maintenance that is: (i) carried out between the hours of 00.00am to 06.00am; and (ii) notified to the Customer at least five (5) Business Days in advance;

**"Services"** means the colocation services at the Data Center;

**"Specified Power Draw"** shall have the meaning set out in Clause 4.3.1 below; and

**"Whinstone Equipment"** means any equipment which is supplied by or on behalf of Whinstone to the Customer for the purpose of providing the Services.

1.2     In the event of any conflict between any of the documents referred to in this Clause 1.2, they shall be given the following order of priority:

    1.2.1     the terms set out in this Agreement; and

    1.2.2     the terms set out in the AUP.

1.3     In the Agreement (except where the context otherwise requires):

    1.3.1     except where the context expressly requires otherwise, references to Clauses, paragraphs and sub paragraphs are references to clauses, paragraphs, sub-paragraphs of or to this Agreement;

    1.3.2     the headings contained in this Agreement are for convenience only and shall not influence the interpretation of this Agreement;

    1.3.3     any reference to a statute, statutory provision, subordinate legislation, code or guideline (**"Legislation"**) is a reference to such Legislation as amended and in force from time to time and to any Legislation which re-enacts or consolidates (with or without modification) any such Legislation.

1.4     Whinstone and the Customer each represents and warrants to each other that it has the power to enter into, exercise its rights under and perform and comply with its obligations under this Agreement and all actions, conditions and things required to be taken, fulfilled and done by it to so enter into, exercise its rights under and perform and comply with its obligations under this Agreement and ensure that those obligations are valid, legally binding and enforceable have been taken, fulfilled and done.

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64

Initial: _____

## 2   CONSTRUCTION OF THE DATA CENTER

2.1   Whinstone shall complete the construction of the Data Center which has a capacity to provide the Customer with the Services set out in this Agreement within 20 weeks of the construction start date, at the earliest by December 31, 2019. However, Whinstone shall proceed the construction to start mining of the Customer as schedule of 4.3.1.

2.2   The Customer may, at its sole discretion and in accordance with Whinstone's request, bear costs incurred by Whinstone for the construction of the Data Center on behalf of Whinstone, by making direct payments to a third party (the costs for the construction of the Data Center that the Customer has borne and will bear on behalf of Whinstone are hereinafter referred to as "**Initial Investment Costs**").

For the avoidance of doubt, the Customer does not bear an obligation to pay Initial Investment Costs in any case.

Whinstone shall deliver documents to the Customer including information following (including but not limited following documents);

[Before payment]

1. Company information of payee

① Name

② Address

③ ID No.

④ Contact Person (Name, Tel No, Email Address etc.)

⑤ Bank account information for wire payment (Bank Name, Branch, Address, Routing No., Account No.)

2. Quotation

3. Purchase Order

4. Invoice

5. Payment (advanced payment) request from Whinstone to Customer

6. Other supporting documents for payment (Product details, Contracts, etc.)

[After payment]

7. Receipt

※Above documents are required documents for auditing

The Parties may discuss payment method other than the above.

2.3   The amount of the Initial Investment Costs is an amount that the Parties will decide reasonably and shall comprise the amount of the deposit regarding the provision of power, the amount of the deposit regarding the lease of the real estate in the state of Texas for the Data Center, the amount of the construction costs for the Data Center, and the amount of the preparation cost of substations and power facilities.

2.4   Whinstone shall repay to the Customer the Initial Investment Costs which the Customer has borne, in accordance with Clause 16.4.

## 3   SERVICE DESCRIPTION

3.1   Data Center Facilities

3.1.1   Whinstone will provide the Customer with an installation environment for the Customer Equipment including, but not limited to, the Licensed Area in two buildings, rack systems, electricity supply (including PDU), transforming equipment, evaporative-cooling, smoke detection, IP Connection Service and physical security. Physical security includes 24 hour patrol, camera security, and



Initial:

a fence around the Licensed Area.

3.1.2     The Customer shall be granted, free of charge, escorted access to the Data Center for equipment installation, removal, additions, subtractions or physical maintenance by prior appointment.

3.1.3     With written prior consent of the Customer, Whinstone may relocate the Customer Equipment within the Data Center or to another facility operated by Whinstone. Any such relocation of the Customer Equipment shall be carried out by Whinstone. Any costs incurred in relation to such relocation shall be borne by Whinstone.

3.1.4     The Customer shall at all times comply with the Data Center Rules that have been provided to the Customer in advance; provided, however, that the Customer shall only be obligated to comply with such Data Center Rules to the extent that they are reasonable.

3.2    Basic Remote Hands Service

3.2.1     Basic Remote Hands Service is available twenty-four (24) hours a day, seven (7) days a week. Where requested by the Customer, Whinstone staff shall be available to perform the following tasks only on the instructions of the Customer in respect of the Customer Equipment:

     i.     Pushing a button;

     ii.     Switching a toggle;

     iii.     Power cycling (turning on/off) the Customer Equipment;
     iv.     Re-setting, rebooting the Customer Equipment;
     v.     Securing cabling to connections;

     vi.     Observing, describing and/or reporting to the Customer indicator lights or display information on machines or consoles;

     vii.     Cable organization;

     viii.     Modifying basic cable layout, labelling and/or re-labelling of the Customer Equipment;

     ix.     Cable patching;

     x.     Checking alarms for faults; and/or

     xi.     Inserting/removing discs or equivalent storage devices into/from the Customer Equipment.

3.2.2     The Customer and Whinstone will work together to labeling the Customer Equipment and any cabling to enable Whinstone staff to perform the Basic Remote Hands Service. Whinstone reserves the right to refuse to perform this Basic Remote Hands Service only where the Customer Equipment is not adequately labelled or where the Customer's instructions are insufficient or unclear to perform the Basic Remote Hands Service. In such case, Whinstone shall immediately contact the Customer and shall follow the Customer's instructions to perform the Basic Remote Hands Service.

