# HAYNES BOONE



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/03/2022

September 30, 2022

**Via ECF**

The Honorable John P. Cronan
United States District Court
Southern District of New York
500 Pearl Street, Room 1320
New York, NY 10007

Leave to file a second amended complaint is GRANTED.
The clerk of the court is requested to update the case caption to reflect
that Defendant's name is Whinstone US, Inc.

SO ORDERED:

*Katharine H Parker*

HON. KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE

10/03/2022

***Re:*** ***GMO Gamecenter USA Inc. and GMO Internet, Inc. v. Whinstone US, Corporation,***
***No. 1:22-cv-5974 (S.D.N.Y.)***

Dear Judge Cronan:

Counsel for plaintiff GMO Gamecenter USA Inc. and GMO Internet, Inc. (collectively, "GMO")
writes to request the Court's leave to file a Second Amended Complaint and to correct a misnomer
of the defendant in the case caption in this matter. Counsel for the defendant consents to GMO's
filing of the Second Amended Complaint and to the amendment of the case caption. *See* Fed. R.
Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent
or the court's leave. The court should freely give leave when justice so requires.").

GMO named defendant "Whinstone US, Corporation" in its Complaint and First Amended
Complaint, since that entity is named in the W Colocation Services Agreement (Texas) at the
center of this action. However, the correct entity name is "Whinstone US, Inc." and the designation
of "Whinstone US, Corporation" in the Colocation Agreement was a misnomer. To correct the
misnomer in the case caption, GMO seeks leave to file a Second Amended Complaint that names
"Whinstone US, Inc." as the defendant, but is otherwise identical to GMO's First Amended
Complaint. The proposed Second Amended Complaint, which names the correct defendant entity,
is attached hereto as Exhibit A, and a redline demonstrating the changes made from the First
Amended Complaint is attached hereto as Exhibit B.

Very truly yours,

/s/ Leslie Thorne

Leslie Thorne
Partner, Haynes and Boone, LLP
Leslie.thorne@haynesboone.com
Direct Phone Number: 212.835.4848

/s/ Robert R. Scher

Robert R. Scher, Esq.
Foley & Lardner LLP
rscher@foley.com
Direct Phone Number: 212.338.3405

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GMO GAMECENTER USA, INC. and GMO INTERNET, INC., | |
| *Plaintiffs*, | |
| - against - | |
| WHINSTONE US, INC., | |
| *Defendant.* | Civil Action No. 1:22-cv-05974-JPC |
| WHINSTONE US, INC., | **SECOND AMENDED COMPLAINT** |
| *Counterclaim Plaintiff*, | |
| - against - | |
| GMO GAMECENTER USA, INC. and GMO INTERNET, INC., | |
| *Counterclaim Defendant.* | |

Plaintiffs GMO Gamecenter USA, Inc. and GMO Internet, Inc., (collectively, "GMO" or "Plaintiffs"), file their Second Amended Complaint against the Defendant, Whinstone US, Inc. ("Whinstone" or "Defendant") and in support thereof states and alleges as follows:

### NATURE OF THE ACTION

1.     This is an action for a breach of contract of a W Colocation Services Agreement (Texas) entered into on October 16, 2019, between Plaintiffs and Defendant (the "Texas Agreement," attached hereto as Exhibit A).

### THE PARTIES

2.     Plaintiff GMO Gamecenter USA, Inc. is a corporation duly organized and existing under, and by virtue of, the laws of the State of California, with its principal place of business in

Tokyo, Japan.

3.  Plaintiff GMO Internet, Inc. ("GMO-I") is a corporation duly organized and existing under, and by virtue of, the laws of Tokyo, Japan, with its principal place of business at Cerulean Tower, 26-1, Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan.

4.  Defendant Whinstone US, Inc. is a corporation duly organized and existing under, and by virtue of, the laws of the State of Delaware, with its principal place of business at 2721 Charles Martin Hall Road, Rockdale, Texas 76567.

## JURISDICTION AND VENUE

5.  The Texas Agreement states that "This Agreement shall be governed by laws of the State of New York and the Parties hereby submit to the exclusive jurisdiction of the New York courts." Venue is proper in this District under the Agreement's forum selection clause and because this action was removed from the New York Supreme Court, New York County pursuant to 28 U.S.C. §§ 1441 and 1446.

6.  Whinstone is a citizen of Texas, while GMO Gamecenter USA, Inc. and GMO-I are citizens of Japan and/or California. The amount in controversy far exceeds $75,000. Accordingly, this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(3).

## FACTUAL BACKGROUND

### A.  Background of the Parties' Relationship

7.  GMO comprehensively develops world-class Internet services. GMO Internet Group launched its Internet operation in 1995 when Japan was still at the dawn of the Internet. Through its project companies—including GMO Gamecenter USA, Inc.—it now offers diverse

services, including internet infrastructure, online advertising and media, internet finance, cryptocurrency mining and trading, and game development, in 59 locations in 20 countries.

8.      Whinstone operates data centers intended for large-scale cryptocurrency mining and high-speed video rendering. At these locations, it offers space and other services to multiple companies conducting bitcoin mining—including GMO—through colocation agreements. Whinstone operates North America's largest bitcoin mining and hosting facility in Rockdale, Texas.  In May 2021, upon information and belief, Whinstone was acquired by Riot Blockchain, Inc. ("Riot"), a publicly-traded bitcoin mining and hosting company, for 11.8 million shares of Riot common stock and $80 million in cash.  Nevertheless, Whinstone maintains a separate corporate existence.

