UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC., <br><br> *Plaintiffs*, <br><br> - against - <br><br> WHINSTONE US, INC., <br><br> *Defendant*. | Civil Action No. 1:22-cv-05974-JPC |
| WHINSTONE US, INC., <br><br> *Counterclaim Plaintiff*, <br><br> - against - <br><br> GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC., <br><br> *Counterclaim Defendant*. | **PROPOSED CASE MANAGEMENT PLAN AND REPORT OF RULE 26(f) MEETING** |

In accordance with Federal Rule of Civil Procedure 26(f) and Magistrate Judge Parker's Individual Practices in Civil Cases, the parties met on September 22, 2022, and exchanged communications thereafter. In accordance with their discussions, the parties submit the following report for the Court's consideration:

**1.     Court Expectations:**

**Rule 1 and Rule 26(b)(1).** Counsel are expected to have reviewed Rule 1 and Rule 26(b)(1) and considered their obligations thereunder in discussing and preparing a discovery plan.

**Additional consideration of proportionality.** Counsel shall discuss and consider whether phased or iterative discovery will increase efficiency, reduce costs and lead to a faster resolution of the case when preparing a discovery plan.

**Document Requests.** Counsel shall be fully familiar with their obligations under Rules 34 and 26(g) and consider and discuss ways to ensure compliance and minimize disputes regarding overbreadth and specificity of requests and responses.

**Competence**. Counsel shall be sufficiently knowledgeable in matters relating to their clients' technological systems to discuss competently issues relating to electronic discovery, or have involved someone competent to address these issues on their behalf.

Counsel are directed to the Model Confidentiality Stipulation and Order and Discussion Topics for Rule 26(f) Conference on Judge Parker's Individual Practices Page.

Counsel represent by their signature below that they have read and will comply with the above.

**Proposed Discovery Plan**

In accordance with Federal Rule of Civil Procedure 26(f) and Judge Parker's Individual Rules, the parties met on September 22, 2022 (at least one week before the Initial Case Management Conference) and are exchanging communications thereafter. At least one week before the Initial Case Management Conference, the parties submit the following report for the Court's consideration:

**2.      Summary of Claims, Defenses, and Relevant Issues.**

Plaintiffs:  In November 2018, GMO and Whinstone entered into a W Colocation Services Agreement (GMO Internet Group) (the "Louisiana Agreement"), pursuant to which GMO paid Whinstone $5.8 million (plus other fees) in exchange for Whinstone's agreement to construct a data center in Louisiana that would begin operations in January 2019.  Whinstone further agreed to provide GMO with space in the data center to operate GMO's bitcoin mining machines, and Whinstone would provide the necessary services to permit GMO's machines to operate.  However, Whinstone failed to timely begin operations at the data center at the requisite capacity for GMO's machines.  Whinstone's failures constituted breaches of the Louisiana Agreement.  At the same time, Whinstone struggled to secure funding to construct a new data center in Midland, and later, Rockdale, Texas.

As a result, GMO and Whinstone entered into a new W. Colocation Services Agreement

(Texas) (the "Texas Agreement"), pursuant to which (i) GMO agreed to provide $33.6 million to Whinstone in order to fund construction of the Rockdale data center, where Whinstone would host GMO's mining machines, (ii) Whinstone acknowledged its defaults under the Louisiana Agreement, and (iii) Whinstone agreed to (1) repay the initial deposit GMO paid under the Louisiana agreement and (2) pay GMO for the loss of profits resulting from Whinstone's breaches of the Louisiana Agreement.

While Whinstone ultimately repaid some of the money owed to GMO, the Loss of Profit by Power Shortage (as defined in the Texas Agreement) remains unpaid in violation of Section 16 of the Texas Agreement. Whinstone also committed other breaches of the Texas Agreement, including (i) failing to supply GMO with the requisite power in violation of Sections 4.3 and 9.1, (ii) failing to negotiate in good faith an amended colocation agreement including a reduction of the hosting fee to repay its indemnity obligations in violation of Section 20.6, (iii) refusing to share profits from power sales in violation of Section 4.3.8, (iv) removing GMO's machines in violation of Section 3.1.3, and (v) overcharging GMO for increases in power prices in violation of Section 4.3.2.

