```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                               :
                                         Docket #1:22-cv-05974-
GMO GAMECENTER USA, INC., et al.,    : JPC-KHP

                    Plaintiffs,      :

  - against -                        :

WHINSTONE US, INC.,                  : New York, New York
                                       October 25, 2022
                    Defendant.       :
                                       INITIAL CASE
----------------------------------- : MANAGEMENT CONFERENCE


                      PROCEEDINGS BEFORE
              THE HONORABLE KATHARINE H. PARKER,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:         HAYNES AND BOONE LLP
                        BY:  LESLIE C. THORNE, ESQ.
                              (appearing telephonically)
                        30 Rockefeller Plaza, 26th Floor
                        New York, New York 10112

For Defendant:          FOLEY & LARDNER, LLP
                        BY:  ROBERT ALLEN SCHER, ESQ.
                              BENJAMIN I. BASSOFF, ESQ.
                        90 Park Avenue
                        New York, NY 10016




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings conducted in person and telephonically and
recorded by electronic sound recording;
Transcript produced by transcription service
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

```
 1                         PROCEEDINGS                3

 2             THE CLERK:  Calling case 22-cv-5974, GMO

 3   Gamecenter USA vs. Whinstone US Corp.

 4             Beginning with counsel appearing by telephone,

 5   please make your appearance for the record.

 6             MS. LESLIE C. THORNE:  Leslie Thorne at Haynes

 7   Boone for GMO.

 8             HONORABLE KATHARINE H. PARKER (THE COURT):

 9   Good morning.  Ms. Thorne, can you hear me clearly?

10             MS. THORNE:  Yes, I can.  Can you hear me?

11             THE COURT:  Yes.  So if there's something -- if

12   you haven't heard something, I ask that you speak up,

13   okay?

14             MS. THORNE:  Okay.

15             THE CLERK:  And counsel for the defendants,

16   please make your appearance for the record.

17             MR. ROBERT SCHER:  On behalf of defendants,

18   Robert Scher and Benjamin Bassoff from  Foley & Lardner,

19   LLP.

20             THE COURT:  All right.  Nice to see you.

21             So we're here for an Initial Case Management

22   Conference.  And I guess this is an essentially breach-

23   of-contract issue.  Ms. Thorne, why don't you tell me a

24   little bit about the issues in the case and go into a

25   little bit more detail about the discovery that you are
```

```
 1                      PROCEEDINGS                4
 2   intending.
 3            MS. THORNE:  Sure.  I'd be happy to.  As you
 4   mentioned, this is a breach-of-contract action.  It
 5   stems from what's called a co-location agreement.  And
 6   under that agreement, my client agreed to essentially,
 7   sort of for purposes of simplification, lease space and
 8   engage other services from Whinstone, which provides
 9   what's called a data center to mine bitcoin.  There's a
10   long history here, but essentially GMO has encountered
11   repeated significant difficulties.  And those include
12   Whinstone failing to provide the necessary contracted-
13   for power to supply the machines.  It's a very power-
14   intensive process.  Whinstone has removed GMO's machines
15   from service, has failed to share the profits of power
16   sales to others, which is addressed in the contract
17   between the parties, and has charged excess amounts.  So
18   there are a number of different issues here.
19            We would ask for a good bit of discovery on
20   those items.  As I'm sure you've seen, there are also
21   counterclaims filed against our client.  So, you know,
22   we would anticipate doing discovery on those.  That
23   includes issues related to negotiation of both the
24   agreement at issue and a predecessor agreement that is
25   contemplated in the agreement at issue but that sort of
```

```
 1                         PROCEEDINGS                    5
 2  plays into that.  I anticipate there will also be a good
 3  bit of discovery related to the damages piece on both
 4  sides.  Both sides have claimed significant damages.
 5  We've claimed almost over $100 million in damages.  Much
 6  of that has to do with lost profit, so I imagine that
 7  will be a fairly arduous process going through the
 8  discovery issues related to that.  And many of the
 9  claims against my client also involve Whinstone's
10  allegations of lost profits that we don't have a full
11  understanding of yet, but I anticipate there will be
12  significant discovery on that.
13          I would just note one other thing that may
14  complicate things a good bit and may play into the
15  schedule, and that is that our clients are all based in
16  Japan.  And many of them are not native English
17  speakers, and so I anticipate there will be some
18  translation issues, both when it comes to depositions
19  and when it comes to documents.
20          THE COURT:  Okay.  Are you anticipating that
21  you'll do remote depositions, or are you going to bring
22  your clients here to New York?
23          MS. THORNE:  I think that, to the extent
24  possible, we would want to do it remotely.  And I'll let
25  Bob speak for himself, but I think we sort of, at least
```

