# EXHIBIT 7



**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW
90 PARK AVENUE
NEW YORK, NY 10016-1314
212.682.7474 TEL
212.687.2329 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
212.338.3405
rscher@foley.com EMAIL

June 13, 2022

**Via Email and Hand Delivery**

Leslie C. Thorne
Haynes and Boone, LLP
30 Rockefeller Plaza, 26th floor
New York, NY 10112
Leslie.thorne@haynesboone.com

Re: Whinstone – GMO W Colocation Services Agreement (Texas), dated October 16, 2019, as amended (the "**Texas Agreement**")

Dear Ms. Thorne:

We represent Whinstone US, Inc. and its parent, Riot Blockchain, Inc., and write in connection with the above referenced Texas Agreement between your client, GMO Gamecenter USA, Inc. and its parent, GMO Internet, Inc. (collectively, "**GMO**"), as well as your letters to Whinstone dated April 12, 2022 and May 9, 2022. To the extent you are not authorized to receive notices for GMO under the Texas Agreement, please advise us immediately and we will send a copy of this letter directly to GMO. Your letters are continuations and additional evidence of the stonewalling by GMO that has repeatedly and persistently continued over the past year. GMO has failed to live up to its obligations under the Texas Agreement and to engage in good faith negotiations with Whinstone as contractually required, thereby causing damages to Whinstone. Whinstone cannot permit GMO's breach of the Texas Agreement to persist unaddressed, nor can it continue to engage in unproductive discussions with a party that is unwilling to negotiate in good faith. Accordingly, unless GMO undertakes the curative actions laid out in this letter by July 14, 2022, Whinstone will take all steps necessary to protect and enforce its rights.

### 1. Background – The Louisiana Agreement and The Texas Agreement.

The parties entered into a W Colocation Services Agreement effective November 28, 2018 (the "**Louisiana Agreement**") pursuant to which Whinstone agreed to provide certain co-location and hosting services to GMO for bitcoin mining operations in Louisiana. Due to certain delays relating to the Louisiana facility Whinstone agreed to develop a new data center in Texas (the "**Texas Facility**"), and GMO agreed to advance certain funding in connection with the construction.

Effective October 16, 2019, the parties entered into a new W Co-location Services Agreement for the Texas Facility (the "**Texas Agreement**") and accompanying Pledge and Security Agreement (the "**Security Agreement**") which superseded and replaced the Louisiana Agreement. Under the Texas Agreement and the Security Agreement, the parties agreed that in addition to providing the hosting and colocation services, Whinstone would pay certain amounts to GMO arising out of the



Louisiana Agreement and the Texas Facility, namely, (1) a deposit of $5,810,720 paid by GMO under the Louisiana Agreement (the "**Original Deposit**"), (2) GMO's loss of profits due to the suspension of power available to GMO in the amount of $2,029,402 ("**Loss of Profit by Power Suspension**"), (3) GMO's investment cost for the construction of the Texas Facility in the approximate amount of $25 million (the "**Initial Investment Cost**") and (4) loss of profits due to the shortage of power available to GMO in an amount to be determined (the "**Loss of Profit by Power Shortage**"). The loss of profit by power amounts were to reimburse GMO for the alleged lost profits arising out of the suspension and shortage of power incurred under the Louisiana Agreement and subsequent migration to the Texas Facility.

The parties agreed in the Texas Agreement and the Security Agreement that when the (1) Original Deposit, (2) *Loss of Profit by Power Suspension* and (3) Initial Investment Cost had been repaid, then (A) the Security Agreement would terminate and the security interest released, and (B) the parties would enter into renegotiation discussions in good faith to agree to a minimum commitment for power usage as was contained in the Louisiana Agreement and based on the hosting agreement usually offered by Whinstone for colocation services. The Texas Agreement and the Security Agreement did not specify the amount of the alleged *Loss of Profit by Power Shortage*. Rather, Whinstone and GMO agreed that they would "decide reasonably" the amount of the alleged Loss of Profit by Power Shortage and that the amount would be repaid over time by lowering the initial rate for power from 2.85 cents per kilowatt hour (kWh) to an amount and for a period of time to be reasonably agreed to by the parties. Despite repeated requests by Whinstone's representatives since the effective date of the Texas Agreement, the final amount of the alleged Loss of Profit by Power Shortage has never been adequately substantiated by GMO. Thus, we must conclude GMO either does not know or cannot calculate the Loss of Profit by Power Shortage amount, and that it is using the unsubstantiated claim for indemnification for such alleged Loss of Profit by Power Shortage to further perpetuate the unreasonable status quo of the Texas Agreement.

