UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GMO GAMECENTER USA, INC. and GMO
INTERNET GROUP, INC.

        *Plaintiffs*,

  - against -

WHINSTONE US, INC.,

        *Defendant*.

Case No. 1:22-cv-05974-JPC

---

WHINSTONE US, INC.,

        *Counterclaim Plaintiff*,

  - against -

GMO GAMECENTER USA, INC. and GMO
INTERNET GROUP, INC.,

        *Counterclaim Defendants*.

---

## WHINSTONE'S MEMORANDUM OF LAW IN OPPOSITION TO GMO'S ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER TO PRESERVE EVIDENCE AND THE STATUS QUO

Maeve L. O'Connor
Elliot Greenfield
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, New York 10001
(212) 909-6000

*Attorneys for Whinstone US, Inc.*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 5

I.     GMO STATES THAT IT HAS PRESERVED ALL RELEVANT EVIDENCE. ............. 5

II.    WHINSTONE TERMINATES THE TEXAS AGREEMENT AND PROVIDES
       GMO 30 DAYS TO PRESERVE EVIDENCE AND REMOVE ITS
       MACHINES ................................................................................................................... 6

III.   WHINSTONE AGREES TO FURTHER DELAY REMOVAL TO ALLOW
       GMO'S EXPERT TO VISIT THE TEXAS FACILITY. .................................................. 8

IV.    ADDITIONAL DELAY WOULD BE EXTREMELY COSTLY TO
       WHINSTONE. ................................................................................................................ 9

ARGUMENT ......................................................................................................................... 9

I.     GMO HAS NOT MET ITS BURDEN TO ESTABLISH THAT INJUNCTIVE
       RELIEF IS APPROPRIATE. ......................................................................................... 9

       A.     GMO Fails to Demonstrate Irreparable Harm Absent Injunctive Relief. ............. 11

       B.     GMO Has Not Established A Likelihood of Success on the Merits or that the
              Balance of Hardships Tips Decidedly in GMO's Favor. ..................................... 13

       C.     GMO Has Not Established That Injunctive Relief is in the Public Interest. ........ 14

II.    A BOND IS APPROPRIATE GIVEN THE LIKELIHOOD OF HARM FACED
       BY WHINSTONE. ....................................................................................................... 14

CONCLUSION ...................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015) .................................................................................................................14

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) ...........................................14

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) ................10

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) .........................................................13

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552 (S.D.N.Y. 2006) .......................................................................................................15

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) .............................13

*Lerario v. New York-Presbyterian/Queens*, 20-cv-6295, 2023 WL 4847141 (S.D.N.Y. July 28, 2023) ................................................................................. *passim*

*Nat'l Council of Arab Americans v. City of New York*, 331 F. Supp. 2d 258 (S.D.N.Y. 2004) .......................................................................................................12

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964 (2d Cir. 1995) ..........................12

*Toussie v. Allstate Ins. Co.*, 15-cv-5235, 2018 WL 11451597 (E.D.N.Y. Aug. 15, 2018) .......................................................................................................................10

*Treppel v. Biovail Corp.*, 233 F.R.D. 363 (S.D.N.Y. 2006) ..........................................10

*Williams v. Rosenblatt Secs. Inc.*, 136 F. Supp. 3d 593 (S.D.N.Y. 2015) ....................13

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................13

**Other Authorities**

Fed. R. Civ. P. 65 ....................................................................................................9, 14

Whinstone U.S., Inc. ("Whinstone") respectfully submits this memorandum in opposition to the Order to Show Cause for a Temporary Restraining Order to Preserve Evidence and the Status Quo ("Order to Show Cause") filed by GMO Gamecenter USA, Inc. and GMO Internet Group, Inc. (collectively, "Plaintiffs" or "GMO") on July 31, 2023.

## PRELIMINARY STATEMENT

GMO's application for an Order to Show Cause falls far short of meeting the stringent standard for emergency injunctive relief and should be denied.  As a threshold matter, GMO's application appears to be a motion for mandatory injunction in disguise: while purporting to seek relief related to evidence preservation, GMO asks the Court to order Whinstone to perform under a contract that has been terminated by supplying continuous power to GMO's bitcoin mining machines.  GMO has not even attempted to satisfy the very high standard for the mandatory injunction it effectively seeks, nor could it: there is no irreparable harm from the termination of a contract, and GMO can assert a claim for monetary damages if it believes the termination was wrongful.

