August 8, 2023

**Via ECF**

The Hon. John P. Cronan
United States District Judge
U.S. District Court for the Southern District of New York
500 Pearl Street, Room 1320
New York, New York 10007

Re:   *GMO Gamecenter USA, Inc., v. Whinstone US, Inc.*, No. 1:22-cv-5974 (S.D.N.Y.)

Dear Judge Cronan:

Pursuant to the Court's August 2, 2023 Order, ECF No. 80 (the "Order"), we write to provide an update on the status of the parties' negotiations in connection with Plaintiffs GMO Gamecenter USA, Inc. and GMO Internet Group, Inc.'s (collectively, "GMO") motion for a temporary restraining order and preliminary injunction. GMO and Defendant Whinstone US, Inc.'s ("Whinstone") met and conferred on August 3 and August 4 (and exchanged emails after those dates),[1] but have been unable to reach a resolution. Therefore, pursuant to the Order, the parties write with their respective proposals and reasoning behind such proposals.

**GMO's Proposal and Reasoning:** GMO's proposal is guided by: (i) Whinstone's obligation to preserve evidence; (ii) the sworn declarations of GMO's expert, which explain the importance of further assessing GMO's operating machines over a period of at least two months; (iii) Whinstone's failure to refute GMO's expert's explanations; (iv) the Scheduling Order, pursuant to which expert designations and reports are not due until December, and (v) GMO's agreement to pay the contract price for power during the Expert Examination Period.

*First*, GMO's machines should remain installed with the power continuously on for at least two months. As GMO's expert explains, visits spread over the course of an Expert Examination Period of at least two months will permit GMO's expert to: (i) observe varied – and thus, representative – conditions affecting GMO's operations, including, among other things, weather conditions, the number of operational transformers[2] and evaporative walls, the temperatures inside Building A, and other conditions causing Whinstone's failure to supply power (*e.g.*, shutdowns related to demand response or otherwise), and (ii) evaluate machine performance by comparing GMO's data

---

[1] A copy of the parties' correspondence is attached as **Exhibit A**.

[2] During the August 1 and 2 site visit, GMO's expert observed that at least three of Whinstone's transformers supplying power to GMO's machines were inoperable. *See* Hayward Decl. ¶ 6(a). It is important for Whinstone to replace these transformers with working transformers that are not currently servicing Building A within one week of the start of the Expert Examination Period.

against conditions observed at the facility. *See* Supplemental Declaration of Kenyon Hayward ("Hayward Decl."), submitted concurrently herewith, ¶¶ 5-6, 8-9. Moreover, the continuous provision of power over the two-month Expert Examination Period is required so that GMO's expert can observe and document the conditions that affect performance. By way of example, the continuous supply of power is important to GMO's expert's ability to monitor the temperature of Building A (which impacts machine performance), which monitoring is essential in light of the fact that Whinstone does not maintain records concerning the temperature inside of Building A. *Id.* ¶ 7, 10. In addition, powering up and down GMO's machines negatively impacts their performance, as compared to a consistent power supply. *Id.* ¶ 10. Importantly, Whinstone has not offered any explanation—by an expert or otherwise—to refute GMO's expert's explanations.

*Second*, GMO will pay Whinstone for power at the same contract rate as the past several years. For years, GMO has paid Whinstone all amounts due under the parties' contract (the "Texas Agreement"). Continuing this status quo for at least two months will not pose any undue financial burden on either party and properly balances business considerations with the importance of allowing GMO's expert to collect highly relevant evidence. This is precisely what the parties have been doing since the litigation began (and before). *Id.* ¶¶ 4-11. Paying for additional of Whinstone's power costs allegedly related to keeping GMO's machines in operation during the Expert Examination Period is unwarranted because Whinstone has an independent obligation to preserve evidence and because such supposed power costs are unsubstantiated. Further, Whinstone's purported termination of the contract is invalid and should not be allowed to cut off GMO's ability to gather the very evidence that could help prove the termination was wrong and that GMO's claims are meritorious.

