N895gmoC                          phone conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    GMO GAMECENTER USA, INC., *et*
     *al.*,
4
                     Plaintiffs,
5
              v.                        22 Civ. 5974 (JPC)
6                                       Remote Proceeding
     WHINSTONE US INC.,
7
                     Defendant.
8
     ------------------------------x
9                                       New York, N.Y.
                                        August 9, 2023
10                                      2:05 p.m.

11   Before:

12                      HON. JOHN P. CRONAN,

13                                      U.S. District Judge

14                            APPEARANCES

15

16   HAYNES AND BOONE, LLP (NY)
            Attorneys for Plaintiffs
17   BY:  LESLIE C. THORNE
             GIORGIO BOVENZI
18           JASON JORDAN

19

20   DEBEVOISE & PLIMPTON, LLP
            Attorneys for Defendant
21   BY:  MAEVE O'CONNOR
             ELLIOT GREENFIELD
22           BRANDON R. FETZER
             JILLIAN TANCIL

23

24

25

```
 1              (The Court and all parties appearing telephonically)
 2              THE COURT:  Good afternoon.  This is Judge Cronan.  We
 3    are here for GMO Gamecenter USA v.  Whinstone US; 22 Civ. 5974.
 4              Before we begin, I will note that we have a court
 5    reporter joining us for this proceeding.  I will ask counsel to
 6    please be sure to identify themselves when we speak so we have
 7    an accurate transcript.  I also will ask anyone who is not
 8    speaking to please stay on mute so we avoid any background
 9    sound.  And lastly, I remind anyone joining that the Court
10    prohibits recording and rebroadcasting of Court conferences,
11    including this one, and violation could result in sanctions.
12              So let me find out who we have on for the parties.  I
13    will start with the plaintiff.
14              MS. THORNE:  Sure.  This is Leslie Thorne for GMO.  I
15    also have a couple other colleagues on the line.  I will be
16    offering argument but would you like their names for
17    appearances sake?
18              THE COURT:  Thank you, Ms. Thorne; yes, if you can
19    tell me who else is joining you.
20              MS. THORNE:  I have Giorgio Bovenzi is on; Gil Porter;
21    and Jason Jordan.  And I believe that is everyone but if
22    someone else is on, please, just announce yourselves.
23              MR. FREYBERG:  Mike Freyberg as well.
24              THE COURT:  Thank you very much and welcome to
25    everyone.
```

N895gmoC                          Phone Conference

1          For the defendant?

2          MS. O'CONNOR:  Yes, your Honor, Maeve O'Connor of

3    Debevoise & Plimpton for the defendant, and with me are some of

4    my colleagues as well -- Elliott Greenfield, Brandon Fetzer,

5    and Jillian Tancil.

6          THE COURT:  Good afternoon to all of you as well.

7          So the purpose of this proceeding is to address the

8    plaintiff GMO's application for injunctive relief on basically

9    an issue regarding the preservation of evidence that was framed

10   as an injunction but is largely a discovery dispute here.  I

11   have reviewed the submissions from the parties as well as the

12   status letter that was filed yesterday, and the declaration

13   from Kenyon Hayward.  I will ask the parties now if there is

14   anything else you wish to add.

15         Ms. Thorne, since this is your application I will

16   start with you.

17         MS. THORNE:  Sure.  I certainly don't want to repeat

18   everything you have read, but in our view we are here because

19   Whinstone wants to use its wrongful termination of the parties'

20   agreement to shirk its obligation to preserve evidence.  We

21   have put forth testimony from our expert as to exactly what is

22   needed and why, even well, well in advance when our expert

23   disclosures would be due, and well, well in advance of the

24   February 16 close of expert discovery.  That has not been

25   controverted by anything that Whinstone has said.  Essentially,

N895gmoC                          Phone Conference

1    our expert has testified that he really needs two months to

2    observe and test the facility.  Obviously, all the reasons for

3    that are outlined in his declaration, but principally we are

4    talking about, you know, observing conditions bearing directly

5    upon machine operation and performance, the changeover time,

6    like how often the machines get turned on and off, and perhaps,

7    most critically, the temperature, which is a function of

8    exceptionally three things:  The outside conditions, the number

9    and length of time machines are running, and the operation of

10   heat mitigation systems.  Whinstone's only response to that is

11   there are outdoor heat fluctuations over the course of a single

12   day and that we don't really have a basis to say that there are

13   any other changes, malfunctions, anything like that over a long

14   period.  But here, in one visit that we were able to do, three

15   of the 15 or so transformers were broken, part of the cooling

16   system was either not on or not working, and Whinstone

17   represented that that's not representative of the normal

18   conditions but here Whinstone has produced fewer than a hundred

19   documents, they will not agree to produce the technical

20   documents that we have sought, they won't allow us to video or

21   photograph before the one hour, one visit we had, and they've

22   destroyed months and months of video evidence.  So here we are

23   really trying to get the scraps we can to prove our case and

24   that leads to sort of my second point, which is, our expert is

25   informed on the best practices group data mining centers.