3.2.3     The following services, which are not included in the Basic Remote Hands Service, may be provided by Whinstone to the Customer on a best effort's basis pursuant to the prior agreement between the Parties:

     i.     Installing applications or software to the Customer Equipment;

     ii.     Uploading of data to the Customer Equipment;

     iii.     Configuring the Customer Equipment operating system;

     iv.     Configuring any software or applications on the Customer Equipment;

     v.     Hardware fault diagnosis;

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

vi. Software fault diagnosis;

vii. Rectifying problems caused by the Customer Equipment or software;

viii. Rectifying problems caused by the Customer; or

ix. Any service whatsoever requiring the opening of the outer casing of any of the Customer Equipment.

3.2.4 Any Basic Remote Hands Service provided by Whinstone shall be billed in thirty (30) minute segments with each event rounded up to the next 30-minute segment based on a rate of $70.00 per hour. The Customer will be informed of the total time incurred after each time Whinstone provides the Basic Remote Hands Service. Whinstone shall log such time incurred for the Basic Remote Hands Service both on the Whinstone internal system and physically on the Licensed Area.

3.2.5 Subject to clause 3.2.1, Whinstone shall endeavor to respond to any Customer request for support of the Basic Remote Hands Service within approximately 30 minutes of receipt by Whinstone of such request and in any case no later than 4 hours after receiving such request. Requests for support of the Basic Remote Hands Service shall be made by phone or tickets system to the notified support number.

3.2.6 No element of technical diagnosis, analysis or advice is provided under the Basic Remote Hands Service. No liability is accepted by Whinstone for any loss or damage suffered by the Customer due to Whinstone staff following instructions issued by or on behalf of the Customer, except that this Clause 3.2.6 shall not apply in cases of Whinstone's willful misconduct or negligence.

3.2.7 Other than in respect of the services specified in this Clause as being included in the Basic Remote Hands Service, it is the Customer's responsibility to maintain and support the Customer Equipment.

# 4 SERVICE SPECIFICATION AND PRICE OF POWER

4.1 The following services are included in the standard Service for which no extra fee is caused:

4.1.1 License of the Licensed Area;

4.1.2 Provision of the cabling necessary in accordance with the Networking-Sheet (Exhibit 1) for a connection to the IP Connection Service by way of a CAT 5 Ethernet cable;

4.1.3 Escorted access by the Customer's employees to the Customer Equipment at anytime 24 hours a day;

4.1.4 Monitored alarm and security call out service;

4.1.5 Single feed power connection to the PDU with a specified power draw as detailed in Clause 4.3 below;

4.1.6 Fire detection and alarm system;

4.1.7 After the RFU Date, acceptance of delivery of the Customer Equipment between 10.00am to 4.00pm on Business Days, subject to two (2) Business Days' notice, to be stored prior to installation;

4.1.8 Initial construction work of Customer Equipment (including unpacking, assembly and installation, LAN cable and power cable connection, initial setting and garbage disposal);

4.1.9 Dual power circuits:

4.1.10 Access circuits;



Initial:

4.1.11   Cabling services (except the services provided in Clause 4.2.1);

4.1.12   IP address and domain names;

4.1.13   Relocation of Customer Equipment from the data center in the state of Louisiana to the Data Center, at Whinstone's cost pursuant to Clause 3.1.3 of the Original Agreements;

4.1.14   Whinstone will be solely responsible to handle any complaints from neighbors of the building with respect to the noise from the Customer Equipment and shall hold the Customer harmless from any responsibility or costs arising out of or in relation to such complaints.

4.2   The following equipment is not included in the standard Service and are not included in this Agreement:

4.2.1   Procurement of power cables, miners and cables that are removable and relocatable

4.3   Specified Power Draw

4.3.1   Whinstone shall provide the Customer with power as provided in the schedule below (the "**Specified Power Draw**"). The Customer will be charged for power usage at 0.0285 USD/kWh.

(i)     as of February 29, 2020 : 40 MW

(ii)    as of April 30, 2020     : 80 MW

(iii)   as of May 31, 2020      : 120MW

(iv)    In avoidance of doubt, Electricity contract shall dictate ramp up schedule (Exhibit 2).

4.3.2   The price set forth in Clause 4.3.1 shall not be increased for 10 years from the RFU Date for any reason other than changes in or the establishment of regulations, orders or policies, under federal law and state law by the state or federal government, legislature or court or any other public authority, or any adverse change outside the control of Whinstone. Whinstone and the Customer shall decide fairly by agreement the effect of to whom can be passed on. The Parties shall consult with each other in good faith on the price from 10 years after the RFU Date.

4.3.3   Until such time as the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid, the Customer shall be charged for the power which the Customer actually used. Once the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid, the Customer shall enter into discussions in good faith about agreeing a minimum commitment for power usage as was contained in the Louisiana Agreement.

4.3.4   If the Customer uses over and above the Specified Power Draw, the Customer will be charged for additional usage at 0.0285 USD/kWh.

4.3.5   If Whinstone determines that the over-usage of power cannot be reasonably permitted, Whinstone reserves the right to require the Customer to remove or deactivate sufficient Customer Equipment to prevent such over-usage within 24 hours of notification which describes in detail such reason for the removal or deactivation. Whinstone shall consult with the Customer in good faith before the notification.

4.3.6   The Customer will be charged for power distribution units (PDU), network cables (RJ45), C13-C14 power plugs and power cords that specifically relate to the operation of the Customer Equipment.

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

4.3.7    The Customer shall be able to sell the power that can be used pursuant to this Agreement to any third party. The price for such power charged to the Customer is 0.055 USD/kWh plus reasonable capex costs for all GPU third parties including the Customer's group companies.

4.3.8    Whinstone shall get prior consent of the Customer to power down miners, except for LRS. In the event that power down, the Customer and Whinstone will share as fair the benefit of selling power deducted loss of profit should getting from performing miners. For the avoidance of doubt, in the event that there is some loss from selling power, the Parties should share as prescribed above as well.