9.      By way of background, bitcoin mining is the process of creating new bitcoin using computing systems that compete to solve mathematical problems.  This process also verifies and validates the information regarding the bitcoin transactions on the bitcoin network and by doing so prevents double-spending.  "Mining" of bitcoins is accomplished using energy-intensive, powerful computers and sophisticated equipment located in data centers to solve complex cryptographic hash puzzles to verify transactions that are then updated on the decentralized blockchain ledger. In return for solving these puzzles, verified miners are rewarded with newly-minted bitcoin (subject to a fixed cap on total bitcoins that may be minted), but they also receive fees from any transaction contained in each block of transactions (which fees, in turn, ensure that miners have the incentive to mine and validate bitcoin transactions and keep the network going).

10.      Colocation agreements are contracts whereby the host (Whinstone in this case) provides a state-of-the-art facility to house and operate data mining equipment (or other internet equipment, such as a website hosting service) of the customer (GMO) that will be operated on a

full-time basis (24 hours per day, 365/366 days per year, subject to very limited force majeure and other contractually-delineated circumstances permitting curtailment).  The host facility provides power, air conditioning, security and internet access, among other services, with the objective of persuading an equipment owner to entrust its equipment to the care of the host, even while the equipment works under remote software management by the owner.  While the equipment software may permit the equipment to be managed by software remotely by the owner, necessary physical inspection and services for caretaking and repair of the equipment can be provided by the host upon request or by the owner who has contractually-agreed access to the site designed to safekeep the facility and other owners' equipment.  Importantly, the host does not own the equipment and has no right to physically access or remove the equipment unless expressly authorized by the owner.

11.     Bitcoin mining is big business. According to CoinMarketCap, the value of all the bitcoins in the world was over $1.03 trillion in late 2021.  While the value of bitcoins fluctuates, a single bitcoin was worth $28,875.30 on May 14, 2022.  Thousands of companies accept bitcoin as payment and a growing number of Wall Street firms (including J.P Morgan, Morgan Stanley and others) are expanding their footprint in the cryptocurrency sector.

12.     GMO has been involved in bitcoin mining since 2017, when it began operations in Iceland.  In 2018, it expanded into Norway and was looking for other opportunities around the globe, including in the United States, Canada, Uzbekistan and Laos.

13.     In June 2018, Whinstone then-President Aroosh Thillainathan attended the GMO Internet Mining Roadshow in Germany.  Mr. Thillainathan subsequently made a proposal to a member of the mining business project team that GMO use space in a mining data center Whinstone planned to build in Louisiana.  Excited about the opportunity to expand operations,

**SECOND AMENDED COMPLAINT**                                                                 **Page 4**

GMO management agreed after a series of site visits, due diligence, and technical discussions with members of the mining business project team.

**B.**     **The Louisiana Agreement**

14.     After months of negotiation, Whinstone affiliate Whinstone US, LLC and GMO-I formalized their agreement in November 2018 through the W Colocation Services Agreement (GMO Internet Group) (including all addenda and amendments, the "Louisiana Agreement," attached hereto as Exhibit B), pursuant to which, *inter alia*:

- GMO-I provided a $5.8 million initial deposit (the "Initial Deposit") to Whinstone to cover data center construction costs and working capital.

- Whinstone agreed to construct a data center in Louisiana that would begin operations in January 2019.

- Post-construction, in exchange for payment of a fee, Whinstone would provide (1) certain space in the data center for GMO-I bitcoin mining equipment, (2) sufficient power at specified levels to allow for operation of the mining machines, (3) internet connection, networking and cooling services, (4) a license to use certain IP addresses, and (4) various other services, including security and certain maintenance of the equipment when requested by GMO-I.

The Louisiana Agreement also included, among other things, various termination and damages provisions.

15.     Despite Whinstone US, LLC's obligation under the Louisiana Agreement to begin operations in January 2019, the Louisiana data center actually began operations in March 2019 with capacity for only 385 units of mining machines, as opposed to the 66,693 machines GMO anticipated pursuant to the terms of the Louisiana Agreement.     Further, Whinstone US, LLC

failed to secure a contract for power supply with the power company, resulting in a situation where only 5 megawatts (MW) of power were supplied to the data center—far below what was required under the Louisiana Agreement. These failures severely restricted GMO-I's ability to mine bitcoin, resulting is significant lost profits to GMO-I. Eventually, the Louisiana data center was forced to suspend operations in July 2019 because there was simply not sufficient power to sustain operations. This failure constituted a breach of the Louisiana Agreement by Whinstone US, LLC, which Whinstone US, LLC and Whinstone acknowledged.

16.     As a result of Whinstone US, LLC's failures, GMO-I demanded that Whinstone and Whinstone US, LLC return its Initial Deposit and make it whole for the lost profits it had suffered and was continuing to suffer.

17.     At the same time, Whinstone had been struggling to secure funding to get a new data center in Midland, Texas constructed. When that project fell apart, Whinstone pursued development of a data center project in Rockdale, but again failed to raise the necessary funds. To proceed with the Rockdale project, Whinstone desperately needed to secure GMO as a customer at that facility. So, as an incentive to (1) deferring payment of the millions of dollars it already owed GMO, (2) secure a contract with GMO and (3) convince GMO to loan it additional money to fund construction costs, Whinstone offered GMO favorable terms for a new colocation arrangement at the Rockdale data center. GMO agreed and the Rockdale data center is now the single-largest bitcoin mining facility in the United States.