Whinstone has alleged counterclaims asserting that GMO breached the Texas Agreement by failing to (i) negotiate in good faith a new colocation agreement in violation of Section 20.6, (ii) use and pay for a minimum amount of power in violation of Section 4.3.3, and (iii) pay Whinstone for increases in the price of power. GMO disputes these claims because, *inter alia*, (i) it was Whinstone, rather than GMO, refused to negotiate in good faith, (ii) the Texas Agreement does not require GMO to use any minimum amount of power, and (iii) the Texas Agreement is clear that GMO is not liable to Whinstone for any increases in power prices.

GMO summarizes the relevant issues in this action as follows:

- Whether Whinstone has failed to repay GMO the Loss of Profit by Power Shortage and the amount of the payment that is owed to GMO;

- Whether and to what extent Whinstone failed to repay GMO for any loss in profits resulting from Whinstone's provision of inadequate power under the Texas Agreement aside from the Loss of Profit by Power Shortage;

- Whether and to what extent either party failed to negotiate in good faith an amended Colocation Agreement providing for a reduction in hosting fees;

- Whether and to what extent Whinstone failed to share profits derived from power sales to other parties;

- Whether Whinstone improperly removed GMO's machines from operation, and the extent of any resulting damages;

- Whether and to what extent Whinstone overcharged GMO for increases in power prices; and

- Whether GMO was obligated to use a minimum amount of power under the Texas Agreement, and if so, whether and to what extent GMO failed to use such minimum amount.

Defendant: This lawsuit arises from GMO's refusal to fulfill its obligation to negotiate in good faith with its business partner, Whinstone, in connection with Whinstone's provision of colocation and hosting services for GMO's bitcoin mining operations.

In November 2018, the parties entered into a W Colocation Services Agreement (the "Louisiana Agreement"), pursuant to which Whinstone agreed to provide certain bitcoin mining colocation services to GMO at a data center facility to be constructed in Louisiana. Thereafter, following certain delays in connection with the Louisiana facility, Whinstone agreed to develop a new data center in Rockdale, Texas (the "Texas Facility") and to provide GMO colocation services there instead. GMO agreed to advance certain funding in connection with the construction of the Texas Facility.

Effective October 16, 2019, the parties entered into a new W Colocation Services Agreement (Texas) (the "Texas Agreement") which superseded and replaced the Louisiana

Agreement. The Texas Agreement was a temporary arrangement put in place by the parties to resolve certain disputes arising from the Louisiana Agreement. It provided GMO with extremely favorable, below-market terms for Whinstone's colocation services, which the parties expressly agreed to renegotiate in good faith and to replace with standard terms Whinstone offers to its other customers once certain conditions and payments, specified therein, had been fulfilled by Whinstone.

Specifically, under Section 20.6 of the Texas Agreement, GMO agreed to renegotiate, in good faith, the terms of the Texas Agreement based on the standard economic terms usually offered by Whinstone for colocation services once Whinstone had paid the following amounts to GMO: (1) a deposit of $5,810,720 paid by GMO under the Louisiana Agreement (the "Original Deposit"); (2) GMO's purported loss of profits due to the suspension of power available to GMO in connection with the Louisiana Facility, in the amount of $2,029,402 ("Loss of Profit by Power Suspension"); and (3) GMO's investment cost for the construction of the Texas Facility in the approximate amount of $25 million (the "Initial Investment Cost"). In addition, Whinstone agreed to indemnify GMO (4) for its alleged loss of profit based on lack of power access under the Louisiana Agreement between January 5, 2019 and the ready-for-use date of the Texas Facility (the "Loss of Profit by Power Shortage"). As security for its payment of the forgoing amounts (collectively, the "Secured Indebtedness"), GMO was granted a first priority security interest in the assets and equity of Whinstone.