```
 1                        PROCEEDINGS                6
 2  preliminarily thought that that would likely be the
 3  case.  But, you know, I also understand that Whinstone
 4  does not want to, you know, waive the ability to ask for
 5  my clients to come to New York.
 6            THE COURT:  Okay.  And so as I understand it,
 7  you don't anticipate any discovery disputes at this
 8  time.  You've laid out with good particularity the
 9  subjects on which you seek discovery.
10            I'll hear from defendant about your
11  counterclaims and defenses now.
12            MR. SCHER:  Thank you, your Honor.  And I don't
13  necessarily disagree that this will be a fair amount of
14  discovery, although I think some of -- I wouldn't call
15  it a dispute at this time -- I think some of the topics
16  listed may not really be appropriate.  So, for example,
17  Ms. Thorne, both in the position statement and in some
18  of the things she said today, talks about the prior
19  agreement, the breaches of the prior agreement and
20  things that Whinstone did or didn't do, but that
21  agreement was superseded by a new agreement.  The new
22  agreement talked about the various breaches under the
23  previous agreement and how they were going to be dealt
24  with.  And they were dealt with.  So certain amounts
25  were owed by the defendant to the plaintiffs.  And all
```

PROCEEDINGS                    7

 2    but one of those were paid.  And the one bucket that

 3    wasn't paid, which is one of the major issues in this

 4    case, has been the source of a lot of back-and-forth of

 5    Whinstone saying, "What do we owe you?  And why do we

 6    owe it to you?  Give us the backup."  And, you know, at

 7    one point they said it was $3 million; now they're

 8    talking in the 30-millions of dollars.  But never, up

 9    until still as we sit there today, have we gotten any

10    indication of what that amount is.

11           Now, I will say we had a meet-and-confer

12    yesterday because we got their initial disclosures.

13    And, again, we got a number; we didn't get a

14    calculation.  And Ms. Thorne did agree to supplement

15    that and said next week we would get sort of a full

16    Excel spreadsheet breakout of that.  So, you know, we

17    look forward to seeing that.

18           But part of the agreement, and not including

19    this bucket that remains unpaid, and it's not supposed

20    to be paid in cash, as they're seeking now; it gets paid

21    by a reduction in the fee.  But once we completed the

22    other things, they were getting very preferential

23    treatment under the new agreement to enable these things

24    to be taken care of.  And under the new agreement, the

25    agreement at issue, once those things were taken care

```
 1                            PROCEEDINGS                 8
 2   of, they were obligated, the parties were obligated to
 3   negotiate a new agreement on more typical terms that we
 4   provide to our other customers.  And we've just been
 5   stonewalled every step of the way.  They have refused to
 6   engage in those negotiations.
 7             THE COURT:  So there was an agreement to agree
 8   in the new agreement?
 9             MR. SCHER:  Yes, there is.
10             THE COURT:  In the operative contract?
11             MR. SCHER:  Yes.  And nobody denies that the
12   things that trigger that step have occurred.
13             THE COURT:  Except for the one --
14             MR. SCHER:  No, the --
15             THE COURT:  -- where there's a dispute?
16             MR. SCHER:  There is a dispute on the one, but
17   that's not included in the trigger.
18             THE COURT:  I see.  I see.  And the one area of
19   dispute -- tell me if I'm correct in my understanding --
20   that pertains to the power or the removal of the
21   machines?
22             MR. SCHER:  No, no, that has to do with the
23   power shortage.
24             THE COURT:  The power shortage.  Okay.
25             MR. SCHER:  And then in terms of operations,
```

1                          PROCEEDINGS                    9

2   you know, look, there are disputes back and forth.  They

3   say we didn't have sufficient power to supply them.

4   They put in -- I don't remember the number -- like

5   nowhere near what they were supposed to use, the space.

6   So not only, you know --

7              THE COURT:  You mean, they didn't have enough

8   machines in the space?

9              MR. SCHER:  They didn't have the ability to use

10  even the power that we were providing them; and at the

11  same time, by not providing the power to them, we were

12  prevented from providing the power to other customers

13  who would actually use the space, so --

14             THE COURT:  I see, so you -- it's your position

15  that they were requiring you to reserve power that they

16  weren't using and not to reallocate it?

17             MR. SCHER:  Exactly.

18             THE COURT:  Okay.

19             MR. SCHER:  And with respect to machines being

20  removed, they were broken, they were inoperable.  So,

21  you know, those are the --

22             THE COURT:  The machines are pretty expensive,

23  right?

24             MR. SCHER:  Everything's expensive, yes, yes.

25             THE COURT:  Right.  I've had a couple --