2. ***Payments to GMO, Satisfaction of the Security Interests, and Riot's Acquisition of Whinstone.***

After entering into the Texas Agreement, Whinstone began paying the amounts due under the Texas Agreement and the Security Agreement. On November 21, 2020, the parties entered into an Amendment of the Texas Agreement, pursuant to which the parties acknowledged that repayment of the Original Deposit and indemnification of the Loss of Profit by Power Suspension amount had been paid in full by Whinstone and agreed to a schedule for repayment of the remaining balance of the Initial Investment Cost (with no penalty for early payment thereof). Thereafter, Whinstone continued to make payments to GMO in satisfaction of its obligations to GMO under the Texas Agreement.

In December 2020, Riot began its diligence investigation of Whinstone in connection with Riot's plan to acquire the company, which Riot completed as of May 26, 2021 (the "**Whinstone Acquisition**"). During this diligence investigation, Riot learned of Whinstone's pledge under the Security Agreement of its capital stock and assets to GMO as security for the satisfaction of the remaining balance of Whinstone's obligations under the Texas Agreement. Therefore, as a condition precedent to the closing of the Whinstone Acquisition, Riot required confirmation that all liens, security interest and rights GMO held with respect to the capital stock of Whinstone had been released and terminated. GMO confirmed, by email from Hideyuki Matsui to Chad Harris, Chief Executive



Officer of Whinstone, dated April 4, 2021, that "all liens, security interests and rights that GMO held with respect to the capital stock and assets of Whinstone US, Inc. under the Pledge and Security Agreement, dated October 16, 2019, among GMO Gamecenter USA, GMO Internet and Whinstone, have been released and terminated." Accordingly, the Security Agreement was terminated, and, pursuant to Sections 4.3.3. and 20.6 of the Texas Agreement, GMO's obligation to renegotiate the terms of the Texas Agreement had commenced, as of that date.

Thus, on April 8, 2021, Riot, in reliance on this confirmation from GMO's authorized representative, publicly announced its agreement to move forward with the Whinstone Acquisition. Despite the ongoing diligence investigation and communications between Whinstone and GMO during the interim period between Riot's public announcement of the Whinstone Acquisition and its completion as of May 26, 2021, GMO gave *no indication that it's confirmation of the release and termination of "all liens, security interests and rights that [it] held with respect to the capital stock and assets of [Whinstone] under the [Security Agreement]" was in any way qualified* or, otherwise, that any additional amounts were alleged to be due or outstanding to GMO under the Texas Agreement. In fact, it was not until your April 12, 2022 letter, which was delivered in the context of the negotiations discussed below, that GMO alleged any amounts remained outstanding from Whinstone to GMO under the Texas Agreement.

### 3. *GMO's Failure to Negotiate in Good Faith is in Breach of the Texas Agreement.*

Following the Whinstone Acquisition, Whinstone approached GMO to engage in good faith discussions to renegotiate the terms of the Texas Agreement as required under Sections 4.3.3. and 20.6 of the Texas Agreement. However, in the nearly twelve months following payment of the required amounts, GMO has repeatedly and persistently failed to negotiate or otherwise discuss in good faith the terms of a revised hosting agreement. Whinstone's attempts to engage in such good faith negotiations are summarized as follows:

- In June 2021, Riot/Whinstone contacted GMO to discuss terms of a renegotiated hosting arrangement with GMO on the basis of Whinstone's standard colocation mining services agreement offered to all other market participants. GMO was slow to respond but ultimately indicated it was ready to negotiate.

- In October 2021, Whinstone provided GMO a copy of its standard colocation agreement. GMO requested that Whinstone provide proposed revised economic terms before it would commence its review of Whinstone's standard agreement. There was no mention by GMO of the existence or amount of the alleged Loss of Profit by Power Shortage .