To the extent that GMO's application is aimed at evidence preservation, it should be denied because GMO (*i*) fails to identify any evidence that has not been preserved, (*ii*) fails to identify any reason why preservation would require Whinstone to perform for three months under a contract that has been terminated, and (*iii*) improperly seeks injunctive relief from an "emergency" of its own making.  GMO also ignores that maintaining the "status quo" will cost Whinstone millions of dollars.  Plaintiffs are not entitled to an emergency injunction that would essentially hijack Whinstone's business and impose substantial costs on Whinstone based on the unsupported assertion that their expert would like to visit GMO's operations on multiple occasions over the course of several months, especially in light of GMO's prior insistence that it had already preserved all relevant evidence for trial.

This lawsuit involves a large number of outdated bitcoin mining machines owned by GMO, many of which are not functioning, that are housed in a 63,000 square foot state-of-the-art bitcoin mining facility in Texas operated by Whinstone (the "Texas Facility") pursuant to a contract between the parties (the "Texas Agreement").  After an unsuccessful settlement conference before Judge Parker, GMO's representatives visited the Texas Facility in March 2023.  Subsequent to that visit, Whinstone noted a substantial increase in activity by GMO personnel at the Texas Facility, including their repair of GMO's dwindling number of machines, as they degrade due to age and GMO's failed maintenance, by cannibalizing the parts from, and then disposing of, multiple other broken machines.  In all, GMO disposed of thousands of its machines during the pendency of this lawsuit.

Given the central importance of the number, condition and functionality of GMO's miners, Whinstone wrote to GMO on May 24 – more than two months ago – raising concerns about GMO's actions in cannibalizing its miners and asking GMO to confirm that it had preserved all evidence concerning its machines prior to their destruction or repair.  (Dkt. No. 73-3 at 1.)  Whinstone also proposed that the parties send experts to the Texas Facility "as soon as possible . . . to preserve all information each party believes will be relevant at trial."  (*Id.* at 2.)

In its May 30 response, GMO denied that its relocation, repair and destruction of its machines constituted spoliation of evidence, insisted that "GMO has preserved *all relevant evidence* concerning the location, functionality, and condition of its machines," and expressly rejected Whinstone's suggestion that the parties send experts to the Texas Facility to ensure preservation of evidence:  "*GMO does not believe that sending a consultant on its behalf for this purpose is necessary.*"  (Dkt. No. 73-4 at 2-3 (emphasis added).)

Despite that clear statement, in subsequent communications, Whinstone repeatedly sought to confirm that GMO did not believe that any other evidence needed to be preserved for trial.  And Whinstone voluntarily delayed removal of GMO's machines for a 30-day period after the Texas Agreement was terminated as of June 29, 2023 to give GMO a further opportunity to preserve any evidence it thought was relevant.  GMO ignored those communications entirely and did not respond.  It was not until Whinstone followed up with GMO on July 24 – two months after Whinstone's first letter and only a few days before GMO's machines were scheduled to be removed – that GMO, for the first time, claimed without elaboration that there was additional evidence to be preserved and demanded that its machines remain installed.  (Dkt. No. 73-9.) GMO did not, however, identify *any* evidence that remains to be preserved.  Nonetheless, Whinstone agreed to postpone removal by an additional four days to accommodate a visit by GMO's expert on August 1 and 2.  GMO's expert has now visited the Texas Facility and observed GMO's machines in operation.