*Third*, <u>Whinstone should disclose technical records concerning Whinstone's operations of Building A at least two weeks prior the end of the Expert Examination Period</u>. Analyzing these records before GMO's expert's last visit to the Texas Data Center will allow him to compare the records against observations made during in-person visits, and further allow him to query investigation of certain items ascertained from the records during my in-person visits. *Id.* ¶ 11. Whinstone has no room to argue that this proposal seeks to improperly accelerate discovery, given discovery is set to close on October 27, 2023 – at most, only one month after GMO's proposed Expert Examination Period – and GMO initially requested these documents on April 28, 2023.[3]

**Whinstone's Proposal and Reasoning:**

---

[3] Consistent with the Order, in a good-faith effort to compromise, GMO offered: (i) an Expert Examination Period of six weeks, provided that (a) the power remains up and running, (b) Whinstone replaces the inoperable transformers with working transformers of the same model that are not currently operating/servicing other parts of Building A, and (c) GMO is permitted to install temperature monitoring at the beginning of the Expert Examination Period and through that period; (ii) GMO will pay Whinstone for power at the same rate it paid under the parties' agreement; and (iii) Whinstone need not produce technical documents in connection with this proposal. Whinstone refused.

After refusing to identify what evidence regarding its claims GMO believed remains to be preserved, GMO's proposal makes clear that it seeks to leave its operations in place not to *preserve* evidence but instead to attempt to *recreate* evidence that it has failed to preserve.

A central issue in this case is the reason underlying the poor performance of GMO's bitcoin mining operation. According to Whinstone, the central reason is that GMO's machines are outdated and many of them are not functioning. GMO, on the other hand, has sought to blame the conditions at the Texas Facility without identifying those conditions or how they purportedly impacted the performance of its machines. It now appears that GMO is focused on temperature and dust levels at the Texas Facility. Ultimately, GMO has been in the best position to know what its legal theories are and similarly had an obligation to preserve evidence regarding that theory. Throughout the time the contract was in place, GMO ran its own bitcoin mining operation at the Texas Facility using power supplied by Whinstone. GMO had continuous access to the facility and even had a dedicated space on site for its personnel to test and repair its miners. GMO collected real-time data from the Texas Facility regarding the performance of its miners. And GMO apparently developed a theory during that period that allegedly poor conditions at the Texas Facility somehow impacted the performance of its miners. Throughout that time, GMO had the ability to preserve the evidence it now claims it needs — for example, by taking temperature readings, photographing alleged dust conditions, documenting any issue with the transformers or cooling pumps that underlie its theory of harm. GMO did none of that.

GMO's proposal represents an effort to shift the burden for its own failure to preserve evidence onto Whinstone: at a cost of millions of dollars in lost profits to Whinstone, GMO wants to turn Whinstone's facility into a laboratory for GMO to attempt to gather data that would purportedly be "representative" of prior years.

Furthermore, GMO's own statements undermine its claim that data collected regarding its operations would be "representative" of the period relevant to this lawsuit. GMO does not dispute that it has relocated, repaired and/or destroyed thousands of its machines. Further, GMO asserts, without explanation, that "many changes . . . have occurred at the data center over the course of the Texas Agreement."

As set forth in detail in Whinstone's opposition brief, GMO's proposal is even more unjustifiable considering that Whinstone has repeatedly urged GMO since May 2023 to preserve all any evidence it believed was relevant for trial. (Dkt. No. 78, Opp'n at 5.) GMO initially stated that it had preserved all the evidence it needed and rejected Whinstone's suggestion of sending representatives to the Texas Facility, and then GMO ignored all subsequent attempts to confirm its position. *See id.* at 5-7. It was not until July 24, nearly 30 days *after* the Texas Agreement was terminated, that GMO suddenly switched course and demanded months of additional time to collect unspecified evidence. *See id.* at 7-8.

GMO's position has not changed since filing the Order to Show Cause despite the Court's instruction to meet and confer in good faith to reach a joint resolution. GMO continues to demand an additional eight weeks for its machines to remain powered on. (Dkt. No. 72, GMO Mem. at 16.) This is on top of the six weeks GMO has already had since termination, during

which it has not collected any "evidence." GMO refuses to compensate Whinstone for the costs of powering GMO's machines during this extended period or for Whinstone's lost profits stemming from its inability to install its own, far more powerful bitcoin miners — costs that total millions of dollars per week. Indeed GMO insists on keeping the bitcoin that it would mine during this period of "evidence preservation."