N895gmoC                          Phone Conference

1   Whinstone has asserted, as recently in its opposition brief,

2   that it is still a facility that is state of the art.  In the

3   one visit we had we uncovered several circumstances that oppose

4   that but we are working sort of blindly because we don't have

5   any documents or any commitment to what documents even exist.

6   And so, without a fulsome production of anything like that on

7   these issues, we think it is important that our expert has an

8   opportunity to look at the conditions, measure the conditions,

9   so that we can put something together given the lack of other

10  evidence.

11        Against that backdrop, I think if you look at the law

12  it is consistent with this.  Other courts have issued

13  preservation orders, they have issued them for longer than we

14  are seeking.  In our view, we are really not asking for the

15  moon here, we are not even asking for the end of expert

16  discovery, we are simply asking for two months that our expert

17  can get in there, measure what is going on, and observe it.

18        And with that -- I know your Honor you have read

19  everything -- do you have questions for us that we can address

20  for you?

21        THE COURT:  I thank you, Ms. Thorne.  One thing I was

22  trying to understand better and you touched upon this a bit,

23  but your expert does mention a few times that the expert would

24  need at least two months but I am having trouble understanding

25  why a full two months is necessary and not a shorter period of

1    time.  Why would four weeks not be enough here?

2          MS. THORNE:  You know, I am not a Bitcoin expert but

3    obviously we have talked to our expert a good bit about this,

4    and part of the reason is because we have a total dearth of

5    information from Whinstone to go on and so I will give you one

6    example.

7          Our expert has said, for instance, that the

8    temperature inside the building is a critical component to the

9    functioning of the machines.  And that changes depending on how

10   many machines are in service, whether or not the heat

11   mitigation systems are working, as well as the outside

12   temperature, and that changes over time and really affects the

13   way the machines run.  Another thing that affects it is how

14   often the facility is turning on and off the machines because,

15   apparently, the more you turn them on and off, the more likely

16   they are to malfunction, is my understanding.  Here, our expert

17   sort of had to jump into action earlier than, frankly we were

18   ready to, in light of this surprise termination.  And the

19   reason I mention the documents is because our expert -- and I

20   believe this is in his supplemental declaration -- said that

21   most places keep a record of what the temperature inside has

22   been.  Here we learned, just through this process, that

23   Whinstone does not do that, they don't have any record of the

24   temperature.  And so, when we have had the occasion to go once,

25   seen the conditions, those conditions are represented to us by

1   Whinstone folks as not representative, it is especially

2   important for him to have a decent period of time to look at

3   these fluctuations and be able to determine for himself what is

4   representative and what is not when there is no documentary

5   evidence to point to other than that.

6           THE COURT:  Your point then that these, the

7   documentary evidence that might otherwise assist your expert,

8   that that doesn't exist?  Or is it that it has not been

9   produced to you?  It sounds like you are saying that the

10  documents just don't exist.  And I will ask Ms. O'Connor, as

11  well, that.

12          MS. THORNE:  I think it is a bit of both.  They have

13  informed us that the records with respect to temperatures

14  simply do not exist, they don't record that, so that is

15  something that needs to be measured over time to understand

16  what is the heat profile of this building and how is that

17  affecting the machines.

18          With respect to some of the other documents that we

19  have sought, other technical documents about machine

20  performance, functioning of evaporative walls -- the

21  evaporative walls are the cooling system -- records of when

22  power turned on and on off, we don't know if those exist or

23  not.

24          THE COURT:  Can you also address, I guess basically,

25  what happened in July?  The notice of termination was sent on

1   June 29 and your expert arrived there earlier this month, I

2   believe on August 1.  Why didn't more occur in July?

3            MS. THORNE:  Sure.  I think there are sort of two

4   issues issue here.  I know Whinstone has argued why didn't you

5   do this earlier?  There is two periods here, before the

6   termination notice and after the termination notice, and I

7   think what you are most focused on here is after the

8   termination notice.  Whinstone keeps saying we had a month to

9   do these things -- but that is simply not the case.  First,

10  Whinstone cut off the power when they sent the termination

11  notice, not a month later.  So the issue here where we need to

12  observe the machines in action, that was done immediately upon

13  entry of the notice.  Also, I mean, here the termination was

14  out of nowhere, months before the expert designation

15  deadline -- by design, we think -- and in the midst of our

16  repeatedly pushing for the production of video evidence.  So,

17  yes, it did take us three weeks to get our expert up to speed

18  but I had never even spoken to our expert before.  We needed to

19  get him up to speed, review information, talk to his new

20  client, and figure out what was needed.  And I say that because

21  we weren't going to haul off and file, you know, a motion and

22  bother this Court before we figured out what was actually

23  necessary and what he actually needed, which we didn't know

24  before because we thought we had, you know, months to delve

25  into that, especially because we didn't have any document

N895gmoC                         Phone Conference

1    productions for Whinstone.  So that's what that lag was.