# 5   OPERATIONS

5.1    Whinstone reserves the right to vary the technical specifications of the Services where necessary for operational reasons and without detracting from, reducing or impairing the overall quality or performance of the Services, after giving reasonable written notice to the Customer (except in the case of an emergency where notice is not possible; provided, however, that in such case, Whinstone shall provide notice to the Customer as soon as reasonably possible).

5.2    Without prejudice to Clause 5.1, Whinstone reserves the right to, after providing the Customer with reasonable advanced written notice (provided, however, that in the event of an emergency, as soon as reasonably possible) at any time to make any change, addition to or replacement of any part of the Services, which is required to conform with any applicable safety, statutory or legal requirement, provided that this does not detract from, reduce or impair the overall quality or performance of the Services.

5.3    The Customer may report any claims including failures of performance of the Services by Whinstone to the Whinstone support center at any time. Whinstone shall take all actions necessary to remedy such failures as soon as possible.

5.4    Whinstone will ensure a service uptime of 99% (per annum starting from the RFU Date) for the provision of the Services, including regular networking, internet-connection, and cooling services, set forth in this Agreement

# 6   INTERNET PROTOCOL ADDRESS

The Customer will have a non-transferable license to use any IP address allocated by Whinstone to the Customer for the duration of this Agreement. If this Agreement is terminated for any reason, the Customer's license to use the IP address shall automatically terminate.

# 7   CHARGES AND PAYMENT

7.1    In consideration of the provision of the Services, the Customer shall pay the Charges in accordance with this Clause 7.

7.2    Whinstone shall issue to Customer an invoice for all necessary equipment, power supplies, network cables, and similar components to take the Customer's miners online in conformance with the terms of this Agreement, and the Customer shall pay the amount set forth in the invoice within fourteen (14) calendar days of receipt of such invoice for power supplies and within thirty (30) calendar days of receipt of such invoice for all amounts incurred for charges other than power supplies by wire transfer to Whinstone's bank account. Whinstone shall separately provide the Customer with the details of such bank account in advance.

7.3    Whinstone shall notify the Customer of the date on which the Services are ready for use **("RFU Date")**. Unless the Customer notifies Whinstone that it does not consider the Services to be ready for use in writing within five (5) Business Days of the receipt date of the notice

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

from Whinstone (including details of any deficiency of the Services), the Customer shall be deemed to have accepted the Services on the RFU Date.

7.4     Whinstone shall have the right to invoice the Customer for the Charges after completing delivery of the Services.

7.5     Whinstone shall be entitled to invoice the Customer for any and all changes to the Services requested by the Customer pursuant to the agreement between the Parties.

7.6     If the Customer fails to pay any amount owed under this Agreement by the dates set forth herein, Whinstone shall be entitled but not obliged to charge the Customer interest in the amount equal to 5% per year on the overdue amount from the due date up to the date of actual payment.

7.7     All Charges and payments referred to in this Agreement are stated exclusive of value added tax and all similar taxes and duties payable in respect of such payments. To the extent that such tax is properly chargeable to the Customer, the Customer shall pay at the time that the payment becomes due an amount equal to the value added tax properly chargeable upon such payment. Whinstone shall provide the Customer with a value added tax invoice with respect to the payment.

7.8     All amounts due under this Agreement shall be paid in full without any deduction or withholding other than as required by law, and the Customer shall not be entitled to assert any credit, deduction, counterclaim or abatement of any nature whatsoever against Whinstone in order to justify withholding payment of any such amount in whole or in part.

7.9     In the event of any failure by the Customer to make full payment to Whinstone of any and all amounts due to Whinstone pursuant to this Agreement, the Customer shall be responsible for all costs and expenses (including legal fees) which Whinstone reasonably incurs in collecting such amounts.

7.10    The Customer shall not be required to pay charges for any period during which Whinstone fails to provide the Services due to any reason.

# 8   CONFIDENTIALITY

8.1     The Parties agree that Confidential Information:

    8.1.1     shall be used solely for the purpose for which it was furnished in connection with performance of this Agreement;

    8.1.2     shall be maintained in strict confidence and shall not be disclosed to third parties, provided, however, that Whinstone and the Customer may disclose Confidential Information to its affiliates and sub-contractors and their respective employees who need to have access to such Confidential Information for the purposes of providing and receiving the Services on the condition that Whinstone and the Customer shall procure compliance by such sub-contractors or affiliates and their respective employees with the terms of this Clause 8; provided, however, that Whinstone and the Customer shall be responsible for any breach of the obligations set forth in this Clause 8 by such sub-contractors or affiliates and their respective employees; and

    8.1.3     upon termination of this Agreement, shall be returned to the disclosing party, together with all copies, or (at the disclosing party's option) destroyed.

8.2     Any disclosure of Confidential Information permitted under Clause 8.1.2 shall be in confidence, and only be to the extent that any persons to whom the information is disclosed need to know the same for the performance of their duties, and the receiving party shall be obliged to procure that all such persons are aware of the obligation of confidentiality and undertake to comply with it.

8.3     The obligations of confidentiality and restricted use set out in Clauses 8.1 and 8.2 are not applicable to Confidential Information that:

Initial:

8.3.1    was previously or becomes known to the receiving party, free from any obligation to keep the same confidential (provided that Confidential Information disclosed in contemplation of the provision of the Services shall still remain subject to such obligations);

8.3.2    is or becomes generally available to the public, other than as a direct or indirect result of unauthorized disclosure by the receiving party, its affiliates or a person engaged by the receiving party or its affiliates contrary to their respective obligations of confidentiality;

8.3.3    is shown to have been independently developed by the receiving party, its officers, employees, agents or contractors;

8.3.4    the parties agree in writing that it need not be kept confidential; or

8.3.5    is required to be disclosed by law or by regulation or by the order of any governmental authority or court, provided that, to the extent permitted by law, prior to any disclosure, the receiving party notifies the disclosing party of the information to be disclosed and the circumstances in which the disclosure is alleged to be required as early as reasonably possible before such disclosure must be made and, at the disclosing party's request and cost, assists the disclosing party in avoiding or limiting any such disclosure.