## C.     **The Texas Agreement**

18.     In order to address both (1) the amounts Whinstone US, LLC and Whinstone owed to GMO-I stemming from the Louisiana data center, and (2) the agreement with respect to the planned Rockdale data center, the Parties executed the W Colocation Services Agreement (Texas)

(with all addenda and amendments, the "Texas Agreement") on or about October 16, 2019. Pursuant to this Agreement, Whinstone agreed to build a Texas data center and provide the same type of services to GMO as had been provided at the Louisiana data center. *See* Texas Agreement at §§ 2-6. In exchange, GMO provided a fee and entrusted to Whinstone over $19.5 million worth of bitcoin mining equipment. *Id.* at § 7. GMO also agreed to provide a $33.6 million loan to Whinstone to fund construction costs.

19.     To address the harm done to GMO-I through Whinstone US, LLC's and Whinstone's failure to perform under the Louisiana Agreement, the Parties also included several terms (1) acknowledging Whinstone's breaches and liability and (2) contemplating multiple indemnity payments to be made by Whinstone to GMO-I. These terms included Whinstone's obligation to repay GMO-I's initial deposit paid in connection with the Louisiana data center and a duty to reimburse GMO-I for a portion of the lost profit due to the power suspension at the Louisiana data center in "an amount of $2,029,402.56 arising out of the suspension of the provision of power by Whinstone…from July 27, 2019 to the date when the Data Center starts operation of 5MW" (the "Loss of Profit by Power Suspension"). *See* Texas Agreement at §§ 16.1-16.2.

20.     Section 16.3 of the Texas Agreement acknowledges Whinstone's additional liabilities stemming from GMO-I's additional lost profits and provides:

> Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension ("Loss of Profit by Power Shortage"), which constitutes a breach of the Original Agreements. The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit by Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties.

**D.**    **Whinstone Refuses To Indemnify GMO And Causes GMO To Suffer Additional Lost Profits.**

21.    Over the course of 2020 and into 2021, GMO pushed Whinstone to repay the amounts owed, but Whinstone engaged in a pattern of delays.

22.    Not only were some of the payments delayed; Whinstone also failed to meet the operational deadlines in the Texas Agreement.  For instance, despite Whinstone's obligation to begin operations within 20 weeks of the construction start date, *see* Texas Agreement at 2.1, the center did not reach 5MW operations until June 2, 2020, much later than expected.  This was largely due to project mismanagement and lack of budget control resulting in significant delays in (1) the construction of the data center building, switch stations, sub-stations and electrical facilities, and (2) putting the power supply schedule in place.  In addition, Whinstone gave priority to other customers, upon information or belief because those arrangements were more profitable for Whinstone.  Subsequently, Whinstone failed to meet contractually-dictated milestones, resulting in additional lost profits for GMO given the lack of capacity provided at the Rockdale facility.  Specifically, Section 4.3 (Specified Power Draw) provides the following:

4.3 Specified Power Draw

4.3.1 Whinstone shall provide the Customer with power as provided in the schedule below (the "**Specified Power Draw**"). The Customer will be charged for power usage at 0.0285 USD/kWh.

(i) as of February 29, 2020 : 40 MW

(ii) as of April 30, 2020 : 80 MW

(iii) as of May 31, 2020 : 120MW

23.    But even after June 2, 2020, Whinstone was only able to supply GMO with 60 MW of power, in violation of Section 4.3 of the Texas Agreement.  Upon information and belief,

**SECOND AMENDED COMPLAINT**                                        **Page 8**

Whinstone could only provide this limited amount of power because it chose to provide power and other electrical equipment to other customers in other data center buildings on the priority basis because it was more profitable for Whinstone.

24.     On July 1, 2020, Whinstone finally paid off the Initial Deposit and the Loss of Profit by Power Suspension at an agreed total amount of approximately $7.9 million, with $2,029,402.56 of that amount attributable to the Loss of Profit by Power Suspension.

25.     Thereafter, GMO initiated attempts to secure payment of the remainder of the lost profits for which Whinstone acknowledged it was liable—the Loss of Profit by Power Shortage required under Section 16.3—which were in excess of $35 million.

26.     But while the Parties exchanged working drafts of an amendment that would lower the hosting fee from $0.0285/kWh to the lowest possible pass-through rate ($0.0210/kWh or less) until the amount was recouped, Whinstone never signed these drafts.

27.     Instead, despite GMO's repeated requests to negotiate payment of the Loss of Profit by Power Shortage and a new, longer-term agreement as anticipated in the Texas Agreement, all discussions came to a halt when Riot acquired Whinstone in May 2021.  Indeed, the now Riot-controlled Whinstone never again made any proposal concerning its indemnity obligations and instead—only after dozens of requests over many months—proposed in bad faith a wholly-unacceptable longer-term agreement with terms vastly disadvantageous to GMO and inconsistent with the parameters and express agreements set forth in the Texas Agreement.

28.     To date, Whinstone has not indemnified GMO for any amounts attributable to the Loss of Profit by Power Shortage described in Section 16.3 of the Texas Agreement.

29.     Nor has Whinstone made GMO whole for the lost profits it suffered after June 2, 2020 as a result of Whinstone's continuing breaches.

30.     Under Section 9.1, Whinstone is liable for, *inter alia,* GMO's loss of revenue, loss of profit, and loss of savings stemming from any breach.  GMO'S losses attributable to these additional breaches exceed $50 million.

**E.      Whinstone Refuses to Provide GMO Its Share of Profit from Power Sales.**

31.     Under Section 4.3.8 of the Texas Agreement, "Whinstone shall get prior consent of the Customer to power down miners, except for LRS.  In the event that power down [sic], the Customer and Whinstone will share as fair the benefit of selling power deducted loss of profit should getting [sic] from performing miners."