Because GMO failed, at the time of negotiating the Texas Agreement, to provide any support or explanation for its purported Loss of Profit by Power Shortage (if any), the parties agreed, under Section 16.3 of the Texas Agreement, to defer further negotiations, to be conducted in good faith, over the amount of the purported Loss of Profit by Power Shortage (if

any) until after the Texas Facility was operational. The parties further agreed that the amount (if any) was to be paid not as a cash sum (as GMO now seeks in its complaint), but rather through a reduction in the base hosting fee due from GMO, in an amount and for a time period to be reasonably agreed upon by the parties. *Id.*

Whinstone held up its end of the bargain. The Texas Facility was available for GMO's use as of June 2, 2020; as of July 1, 2020, Whinstone had timely repaid the Original Deposit *and* the Loss of Profit by Power Suspension by July 1, 2020; and, as of March 29, 2021, Whinstone had timely repaid the Initial Investment Cost, each of which the parties acknowledged and agreed in the Texas Agreement and the subsequent November 21, 2020 amendment thereto. Following these payments, GMO released its security interest in Whinstone's assets and equity. Remarkably, however, GMO had still failed to provide an amount of, or any substantiation for, its purported Loss of Profit by Power Shortage as of time it released its security interest, despite repeated requests from Whinstone for the same.

Having fulfilled its obligations, Whinstone approached GMO to negotiate the amount of the Loss of Profit by Power Shortage and to negotiate a new colocation services agreement on par with Whinstone's standard colocation services agreement offered to other colocation customers. But GMO refused to negotiate in good faith, thereby breaching the Texas Agreement.

In particular, GMO breached Section 16.3 of the Texas Agreement by failing reasonably to negotiate the amount and repayment of GMO's alleged Loss of Profit by Power Shortage. GMO has utterly failed to substantiate the amount of its alleged loss. It has provided Whinstone with wildly different amounts ranging from $3 million to $35 million, all while failing to provide a shred of documentary support or an explanation of how these amounts were calculated. GMO

any) until after the Texas Facility was operational. The parties further agreed that the amount (if any) was to be paid not as a cash sum (as GMO now seeks in its complaint), but rather through a reduction in the base hosting fee due from GMO, in an amount and for a time period to be reasonably agreed upon by the parties. *Id.*

Whinstone held up its end of the bargain. The Texas Facility was available for GMO's use as of June 2, 2020; as of July 1, 2020, Whinstone had timely repaid the Original Deposit *and* the Loss of Profit by Power Suspension by July 1, 2020; and, as of March 29, 2021, Whinstone had timely repaid the Initial Investment Cost, each of which the parties acknowledged and agreed in the Texas Agreement and the subsequent November 21, 2020 amendment thereto. Following these payments, GMO released its security interest in Whinstone's assets and equity. Remarkably, however, GMO had still failed to provide an amount of, or any substantiation for, its purported Loss of Profit by Power Shortage as of time it released its security interest, despite repeated requests from Whinstone for the same.

Having fulfilled its obligations, Whinstone approached GMO to negotiate the amount of the Loss of Profit by Power Shortage and to negotiate a new colocation services agreement on par with Whinstone's standard colocation services agreement offered to other colocation customers. But GMO refused to negotiate in good faith, thereby breaching the Texas Agreement.

In particular, GMO breached Section 16.3 of the Texas Agreement by failing reasonably to negotiate the amount and repayment of GMO's alleged Loss of Profit by Power Shortage. GMO has utterly failed to substantiate the amount of its alleged loss. It has provided Whinstone with wildly different amounts ranging from $3 million to $35 million, all while failing to provide a shred of documentary support or an explanation of how these amounts were calculated. GMO

also breached its obligation under Section 20.6 by failing and refusing to negotiate in good faith for a new colocation agreement based on the standard hosting agreement offered by Whinstone to its other customers.  Instead, GMO used the purported Loss of Profit by Power Shortage as a roadblock to further negotiations, all while it continues to take advantage of the below market terms of the Texas Agreement.  In addition to these breaches, GMO has also refused to agree on and pay for its minimum power usage commitment as required under Section 4.3.3 of the Texas Agreement, tying up power that could otherwise be diverted to and paid by Whinstone's other customers at the Texas Facility.