```
 1                        PROCEEDINGS                10
 2            MR. SCHER:  So I'm not saying --
 3            THE COURT:  -- involving these crypto machines,
 4  mining machines.
 5            MR. SCHER:  Yeah, I'm not saying that we have a
 6  discovery dispute, but when I look at the list of the
 7  areas -- so, you know, we'll do our document requests,
 8  and they'll do theirs, and we'll object to certain
 9  things that we don't think are, you know, relevant or
10  necessary, and we'll see -- we've worked very well
11  together so far.  We're at the very early stages.  So I
12  anticipate any disputes, we'll discuss; and, obviously,
13  we'll bring anything that we can't resolve to you.
14            THE COURT:  And how much of the discovery will
15  be e-discovery, you know, emails and things like that?
16            MR. SCHER:  All of it.
17            THE COURT:  All of it?
18            MR. SCHER:  Practically all of it.  I mean, in
19  this day and age --
20            THE COURT:  All of it.
21            MS. THORNE:  Yes, I think a good bit of it.
22            THE COURT:  Have you already discussed who the
23  relevant custodians are?
24            MR. SCHER:  We have not.  We've listed people
25  in the initial disclosures, but we have not -- we've
```

```
 1                        PROCEEDINGS              11
 2   agreed to the general process, that we will propose
 3   custodians, we'll propose search terms.  And, you know,
 4   everybody's sent out litigation hold notices and
 5   documents are being preserved.  But we haven't gone
 6   through that process yet.
 7              THE COURT:  Okay.  For the ESI protocol, I just
 8   throw out something for you all to consider, which is
 9   whether it makes sense for the parties to do an initial
10   production based on their own best assessments of how to
11   collect the responsive documents, what's a reasonable
12   search; and then if there's -- you can disclose the
13   search terms that you use, if that's what you're using,
14   and then if through review of documents that are
15   produced and depositions, there needs to be a
16   supplemental review and production, that might be more
17   efficient, maybe.  I just find that sometimes if it's a
18   heavy e-discovery case, that if there are a lot of
19   disputes over search terms, it can delay things quite a
20   bit, and it may not be particularly meaningful in the
21   end.  And so I just ask both sides to think about what
22   will be efficient, and maybe the ESI discovery can be
23   more iterative and maybe that would be more efficient.
24   But I just throw that out there for you to think about.
25              MR. SCHER:  Thank you, your Honor.  We're happy
```

```
 1                        PROCEEDINGS              12

 2  to discuss that with Ms. Thorne.

 3          And the one thing I will say that we already

 4  have agreed to is -- although we haven't identified the

 5  documents -- that certain documents, you know, that are

 6  the key documents in the case, the agreements and, you

 7  know, things like that, we will produce irrespective of

 8  search terms and things like that.

 9          THE COURT:  Right, right, of course.  Of

10  course.  I mean, what you're going to -- so it sounds

11  like it's not really the negotiation of the contract but

12  it's the fulfillment of the contract.  And there may be

13  certain individuals who have knowledge of this power or

14  communications relating to the provision of power,

15  requests for the power, reallocation of the power; it

16  sounds like that's where the focus of e-discovery will

17  be.  Is that right?