- In November 2021, Whinstone provided GMO with a term sheet laying out the proposed revised economic terms of its hosting arrangement, which were on par with the terms offered to all of Whinstone's other hosted mining clients (including Riot) and reflected Whinstone's elevated cost of power resulting from changes to the applicable Texas PUC regulations. GMO did not respond to this term sheet, instead requesting Whinstone provide an executable agreement for its review. And again, GMO did not mention the alleged Loss of Profit by Power Shortage as an impediment to, or even a factor in, the negotiations.



- On December 9, 2021, Whinstone presented GMO with an executable agreement on the basis of the term sheet and its standard form of colocation mining services agreement (the "**Proposed Agreement**").

- On December 23, 2021, GMO responded to the Proposed Agreement with a revised draft that effectively negated the material terms of Whinstone's Proposed Agreement. As Whinstone made clear at the time, GMO's counter-proposal was not consistent with good faith negotiations. GMO offered no further substantive negotiations on Whinstone's proposal, adopting a "take it or leave it" attitude and falsely asserting that it was under no obligation to renegotiate the terms of the Texas Agreement.

- In February 2022, Whinstone submitted an alternative and final proposal providing GMO with, in essence, a royalty on Riot-owned newer generation miners that would operate in the 120 MW of capacity allotted to GMO in the Texas Facility. Under this final proposal, Riot would allocate a portion of the hashrate its newer generation miners would produce to GMO at a 20% premium above the maximum rated hashrate that all of GMO's nearly five-year-old miners could produce, including the GMO miners that had degraded and become inoperable due to ordinary wear and tear. This offer would effectively have allowed GMO to upgrade its mining operations to Riot's state of the art miners, without GMO having to spend tens of millions of Dollars in capital expenses to acquire competitive mining equipment. GMO rejected this attractive proposal out of hand and without explanation. Despite this, Whinstone has continued to attempt to engage in dialogue with GMO regarding a renegotiated hosting agreement without any meaningful good faith engagement or responses from GMO.

- Instead, on April 12, 2022 you, on behalf of GMO, sent a letter to Riot and Whinstone asserting, among other things, a claim of $84,000,000 for "indemnification due to power shortages," which we assume refers to the Loss of Profit by Power Shortage amount. As discussed in more detail below, you provided no support whatsoever for this amount, and it is clearly excessive and without any basis in reality.

Thus, after nearly a year of attempted good faith negotiations by Whinstone, GMO has repeatedly and persistently failed to negotiate or otherwise discuss in good faith the terms of a renegotiated agreement as required under the Texas Agreement. This ongoing breach of GMO's obligations under the Texas Agreement has caused, and continues to cause, Whinstone substantial damages, including without limitation, Whinstone's loss of revenue due to GMO's failure to pay the adjusted base hosting fee amount charged by Whinstone in response to regulatory changes affecting its cost of power, as invoiced by Whinstone and as set forth in the Proposed Agreement Whinstone has put forward as part of the renegotiation of the Texas Agreement.

### 4. *GMO is in Breach for its Failure to Use the Specified Power Draw.*

Adding to this failure to negotiate in good faith, GMO has failed to utilize its allotted power capacity in breach of its obligations under the Texas Agreement, which has caused and continues to cause substantial damages to Whinstone. Whinstone agreed to provide GMO with a Specified Power Draw of 120 MW at the Texas Facility, and, after the Texas Facility was ready for use by GMO, GMO agreed to use the Specified Power consistent with its obligations under the 2018 Louisiana Agreement. In June 2020, Whinstone informed GMO that the 120 MW of capacity was ready for use. However,



**FOLEY & LARDNER LLP**

GMO has never undertaken serious efforts to use the full 120 MW, and indeed has never used more than 50 MW of its allotted capacity. Despite this, Whinstone held the full 120 MW of capacity out for GMO's use through March, 2022, at a net cost to Whinstone of $504,000.00 per month based on the colocation fees Whinstone should have been collecting from the operation of miners in this unused capacity. GMO's failure to utilize its allotted power capacity is in breach of its obligations under the Texas Agreement and further evidence of GMO's bad faith.