Although GMO now demands that its machines remain in place and powered on for an additional two or three months, it provides absolutely no basis for that delay.  By its own account, GMO has years of detailed performance data on the machines at issue.  In addition, GMO has had its expert on site over the past two days with unfettered access and opportunity to preserve any evidence GMO reasonably needs for trial.  Even in its filings, GMO remains unable to identify any evidence that remains to be preserved, much less any reason why that evidence would need to be collected over a period of months or why its machines should be continuously powered during that period at enormous expense to Whinstone.  GMO's reliance on vague assertions by its expert of a purported need to "observe and document GMO's operating machines on multiple occasions over the course of at least two months" and with the benefit of

having reviewed unspecified "technical documents . . . that will be exchanged over the course of discovery" falls far short of satisfying GMO's burden for the extraordinary relief it seeks.   (Dkt. No. 74 ¶¶ 6-7.)  GMO's continued inability to identify any evidence to be preserved or any concrete basis for further delay raises questions about its motivations for filing this application and suggests it seeks to force Whinstone to continue to perform under a contract that has been terminated.  Doing so will cost Whinstone millions of Dollars and would be extraordinarily prejudicial to Whinstone.

GMO's request for emergency injunctive relief is also inappropriate because its so-called "emergency" is one of GMO's own making.  GMO filed its application for Order to Show Cause fully *two months* after receiving Whinstone's May 24 letter and *one month* after receiving the Notice of Termination, in which Whinstone voluntarily gave GMO until July 29 to remove its machines and preserve any evidence it thought relevant for trial.  If GMO actually believed there was evidence to preserve, it could have promptly sent its expert to visit the Texas Facility back in May per Whinstone's invitation instead of rejecting the idea as unnecessary.  Or it could have raised the issue when it received the Notice of Termination or at any point during the month of July.  Instead, GMO repeatedly ignored Whinstone's letters, waited until after the 30-day period that Whinstone voluntarily offered in good faith had expired, and now runs to this Court at the eleventh hour seeking an expedited hearing and extraordinary relief.

Furthermore, the two- or three-month delay of removal that GMO seeks would result in enormous financial harm for Whinstone, as hosting GMO's machines at the Texas facility involves substantial operating costs – including electrical power and cooling – and would also prevent Whinstone from installing modern, functional bitcoin mining machines capable of

generating millions of dollars of profits.  The requested Order would be extraordinarily

prejudicial to Whinstone.

The Court should deny GMO's application for injunctive relief.

## BACKGROUND

## I.    GMO STATES THAT IT HAS PRESERVED ALL RELEVANT EVIDENCE.

In March 2023, at the direction of Judge Parker following an unsuccessful mediation

session, representatives of GMO visited the Texas Facility.  (Dkt. No. 73-3 at 1.)  Following that

visit, Whinstone noted a significant increase in activity by GMO personnel, which resulted in

thousands of GMO's machines being moved and/or destroyed.  (*Id.*)  Specifically, GMO had a

large number of non-functioning machines, and engaged in a process of attempting to repair

those machines by taking the working parts from several machines and scrapping the remaining

parts as waste.  (Dkt. No. 73-4 at 1-2.)

Because the number, condition and functionality of GMO's machines are highly relevant

to the claims and defenses in this lawsuit, Whinstone wrote to GMO on May 24, raising its

concerns about GMO's actions and asking GMO to confirm the steps it had taken to "preserve

evidence concerning the location, functionality and condition of its machines prior to their

destruction or repair."  (Dkt. No. 73-3 at 1.)  Whinstone also asked GMO to confirm that it had

preserved information from the stream of "real-time data and diagnostic information concerning

the performance of each of its miners," to which only GMO has access.  (*Id.* at 2.)  Whinstone

also proposed that each party "arrange for an appropriate consultant to visit the facility as soon as

possible . . . to preserve all information each party believes will be relevant at trial."  (*Id.*)

In response, GMO defended its practice of relocating, repairing, destroying and disposing

of its machines – a position that is difficult to reconcile with its insistence now that the "status

quo" be maintained through the end of the discovery period.  (Dkt. No. 73-4 at 1-2.)  GMO also

confirmed that it "has preserved all relevant evidence concerning the location, functionality, and condition of its machines, including its real-time data and diagnostic information concerning the performance of its miners." (*Id.* at 2-3.) And GMO expressly rejected Whinstone's suggestion that the parties send experts to the Texas Facility to ensure preservation of evidence, stating that "GMO does not believe that sending a consultant on its behalf for this purpose is necessary." (*Id.* at 3.)