Whinstone does not believe that GMO is entitled to delay deinstallation of its machines any further than it already has. However, in an effort to reach a compromise, Whinstone has offered the following proposal beyond the six weeks GMO had since termination and the ten weeks since GMO confirmed they preserved all relevant evidence and did not need to send an expert to the Texas Facility. Ultimately, Defendant's proposal permits GMO's expert ample time to observe the facility in operation while balancing the financial harm to Whinstone from further delay:

- Whinstone will provide GMO two weeks for its expert to observe GMO's operation, and would not oppose GMO's request to install temperature monitoring devices. During this time, Whinstone will replace certain inoperable transformers that power GMO's machines, which Whinstone expects will take approximately one week. If it takes longer than a week to replace the transformers, GMO will have access to the facility for one week after installation is complete.

- GMO's miners will remain powered on during this approximately two-week period. Within 14 days after the end of the period, GMO will pay Whinstone for the power used at Whinstone's cost and turn over any bitcoin that GMO mined.

- Whinstone's testing of miners that are not currently installed will commence immediately so that the parties have a record of their condition prior to shipment. GMO is welcome to participate in that process.

GMO claims that Whinstone has "fail[ed] to refute GMO's expert's explanations," yet overlooks that GMO has failed to disclose the entirety of its expert's reasoning as it failed to disclose its expert's "supplemental declaration"[4] prior to the filing of this letter. In any event, GMO's proposal goes far beyond the time needed and instead looks more like the reinstatement of the terminated contract:

- GMO does not need eight additional weeks to conduct temperature readings. The high-low outdoor temperature range in Austin varies by over 20 degrees each day, which is a larger swing than GMO would see by visiting the facility at the same time on each visit. For example, the temperature on August 9 is expected to range between 78 and 105 degrees. According to historical records, the average temperature in August 2022 was 83.73 and 78.95 in September 2022.

---

[4] GMO's inclusion of an undisclosed supplemental declaration here is improper where the Court's Order solely requested a "joint status letter" containing each party's reasoning.

- GMO's assertion that it needs eight additional weeks to capture the "variation" that has taken place during the life of the contract only highlights GMO's failure to preserve evidence relevant to its theories.  Moreover, the alleged existence of these supposed changes to the facility undercuts GMO's position that the newly collected data would be representative of GMO's historical operations.

- GMO's speculation that shutdowns or malfunctions will occur during the eight week period does not justify further delay.  It is likely that, even with eight additional weeks of access, GMO's expert will observe nothing of the sort.  To the extent any shutdowns or malfunctions occur, such issues would not necessarily be representative of the conditions while the contract was in place.  GMO's prior failure to preserve evidence of alleged operational issues impacting the performance of their miners — which GMO apparently believes is important to its claims — is not a justification for a mandatory injunction requiring Whinstone to perform for eight weeks under a terminated contract.

- GMO does not need eight additional weeks to observe the number of machines supplied with power.  The number of operating transformers determines the number of machines supplied with power.  Speculation that a transformer may cease to operate is not a basis to insist upon eight weeks of observation.

- GMO's document requests relate to historical materials that would be exchanged during the normal course of discovery.  For example, GMO is seeking records concerning "the location of [its] mining machines," which also is something that GMO could have been tracking all along.  There is no need to accelerate the production of this historical information for purposes of evidence preservation.

GMO's offer to compensate Whinstone at the "contract rate" from the "past several years" is also insufficient.  GMO's proposal ignores the reality that the contract has been terminated, and so paying at this rate would not continue the "status quo."  Instead, it would cause substantial financial harm to Whinstone as the rate for power GMO would pay pursuant to the terminated Texas Agreement is significantly lower than the rate Whinstone pays for power.  GMO also ignores that keeping its machines in place costs Whinstone millions of dollars in lost profits because it prevents Whinstone from installing modern, far more powerful bitcoin mining machines.  Finally, any bitcoin mined by GMO should be turned over to Whinstone since the purpose of this process is to allow GMO's expert to observe its operations, not reinstate GMO's operations.

For these reasons, the Court should adopt Whinstone's proposal.

Respectfully submitted,

| **DEBEVOISE & PLIMPTON LLP** | **HAYNES AND BOONE, LLP** |
|---|---|
| By: *s/ Maeve O'Connor*<br>Maeve O'Connor<br>moconnor@debevoise.com<br>66 Hudson Boulevard<br>New York, NY 10001<br>Tel: 212.909.6000 | By: *s/ Leslie C. Thorne*<br>Leslie C. Thorne<br>Leslie.Thorne@haynesboone.com<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>Tel: 212.659.7300 |
| *Attorneys for Defendant<br>and Counterclaim-Plaintiff* | *Attorneys for Plaintiffs and<br>Counterclaim- Defendants* |