2                I also just wanted to note, because it was noted in

3    Whinstone's portion of the joint letter, they also seem to say

4    you should have been doing things before termination.  I just

5    wanted to correct some false statements in there.  First, their

6    argument that we could have been gathering this information is

7    false.  All GMO workers were explicitly prohibited from taking

8    photos or video, as were we, counsel, when we visited in March.

9    Second, these really are expert issues.  We have done

10   everything we can to scramble and try to get an expert up to

11   speed so he could figure out what was needed ever since we got

12   the termination.

13               THE COURT:  I understand that GMO will be paying the

14   hosting fee for the duration of this but it seems to me that

15   that fee is considerably less than what Whinstone otherwise

16   would be receiving for hosting.  Can you address that issue and

17   how that comes into play and the millions of dollars it sounds

18   like Whinstone will be losing out on if I grant the relief you

19   seek?

20               MS. THORNE:  I would be happy to.

21               First and foremost, there is a presumption that

22   parties bear their own costs of preservation.  Second, there is

23   no competent evidence of costs here.  What you have is a

24   totally conclusory affidavit without any corroborating

25   invoices, without even whole numbers.  There is really no

1  foundation whatsoever to support that and, in fact, courts have

2  looked at affidavits just like these and said that they are not

3  competent evidence because they are -- they simply lack

4  foundation.

5         And also I would say, from what we do know is out

6  there, Whinstone has said oh, GMO shouldn't be allowed to just

7  may what they were paying under the contract, they should have

8  to pay market.  But what they leave out is that they don't pay

9  market, they pay the utility under a long-term contract where

10  the price of power they pay is exactly the same, by design, to

11  the amount that GMO pays them.  And so, the idea that they have

12  these other costs is simply false.  They don't.  They are

13  paying for power what we pay them under the contract and that

14  we are happy to continue paying them, even though they bear the

15  costs of preservation here.

16         I would also note that there are statements about all

17  these supposed profits they would have, are also not competent

18  evidence.  There is no evidence that's the case.  The case of

19  *Toussie* we cited in our papers specifically rejects this

20  reasoning.  You can't get out of obligation to preserve

21  evidence just because you might profit from doing so; there it

22  was the sale of valuable property.  And I would also argue that

23  the affidavit that you have in front of you from Mr. Davidson

24  is not credible for two reasons:  One, these machines have been

25  here and up and running for the entire duration of this

1   lawsuit.  This is not something new.  And I would also note

2   that, as reflected in the supplemental affidavit, many of the

3   racks at this facility are just sitting empty.  So, we know

4   that they aren't even using the space that they do have so this

5   argument that, oh, we would be making millions and millions and

6   millions of dollars every month is both without foundation and

7   all evidence to the contrary.

8            THE COURT:  Thank you, Ms. Thorne.  Let me hear now

9   from Ms. O'Connor.

10            MS. O'CONNOR:  Thank you, your Honor.

11            So I would obviously like to respond to a number of

12   things we just heard and I think we have a very different

13   perspective on virtually every aspect of this.  So, just taking

14   a step back to frame up what is at issue, because it does seem

15   we are talking across purposes, we have heard a lot about how

16   GMO is operating blind, they really don't have information they

17   need, and we have unjustly terminated the contract and have ill

18   intent or various assertions like that.  GMO is not operating

19   blind.  This is their facility -- and I will come around to

20   that -- but they have employees on site.  So, this is really

21   not a dispute about evidence preservation and spoliation, it is

22   about GMO wanting to generate evidence at Whinstone's expense

23   to fill in gaps in its case and specifically evidence on

24   matters that have been within GMO's custody and control since

25   the contract began and that GMO has not preserved.  And, the

1    relief that they're seeking here is very extreme.  It is not

2    evidence preservation-type relief, it is a mandatory

3    injunction.  It would require Whinstone to continue to perform

4    under a terminated contract for eight additional weeks and, not

5    for nothing, would permit GMO to continue to mine Bitcoin for

6    gain throughout that period because powering the machines means

7    that they're mining -- all of this at very significant expense

8    to Whinstone.

9            It is not true that Whinstone pays the same rate as

10   the contract rate.  Whinstone's cost for providing power

11   greatly exceeds the contract rate so there is no question that

12   requiring Whinstone to provide power at the contract rate would

13   cause significant loss to Whinstone, and if there is some

14   further documentation that would be helpful around that, we are

15   happy to provide it.

16           This case, obviously, is a contract dispute that

17   relates to Bitcoin mining and I think it is important to

18   understand that GMO partnered with Whinstone to build this

19   facility in Texas to house and power GMO's machines for its

20   operation.  And this whole thing was within GMO's custody and

21   control; it was their machines, this was their network, it was

22   their stream of diagnostic data.  They provided the miners for

23   the Bitcoin mining operation, they had access to the facility.