Without prejudice to any other rights and remedies that the disclosing party may have, the receiving party agrees that if Confidential Information is used or disclosed or threatened to be used or disclosed other than in accordance with the terms of this Agreement, the disclosing party shall, without proof of special damage, be entitled to seek an injunction, specific performance or other equitable relief for any actual or threatened breach of this Clause 8.

8.4    Notwithstanding Clause 8.1, Whinstone and its affiliates may make reasonable references to the Customer as a customer of the Services in its advertising and/or promotional literature and other materials with the prior written consent of the Customer.

8.5    In order for Whinstone to provide the Services, the Customer will need to supply certain information or data. Where such information or data constitutes Personal Data, Whinstone will comply with the Data Protection Laws. The Parties shall duly observe and comply with all their obligations under the Data Protection Laws in relation to any Personal Data processed in connection with this Agreement and shall render such assistance and co-operation as is reasonably necessary or reasonably requested by the other Party in respect thereto.

8.6    It shall be the Customer's responsibility to keep any Personal Data provided to Whinstone up to date and the Customer warrants and undertakes to Whinstone that all of its Personal Data and contact details are accurate and complete.

8.7    Whinstone may pass the Customer's Personal Data to Whinstone affiliates and to any third-party suppliers Whinstone may use to provide the Services that involve processing data on Whinstone's behalf for the purpose of providing the Services and as contemplated by the terms of this Agreement; provided, however, that Whinstone shall be responsible for any breach of the obligations set forth in this Clause 8 by such affiliates and third party suppliers.

# 9    LIABILITY

9.1    Whinstone shall be liable for an amount decided based on reasonable evidence in contract, tort (including negligence), for breach of a statutory duty or otherwise arising under or in connection with this Agreement for any of the following:

9.1.1 loss of revenue, loss of profit, loss of goodwill, loss of reputation, loss of anticipated savings, loss of business, loss of contracts;

9.1.2 any direct, indirect, special or consequential loss or damage.

9.2    In no event will Whinstone have any liability for non-provision or delay in the provision of the

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

Services which:

9.2.1    can be reasonably attributed to the acts or omissions of the Customer, its affiliates, employees, workers, sub-contractors, agents or customers including but not limited to failure to provide complete, accurate information in a timely manner for Whinstone;

9.2.2    arises from or as a consequence of use of the Services other than in accordance with the express terms of this Agreement; and/or

9.2.3    occurs during any period of suspension in accordance with Clause 14,

provided, however, that this Clause 9.2 shall not apply in the case of willful misconduct or negligence by Whinstone, its affiliates, employees, workers, sub-contractors or agents.

9.3    Whinstone shall not be liable for any claim arising under this Agreement unless the Customer gives Whinstone written notice of the claim within twelve months of becoming aware of the circumstances giving rise to the claim.

9.4    Whinstone will maintain a minimum insurance coverage of $20,000,000 per occurrence of general liability insurance for its facilities. This coverage will not include business income interruption coverage.

9.5    The Customer shall be liable in contract damages incurred at ordinary and direct losses caused by the Customer's breach.

## 10 ASSIGNMENT

10.1    The Services are provided for the Customer and the Customer's affiliates' use only (subject always to such use being in accordance with the terms of this Agreement) and the Customer undertakes not to otherwise resell, or lease the Services to any third party except for its affiliates without the prior written consent of Whinstone. The Customer is and shall remain liable to Whinstone for any act or omission of any of its Representatives and/or customers.

10.2    Whinstone may, upon receipt of the Customer's prior written consent, assign, sub-license or deal in any other manner with this Agreement or any rights under the Agreement, or sub-contract any or all of any or all of obligations under this Agreement to one or more of its affiliates or to any third party upon a sale of all or substantially all of its assets and will provide notice to the Customer of any such assignment, provided, however, that the Customer is provided with the Services under the same terms and conditions as those of this Agreement until the expiration of the Initial Term or the relevant Extended Term, as the case may be, of this Agreement.

## 11 INTELLECTUAL PROPERTY RIGHTS

All Intellectual Property in the Whinstone Equipment and/or owned or used by Whinstone and/or its affiliates, sub-contractors, agents and/or suppliers ("Owners") in the performance of this Agreement shall be and will remain vested in the Owners, and except as expressly provided in this Agreement, the Customer shall not acquire any rights, title or interest in or to any Intellectual Property owned and/or used by the Owners provided that the Customer is hereby granted at no additional cost a non-exclusive license to use all such Intellectual Property as is required to use the Services and the IP Connection Service in accordance with the terms of this Agreement until this Agreement is terminated or expires. The Customer shall indemnify Whinstone in respect of any and all claims from third parties relating to infringement of third-party licenses or terms and conditions applicable to the use of the Services and the IP Connection Service by the Customer and/or its Representatives or customers, except in the case that the infringement is caused by the Intellectual Property of the Owners or the Whinstone Equipment.



Initial:

## 12 FORCE MAJEURE

12.1 Neither Party shall in any circumstances be liable to the other for any loss of any kind whatsoever including any damages whether directly or indirectly caused or incurred by the other Party by reason of any failure or delay in the performance of its obligations hereunder which is due to Force Majeure.

12.2 intentionally deleted

12.3 If either of the Parties becomes aware of circumstances of Force Majeure which give rise to or which are likely to prevent the performance of any obligations on its part, it shall, as soon as reasonably possible and in any event within five (5) Business Days after commencement of the Force Majeure, serve notice in writing on the other party specifying the nature and extent of the circumstances giving rise to Force Majeure.