32.     As disclosed in Riot's Form 10-K filing for the fiscal year ended December 31, 2021, the State of Texas experienced an extreme and unprecedented winter weather event in February 2021 ("Winter Storm Uri") that resulted in prolonged freezing temperatures and caused an electricity generation shortage that was severely disruptive to the whole state. While demand for electricity reached extraordinary levels due to Winter Storm Uri, the supply of electricity significantly decreased in part because of the inability of certain power generation facilities to supply electric power to the grid. At the request of the ERCOT (the grid operator serving most of Texas), Whinstone stopped supplying power to its customers and instead sold power back onto the power grid.  During this time, GMO was not supplied with power to operate its bitcoin mining machines.

33.     Whinstone's sale of power onto the grid resulted in significant profit to Whinstone. Specifically, Riot disclosed the following in its Form 10-K:

> "In April 2021, under the provisions of the TXU Power Supply Agreement, and as a result of the weather event, Whinstone entered into a Qualified Scheduling Entity ("QSE") Letter Agreement, which resulted in Whinstone being entitled to receive approximately $125.1 million for its power sales during the February winter storm, all under the terms and conditions of the QSE Letter Agreement. Whinstone received cash of $29.0 million in April 2021 (after deducting $10.0 million in power

management fees owed by Whinstone), approximately $59.7 million is scheduled to be credited against future power bills of Whinstone beginning in 2022 and the remaining $26.3 million is contingent upon ERCOT's future remittance."

34.     Riot similarly disclosed in its Form 8-K reported on August 16, 2022 that it sold power back into the grid and/or to a third party for a significant profit.

35.     Under Section 4.3.8 of the Colocation Agreement, GMO is entitled to share in Whinstone's multi-million-dollar profit.  On multiple occasions, GMO sought information on the profits and other benefits Whinstone enjoyed from the February 2021 sale of power.  Whinstone never responded.  Nor did it ever pay GMO any share of the profits or provide any other benefit as required under the Texas Agreement.

## F.     Whinstone Commits Other Breaches—Including Wrongfully Removing GMO Equipment and Overcharging GMO for Power.

36.     Aside from GMO's lost profits attributable to Whinstone's delays in providing the levels of power it was contractually obligated to deliver, Whinstone also committed additional material and ongoing breaches of the Texas Agreement.  Specifically, and by way of example:

a.     On or about March 29, 2022, Whinstone improperly removed certain of GMO's mining machines in breach of its obligations under Section 3.1.3 of the Texas Agreement (allowing for relocation of equipment only with prior written consent of GMO, which Whinstone neither requested not obtained) and Section 14 of the Texas Agreement (which allows Whinstone to suspend services only under certain circumstances, none of which are applicable).  Due to Whinstone/Riot's removal of GMO's machines, GMO suffered a decrease of an estimated 20 petahashes in mining capacity, which amounts to at least $16,000 a day in profits.  While GMO demanded that the equipment be returned/replaced and send a formal notice related to such

on April 12, 2022, it did not receive any response. And upon visiting the Rockdale data center on May 7, 2022, GMO personnel discovered that its machines had not been placed back in service but had instead been replaced by Whinstone machines operating for Whinstone's own benefit. Despite multiple demands that the GMO machines be put back in position, Whinstone refused.

b. Whinstone also recently invoiced GMO for an increase in power price from $0.0285/kWh to $0.03/kWh (resulting in an increased cost of approximately $50,000.00 per month), ostensibly because the power price to be paid by Whinstone to its provider, TXU Energy, is set to increase. However, the 2019 Texas Agreement provides that the power price of $0.0285 USD/kWh "shall not be increased for 10 years" and that "the Parties shall consult with each other in good faith on the price" thereafter. *See* Texas Agreement at § 4.3.2. Whinstone's right to pass on increases is strictly limited to changes in regulation and similarly-imposed costs. Despite GMO formally disputing the charges and seeking explanation, no explanation or evidence has been submitted by Whinstone that this power price increase meets that standard. The recent charges therefore constitute a further breach of the 2019 Texas Agreement. Moreover, even if the price increase fell within a permitted exception under Section 4.3.2, Whinstone does not have the right to unilaterally bill GMO for its alleged increased costs. Instead, Section 4.3.2 provides, in such circumstances, that the parties "shall decide fairly by agreement the effect of to whom can be passed on." No such agreement

was sought or reached here. Indeed, when GMO sought further information to evaluate the new charges, it received no response whatsoever from Whinstone. Thus, the supplemental invoices do not comply with the 2019 Texas Agreement and constitute a further breach.

## CAUSE OF ACTION
### (Breach of Contract)

37.     GMO incorporates the allegations contained in paragraphs 1 through 36 of this Second Amended Complaint as if fully set forth herein.

38.     The Texas Agreement constitutes an enforceable agreement between the Parties.

39.     GMO has fully performed its obligations under the Texas Agreement, including but not limited to any conditions precedent to Whinstone's performance.

40.     Whinstone has breached the Texas Agreement by, *inter alia*:

    a.     Failing to pay the indemnification owed under Section 16.3 of the Texas Agreement;

    b.     Failing to pay the damages owed under Section 9.1 of the Texas Agreement as a result of its failure to meet its obligations to provide power;

    c.     Failing to remit to GMO its fair share of profits stemming from the sale of power during Winter Storm Uri, pursuant to Section 4.3.8 of the Texas Agreement;

    d.     Removing GMO's mining equipment without permission in violation of Texas Agreement, including but not limited to Sections 3.1.3 and 14; and

    e.     Overcharging GMO in violation of Section 4.3.2 of the Texas Agreement.