GMO's breaches extend beyond its refusal to negotiate in good faith with its business partner, Whinstone.  GMO also breached its obligations under the Texas Agreement by refusing to pay the increased costs of Whinstone's electricity supply resulting from Electric Reliability Council of Texas ("ERCOT")-mandated surcharges imposed by Whinstone's utility provider, which Whinstone is reasonably entitled to pass on to GMO pursuant to Section 4.3.2.

As a result of GMO's material breaches, Whinstone is entitled to recover on its counterclaims its full damages, in the amount of at least $22,221,762.82, calculated as of August 2022 (which continues to accrue), exclusive of interest, attorneys' fees and costs.  Whinstone is further entitled to a judgment declaring that Whinstone may terminate the Texas Agreement or, in the alternative, declaring (i) that that the terms of the Agreement be modified to conform with the hosting agreement usually offered by Whinstone for colocation services, and, as supplemental relief, ordering GMO to pay Whinstone the amounts that should have been paid to date under this Agreement, and (ii) declaring the reasonable amount of the Loss of Profit by Power Shortage and the reasonable amount of the reduced hosting fee and the amount of time that the reduced hosting fee is to be applied.

On the other hand, GMO is barred from recovering on its breach of contract claims (which Whinstone denies) because, *inter alia*, GMO has materially breached the Texas Agreement, and failed to mitigate its purported damages. Separately, GMO's claim for payment of a share of profits Whinstone earned from the sale of power back to the grid during Winter Storm Uri is barred because Whinstone has already paid such credits to GMO.

**3. Basis of Subject Matter Jurisdiction.**

Defendant Whinstone is a citizen of Texas, while Plaintiffs GMO Gamecenter USA, Inc. and GMO Internet Group, Inc. are citizens of Japan and/or California. The amount in controversy far exceeds $75,000. Accordingly, this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(3).

**4. Subjects on Which Discovery May Be Needed.**

<u>Plaintiffs</u>: Plaintiffs anticipate they will need discovery on at least the following topics, subject to future developments in this action and without waiving any rights to supplement these topics:

- Riot Blockchain's acquisition of Whinstone in May 2021.
- The Louisiana Agreement, the parties' negotiations thereof and performance thereunder.
- The Texas Agreement, the parties' negotiations thereof and performance thereunder.
- Whinstone's breaches of the Louisiana Agreement, including but not limited to Whinstone's delays in beginning operations of the Louisiana data center, failure to supply sufficient capacity for mining machines in the Louisiana data center, and failure to secure a contract for power supply.
- The Louisiana data center's suspension of operations in July 2019.
- GMO's provision of funds to Whinstone in connection with the Louisiana and

Texas Agreements, including but not limited to any loans provided to Whinstone.

- Whinstone's construction of the Texas data center pursuant to the Texas Agreement.

- GMO's provision of mining equipment to Whinstone pursuant to the Texas Agreement.

- GMO's provision of loans to Whinstone pursuant to the Texas Agreement.

- Whinstone's obligation to pay the Original Deposit to GMO pursuant to the Texas Agreement.

- Whinstone's obligation to pay the Loss of Profit by Power Suspension to GMO pursuant to the Texas Agreement.

- Whinstone's obligation to pay the Initial Investment Cost to GMO pursuant to the Texas Agreement.

- Whinstone's obligation to pay the Loss of Profit by Power Shortage pursuant to the Texas Agreement.

- Whinstone's delayed beginning of operations of the Texas data center, including delays to construction of the Texas center and to providing power.

- Whinstone's provision of power to other customers between October 2019 and present.

- Whinstone's provision of power to the Texas data center pursuant to Section 4.3 of the Texas Agreement.

- The parties' negotiations of a new colocation agreement, including but not limited to all drafts of such a new colocation agreement.

- Whinstone's sale of power to the Texas power grid during the course of the Texas Agreement, including but not limited to pursuant to a Qualified Scheduling Entity Letter Agreement or other agreements on or about April 2021, and Whinstone's sale of power to the Texas power grid on or about August 2022.

- Whinstone's removal of GMO's mining machines, and the replacement of GMO's machines with Whinstone's own machines, on or about March 29, 2022, including but not limited to Whinstone's allegation that GMO's equipment that Whinstone removed was "non-operable."