18          MR. SCHER:  I would agree -- I would agree with

19  that.

20          THE COURT:  Ms. Thorne, do you agree with that?

21          MS. THORNE:  I think that's fair, yes.  I do.

22          THE COURT:  Okay.  I have some samples on my --

23  for e-discovery on my web page -- so you're welcome to

24  take a look at that -- or topics to discuss.  And do you

25  anticipate there being significant privilege issues in
```

```
 1                        PROCEEDINGS                    13
 2   the case?
 3            MR. SCHER:  I anti --
 4            MS. THORNE:  I do not.
 5            MR. SCHER:  Yeah, I mean, there may be some
 6   privilege issues, but I don't think it's significant.
 7            THE COURT:  Okay.
 8            MR. SCHER:  And I know on our end --
 9            MS. THORNE:  Nothing out of the ordinary.
10            MR. SCHER:  -- lawyers were involved along the
11   way, but I don't think it will be a problem.
12            THE COURT:  Okay.  So if there's not going to
13   be an extensive privilege log, then I'll leave it to you
14   all to discuss.  But if it's going to be more extensive,
15   then you can think about bucketing and things of that
16   sort.  So I'd ask you to think about that and what makes
17   sense to be efficient.
18            And it sounds like with respect to the damages,
19   that much of that may be through expert testimony.
20   Ms. Thorne, is that correct?
21            MS. THORNE:  I agree with that.  I think
22   there'll be a good bit of expert testimony in this case.
23            THE COURT:  Okay.  And then I see there's no
24   jury demand, so this would be a bench trial on the
25   contract; is that right?
```

```
 1                      PROCEEDINGS                 14
 2            MS. THORNE:  Correct.
 3            MR. SCHER:  Yes, your Honor.
 4            THE COURT:  All right.  If there are -- you may
 5   already have remote deposition protocols that you use
 6   and that you like.  If you want to look at what I have
 7   on my website, you're welcome to use it.  I do have a
 8   form, confidentiality agreement, so if there's
 9   confidential information that's being exchanged.  My
10   form has worked.  It's really, really simple, doesn't
11   have a lot of legal muck.  Obviously, if you want to
12   negotiate something more specific about clawbacks and
13   that kind of thing, you can add it; but I ask that you
14   send me a redline of the -- of changes to it.  And this
15   is just to cut down on time negotiating on provisions
16   that have a lot of legalese and not a lot of meaning or
17   -- okay.
18            Now, for any discovery disputes that may arise,
19   I do like to try to resolve those informally, if I can.
20   I do expect the parties to meet and confer, and if you
21   cannot resolve the issue, to send me a letter and I'll
22   try to schedule a conference in short order to see if I
23   can resolve it, rather than through formal briefing.  If
24   there needs to be formal briefing on a discovery issue,
25   of course we can set a schedule.  But hopefully, we can
```

```
 1                        PROCEEDINGS              15

 2  avoid that in this case.

 3           I'm going to set -- I'm going to adopt your

 4  proposed schedule; and what I'm going to do is set

 5  another date for a Case Management Conference in

 6  December.

 7           Chris, what date do we have open, before the

 8  15th?

 9           THE CLERK:  How about the 5th at 11:30 or --

10           THE COURT:  That's fine.

11           THE CLERK:  Yes, 11:30?  Is that good?

12           THE COURT:  Yes.

13           THE CLERK:  In person?

14           THE COURT:  Yes.

15           Now, I assume it's premature to talk about

16  settlement right now, since the parties have been having

17  discussions or since it seems like there needs to be

18  some fleshing out of the damages theories.  But I'm

19  happy to schedule a settlement conference if the parties

20  would like.

21           MR. SCHER:  Well, your Honor, Ms. Thorne and I

22  have talked about mediation.   And it seems -- you know,

23  both parties, they have an existing relationship, which

24  is always helpful.