### 5. *GMO's Claims in its April 2022 Letter are without Basis or Substantiation.*

Your April 12, 2022, letter claims - without substantiation or support - that "GMO's most recent estimate was that the combined claims for indemnification would be in the amount of $84MM or more through the end of February 2022." However, despite repeated requests for information to substantiate this claim, GMO has never provided any supporting data to justify the alleged damages, nor even how GMO calculates the claim. In any event, it is mathematically impossible that the miners GMO has deployed at the Texas Facility could have generated $84 million in lost profit during the period following Riot's completion of the Whinstone Acquisition, so we must conclude this newly claimed amount consists (at least in part) of amounts which GMO confirmed had been satisfied in full as of April 4, 2021 and that GMO's claim is simply a delaying tactic and yet further evidence of its bad faith. Accordingly, Whinstone again asks GMO to provide a well-founded and substantiated calculation of these alleged damages, information identifying their source and a reasonable explanation of how they were calculated, as well as all supporting documentation substantiating their amount and source, failing which Whinstone will understand that GMO is unable to do so.

### 6. *Alleged Breach of Access Rights.*

Your May 9 letter misstates the interactions between GMO and Whinstone regarding GMO's request for access to the Data Center, and is simply further evidence of GMO's pattern and refusal to negotiate in good faith. Under the Texas Agreement GMO (and all other customers) is entitled to "escorted access to the Data Center for equipment installation, removal, additions, subtractions or physical maintenance by prior appointment." GMO has requested, however, extended access for a period of one (1) month for purposes clearly outside of the scope of access permitted under the Texas Agreement, such as access for office space and meetings (the "**Visit**"). Indeed, GMO's representatives have repeatedly informed Whinstone that GMO's representatives will not be conducting maintenance and service-related activities during the Visit, but rather is requesting access for office space and meetings during the one (1) month period. GMO has requested that Whinstone's personnel continue to perform all maintenance and service-related activities for GMO's miners, consistent with the parties' course of dealing throughout the entirety of their relationship.

GMO has also objected to Whinstone's Data Center Rules. Whinstone is well within its rights to establish reasonable rules and regulations governing the use of and access to the Data Center, and GMO has agreed to abide by such rules in accordance with Section 3.1.4 of the Texas Agreement. The Data Center is a private, highly confidential data center facility that houses equipment and data for multiple Whinstone customers, all of whom trust in and value the limited access and robust security of the Data Center. The Data Center is also located on a private road in private land in a rural area with limited access to emergency medical services, is an active work site with ongoing large-scale construction and the obvious and non-obvious hazards to employees and visitors. Accordingly, Whinstone has established the Whinstone Data Center Rules and Acceptable Use Policy (the "**Data**



**FOLEY & LARDNER LLP**

Center Rules") and the Visitor Policy and Waiver of Liability (the "**Visitor Policy**") to protect the security and confidentiality of all of Whinstone's clients and their equipment, and to ensure the health and safety of all persons present on the Texas Facility premises. The Data Center Rules and Visitor Policy are generally applicable to all persons accessing the Texas Facility premises, and GMO is the first client or visitor to express any reservation with them.

Despite these reasonable and common-sense rules adopted by Whinstone in furtherance of its duties to protect the confidentiality and security of the Data Center and its contents, and the safety of invitees to its premises, you have expressed GMO's complete unwillingness to require its representatives to abide by these rules and asserted that these requirements constitute a breach of the Texas Agreement. We disagree, and Whinstone does not accept the statement in your May letter that GMO's representatives have signed the same under duress, as this implies their intent to (a) challenge the effectiveness of the documents and (b) not comply with the same; thus, we view the allegations set forth in your letter as nothing more than further evidence of GMO's bad faith. However, notwithstanding its non-acceptance of your statements that GMO's representatives have signed the Data Center Rules and Visitor Policy under duress (and the implications thereof), Whinstone has – in good faith – agreed to permit the Visit according to the terms and conditions set forth in the extended data center facility access agreement, dated as of May 11, 2022, between Whinstone and GMO.

### Conclusion

Accordingly, GMO has left Whinstone with no choice but to give formal written notice of default under the Texas Agreement. Unless GMO (i) agrees to one of Riot's prior proposals, or otherwise provides good faith suggested changes that are consistent with GMO's obligations under the Texas Agreement by July 14, 2022; or (ii) makes a good faith proposal to resolve the outstanding issues and disputes between the parties, Whinstone will take all steps necessary to protect and enforce its rights.

We regret this situation has come to this; however, it is GMO's recalcitrance and bad faith that have led us to this point.

Sincerely,

*Robert Scher*

Robert A. Scher

cc: William Jackman, General Counsel,
Riot Blockchain, Inc.