On June 23, Whinstone followed up with GMO again to confirm that any and all relevant evidence "relating to GMO's operations at the Texas Facility" had been adequately preserved. (Dkt. No. 73-5.) Whinstone requested that GMO "promptly let us know if there is other evidence regarding GMO's operations at the Texas Facility that you believe will be relevant at trial so that the parties can ensure it is adequately preserved." (*Id.*) Whinstone made clear that, absent any response from GMO, Whinstone would "otherwise understand GMO's position to be that it has preserved the evidence it believes it needs for trial." (*Id.*) GMO never responded to Whinstone's June 23 letter.

## II.  WHINSTONE TERMINATES THE TEXAS AGREEMENT AND PROVIDES GMO 30 DAYS TO PRESERVE EVIDENCE AND REMOVE ITS MACHINES.

On June 29, Whinstone sent a Notice of Termination to GMO, terminating the Texas Agreement with immediate effect, and powered down GMO's operation at the Texas Facility. (Dkt. No. 73-6.) In the Notice of Termination, Whinstone confirmed its understanding, based on GMO's May 30 letter, that "GMO has preserved all relevant evidence regarding its mining operations at the Texas Facility that it believes it needs for trial." (*Id.*) Nonetheless, acting in an abundance of caution, Whinstone did not immediately remove GMO's machines and instead voluntarily provided GMO with an additional 30 days – *i.e.*, until July 29 – to "preserve any other evidence that GMO believes may be at the Texas Facility which GMO believes would be

relevant at trial." (*Id.*)  Whinstone further expressed its willingness to "coordinate with GMO and its counsel to facilitate a joint process for doing so." (*Id.*)

Remarkably, for nearly one month, GMO completely ignored the Notice of Termination. GMO did not complain about the termination of the Texas Agreement or the shutting off of power to its operations; nor did it raise any concerns regarding preservation of evidence and spoliation.  Instead, GMO acted as though nothing had happened, continuing to send personnel to the Texas Facility but taking no apparent action to either preserve evidence or remove its machines.

With the 30-day period drawing to a close with no response from GMO, Whinstone followed up with a letter dated July 24, urging GMO to begin removing its machines and stating that, in the alternative, Whinstone would remove them beginning on July 29.  (Dkt. No. 73-8.) Despite GMO's refusal to engage on the topic, Whinstone again raised the issue of evidence preservation:  "GMO previously confirmed that it has preserved all relevant evidence concerning its operations at the Texas Facility, but we remain willing to coordinate with GMO to facilitate a joint process for preserving any additional evidence that GMO believes may be relevant." (*Id.*)

GMO finally responded.  After failing to act upon the Notice of Termination for nearly a month, GMO challenged the propriety of the termination and demanded that "Whinstone immediately retract its Notice of Termination and re-supply power to GMO's mining machines at the Texas Data Center."  (Dkt. No. 73-9 at 4.)  GMO also baselessly asserted that Whinstone's powering down and planned removal of GMO's machines constituted destruction of evidence. (*Id.* at 3-4.)[1]  GMO made no attempt to articulate how turning off the power to its machines

---

[1]     GMO also contended that Whinstone improperly failed to preserve security video of "Building A" of the Texas Facility, which houses GMO's operations.  (*Id.* at 4  & n.1.) GMO provides no reason to think that security video showing the *exterior* of Building A

could possibly constitute spoliation; nor did GMO identify any additional evidence to be preserved or explain why it had ignored Whinstone's multiple attempts to confirm that GMO had preserved the evidence it believed it needed for trial.  (*Id.*)

Whinstone responded by letter dated July 26, recounting GMO's failure to respond to Whinstone's letter or engage on the topic of evidence preservation.  (Dkt. 73-10.)  Whinstone also noted GMO's consistent failure to "identify any evidence that remains to be preserved."  (*Id.* at 2.)  Whinstone confirmed that it would begin removing GMO's machines by the July 29 deadline.  (*Id.* at 3.)  Whinstone stated that it "intends to engage a third-party expert to assist with removal and to test GMO's miners as they are removed from the racks."  (*Id.*)  Whinstone invited GMO to "attend or participate in that process" and stated that it "remain[s] willing to discuss the preservation of additional evidence if GMO specifically identifies what it believes should be preserved."  (*Id.*)

GMO has yet to specifically identify any such evidence.