24   They had their own repair facility on-site, they had their own

25   employees on-site, and they serviced their own machines.  Over

1    time, plaintiffs developed a theory that the conditions at the

2    facility were somehow adversely impacting the performance of

3    their machines and they decided to file suit based on that

4    theory.  They articulated that theory in some type of public

5    filing in Japan saying the poor performance was due to

6    operational conditions.  They have never detailed that theory

7    for us, it is their theory about their claims and it was their

8    obligation to preserve the evidence that they're now saying is

9    critical.  And, that would have been easy to do, they could

10   have taken temperature readings every day outside and inside.

11   They could have looked at which machines were working and not

12   working, and transformers.  It would have been easy for them to

13   do all of this because they were there, their employees were

14   there.

15            I think that, you know, plaintiffs have tried very

16   hard to make this seem fact intensive and complex.  It is

17   actually quite simple.  This isn't a nuclear reactor where they

18   need our key to get inside.  The evidence that they say they

19   need is observational.  And you can tell that from their

20   expert's supplemental declaration which, by the way, we think

21   was completely improper and not disclosed to us until it hit

22   the docket, but it is evidence about temperature, weather,

23   evidence about things that could be observed.  Plaintiffs have

24   had lots of time to preserve this observational evidence, they

25   know what their theory is, we don't.  Their employees have been

1    on site throughout the contract period, they have had three

2    years of operations, more than a year since they filed suit and

3    have had these 10 weeks of time from May 24th through August 2

4    when they filed this motion where we kind of explicitly urged

5    them to collect any outstanding evidence and, you know, they

6    didn't do that.  So we do feel this is an emergency of their

7    own making and, in our view, the request that they are making

8    is essentially trying to use building A of this Texas facility

9    as sort of a laboratory for their expert to test and observe

10   various conditions that plaintiffs base their claims on but

11   previously failed to document.  We see this as evidence

12   creation.

13           Another interesting point to emphasize here, according

14   to plaintiff's argument this experiment is not likely to be

15   useful for obtaining evidence that is representative of

16   conditions at the facility over the course of the Texas

17   Agreement because plaintiffs have repeatedly said that

18   conditions at the facility are already materially changed, and

19   separate and apart from that, plaintiffs themselves have moved,

20   destroyed thousands of machines just since March.  So the

21   situation is not static and the request for eight weeks feels

22   arbitrary, at best, and not based on anything concrete that

23   their expert can point to apart from we just want more time, I

24   want to come back three times on different days because the

25   weather might be more widely different than if I observed

1    continuously for 24 hours for a shorter period when the average

2    temperature change is 20 to 25 degrees.  It just feels like an

3    arbitrary request.  It would impose tremendous expense and

4    burden on Whinstone.  We have a lost opportunity cost of about

5    $4.6 million a month, we have costs of just maintaining their

6    machines with the security and the cooling and the power of at

7    least $900,000 a month, and so we believe that our proposal

8    really strikes an eminently fair balance under these

9    circumstances, that the significant cost to Whinstone of

10   further extending this period of time for GMO to observe the

11   facility in the hope that things might change -- right -- maybe

12   a different transformer will break over time, or maybe if we

13   observe for a longer period of time we will notice that a

14   cooling wall has gone down, or maybe if we observe for a longer

15   period of time we will see a more extreme temperature.  Those

16   are speculative and they're not concrete, they're not real, and

17   we don't feel that that justifies imposing this enormous cost

18   when GMO has had people on-site who apparently made the

19   observations underlying this lawsuit but never preserved them.

20          I would like to just address a couple more points and

21   then obviously I want to see if the Court has any questions,

22   but one was document production, the sense that they're just

23   really struggling to make their case because we are not

24   producing documents.  We are ahead of plaintiffs in document

25   production.  We have done more than they have done and so this

1   is a, I think, a two-way street.  We sent them hit counts,

2   terms for hit counts ages ago.  They just sent us hit counts

3   earlier this week.  They really haven't produced anything.  So,

4   I think that insinuations of foul play are really have no place

5   in this conversation.

6           Finally, this notion of videotapes.  Ms. Thorne

7   suggested that we terminated the contract because they were

8   pressing us for evidence -- videotape evidence.  This is a

9   complete red herring.  There are video security machines

10  outside the facility.  We did not think that those have any

11  conceivable relevance because this isn't a case where we are

12  trying to see, like, who broke into the facility with a crowbar

13  at 2:00 in the morning.  I don't know what relevance that has.