12.4 If either party is prevented from performance of substantially all of its obligations by Force Majeure for a continuous of more than two (2) months in total, the other party may terminate this Agreement by giving notice in writing to the other party at any time, in which case neither Party shall have any liability to the other except that rights and liabilities which accrued prior to such termination shall continue to subsist. For the avoidance of doubt, the Customer may elect to continue this Agreement even after such two (2) months; provided, however, that the Customer shall not be required to pay any charges for the period that Whinstone is prevented from performance of its obligations by Force Majeure.

## 13 NOTICES

13.1 Any notice given or made under this Agreement or required by law or regulation shall be in writing and in English and signed by or on behalf of the Party giving it and shall be served by hand delivering it or sending it by courier (with signature required) to the address and for the attention of the relevant Party set out in Clause 13.2 (or as otherwise notified by that party under this Clause). Any notice shall be deemed to have been received at the time of delivery.

13.2 The addresses of the Parties for the purposes of Clause 13.1 are:
   (i)   Whinstone
         4304 Firestone Road Metairie, LA 70001
         Marked for the attention of: Lyle Theriot

   (ii)  the Customer and GMO-I
         CERULEAN TOWER, 26-1, Sakuragaoka-cho, Shibuya-ku, Tokyo JAPAN
         Marked for the attention of: Satoshi Makita, Masaya Yanagi, Hidetoshi Kawagome,
         Hideyuki Matsui

13.3 In proving service, it shall be sufficient to prove that the envelope containing such notice was addressed to the address of the relevant Party set out in Clause 13.2 (or as otherwise notified by that Party under this Clause) and delivered to that address.

13.4 For the avoidance of doubt, notice given under this Agreement shall not be validly served if sent by email.

13.5 Either party may at any time notify the other of a change of address or person for the purposes of the serving of notices and the provisions of this Clause 13 shall apply to such notice.

## 14 SUSPENSION OF SERVICES

14.1 Whinstone reserves the right to suspend the Services for the following reasons:

   14.1.1    to carry out Maintenance with the prior written consent of the Customer;

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

14.1.2    to make any modification, change, addition to, or replacement of, the Whinstone Equipment or any part of the IP Connection Service or the Services, where this is required to conform with any applicable safety, statutory or legal requirements, provided that such modification, change, addition or replacement does not detract from, reduce or impair the overall quality or performance of the Services, with prior written consent of the Customer;

14.1.3    where the Customer fails to pay any Charges in accordance with Clause 7;

14.1.4    where Whinstone is obliged to comply with an order, instruction or request of Government, court, law enforcement agency or other competent administrative or regulatory authority;

14.1.5    in an emergency; or

14.1.6    where Whinstone has reason to terminate this Agreement in accordance with its terms.

14.2    Where suspension of the Services is necessary in accordance with the provisions of Clause 14.1.2, Whinstone will carry out such work as Scheduled Maintenance but in circumstances where this is not possible, Whinstone shall use all reasonable endeavors to perform such work between the hours of midnight and 6am and shall restore the Services as soon as reasonably practical in the circumstances.

14.3    Except where Whinstone is entitled to and subsequently elects to terminate this Agreement in respect of such Services in accordance with the terms of this Agreement, in the case that Whinstone suspends the Services in accordance with the provisions of Clause 14.1.3 or 14.1.6, Whinstone shall use commercially reasonable efforts to reinstate the Services as soon as is reasonably practical upon Whinstone's reasonable satisfaction that the grounds for suspension set forth in this Clause 14.3 are no longer applicable and subject to the Customer having paid to Whinstone a reinstatement fee in respect of the restoration of such Service(s) in the amount of USD 250.00 (or such other amount as may be notified to the Customer from time to time) for each Service, which fee shall constitute Charges for the purposes of this Agreement. The provisions of Clause 9 shall apply to such reinstatement fees.

14.4    If Whinstone exercises its right of suspension under this Clause, this will not exclude its right to terminate this Agreement later in respect of that or any other event, nor will it prevent Whinstone claiming damages from the Customer in respect of any breach.

## 15 TERMINATION

15.1    This Agreement shall commence on the Commencement Date and shall continue for a period of 36 months from the RFU Date of Original Agreements ("**Initial Term**") unless and until terminated in accordance with this Clause 15.

This Agreement shall be automatically extended for a period of 12 months ("**Extended Term**") at the end of the Initial Term and at the end of each Extended Term, provided, however, that this Agreement will automatically terminate on 31 December 2029 for as long as all Secured Indebtedness listed in the PLEDGE AND SECURITY AGREEMENT are settled in full.

For the avoidance of doubt, the Customer can terminate this Agreement after the initial 36 months of the Initial Term with no penalty by notifying Whinstone in writing 120 days prior to the end of this Agreement.

15.2    Either Party (the "**Non-Defaulting Party**") may terminate this Agreement (without prejudice to its other rights and remedies) with immediate effect by written notice to the other Party (the "**Defaulting Party**") if:

15.2.1    the Defaulting Party commits a material breach of any of its material obligations under this Agreement (including failing to pay any sums payable under this Agreement by the due date and failing to make the Services ready for use by the date set out in Clause 7.3 or to provide the Services in accordance with the



Initial:

schedule set out in Clause 4.3.1) and if the breach is capable of remedy, fails to remedy it during the period of 30 days starting on the date of receipt of notice from the Non-Defaulting Party specifying the breach and requiring it to be remedied; or

15.2.2 the Defaulting Party becomes insolvent (including being unable to pay its debts as they fall due and/or that the value of its assets is less than the amount of its liabilities taking into account its contingent and prospective liabilities), proposes an individual, company or partnership voluntary arrangement, has a receiver, administrator or manager appointed over the whole or any part of its business or assets; if any petition shall be presented, order shall be made or resolution passed for its winding up (except for the purpose of a bona fide amalgamation or reconstruction), bankruptcy or dissolution (including the appointment of provisional liquidators/interim receivers or special managers); if it shall otherwise propose or enter into any composition or arrangement with its creditors or any class of them; if it ceases or threatens to cease to carry on business or if it claims the benefit of any statutory moratorium; or

15.2.3 the Defaulting Party suffers or there occurs in relation to that Party, any event which is analogous to any of the events referred to in Clause 15.2.2 in any part of the world.