41.     GMO has suffered significant damages as a result of Whinstone's breaches.

**WHEREFORE,** GMO demands judgment as follows:

a.      that the Court find that Whinstone committed the breaches alleged herein and award GMO all actual and consequential damages flowing therefrom;

b.      Pre- and post-judgment interest; and

c.      Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
September 30, 2022

Respectfully submitted,

By: */s/ Leslie C. Thorne*
    Leslie C. Thorne
    leslie.thorne@haynesboone.com
    Alexandra Larkin
    alexandra.larkin@haynesboone.com
    Michael Freyberg
    michael.freyberg@haynesboone.com

    HAYNES AND BOONE, LLP
    30 Rockefeller Plaza, 26th Floor
    New York, NY 10112
    Telephone: (212) 659-7300
    Facsimile: (212) 918-8989

    **ATTORNEYS FOR GMO GAMECENTER USA, INC. and GMO INTERNET, INC.**

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GMO GAMECENTER USA, INC. and GMO INTERNET, INC.,
                     *Plaintiffs*,
     - against -
WHINSTONE US, ~~CORPORATION~~INC.,
             *Defendant.*     Civil Action No. 1:22-cv-05974-JPC

WHINSTONE US, ~~CORPORATION~~INC.,      **SECOND AMENDED COMPLAINT**
             *Counterclaim Plaintiff*,
     - against -
GMO GAMECENTER USA, INC. and GMO INTERNET, INC.,
             *Counterclaim Defendant.*
             ~~Civil Action No. 1:22-cv-05974-JPC~~

~~**AMENDED COMPLAINT**~~

     Plaintiffs GMO Gamecenter USA, Inc. and GMO Internet, Inc., (collectively, "GMO" or "Plaintiffs"), file their Second Amended Complaint against the Defendant, Whinstone US ~~Corporation~~, Inc. ("Whinstone" or "Defendant") and in support thereof states and alleges as follows:

**NATURE OF THE ACTION**

     1.     This is an action for a breach of contract of a W Colocation Services Agreement (Texas) entered into on October 16, 2019, between Plaintiffs and Defendant (the "Texas Agreement," attached hereto as Exhibit A).

**THE PARTIES**

     2.     Plaintiff GMO Gamecenter USA, Inc. is a corporation duly organized and existing under, and by virtue of, the laws of the State of California, with its principal place of business in

Tokyo, Japan.

3.    Plaintiff GMO Internet, Inc. ("GMO-I") is a corporation duly organized and existing under, and by virtue of, the laws of Tokyo, Japan, with its principal place of business at Cerulean Tower, 26-1, Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan.

4.    Defendant Whinstone US, ~~Corporation~~Inc. is a corporation duly organized and existing under, and by virtue of, the laws of the State of Delaware, with its principal place of business at 2721 Charles Martin Hall Road, Rockdale, Texas 76567.

## JURISDICTION AND VENUE

5.    The Texas Agreement states that "This Agreement shall be governed by laws of the State of New York and the Parties hereby submit to the exclusive jurisdiction of the New York courts." Venue is proper in this District under the Agreement's forum selection clause and because this action was removed from the New York Supreme Court, New York County pursuant to 28 U.S.C. §§ 1441 and 1446.

6.    Whinstone is a citizen of Texas, while GMO Gamecenter USA, Inc. and GMO-I are citizens of Japan and/or California. The amount in controversy far exceeds $75,000. Accordingly, this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(3).

## FACTUAL BACKGROUND

### A.    Background of the Parties' Relationship

7.    GMO comprehensively develops world-class Internet services. GMO Internet Group launched its Internet operation in 1995 when Japan was still at the dawn of the Internet. Through its project companies—including GMO Gamecenter USA, Inc.—it now offers diverse

services, including internet infrastructure, online advertising and media, internet finance, cryptocurrency mining and trading, and game development, in 59 locations in 20 countries.

8.      Whinstone operates data centers intended for large-scale cryptocurrency mining and high-speed video rendering. At these locations, it offers space and other services to multiple companies conducting bitcoin mining—including GMO—through colocation agreements. Whinstone operates North America's largest bitcoin mining and hosting facility in Rockdale, Texas.  In May 2021, upon information and belief, Whinstone was acquired by Riot Blockchain, Inc. ("Riot"), a publicly-traded bitcoin mining and hosting company, for 11.8 million shares of Riot common stock and $80 million in cash.  Nevertheless, Whinstone maintains a separate corporate existence.

9.      By way of background, bitcoin mining is the process of creating new bitcoin using computing systems that compete to solve mathematical problems.  This process also verifies and validates the information regarding the bitcoin transactions on the bitcoin network and by doing so prevents double-spending.  "Mining" of bitcoins is accomplished using energy-intensive, powerful computers and sophisticated equipment located in data centers to solve complex cryptographic hash puzzles to verify transactions that are then updated on the decentralized blockchain ledger. In return for solving these puzzles, verified miners are rewarded with newly-minted bitcoin (subject to a fixed cap on total bitcoins that may be minted), but they also receive fees from any transaction contained in each block of transactions (which fees, in turn, ensure that miners have the incentive to mine and validate bitcoin transactions and keep the network going).

10.     Colocation agreements are contracts whereby the host (Whinstone in this case) provides a state-of-the-art facility to house and operate data mining equipment (or other internet equipment, such as a website hosting service) of the customer (GMO) that will be operated on a

full-time basis (24 hours per day, 365/366 days per year, subject to very limited force majeure and other contractually-delineated circumstances permitting curtailment).  The host facility provides power, air conditioning, security and internet access, among other services, with the objective of persuading an equipment owner to entrust its equipment to the care of the host, even while the equipment works under remote software management by the owner.  While the equipment software may permit the equipment to be managed by software remotely by the owner, necessary physical inspection and services for caretaking and repair of the equipment can be provided by the host upon request or by the owner who has contractually-agreed access to the site designed to safekeep the facility and other owners' equipment.  Importantly, the host does not own the equipment and has no right to physically access or remove the equipment unless expressly authorized by the owner.