- Whinstone's invoicing GMO for ERCOT increases of the price of power.

- Whinstone's allegation that GMO failed to use power as contemplated under

- Section 4.3 of the Texas Agreement.

- Whinstone's allegation that GMO failed to identify the amount or provide an explanation for the amount of GMO's Loss of Profit by Power Shortage.

- Whinstone's allegation that GMO used "outdated and non-functioning equipment" and Whinstone's related allegations in paragraph 49 of its Counterclaims.

- Whinstone's alleged March 2022 offer described in paragraph 40 of its Counterclaims.

- Whinstone's alleged damages as alleged in its Counterclaims.

- Any other documents or communications that relate to the parties' claims and defenses in this action.

<u>Defendant</u>:  Whinstone continues to investigate its counterclaims and defenses in this action, which is in the early, pre-discovery phase.  At this time, Whinstone anticipates taking discovery on at least the following subjects, without waiving and without prejudice to any of its rights and remedies, all of which are expressly reserved –

- The amount (if any) and calculation of GMO's purported Loss of Profit by Power Shortage.

- The parties' negotiation, execution and performance of the Louisiana Agreement.

- The parties' negotiation, execution and performance of the Texas Agreement.

- GMO's breaches of the Texas Agreement, including, *inter alia*, its:

    o failure and refusal to negotiate in good faith (pursuant to Section 16.3 of the Texas Agreement) the amount (if any) and repayment of GMO's alleged Loss of Profit by Power Shortage;

    o failure and refusal to negotiate in good faith (pursuant to Section 20.6) a new colocation services agreement based on the standard hosting agreement offered by Whinstone to other customers;

    o failure and refusal (pursuant to Section 4.3.3) to agree on and pay for the Specified Power Draw; and

    o failure and refusal (pursuant to Section 4.3.2) to pay the increased costs of Whinstone's electricity supply resulting from ERCOT-mandated surcharges imposed by Whinstone's utility provider.

- Proofs of payments received from Whinstone, including but not limited to proofs of payment of credits with respect to Whinstone's sale of electrical power back to the grid as a result of Winter Storm Uri.

- The relationship, corporate governance and ownership structure between and among GMO Gamecenter USA, Inc. and GMO Internet Group, Inc., and any corporate parents, affiliates or subsidiaries.

- GMO's historical and future anticipated power needs for its bitcoin mining operations, including but not limited to is historical and future anticipated power needs at other bitcoin mining facilities.

- The effects, if any, that the fluctuating price of bitcoin has had on GMO's business plans for its bitcoin operation.

- Steps (if any) that GMO took to mitigate its alleged damages in connection with the Louisiana Agreement, the Louisiana Facility, and the Texas Agreement.

- The allegations in GMO's complaint.

- GMO's alleged damages.

- Any other documents or communications that relate to the parties' claims, counterclaims and defenses in this action.

- The subjects listed above by GMO.

## 5. Informal Disclosures

The information required by Rule 26(a)(1) of the Federal Rules of Civil Procedure was exchanged between Plaintiffs and Defendant on <u>October 17, 2022</u>.  In addition, the Parties will, at a reasonable time thereafter, produce an initial set of relevant documents identified in their Initial Disclosures and will continue to supplement their production.

## 6. Formal Discovery

The parties jointly propose to the Court the following discovery plan:

All fact discovery must be completed by <u>July 25, 2023</u>.

*The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. The following interim deadlines may be extended by the parties on consent without application to the*

> *Court, provided that the parties meet the deadline for completing fact discovery set forth in 3(a) above.*

     i. <u>Depositions</u>: Depositions shall be completed by <u>June 23, 2023</u> and limited to no more than <u>ten (10)</u> depositions per party, absent agreement of the parties or on a showing of good cause. Absent an agreement between the parties or an order from the Court, non-party depositions shall follow initial party depositions.

     ii. <u>Interrogatories</u>: Initial sets of interrogatories shall be served on or before <u>November 14, 2022</u>. All subsequent interrogatories must be served no later than thirty (30) days prior to the discovery deadline.

     iii. <u>Requests for Admission</u>: Requests for admission must be served on or before <u>June 23, 2023</u>.

     iv. <u>Requests for Production</u>: Initial requests for production will be exchanged on or before <u>November 14, 2022</u> and responses shall be due on <u>December 14, 2022</u>. All subsequent requests for production must be served no later than 30 days prior to the deadline for the completion of discovery.

     v. <u>Supplementation</u>: Supplementations under Rule 26(e) must be made within a reasonable period of time after discovery of such information.