25           THE COURT:  Yes.
```

```
 1                        PROCEEDINGS                  16

 2          MR. SCHER:  Or can be helpful.  Ms. Thorne

 3  suggested the two of us talk a little bit first because,

 4  in her view -- and I don't disagree with this view --

 5  the clients are talking over each other.  And we haven't

 6  talked about specifics, but I think the idea is, whether

 7  it's with you or some outside service, to possibly do an

 8  early mediation.  I don't know -- you know, I think I

 9  know the answer to his question.  My client wants to

10  know, well, do things get put on hold if we do that so

11  we're not spending money in two areas, so this may be

12  premature.  But I don't know if your view is if you want

13  to mediate, go ahead and mediate, but the schedule is

14  the schedule, and --

15          THE COURT:  So it depends on the case.  It

16  depends how close you are and how likely settlement is

17  to be reached.  And so I need to know, you know, more

18  details about it.  If I'm supervising a settlement

19  conference and I have a good sense of what's happening,

20  you know, then that's sometimes helpful to me, to

21  understand where the parties are.  If you want an early

22  settlement conference, I can fit you in in January, but

23  not before January.

24          MR. SCHER:  Okay.  So why don't Ms. Thorne and

25  I -- we've already agreed to talk further on this -- but
```

```
 1                        PROCEEDINGS                    17

 2  it sounds like we should do that.  And even if it's

 3  before our December 5th conference, if we can get in

 4  touch with you and let you know --

 5            THE COURT:  Sure.

 6            MR. SCHER:  -- where we are and if we need your

 7  services.

 8            THE COURT:  Sure.  And for settlement

 9  conferences, I am doing them in person.  If you think

10  that this -- if it's a more complex situation, sometimes

11  I've had just the lawyers come in and for a -- if

12  there's going to be some business dealing going forward,

13  in other words, sometimes the lawyers want to discuss

14  the structure for a settlement and then the parties come

15  in a second day to have a more robust discussion to

16  finalize things.  So it depends on the case.  But that's

17  also something that, you know, you can talk about if you

18  think that's -- it's really a two-part kind of

19  discussion.  I've done that sometimes in complex cases

20  where there may be a business deal as part of the

21  settlement.  So you can let me know in December, at the

22  December conference, if you want to put something on the

23  calendar.  Okay?

24            MR. SCHER:  Thank you.

25            THE COURT:  Anything else, Ms. Thorne?
```

```
 1                      PROCEEDINGS                 18
 2            MS. THORNE:  Your Honor --
 3            THE COURT:  Yes.
 4            MS. THORNE:  -- the only thing I couldn't hear
 5  was what the date is for the December Settlement
 6  Conference.
 7            THE COURT:  December 5.  And that will be in a
 8  Scheduling Order that I'll issue after this conference.
 9  December 5 at 11:30.
10            MS. THORNE:  I have a mediation on the 5th and
11  6th.  Is there any way that we could schedule for
12  another date?
13            THE COURT:  Yes.
14            MS. THORNE:  Apologies.
15            THE CLERK:  Judge, how about the 13th?
16            THE COURT:  At four?
17            THE CLERK:  I was going to say like 11:45.
18            THE COURT:  No.  We could do the 13th at four.
19            MS. THORNE:  That works for me.  I very much
20  appreciate it.
21            THE COURT:  That's a Tuesday.
22            MS. THORNE:  Yes.
23            MR. SCHER:  I don't have my phone on me, but I
24  assume that's fine.
25            THE COURT:  Okay.  December 13 at four.
```

```
 1                        PROCEEDINGS                    19

 2             MS. THORNE:  Thank you very, very much.

 3             MR. SCHER:  Thank you, your Honor.

 4             THE COURT:  Okay.  Nice to meet everybody.  See

 5    you in December.

 6             (Whereupon, the matter is adjourned.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                                           20

2

3                        C E R T I F I C A T E

4

5           I, Carole Ludwig, certify that the foregoing

6    transcript of proceedings in the case of Gamecenter USA,

7    Inc. et al v. Whinstone US, Inc., Docket #22-cv-05974-

8    JPC-KHP GMO, was prepared using digital transcription

9    software and is a true and accurate record of the

10   proceedings.

11

12

13

14   Signature_____
                        *Carole Ludwig*

15                      Carole Ludwig

16   Date:    October 26, 2022

17

18

19

20

21

22

23

24

25