### III.   WHINSTONE AGREES TO FURTHER DELAY REMOVAL TO ALLOW GMO'S EXPERT TO VISIT THE TEXAS FACILITY.

Despite GMO's failure to provide any explanation for its delay or to identify any evidence to be preserved, Whinstone agreed to further delay removal of GMO's machines by four additional days – until August 2 – in order to allow GMO's expert to visit the Texas Facility.  (Dkt. No. 73-11.)  GMO then requested that its expert be allowed to visit on August 1 and 2, and so removal was further postponed to August 3.  In accordance with the Court's August 1 Order, no removal will occur until a decision on GMO's motion.  (Dkt. No. 76.)

---

could possibly have any relevance to GMO's claims, which involve its operations taking place in the *interior* of that building.  Nonetheless, Whinstone agreed to begin preserving that video footage beyond its default 30-day retention period.

As of this filing, GMO's counsel and their expert have had two full days to inspect GMO's machines, although they chose to spend only a few hours at the Texas Facility on August 1 and less than two hours on August 2. During the visit, GMO was permitted to take photographs and videos and preserve any evidence it deemed relevant. The power to GMO's operation was restored during the visit. Once the removal process begins, Whinstone will work with a third-party expert to assist with removal of GMO's miners, each of which will be tested as it is removed. GMO remains welcome to attend or participate in this process.

## IV.    ADDITIONAL DELAY WOULD BE EXTREMELY COSTLY TO WHINSTONE.

Every day that removal is delayed causes substantial financial harm to Whinstone. As set forth in the accompanying Declaration of Heath Davidson, Whinstone faces financial losses of millions of dollars per month if GMO's miners remain in the Texas Facility including both operational costs and lost profits.

## <u>ARGUMENT</u>

## I.    GMO HAS NOT MET ITS BURDEN TO ESTABLISH THAT INJUNCTIVE RELIEF IS APPROPRIATE.

GMO cannot meet the high bar to obtain the "extraordinary relief" it seeks under Rule 65. A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," and it "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lerario v. New York-Presbyterian/Queens*, 20-cv-6295, 2023 WL 4847141, at *4 (S.D.N.Y. July 28, 2023) (citations omitted). To meet the "heavy burden" in seeking a preliminary injunction, a movant must establish "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims . . . plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *Id.*

In the guise of seeking to preserve evidence, GMO asks the Court to order Whinstone to continue to provide power, cooling, security and other services to GMO's operations (allowing GMO to hijack Whinstone's business so it can continue mining bitcoin), in exchange for payment by GMO at the contract rate, and to forgo use of that facility for Whinstone's own, far more profitable mining operation.  Essentially, GMO seeks an order requiring Whinstone to continue to perform all of its obligations under the Texas Agreement, despite the fact that the Texas Agreement has been terminated.  Yet GMO does not – and cannot – demonstrate irreparable harm from the termination of the Texas Agreement, and GMO makes no attempt to show a likelihood of success on the merits, a balance of hardships that tipping decidedly in its favor, or a public interest in an injunction being ordered.

Although the relief it seeks goes well beyond preservation of evidence, GMO asserts that the Court should apply a different standard because the injunctive relief sought relates to the preservation of evidence.  (Dkt. No. 72, GMO Mem. at 10-11.)   GMO's requested relief is a far cry from the preservation orders at issue in the cases it cites.  *See Toussie v. Allstate Ins. Co.*, 15-cv-5235, 2018 WL 11451597, at *1 (E.D.N.Y. Aug. 15, 2018) (storage of boxes of personal items); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 366 (S.D.N.Y. 2006) (preservation of electronic data).  In any event, the various balancing tests that courts have applied for injunctive relief in the context of evidence preservation are no less stringent, and GMO's motion would also fail under those tests as well for the simple reason that GMO fails to identify any relevant and important evidence that would be destroyed in the absence of an order, or to demonstrate that the requested order is not unduly burdensome.  *See Treppel*, 233 F.R.D. at 369-72 (denying application for preservation order).