14  There are not operable video machines inside the facility,

15  there haven't been for years, so we just think that whole thing

16  is sort of a red herring that I think cast aspersions on us

17  that are not helpful in resolving this.  And the final point I

18  will make, your Honor, if I may, this is really a situation

19  where we bent over backwards to try to have a conversation

20  about evidence, make sure that they have the evidence preserved

21  that they needed for trial and to make sure that to the extent

22  they were repairing and trashing their own machines, that there

23  was a record of that for the trial.  We raised it several

24  times.  We, starting in May of 2023 after we had seen them

25  disposing of a large number of machines, we followed up to try

1    to confirm their response that they had all the evidence they

2    needed.  They rejected our suggestion of a consultant going in

3    to work together.  You know, this went on and on, and I think

4    we do have a little bit of a feeling of that we acted here in

5    the utmost good faith and that no good deed goes unpunished

6    because we kept offering have 30 days.  OK, we are terminating,

7    we will give 30 days.  Come in, we will work with you.  Then

8    they asked for more time, we gave them more time, they used it

9    to file this motion, so we found it challenging to move

10   productively forward in this conversation, although we feel we

11   have acted tremendously in good faith and don't appreciate the

12   insinuation to the contrary.

13           I would be happy to answer any questions, your Honor,

14   if you have them for me.

15           THE COURT:  Thank you.  Can you help me understand why

16   the decision to send the termination notice was made on

17   June 29?  What prompted that?

18           MS. O'CONNOR:  I think just ongoing -- these were

19   issues that were frustrating to the parties and constituted a

20   material breach because the plaintiffs were supposed to be

21   negotiating with us in good faith to have a new agreement in

22   place, they were supposed to be utilizing their maximum power,

23   and they would not engage on any of these fronts.  We had had a

24   couple of failed efforts to engage with them regarding these

25   issues and felt that, you know, enough already, it was time to

 1   send termination notice, that we were within our rights to

 2   send.  It was not related to video evidence, certainly.

 3              THE COURT:  What I was trying to understand what this

 4   sounds like, the former attorney before I believe you came on

 5   this case, raised this issue of a breach back in mid-2022 and

 6   then the termination notice wasn't until about a year later.

 7   Is that because there were discussions going on in the interim,

 8   I take it?

 9              MS. O'CONNOR:  Yes, there were efforts in the interim,

10   is my understanding, to make progress.  From our perspective,

11   not successful at all.  The parties had a failed mediation,

12   there were various efforts to see if there was a way to resolve

13   this without continuing down the road of litigation, which is

14   where termination had the possibility of going.

15              THE COURT:  Ms. O'Connor, there was one allegation, I

16   believe, on page 12 of GMO's brief, that Whinstone had taken

17   steps to prevent GMO's ability to assess the machines by

18   cutting the power supply and removing the machine from

19   operations.  Can you address that?

20              MS. O'CONNOR:  I apologize, your Honor.  One moment?

21              (pause)

22              MS. O'CONNOR:  Where was this your Honor?  Page 12 of

23   their brief?

24              THE COURT:  I believe so.  Give me one moment.

25              MS. O'CONNOR:  I will try to find it but it may be a

N895gmoC                        Phone Conference

 1 | reference to termination that we cut the power upon sending the

 2 | notice of termination and said that we intended to de-install

 3 | their machines but would provide a 30-day period for them to

 4 | come in and do whatever they needed to do if they felt there

 5 | was evidence they needed to preserve, which they already told

 6 | us they didn't think was the case.

 7 |         THE COURT:  What I was referring to here is the last

 8 | paragraph on page 12 references Whinstone having cut the power

 9 | supply to GMO's machines and it wasn't clear to me what exactly

10 | that was referring to.  Can you help me with that?

11 |         MS. O'CONNOR:  I believe, your Honor, that is a

12 | reference to the termination.

13 |         THE COURT:  I will ask everyone to give me a moment

14 | here.

15 |         (pause)

16 |         MS. THORNE:  If I may, because I think we are talking

17 | about my brief, if I can elucidate?

18 |         THE COURT:  This is Ms. Thorne.

19 |         MS. THORNE:  Is this the part where it says GMO has

20 | alleged that Whinstone failed to provide sufficient power,

21 | etc., etc.?

22 |         THE COURT:  Thank you, yes.

23 |         MS. O'CONNOR:  I thought it was the bottom paragraph

24 | of page 12.

25 |         THE COURT:  So, Ms. Thorne, in part you have

1    referenced mainly the second sentence from the last paragraph

2    because Whinstone has cut the power supply to GMO's machines

3    and plans to unilaterally remove GMO's machines from operation.

4    I understand the second part, the plaintiff's view to remove

5    the machine, but the reference to Whinstone having in the past

6    cut the power supply, what are you referring to there?

7         MS. THORNE:  Yes.  In March 2022, Whinstone removed

8    tens of thousands of machines from operation and moved them to

9    another building.

10        THE COURT:  I see.

11        MS. THORNE:  That is part of the reason.  As they know

12   there has been significant correspondence on this, why video is

13   important and should have been maintained and was not because

14   there has been a dispute between the parties about where those

15   machines were moved to and how they were treated.

16        THE COURT:  What is the relevance of this video from

17   your perspective then, Ms. Thorne?  It sounds like from

18   Ms. O'Connor that this video evidence wouldn't have been that

19   useful either way.