15.3 Either Party reserves the right to terminate this Agreement with immediate effect by written notice and without further obligation or liability to the Customer as required by any law enforcement or other government or regulatory organization or authority or by the courts.

15.4 All rights and obligations of the Parties shall cease to have effect immediately upon termination of this Agreement except that termination shall not affect:

15.4.1 accrued rights and obligations of the Parties at the date of termination;and

15.4.2 the continued survival and validity of the rights and obligations of the Parties under Clauses 8, 9, 15.4, 16, 18, 20 and 22 and any other provisions of this Agreement necessary for the interpretation or enforcement of this Agreement.

15.5 For the avoidance of doubt, save where otherwise agreed in writing between the Parties, termination of any Service does not constitute termination of this Agreement, and, where this Agreement has been terminated in accordance with its terms, all Services will automatically terminate upon such termination.

15.6 Upon expiration or termination of the Services or of this Agreement, the Customer shall surrender the Licensed Area in good condition, except for any reasonable wear and tear.

15.7 The Customer agrees that until such time as the Licensed Area is surrendered to Whinstone free and clear of all of Customer Equipment and property and placed in a neat and orderly condition in accordance with this Agreement, the Customer shall continue to be liable to Whinstone for the Charges and shall in addition be liable for any losses and/or damages which Whinstone may sustain or become liable for as a result of the failure of the Customer to return the Licensed Area in a timely manner and in a neat and orderly condition.

15.8 Upon termination of this Agreement, the Customer shall at its own cost and expense return to Whinstone all IP addresses provided to it by Whinstone.

## 16 REPAYMENT AND INDEMNIFICATION

16.1 Whinstone acknowledges that it shall refund to GMO-I the deposit in the amount of $5,810,720.61 that GMO-I paid to Whinstone in connection with the Original Agreements ("**Original Deposit**").

16.2 Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit in an amount of $ 2,029,402.56 arising out of the suspension of the provision of power by Whinstone, set out in the Original Agreements, from July 27, 2019 to the date when the Data

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

Center starts operation of 5MW ("**Loss of Profit by Power Suspension**"), which constitutes a breach of the Original Agreements.

16.3 Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension ("**Loss Of Profit By Power Shortage**"), which constitutes a breach of the Original Agreements. The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit By Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties.

16.4 The Parties agree that the Original Agreements are hereby terminated and fully replaced by this Agreement, and neither Party has any right or claim under the Original Agreements other than those set out in this Agreement.

16.5 Whinstone shall repay (a) the Original Deposit to GMO-I and (b) Initial Investment Cost and, after the Customer's claim, interest at the rate of 7% per year to the Customer and indemnify (c) Loss Of Profit By Power Suspension to GMO-I, by paying on a monthly basis to the Customer and GMO-I the amount of all of Whinstone's profits derived (i) from the Customer in connection with this Agreement and (ii) from each third party, which is a party to the Parallel Transactions, in connection with the Parallel Transactions, if any.

   16.5.1 Whinstone shall make monthly payments over 36 months starting from the end of June 2020. The actual amount to be paid each month shall be mutually discussed prior to June 2020.

   16.5.2 The amount of all of the Whinstone's profits shall be calculated by deducting (x) the amount of the costs of power charged to Whinstone by the power company and (y) the amount of the minimum operation costs in connection with this Agreement and the Parallel Transactions, from (z) the amount of the charges paid by the Customer and the third parties to the Parallel Transactions. For the avoidance of doubt, (z) the amount of the charges paid by the Customer shall be calculated based on the price of power of 0.0285 USD/kWh.

   16.5.3 The Parties shall separately agree on (y) the amount of the minimum operation costs in connection with this Agreement and the Parallel Transactions.

   16.5.4 The Customer and GMO-I may, in its sole discretion, determine how the payment by Whinstone is allocated to (a), (b), or (c) set forth above. For the avoidance of doubt, the aforementioned payments shall be applied towards (a), (b), and (c) listed under 16.5.

16.6 Whinstone shall give its assets as security as soon as practical, which Whinstone obtained with the Initial Investment Costs, for the repayment of (a) and (b) and the indemnification of (c) set forth above.

16.7 Whinstone shall disclose to the Customer and GMO-I the contracts that are not under NDA with third parties regarding Parallel Transactions which stipulate the charges paid to Whinstone in exchange for the provision of the data center services, immediately after conclusion of such contracts. This Clause is applied until the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid by Whinstone.

16.8 If Whinstone defaults on this Agreement for material breaches, Whinstone shall, at the instruction and designation by the Customer or GMO-I, assign or make every effort to assign all of its assets and contracts to the Customer free of charge to the extent permitted by Legislation. This Clause is applied until the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid by Whinstone.

16.9 The Customer and Whinstone will work together to successfully manage a repayment plan of the total debt owed by Whinstone to the Customer and GMO-I, in accordance with 16.5 to 16.6.

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64

Initial: _____

# 17 ANTI-BRIBERY AND CORRUPTION

Each Party warrants and represents that it has not and will not carry out any act that could be an offense under anti-bribery laws.

# 18 APPLICABLE LAW

18.1    This Agreement shall be governed by laws of the State of New York and the Parties hereby submit to the exclusive jurisdiction of the New York courts. The Parties further agree that any non-contractual disputes between them shall be governed by laws of the State of New York and subject to the exclusive jurisdiction of the State of New York courts.

18.2    In the event that the Customer is established in a country other than the United States of America, it shall appoint an agent to receive on its behalf in the United States of America service of any proceedings arising out of or in connection with this Agreement or the legal relationships established by this Agreement and shall give Whinstone written notice of the identity of such agent and the agent's address at the same time as entering into this Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the Customer).