11.     Bitcoin mining is big business. According to CoinMarketCap, the value of all the bitcoins in the world was over $1.03 trillion in late 2021.  While the value of bitcoins fluctuates, a single bitcoin was worth $28,875.30 on May 14, 2022.  Thousands of companies accept bitcoin as payment and a growing number of Wall Street firms (including J.P Morgan, Morgan Stanley and others) are expanding their footprint in the cryptocurrency sector.

12.     GMO has been involved in bitcoin mining since 2017, when it began operations in Iceland.  In 2018, it expanded into Norway and was looking for other opportunities around the globe, including in the United States, Canada, Uzbekistan and Laos.

13.     In June 2018, Whinstone then-President Aroosh Thillainathan attended the GMO Internet Mining Roadshow in Germany.  Mr. Thillainathan subsequently made a proposal to a member of the mining business project team that GMO use space in a mining data center Whinstone planned to build in Louisiana.  Excited about the opportunity to expand operations,

GMO management agreed after a series of site visits, due diligence, and technical discussions with members of the mining business project team.

**B.    The Louisiana Agreement**

14.    After months of negotiation, Whinstone affiliate Whinstone US, LLC and GMO-I formalized their agreement in November 2018 through the W Colocation Services Agreement (GMO Internet Group) (including all addenda and amendments, the "Louisiana Agreement," attached hereto as Exhibit B), pursuant to which, *inter alia*:

- GMO-I provided a $5.8 million initial deposit (the "Initial Deposit") to Whinstone to cover data center construction costs and working capital.

- Whinstone agreed to construct a data center in Louisiana that would begin operations in January 2019.

- Post-construction, in exchange for payment of a fee, Whinstone would provide(1) (1) certain space in the data center for GMO-I bitcoin mining equipment, (2) sufficient power at specified levels to allow for operation of the mining machines, (3) internet connection, networking and cooling services, (4) a license to use certain IP addresses, and (4) various other services, including security and certain maintenance of the equipment when requested by GMO-I.

The Louisiana Agreement also included, among other things, various termination and damages provisions.

15.    Despite Whinstone US, LLC's obligation under the Louisiana Agreement to begin operations in January 2019, the Louisiana data center actually began operations in March 2019

with capacity for only 385 units of mining machines, as opposed to the 66,693 machines GMO

anticipated pursuant to the terms of the Louisiana Agreement.   Further, Whinstone US, LLC

failed to secure a contract for power supply with the power company, resulting in a situation where only 5 megawatts (MW) of power were supplied to the data center—far below what was required under the Louisiana Agreement.  These failures severely restricted GMO-I's ability to mine bitcoin, resulting is significant lost profits to GMO-I.  Eventually, the Louisiana data center was forced to suspend operations in July 2019 because there was simply not sufficient power to sustain operations.  This failure constituted a breach of the Louisiana Agreement by Whinstone US, LLC, which Whinstone US, LLC and Whinstone acknowledged.

16.     As a result of Whinstone US, LLC's failures, GMO-I demanded that Whinstone and Whinstone US, LLC return its Initial Deposit and make it whole for the lost profits it had suffered and was continuing to suffer.

17.     At the same time, Whinstone had been struggling to secure funding to get a new data center in Midland, Texas constructed.  When that project fell apart, Whinstone pursued development of a data center project in Rockdale, but again failed to raise the necessary funds.  To proceed with the Rockdale project, Whinstone desperately needed to secure GMO as a customer at that facility.  So, as an incentive to (1) deferring payment of the millions of dollars it already owed GMO, (2) secure a contract with GMO and (3) convince GMO to loan it additional money to fund construction costs, Whinstone offered GMO favorable terms for a new colocation arrangement at the Rockdale data center.  GMO agreed and the Rockdale data center is now the single-largest bitcoin mining facility in the United States.

**C.     The Texas Agreement**

18.     In order to address both (1) the amounts Whinstone US, LLC and Whinstone owed to GMO-I stemming from the Louisiana data center, and (2) the agreement with respect to

the planned Rockdale data center, the Parties executed the W Colocation Services Agreement

(Texas)

(with all addenda and amendments, the "Texas Agreement") on or about October 16, 2019. Pursuant to this Agreement, Whinstone agreed to build a Texas data center and provide the same type of services to GMO as had been provided at the Louisiana data center. *See* Texas Agreement at §§ 2-6. In exchange, GMO provided a fee and entrusted to Whinstone over $19.5 million worth of bitcoin mining equipment. *Id.* at § 7. GMO also agreed to provide a $33.6 million loan to Whinstone to fund construction costs.

19. To address the harm done to GMO-I through Whinstone US, LLC's and Whinstone's failure to perform under the Louisiana Agreement, the Parties also included several terms (1) acknowledging Whinstone's breaches and liability and (2) contemplating multiple indemnity payments to be made by Whinstone to GMO-I. These terms included Whinstone's obligation to repay GMO-I's initial deposit paid in connection with the Louisiana data center and a duty to reimburse GMO-I for a portion of the lost profit due to the power suspension at the Louisiana data center in "an amount of $2,029,402.56 arising out of the suspension of the provision of power by Whinstone…from July 27, 2019 to the date when the Data Center starts operation of 5MW" (the "Loss of Profit by Power Suspension"). *See* Texas Agreement at §§ 16.1-16.2.

20. Section 16.3 of the Texas Agreement acknowledges Whinstone's additional liabilities stemming from GMO-I's additional lost profits and provides:

> Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension ("Loss of Profit by Power Shortage"), which constitutes a breach of the Original Agreements. The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit by Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties.