**7. Anticipated Discovery Disputes.**

The parties do not anticipate any discovery disputes at this time.

**8. Amendments to Pleadings.**

a. Are there any amendments to pleadings anticipated? <u>The parties do not anticipate amending the pleadings at this time.</u>

b. Last date to amend the pleadings without leave: <u>The parties' time to amend the pleadings without leave has already expired</u>.

c. Last date to seek leave to amend the pleadings: <u>December 13, 2022</u>.

**9. Joinder of Parties**

a. Are there other necessary parties that need to be joined. <u>No</u>.

b. Is joinder of other parties anticipated? <u>The parties do not anticipate joinder of other parties</u>.

    c.    Last date to join other parties:  <u>November 14, 2022</u>.

**10.**    **Expert Witness Disclosures**

At this time, the parties <u>do</u> anticipate utilizing experts. Expert discovery shall be completed by <u>September 25, 2023</u>.  Initial Expert Report(s) by the party that has the burden of proof on an issue shall be due by August 15, 2023.  Rebuttal Expert Report(s) shall be due by September 5, 2023.

**11.**    **Electronic Discovery and Preservation of Documents and Information**

    a.    Have the parties discussed electronic discovery? <u>Yes</u>.

    b.    Is there an electronic discovery protocol in place? If not, when the parties except to have one in place?  <u>The parties have not agreed to an e-discovery protocol, but plan to negotiate one in the coming weeks</u>.

    c.    Are there issues the parties would like to address concerning preservation of evidence and/or electronic discovery at the Initial Case Management Conference? <u>The Parties anticipate translation issues, since many of GMO's employees and representatives speak Japanese and not English</u>.

**12.**    **Anticipated Motions**

The parties do not anticipate any motions at this time, although the parties may identify bases for dispositive motions as the case develops.

**13.**    **Early Settlement or Resolution**

The parties <u>have</u> discussed (and are continuing to discuss) the possibility of settlement, including an early mediation. The parties request a settlement conference by no later than <u>August 8, 2023</u>.

The following information is needed before settlement can be discussed: <u>The parties may</u>

require certain information on the discovery topics listed in Section 4 above.

14. **Trial**

    a.    The parties anticipate that this case will be ready for trial by <u>October 25, 2023</u>.

    b.    Plaintiff anticipates that the trial of this case will require <u>ten (10)</u> days.

    c.    The parties request a <u>bench</u> trial.

    d.    The parties <u>do not</u> consent to a trial before a Magistrate Judge at this time.

15. **Other Matters.**

<u>The parties have nothing else to report at this time</u>.

Respectfully submitted this 18th day of October, 2022.

| HAYNES AND BOONE, LLP | FOLEY & LARDNER LLP |
|---|---|
| By: */s/ Leslie C. Thorne* | By: */s/ Robert A. Scher* |
| Leslie C. Thorne<br>leslie.thorne@haynesboone.com<br>Alexandra Larkin<br>alexandra.larkin@haynesboone.com<br>Michael Freyberg<br>michael.freyberg@haynesboone.com<br>30 Rockefeller Plaza, 26th Floor<br>New York, NY 10112<br>Telephone: (212) 659-7300<br>Facsimile: (212) 918-8989 | Robert A. Scher, Esq.<br>Benjamin I. Bassoff, Esq.<br>rscher@foley.com<br>bbassoff@foley.com<br>90 Park Avenue<br>New York, NY 10016-1314<br>Tel. 212-682-7474<br><br>**ATTORNEYS FOR DEFENDANT WHINSTONE US, INC.** |
| **ATTORNEYS FOR GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC.** | |