### A.    GMO Fails to Demonstrate Irreparable Harm Absent Injunctive Relief.

GMO fails to establish that it will suffer irreparable harm absent injunctive relief because it fails to identify what relevant evidence remains to be preserved, much less why that evidence would need to be collected over multiple visits to the Texas Facility over the course of two or three months.  (GMO Mem. 11-12.)  *See Lerario*, 2023 WL 4847141, at *5 (irreparable harm for preliminary injunction not demonstrated where movant "ha[d] not explained" what harm she would face "if the injunction is not issued").  Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Id.* (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).

GMO relies entirely on vague references to evidence that is "at the heart of this dispute" and its desire to have its expert "observe, assess, and document" GMO's machines in operation.  (GMO Mem. 11-12.)  GMO's expert adds nothing in his declaration.   (Dkt. No. 74.)  GMO's inability – even at the stage of running to court seeking emergency relief – to specifically identify any evidence that it believes is at risk of spoliation is remarkable, and it completely undermines GMO's motion.

This deficiency is particularly glaring in light of the fact that GMO confirmed, more than two months ago, that it had already "preserved *all relevant evidence* concerning the location, functionality, and condition of its machines, including its real-time data and diagnostic information concerning the performance of its miners" and therefore, "sending a consultant on its behalf" to the Texas Facility to preserve evidence was not "necessary."  (Dkt. No. 73-4 at 2-3.)  GMO's only response is to assert, without explanation, that Whinstone somehow "elicited confirmations" improperly and then "twisted" those statements.  (GMO Mem. 13.)  That assertion falls flat:  GMO's words mean exactly what they say.  Furthermore, if GMO actually believed there was additional evidence to preserve, it could have identified that evidence and

taken steps to preserve it over the past two months, including in response to Whinstone's June 23, June 29 and July 24 requests.  GMO's gamesmanship should be rejected.

Now, having been granted a further delay of removal (beyond the initial 30-day period Whinstone offered) in order for its expert to visit the site on August 1 and 2, GMO makes the equally unsupported assertion that it will be prejudiced if its expert is not allowed to "observe" GMO's machines in operations over the course of "at least two months, and preferably through the end of the discovery period."  (GMO Mem. 12.)  Again, GMO's expert provides no information in support of this extraordinary request, stating in conclusory fashion that "[i]n order to fully and properly assess the operations of GMO's Bitcoin mining machines . . . , I need to visit the Texas Data Center to observe and document GMO's operating machines on multiple occasions over the course of at least two months."  (Dkt. No. 74 ¶ 6.)  GMO's expert also makes a vague reference to the "benefit" of reviewing "Whinstone and GMO's technical documents concerning GMO's operations," but he does not identify any such documents or explain what information would be contained in those documents.  (*Id.*)  GMO does not explain what "technical documents" about its operations it does not already have, nor has GMO requested any "technical documents" in connection with its expert's visit to the Texas Facility.

The "timing of this motion also undermines [GMO's] argument for irreparable harm." *Lerario*, 2023 WL 4847141, at *6.  "Unreasonable delay may 'preclude the granting of preliminary injunctive relief'" because the movant's "'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'"  *Id.* (quoting *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)).  That is particularly true where, as here, "the emergency created by this preliminary injunction application is of [GMO's] making."  *Nat'l Council of Arab Americans v.*

*City of New York*, 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004).  As the facts set forth above make

clear, GMO's purported need for "emergency" injunctive relief is a problem of its own making:

- GMO rejected Whinstone's May 24 invitation to send experts to the Texas Facility to preserve any evidence GMO believed was relevant for trial;

- GMO ignored Whinstone's June 23 follow-up letter asking that GMO "promptly let us know if there is other evidence regarding GMO's operations at the Texas Facility that you believe will be relevant at trial so that the parties can ensure it is adequately preserved";

- GMO ignored Whinstone's June 29 Notice of Termination, which again sought confirmation that "GMO has preserved all relevant evidence regarding its mining operations at the Texas Facility that it believes it needs for trial"; and

- GMO failed to take advantage of the 30-day period that Whinstone voluntarily provided, in an abundance of caution, to allow GMO to "preserve any other evidence that GMO believes may be at the Texas Facility which GMO believes would be relevant at trial."