20        MS. THORNE:  Sure.

21        From our perspective it is critical because of that

22   very issue.  One of the things, one of the many things that

23   Whinstone has done here is they have not provided sufficient

24   power and they have removed our machines without cause and

25   thrown -- mistreated them and thrown them around into piles in

1    another building.  They have said they did not do that.  And

2    so, we have been asking for the video evidence of this for some

3    time.  They only recently said that the video evidence is

4    destroyed every 30 days so they would keep only the previous 30

5    days.  In addition to those videotapes, Whinstone was

6    videotaping our workers while they were working and in the

7    facility and they have not produced those either.  I don't know

8    if those have been destroyed also but they have not been

9    produced.

10          And with respect to whether we could have created this

11   documentation, we could not.  Every time someone enters the

12   facility, including the GMO workers, they have to sign an

13   agreement that they will not video, they will not modify

14   anything in the facility, they will not take any photographs,

15   they will not record anything in any way, or they are not

16   permitted entry.  So the idea that this could have been

17   preserved by us, the conditions of the facility, is simply not

18   accurate.  They were specifically forbidden from doing that.

19          And I wanted to address a couple of other things but I

20   didn't want to interrupt your Honor, if your Honor is still

21   asking Ms. O'Connor questions.

22          THE COURT:  No, you may continue, Ms. Thorne.

23          MS. O'CONNOR:  OK.  I would like to respond to a

24   number of the things we just heard but I will wait.

25          THE COURT:  Actually, why don't we stay on one topic

1    at a time then.  So Ms. Thorne, I will go back to you in a

2    moment.

3              MS. THORNE:  Sure.

4              THE COURT:  Ms. O'Connor.

5              MS. O'CONNOR:  OK.  I do feel that the level of

6    accusations here is truly not productive but I need to respond

7    to some of this.  GMO has never used the power allotted to it.

8    There is no basis for the suggestion that we did not adequately

9    power their machines apart from the limited transformer issue

10   that's been discussed.  Their machines are not functional, they

11   are old, they are broken down, and the issue that arose in

12   March of 2022 is not -- I don't think the facts around that

13   have any relevance to whether evidence is being preserved now,

14   I don't think there is relevance to any issues before this

15   court.  But, fundamentally, they had so many non-functional

16   machines that it was causing the entire facility to fail.  So

17   what Whinstone had to do was gather up non-functional machines

18   and put them in another room for testing and consolidate so

19   that the system would work.  And that's not something that

20   videotape is needed to establish.  I still don't see any

21   relevance of that.  There is no truth to the assertion that

22   their people were videotaped inside the facility because there

23   aren't working interior videotape machines.

24              I just, I feel that we are going in an unproductive

25   direction of a lot of insinuation that's not really on point

1   for the issues that are before the Court today and I hope that

2   we can stay in a more productive type of conversation.

3          In terms of there is a standard visitor form that I

4   think says don't take photographs.  They never asked to take

5   video.  Nothing prevented them from taking temperature

6   readings, nothing prevented them from documenting their dust

7   findings in other ways and comparing the outside temperature,

8   and I think the important thing to emphasize is that we can't

9   read their minds but they have a theory on which they sued us

10  based on observations that they did not document, and then they

11  let another year go by, still without documenting them, and

12  then they let another 10 weeks go by, still without documenting

13  them, and now want to hold us up for two more months so that

14  they can create evidence that they will argue is or is not

15  representative of prior conditions and, fundamentally, our view

16  is that just doesn't make any sense.

17         MS. THORNE:  If I may, your Honor, respond?

18         THE COURT:  You may, briefly.

19         MS. THORNE:  Everything you just heard from

20  Ms. O'Connor I think proves the point of why it is important to

21  document the conditions at this facility.  Whinstone's

22  expression of surprise that we are identifying these problems

23  is not well taken.  We are not the only ones making these

24  arguments, there are other suits against them by other

25  customers that alleged just these problems with how they have

1   kept their facility, and I think what you just heard from

2   counsel was a lot of complaint about GMO not using the allotted

3   power.  First and foremost, that was the basis of their

4   termination, supposedly, although one can simply take a quick

5   look at the Texas agreement and see that there is no obligation

6   to use any amount of power.  But that, I believe, is not an

7   issue for today, we are not trying to argue the merits but I

8   think it is worth noting here.

9           THE COURT:  Let's just stick to the issues to be

10  resolved in your application.

11          MS. THORNE:  Sure.

12          One other issue is that counsel expressed that we

13  still have not told them our theory or the reasons we need

14  this, citing the statement that they never saw the supplemental

15  declaration.  On the first meet and confer call they asked us

16  to explain exactly that.  And I will tell you, I was not crazy

17  about doing that and having to provide them significantly more

18  information about exactly what our expert is doing and why,

19  when they have no like obligation.  That being said, we sent

20  them a very detailed e-mail that went through all of the things

21  that are in the supplemental declaration.  They have provided

22  no response, no meaningful response to that at all, no expert

23  of their own to say, no, you don't need this.  And so, to come

24  now and say, well, you really don't need it because you should

25  have done it before when we were specifically barred from doing

1     that, doesn't land well.