If for any reason such agent ceases to be able to act as agent or no longer has an address in the United States of America, the Customer shall forthwith appoint a substitute acceptable to Whinstone and deliver to Whinstone the new agent's name and address.

# 19 MISCELLANEOUS

19.1    No failure or delay of either Party in exercising its rights hereunder (including the right to require performance of any provision of this Agreement) shall be deemed to be a waiver or release of such rights. Any waiver or release must be specifically granted in writing signed by the Party waiving its rights and shall:

19.1.1    be confined to the specific circumstances in which it is given;

19.1.2    not affect any other enforcement of the same or any other right; and

19.1.3    unless it is expressed to be irrevocable, be revocable at any time in writing.

Any single or partial exercise of any right, power or remedy provided by law or under this Agreement shall not preclude any other or further exercise of it or the exercise of any other right, power or remedy.

19.2    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction that shall not affect or impair:

19.2.1    the legality, validity, or enforceability in that jurisdiction of any other provision of this Agreement; or

19.2.2    the legality, validity, or enforceability under the law of any other jurisdiction of that or any other provision of this Agreement.

19.3    All work performed by Whinstone under this Agreement shall be performed as an independent contractor and not as an agent of the Customer and neither Party shall be, nor represent itself to be, the employee, agent, representative, partner or joint venture of the other. Neither Party shall have the right or authority to assume or create an obligation on behalf of or in the name of the other or to otherwise act on behalf of the other. The performing Party shall be responsible for its employees' compliance with all applicable laws, rules, and regulations while performing work under this Agreement.

19.4    No modification, amendment or other change may be made to this Agreement or any part thereof unless reduced to writing and executed by authorized representatives of Whinstone and the Customer. Unless expressly so agreed, no modification or variation of this Agreement shall constitute or be construed as a general waiver of any provisions of this Agreement, nor

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

shall it affect any rights, obligations or liabilities under this Agreement which have already accrued up to the date of such modification or waiver, and the rights and obligations of the Parties under this Agreement shall remain in full force and effect, except and only to the extent that they are so modified or varied.

## 20 ENTIRE AGREEMENT

20.1    This Agreement constitutes the entire understanding between the Parties concerning the subject matter of the Agreement and supersedes any previous agreement or understanding between the Parties in relation to the subject matter.

20.2    With effect from the date of this Agreement, all Services shall be provided solely in accordance with the terms of this Agreement and all prior agreements and understandings between the Parties in relation to the same shall be deemed terminated from the date hereof. Save in respect of rights and liabilities arising prior to such date, all such prior agreements and understandings shall cease to be of effect from the date of signature of this Agreement. In no event shall the pre-printed terms and conditions found on any Customer purchase order, acknowledgement, or other form be considered an amendment or modification of this Agreement, even if such documents are signed by representatives of both parties; such pre-printed terms and conditions shall be null and void and of no force and effect.

20.3    Neither Party shall have any liability or remedy in tort (including negligence) in respect of any representation, warranty or other statement (including any contained in this Agreement) being false, inaccurate or incomplete unless it was made fraudulently.

20.4    Each Party acknowledges and agrees that in entering into the Agreement or in amending any part of this Agreement, it has not relied on any statement, representation, warranty, understanding, undertaking, promise or assurance (whether negligently or innocently made) of any person (whether Party to this Agreement or not) other than as expressly set out in this Agreement. Each Party irrevocably and unconditionally waives all claims, rights and remedies which, but for this Clause, it might otherwise have had in relation to any of the foregoing.

20.5    Nothing in Clauses 20.1 to 20.4 (inclusive) shall limit or exclude any liability for fraud.

20.6    The Parties agree that when the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid, the Parties will enter into discussions in good faith to renegotiate this Agreement based on the hosting agreement usually offered by Whinstone for colocation services.

## 21 COUNTERPARTS

21.1    This Agreement may be executed in any number of counterparts, and by the Parties on separate counterparts, but shall not be effective until each of the Parties has executed at least one counterpart.

21.2    Each counterpart shall constitute an original, but all the counterparts shall together constitute one and the same instrument.

## 22 THIRD PARTIES

It is agreed that this Agreement is not intended to, and does not give to any other person who is not a Party to this Agreement any rights to enforce directly any provisions contained in this Agreement except for any person to whom the benefit of this Agreement is assigned or transferred in accordance with Clause 10.

## 23 FURTHER ASSURANCE

Each Party shall, if requested by the other Party and at the other Party's cost, execute or

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

cause to be executed all documents and do or cause to be done all further acts and things as may be necessary in order to vest in and secure to the other Party and its successors in title the full benefit of the assets, rights and benefits to be transferred or granted to the other Party under this Agreement and for the protection and enforcement of the same and otherwise to give effect to this Agreement and to the rights and obligations contained within this Agreement.



Initial:

# SCHEDULE

### Acceptable Use Policy

This Acceptable Use Policy applies to you and anybody you allow to use the Services. Any reference to "you" shall be interpreted to mean you and anybody you allow to use the Services. You are responsible for the use of the Services by any person you allow to use it.

Any user of the Services (a "**User**") will need to comply with this Acceptable Use Policy (AUP). Whinstone may change the AUP to reflect any changes in the law or community standards or whenever Whinstone deems it necessary.

### 1. Don't use the Services illegally!

The Services may only be used for lawful purposes in accordance with all current and future laws, statutes and regulations in force from time to time in the country (or countries) in which the Services are being used ("Laws").

You may not use the Services to send, receive, store, distribute, transmit, post, upload or download any materials or data which:

- violates any Laws;

- violates any Whinstone information security policies;

- is defamatory, offensive, abusive, indecent, obscene, or constitutes harassment;

- is in breach of any third-party rights (including any third-party intellectual property rights);

- has any fraudulent purpose or effect; or

- damages or may damage our name and/or reputation

or permit any other person (whether intentionally or otherwise) to do so.