### D. **Whinstone Refuses To Indemnify GMO And Causes GMO To Suffer Additional Lost Profits.**

21.     Over the course of 2020 and into 2021, GMO pushed Whinstone to repay the amounts owed, but Whinstone engaged in a pattern of delays.

22.     Not only were some of the payments delayed; Whinstone also failed to meet the operational deadlines in the Texas Agreement.  For instance, despite Whinstone's obligation to begin operations within 20 weeks of the construction start date, *see* Texas Agreement at 2.1, the center did not reach 5MW operations until June 2, 2020, much later than expected.  This was largely due to project mismanagement and lack of budget control resulting in significant delays in (1) the construction of the data center building, switch stations, sub-stations and electrical facilities, and (2) putting the power supply schedule in place.  In addition, Whinstone gave priority to other customers, upon information or belief because those arrangements were more profitable for Whinstone.  Subsequently, Whinstone failed to meet contractually-dictated milestones, resulting in additional lost profits for GMO given the lack of capacity provided at the Rockdale facility.  Specifically, Section 4.3 (Specified Power Draw) provides the following:

> 4.3 Specified Power Draw
>
> 4.3.1    Whinstone shall provide the Customer with power as provided in the schedule below (the "**Specified Power Draw**"). The Customer will be charged for power usage at 0.0285 USD/kWh.
>
> (i)      as of February 29, 2020 : 40 MW
>
> (ii)     as of April 30, 2020 : 80 MW
>
> (iii)    as of May 31, 2020 : 120MW

23.     But even after June 2, 2020, Whinstone was only able to supply GMO with 60 MW of power, in violation of Section 4.3 of the Texas Agreement.  Upon information and belief,

Whinstone could only provide this limited amount of power because it chose to provide power and other electrical equipment to other customers in other data center buildings on the priority basis because it was more profitable for Whinstone.

24.     On July 1, 2020, Whinstone finally paid off the Initial Deposit and the Loss of Profit by Power Suspension at an agreed total amount of approximately $7.9 million, with $2,029,402.56 of that amount attributable to the Loss of Profit by Power Suspension.

25.     Thereafter, GMO initiated attempts to secure payment of the remainder of the lost profits for which Whinstone acknowledged it was liable—the Loss of Profit by Power Shortage required under Section 16.3—which were in excess of $35 million.

26.     But while the Parties exchanged working drafts of an amendment that would lower the hosting fee from $0.0285/kWh to the lowest possible pass-through rate ($0.0210/kWh or less) until the amount was recouped, Whinstone never signed these drafts.

27.     Instead, despite GMO's repeated requests to negotiate payment of the Loss of Profit by Power Shortage and a new, longer-term agreement as anticipated in the Texas Agreement, all discussions came to a halt when Riot acquired Whinstone in May 2021.  Indeed, the now Riot- controlled Whinstone never again made any proposal concerning its indemnity obligations and instead—only after dozens of requests over many months—proposed in bad faith a wholly- unacceptable longer-term agreement with terms vastly disadvantageous to GMO and inconsistent with the parameters and express agreements set forth in the Texas Agreement.

28.     To date, Whinstone has not indemnified GMO for any amounts attributable to the Loss of Profit by Power Shortage described in Section 16.3 of the Texas Agreement.

29.     Nor has Whinstone made GMO whole for the lost profits it suffered after June 2, 2020 as a result of Whinstone's continuing breaches.

30.     Under Section 9.1, Whinstone is liable for, *inter alia,* GMO's loss of revenue, loss of profit, and loss of savings stemming from any breach.  GMO'S losses attributable to these additional breaches exceed $50 million.

**E.      Whinstone Refuses to Provide GMO Its Share of Profit from Power Sales.**

~~31.~~ 31. Under Section 4.3.8 of the Texas Agreement, "Whinstone shall get prior consent of the Customer to power down miners, except for LRS.  In the event that power down [sic], the Customer and Whinstone will share as fair the benefit of selling power deducted loss of profit should getting [sic] from performing miners."

~~32.~~ 32. As disclosed in Riot's Form 10-K filing for the fiscal year ended December 31, 2021, the State of Texas experienced an extreme and unprecedented winter weather event in February 2021 ("Winter Storm Uri") that resulted in prolonged freezing temperatures and caused an electricity generation shortage that was severely disruptive to the whole state. While demand for electricity reached extraordinary levels due to Winter Storm Uri, the supply of electricity significantly decreased in part because of the inability of certain power generation facilities to supply electric power to the grid. At the request of the ERCOT (the grid operator serving most of Texas), Whinstone stopped supplying power to its customers and instead sold power back onto the power grid.  During this time, GMO was not supplied with power to operate its bitcoin mining machines.

33.     Whinstone's sale of power onto the grid resulted in significant profit to Whinstone.  Specifically, Riot disclosed the following in its Form 10-K:

> "In April 2021, under the provisions of the TXU Power Supply Agreement, and as a result of the weather event, Whinstone entered into a Qualified Scheduling Entity ("QSE") Letter Agreement, which resulted in Whinstone being entitled to receive approximately $125.1 million for its power sales during the February winter storm, all under the terms and conditions of the QSE Letter Agreement.

Whinstone received cash of $29.0 million in April 2021 (after deducting $10.0 million in power

management fees owed by Whinstone), approximately $59.7 million is scheduled to be credited against future power bills of Whinstone beginning in 2022 and the remaining $26.3 million is contingent upon ERCOT's future remittance."

34.     Riot similarly disclosed in its Form 8-K reported on August 16, 2022 that it sold power back into the grid and/or to a third party for a significant profit.