(Dkt. No. 73-3, 73-4, 73-5, 73-6.)  Instead, throughout this two-month period, GMO sat idly by

and did not once raise any concerns about evidence preservation (aside from its bizarre concern

about Whinstone's security footage).  As GMO's efforts over the past few days demonstrate, had

they any concerns about evidence preservation, they could have and should have quickly acted

on those concerns.

    **B.**    **GMO Fails to Demonstrate a Likelihood of Success on the Merits Or That the Balance of Hardships Tips Decidedly in GMO's Favor.**

GMO's moving papers are entirely void of an analysis contemplating their likelihood of

success on the merits or whether the balance of hardships "decidedly favors" GMO, which

further necessitates denying their efforts to obtain injunctive relief.

When presenting evidence showing a likelihood of success on the merits, "[l]ikelihood

sets, of course, a higher standard than 'possibility.'" *Lerario*, 2023 WL 4847141, at *7 (quoting

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).  That the moving party

has survived a motion to dismiss has no bearing on whether that party has presented a likelihood

of success on the merits. *Id.* (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). GMO cannot satisfy its burden because "nothing in [GMO's] preliminary injunction papers allows the Court to conclude that [GMO] is likely or clearly likely to prevail on a full record." *Id.*; *see also Williams v. Rosenblatt Secs. Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").

GMO likewise does not establish that the "balance of hardships" tips "decidedly" in its favor. *Lerario*, 2023 WL 4847141, at *8. Under this analysis, the Court "must balance the competing claims of injury and must consider the effect on each party." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As GMO fails to identify any evidence that would not be preserved in the absence of an injunction, there is no basis to conclude that GMO would suffer any injury or hardship. By contrast, as detailed in the accompanying Davidson Declaration, any further delay of allowing Whinstone to remove GMO's machines would "be certain to burden" Whinstone and cost it "substantial resources." *Lerario*, 2023 WL 4847141, at *8.

### C.      GMO Fails to Demonstrate That Injunctive Relief is in the Public Interest.

GMO does not argue that the public interest would be served by the injunctive relief sought, and therefore they have not met their burden on this factor. *Lerario*, 2023 WL 4847141, at *8 (plaintiff failed to show that the requested preliminary injunction was in the public interest where she failed to argue same in the moving papers).

## II.      A BOND IS APPROPRIATE GIVEN THE LIKELIHOOD OF HARM FACED BY WHINSTONE.

The bond requirement of Rule 65(c) is appropriate here because Whinstone has established "proof of likelihood of harm[.]" *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985

(2d Cir. 1996) (citations omitted).  The relief sought by GMO is "extraordinary" and granting it would have "serious implications" on Whinstone.  *Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 WL 9593616, at *18 (E.D.N.Y. Dec. 24, 2015).  An injunction would effectively require compliance with a terminated contract, rather than merely "preserve the preexisting status quo" with respect to the preservation of evidence.  The bond should be based on Whinstone's current losses rather than any amount GMO would have paid under the terminated contract.  Whinstone will lose at least $5 million dollars per month if it is prevented from removing GMO's machines from the Texas Facility.  (Davidson Decl. ¶¶ 8-9.)  There is easily a "rational basis" to support a security requirement here.  *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006).

## CONCLUSION

For the reasons stated above, the Court should deny GMO's Order to Show Cause for a Temporary Restraining Order to Preserve Evidence.


Dated:  August 2, 2023            DEBEVOISE & PLIMPTON LLP

                                 *s/ Maeve L. O'Connor*
                                 Maeve L. O'Connor
                                 Elliot Greenfield
                                 Brandon Fetzer
                                 DEBEVOISE & PLIMPTON LLP
                                 66 Hudson Blvd.
                                 New York, New York 10001
                                 (212) 909-6000
                                 mloconnor@debevoise.com
                                 egreenfield@debevoise.com
                                 bfetzer@debevoise.com

                                 *Attorneys for Whinstone US, Inc.*