2             THE COURT:  Thank you.  Unless there is anything else

3     you would like to address, Ms. Thorne?

4             MS. THORNE:  No, not unless you have any other

5     questions.

6             THE COURT:  I don't.  I will just ask you to give me

7     one moment here.

8             MS. THORNE:  Sure.

9             (pause)

10            THE COURT:  Thank you all for your patience.  I will

11    now issue my ruling on this dispute, and I will state now on

12    the record the reasons for my conclusion.  I will follow this

13    with a brief written order.

14            Under federal common law and many procedural rules

15    that govern discovery, litigants in federal cases have a duty

16    to preserve documents and property that could potentially serve

17    as evidence in a lawsuit and courts have the authority to issue

18    preservation orders to enforce litigants preservation

19    obligations.  The cite for that is *Toussie v. Allstate*

20    *Insurance Co.*, 2018 WL 11451597 and August 15, 2018 decision

21    from the Eastern District of New York in which Judge Ross also

22    collected cases for that proposition.  Such preservation orders

23    are especially appropriate where there is a reasonable

24    probability that pertinent or relevant information will be lost

25    or destroyed, or the risk of loss or destruction in the absence

1   of Court intervention.  While the Second Circuit has not

2   directly addressed the question of what standard a Court should

3   apply in determining whether to enter a preservation order

4   related to tangible property, courts in the Second Circuit have

5   generally rejected the view that a party seeking a preservation

6   order must also meet the usual requirements for a preliminary

7   injunction.  And *Toussie* is a cite for that as well.  Instead,

8   courts faced with motions to preserve certain discovery items

9   have applied a balancing test which considers three factors:

10          First, the level of concern the Court has for the

11  continuing existence and maintenance of the integrity of the

12  evidence in question in the absence of an order directing

13  preservation of the evidence; second, any irreparable harm

14  likely to result to the party seeking the preservation of

15  evidence absent an order directing preservation; and third, the

16  capability of an individual, entity, or party, to maintain the

17  evidence sought to be preserved not only as evidence as to the

18  evidence's original form, condition, or contents, but also the

19  physical, spatial, and financial burden created by ordering

20  evidence preservation.  And the cite for that is *In Re:  Matter*

21  *of Complaint of Specialist LLC*, 2016 WL 6884919, a November 22,

22  2016 decision out of this district from Judge Karas.

23          The first factor, which is the danger of destruction,

24  clearly points in favor of preservation.  The defendant

25  (Whinstone) sent the plaintiff (GMO) a notice of termination on

N895gmoC                          Phone Conference

1    June 29, 2023.  That notice stated that Whinstone would remove

2    GMO's machines in 30 days, which would have been on July 29th.

3    Whinstone then sent a follow-up letter on July 24th urging GMO

4    to remove their machines and also warning that Whinstone would

5    remove the machines itself starting on July 29.  Whinstone then

6    gave the plaintiffs one final chance until August 2nd to remove

7    the machines.  And as of today it very well may be the case

8    that the only reason that Whinstone has not removed the

9    machines is because I issued orders directing that they refrain

10   from doing so including by disconnecting and/or disposing the

11   machines until further order.

12       So as to the first factor, I find that removal of

13   GMO's machines would be imminent absent further judicial

14   intervention.

15       The second factor which looks at the likelihood of

16   irreparable harm to the party seeking preservation also points

17   in GMO's favor.  This action centers around a contract for

18   Whinstone to host Bitcoin mining machines at its facility.  GMO

19   alleges that Whinstone failed to provide adequate power to the

20   machine, had improperly removed the machine from operation, and

21   failed to provide a fully functioning host center for the

22   machine.

23       Now, Whinstone on the other hand contends that the

24   machines are outdated or inoperable, therefore evidence about

25   the operations of GMO's machines is critical to the parties'

1    claims in this case as well as the defense's.  And GMO's

2    expert, Mr. Hayward, avers that in order to fully and properly

3    assess the operation of those Bitcoin mining machines, he needs

4    to observe and document them on multiple occasions in operation

5    under conditions that they would have been in during the terms

6    of the contract.

7           Now, the third factor, however, which looks at the

8    burden of preservation points more in favor of Whinstone.

9    Whinstone's vice president of operations avers in his

10   declaration that continuing to host GMO's Bitcoin mining

11   machines at its facility would cost approximately $900,000 per

12   month, and while GMO has agreed to compensate Whinstone for

13   continuing to host their machines at the same contract rate as

14   it has paid in the past several years, that will not account

15   for the approximately 4.6 million in lost profits per month

16   that Whinstone estimates it will suffer by not being able to

17   host newer, more efficient, and far more profitable machines in

18   the space currently occupied by GMO's machines.