### 2. Do not violate anyone's systems or network security

You must not use the Services to violate our network security or any third party's system or network security by any method including:

- unauthorized access to or use of data, systems or networks, including any attempt to probe, scan or test the vulnerability of a system or network;

- unauthorized monitoring of data or traffic on any network or system without the express authorization of the owner of the system or network; or

- unauthorized interference with any user, host, system or network without the express authorization of the owner of the system or network.

You must not send, receive, store, distribute, transmit, post, upload or download any materials that are designed to violate our network security or any third party's system or network security. Examples of such prohibited material may include (but are not limited to):

- programs containing viruses or Trojan horses;

4304 Firestone Road Metairie, LA 70001

21

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial:

- tools designed to compromise the security of other sites;

- programs or services designed to send or facilitate the sending of unsolicited advertisements; or

- programs or services designed to encourage or facilitate a breach of this AUP or any acceptable use policy of another Internet services provider.

You must not connect to the Services insecure machines or services able to be exploited by others to carry out actions which constitute a breach of this AUP including but not limited to the transmission of unsolicited bulk email or email containing infected attachments or attempts to disrupt websites and/or connectivity or any other attempts to compromise the security of other users of our network or any other third-party system.

You are responsible for all data and/or traffic originating from the machines and/or networks that you have connected to the Services. You must immediately disconnect (and subsequently secure prior to reconnection) machines generating data and/or traffic which contravenes this AUP upon your becoming aware of the same and/or once notified of such activity by Whinstone.

### 3.   E-mail

You must not send email to anyone who does not wish to receive it. We acknowledge that email is an informal method of communication however you must refrain from sending emails to another user after receiving a request to stop.

Unsolicited Bulk Email means email which is both 'Unsolicited', meaning that the recipient has not granted verifiable permission for the message to be sent, and 'Bulk', meaning that the message is sent as part of a larger collection of messages, all having substantively identical content. You must not send Unsolicited Bulk Email or any other form of abusive electronic communication. In particular, unsolicited advertising mailings (whether commercial or informational) are strictly prohibited. You must only send advertising material to recipients that have specifically requested it.

You must not transmit or knowingly reply to mail-bombs. Mail-bombing is either emailing multiple copies of a single message, or sending large or multiple files or messages to a single user or Internet site with the intention of disrupting the recipient's mail service.

You must not use false email headers or alter the headers of email messages to conceal their email address or to prevent Internet users from responding to messages. You must not use any email address that you are not authorized to use.

You must not suggest or imply that any email you send is from, authorized or endorsed by, any Whinstone company or any other third party or relates to any Whinstone business or any other third-party business without express prior consent.

### 4.   Advertising to unsolicited recipients

You must not operate, host, provide hosting facilities to or assist in any way any web site, email address, or any other online service which is advertised or promoted by means of Unsolicited Bulk Email (whether commercial or informational), any mass messaging facility or any other form of abusive electronic communication. This prohibition applies whether the abusive communication takes place using our network, or otherwise. Hosting providers in particular should take care to ensure that their own acceptable use policy includes a prohibition of services advertising to unsolicited email recipients, since Whinstone reserves the right to demand immediate suspension of access to services advertising to unsolicited email recipients, once such services are drawn to the attention of Whinstone.

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF54



Initial: _____

### 5.   World Wide Web and surfing the net

You will be solely responsible for your use of the Internet and any web pages owned and/or operated by you or anyone you permit to use the Services and that are connected to the Services. You must not use world wide web pages within or outside the Services to violate any part of this AUP or to disrupt or attempt to disrupt another Internet user's Internet experience and, in particular, any such web pages must comply at all times with the provisions of clause 1 and clause 2 of this AUP.

### 6.   What can we do?

Firstly, you should be aware that we will block any electronic communication that we reasonably consider to have breached this AUP.

Secondly, if you have breached this AUP, or we reasonably suspect that you may have breached this AUP we will notify you (provided that this notification does not prejudice any investigation) and we may also:

(a)   immediately suspend your access to the Services until such time as we are satisfied the breach has stopped;

(b)   immediately end your contract for the provision of the Services;

(c)   notify and/or pass on the details of the breach of the AUP to any relevant government, statutory, self-regulatory or law enforcement agency (each a "**third party authority**");

(d)   investigate the alleged breach of the AUP, which may include gathering information from you and/or the complaining party (if any) and the examination of any other data or material on our network or our servers; or

(e)   remove (either temporarily or permanently), copy, store, monitor or otherwise deal with data and/or other material on our network and/or our servers.

DocuSign Envelope ID: C7941DAA-E6A9-49F0-BFC0-8F9B1768CF64



Initial: _____

You expressly authorize Whinstone to use your personal data and other account information in connection with any investigation carried out by Whinstone in accordance with this AUP, including by disclosing it to any third-party authority that Whinstone considers has a legitimate interest in any such investigation or its outcome.

Whinstone reserves the right to terminate the Services with immediate effect and without further obligation or liability to you as required by any law enforcement organization or by the courts or any relevant regulatory authority.

## 7.    Your liability to us

You agree to indemnify and hold Whinstone and the Whinstone group of companies, its affiliates, officers, employees and agents harmless against all claims, actions, demands, costs (including legal costs and disbursements), expenses, losses and damages arising out of or incurred as a consequence of your breach of this AUP or breach of this AUP by anyone permitted to use the Services by you. In many instances a breach of this AUP would constitute a breach of law and may in some cases carry criminal liability.

Accepted by: _____

Print Name:  Hirofumi Yamashita for GMO GAMECENTER USA., INC._____

Date:    10/16/2019

Accepted by: _____

Print Name:  Masatoshi Kumagai for GMO INTERNET, INC._____

Date:    10/16/2019

Accepted by: _____

Printed Name: Aroosh Thillainathan for Whinstone US, Corporation.

Date: 10/16/2019