35.     Under Section 4.3.8 of the Colocation Agreement, GMO is entitled to share in Whinstone's multi-million-dollar profit.  On multiple occasions, GMO sought information on the profits and other benefits Whinstone enjoyed from the February 2021 sale of power.  Whinstone never responded.  Nor did it ever pay GMO any share of the profits or provide any other benefit as required under the Texas Agreement.

**F.     Whinstone Commits Other Breaches—Including Wrongfully Removing GMO Equipment and Overcharging GMO for Power.**

36.     Aside from GMO's lost profits attributable to Whinstone's delays in providing the levels of power it was contractually obligated to deliver, Whinstone also committed additional material and ongoing breaches of the Texas Agreement.  Specifically, and by way of example:

   a.     On or about March 29, 2022, Whinstone improperly removed certain of GMO's mining machines in breach of its obligations under Section 3.1.3 of the Texas Agreement (allowing for relocation of equipment only with prior written consent of GMO, which Whinstone neither requested not obtained) and Section 14 of the Texas Agreement (which allows Whinstone to suspend services only under certain circumstances, none of which are applicable).  Due to Whinstone/Riot's removal of GMO's machines, GMO suffered a decrease of an estimated 20 petahashes in mining capacity, which amounts to at least $16,000 a day in profits.

While GMO demanded that the equipment be returned/replaced and send

a formal notice related to such

2

on April 12, 2022, it did not receive any response. And upon visiting the Rockdale data center on May 7, 2022, GMO personnel discovered that its machines had not been placed back in service but had instead been replaced by Whinstone machines operating for Whinstone's own benefit. Despite multiple demands that the GMO machines be put back in position, Whinstone refused.

b.   Whinstone also recently invoiced GMO for an increase in power price from $0.0285/kWh to $0.03/kWh (resulting in an increased cost of approximately $50,000.00 per month), ostensibly because the power price to be paid by Whinstone to its provider, TXU Energy, is set to increase. However, the 2019 Texas Agreement provides that the power price of $0.0285 USD/kWh "shall not be increased for 10 years" and that "the Parties shall consult with each other in good faith on the price" thereafter. *See* Texas Agreement at § 4.3.2. Whinstone's right to pass on increases is strictly limited to changes in regulation and similarly-imposed costs. Despite GMO formally disputing the charges and seeking explanation, no explanation or evidence has been submitted by Whinstone that this power price increase meets that standard. The recent charges therefore constitute a further breach of the 2019 Texas Agreement. Moreover, even if the price increase fell within a permitted exception under Section 4.3.2, Whinstone does not have the right to unilaterally bill GMO for its alleged increased costs. Instead, Section 4.3.2 provides, in such circumstances, that the

parties "shall decide fairly by agreement the effect of to whom can be passed on."  No such agreement

1

was sought or reached here. Indeed, when GMO sought further information to evaluate the new charges, it received no response whatsoever from Whinstone. Thus, the supplemental invoices do not comply with the 2019 Texas Agreement and constitute a further breach.

## CAUSE OF ACTION
### (Breach of Contract)

37.    GMO incorporates the allegations contained in paragraphs 1 through 36 of this <u>Second Amended</u> Complaint as if fully set forth herein.

38.    The Texas Agreement constitutes an enforceable agreement between the Parties.

39.    GMO has fully performed its obligations under the Texas Agreement, including but not limited to any conditions precedent to Whinstone's performance.

40.    Whinstone has breached the Texas Agreement by, *inter alia*:

    a.    Failing to pay the indemnification owed under Section 16.3 of the Texas Agreement;

    b.    Failing to pay the damages owed under Section 9.1 of the Texas Agreement as a result of its failure to meet its obligations to provide power;

    c.    Failing to remit to GMO its fair share of profits stemming from the sale of power during Winter Storm Uri, pursuant to Section 4.3.8 of the Texas Agreement;

    d.    Removing GMO's mining equipment without permission in violation of Texas Agreement, including but not limited to Sections 3.1.3 and 14; and

    e.    Overcharging GMO in violation of Section 4.3.2 of the Texas Agreement.

41.     GMO has suffered significant damages as a result of Whinstone's breaches.

**WHEREFORE,** GMO demands judgment as follows:

     a.        that the Court find that Whinstone committed the breaches alleged herein

                    and award GMO all actual and consequential damages flowing therefrom;

     b.        Pre- and post-judgment interest; and

     c.        Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
September ~~12~~30, 2022

                                 Respectfully submitted,

                               By: */s/ Leslie C. Thorne*
                                 Leslie C. Thorne
                                 leslie.thorne@haynesboone.com
                                 Alexandra Larkin
                                 alexandra.larkin@haynesboone.com
                                 Michael Freyberg
                                 michael.freyberg@haynesboone.com

                               HAYNES AND BOONE, LLP
                               30 Rockefeller Plaza, 26th Floor
                               New York, NY 10112
                               Telephone: (212) 659-7300
                               Facsimile: (212) 918-8989

                               **ATTORNEYS FOR GMO GAMECENTER**
                               **USA, INC. and GMO INTERNET, INC.**

Document comparison by Workshare Compare on Friday, September 30, 2022
3:26:47 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\freyberm\Documents\Work\Litigation\GMO\ Filings\ECF 16 - 2022-09-12- (16) GMO_Amended Complaint_FINAL.pdf |
| Description | ECF 16 - 2022-09-12- (16) GMO_Amended Complaint_FINAL |
| Document 2 ID | netdocuments://4873-8652-9589/2 |
| Description | GMO - Second Amended Complaint |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 15 |
| Deletions | 14 |
| Moved from | 1 |
| Moved to | 1 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 31 |