19          When considering the facts I also note that GMO has

20   been on notice of Whinstone's plan to remove their machines

21   from its facility since at least June 29, 2023, but as

22   Ms. Thorne notes, it certainly would take time to bring the

23   expert up to speed.  But even taking that into account, it

24   still was not until earlier this month that GMO's expert

25   finally arrived at Whinstone's facility.

1          Also, I note that this case is still relatively early

2      on in discovery.  I referred this case to Judge Parker for

3      general pretrial supervision and I understand from the docket

4      that Judge Parker has set a fact discovery deadline of October

5      27th, 2023, and an expert discovery deadline of February 16,

6      2024.  I note that for the reason that is at least somewhat

7      understandable that GMO may not have otherwise felt an urgency

8      in sending its expert to the Whinstone facility.

9          Having weighed all of these factors, I find that the

10     continued preservation of evidence that the plaintiff GMO

11     requests is appropriate but not for the full period of time

12     that GMO is requesting.  Specifically, and as will be noted in

13     a written order, I order that Whinstone shall refrain from

14     disconnecting and/or removing GMO's machines from its Texas

15     facility for another five weeks.  That will come to September

16     13th, 2023 at 5:00 p.m.  During this time, GMO's expert shall

17     have access to the machines to conduct any observations, gather

18     any evidence as necessary, and do whatever he needs to do to

19     perform the evaluation that is appropriate.

20         GMO shall pay Whinstone for continuing to host their

21     machines at the same rate as the past several years, and such

22     payment shall be due by September 27th, 2023, two weeks after

23     the period of preservation expires.

24         I also note that GMO's machines shall remain

25     operational solely for the purposes of evidence preservation

N895gmoC                          Phone Conference

1   and collection.  Ms. O'Connor touched upon this a bit earlier

2   so I will address it.  To the extent that GMO derives any

3   independent value from their machines remaining operational at

4   Whinstone's expense, Whinstone may amend its answer to assert

5   any counterclaim based on such unjust enrichment, and if that

6   is appropriate, any amended answer should be filed by September

7   27, 2023.

8           As I mentioned, a written order will follow and most

9   likely be on the docket later today or, at the latest, early

10  tomorrow.

11          Are there any other matters that we need to address,

12  Ms. Thorne, from GMO's perspective?

13          MS. THORNE:  No.  I think that is all we need.

14          THE COURT:  And Ms. O'Connor?

15          MS. THORNE:  Thank you, your Honor.

16          THE COURT:  Thank you.

17          Ms. O'Connor?

18          MS. O'CONNOR:  Yes.  One final thing, your Honor.  I

19  do need to be clear that the power in the Texas facility is

20  subject to curtailment pursuant to the Electric Reliability

21  Council of Texas Mandates (ERCOT), and GMO had expressly agreed

22  to this, so I just need to be clear in any order that to the

23  extent there is curtailment pursuant to ERCOT mandate, that

24  that is not impermissible.

25          THE COURT:  Ms. Thorne, I take it there is no

N895gmoC                          Phone Conference

1    objection to that?

2              MS. THORNE:  No.  We do not want them to violate any

3    regulatory obligations they have.  We don't know the extent of

4    those regulatory obligations but to the extent that ERCOT is

5    requiring them to do that, that's fine.  We have already made a

6    claim to some of those profits and would maintain that claim

7    but I think that's an issue for another day.

8              THE COURT:  And Ms. O'Connor, just so I have the

9    language correct with respect to ERCOT, first of all, that's

10   the Electric Reliability Council of Texas; is that right?

11             MS. O'CONNOR:  That's correct.

12             THE COURT:  How would you propose that I phrase that

13   in the order?

14             MS. O'CONNOR:  That the machines will be powered on

15   subject to any curtailment requested or required by ERCOT.

16   There is an agreement with ERCOT that GMO is aware of that

17   Whinstone is a party to, and pursuant to that agreement we are

18   required to curtail from time to time.  I am not positive if I

19   have the exact language which is the only reason I am saying

20   requested or required by ERCOT.

21             THE COURT:  Yes.  I will include language that says

22   something along the lines of:  *The machines shall remain*

23   *powered on through September 13, 2023, subject to any*

24   *curtailment requested or required by the Electric Reliability*

25   *Council of Texas.*  So hopefully that covers it.

N895gmoC                          Phone Conference

1          MS. THORNE:  This is Leslie Thorne.

2          May we ask for a copy of that agreement so we can see

3   what is required?

4          THE COURT:  Ms. O'Connor, do you have any objection to

5   providing that?

6          MS. O'CONNOR:  No.  I would think that they already

7   have it because GMO agreed to it, but I have no objection.  I

8   will speak to my client.

9          THE COURT:  Thank you, all.  And I hope everyone has a

10   good rest of the day.  Take care.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25