**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC.,<br><br>*Plaintiffs,*<br><br>- against -<br><br>WHINSTONE US, INC.,<br><br>*Defendant.* | Case No. 22-cv-5974-JPC-KHP |
| WHINSTONE US, INC.,<br><br>*Counterclaim Plaintiff,*<br><br>- against -<br><br>GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC.,<br><br>*Counterclaim Defendants.* | **AMENDED ANSWER TO THIRD AMENDED COMPLAINT <u>AND COUNTERCLAIMS</u>** |

Defendant Whinstone US, Inc., by and through undersigned counsel, for its Amended Answer to the Third Amended Complaint (the "Complaint") and Counterclaims against Defendants GMO Gamecenter USA, Inc. ("GMO USA") and GMO Internet Group, Inc. ("GMO-I" and together with GMO USA, "GMO" or "Plaintiffs"), alleges as follows:

1.      Whinstone denies the allegations in paragraph 1 of the Complaint, except admits that Plaintiffs purport to allege a claim for breach of contract and admits that Exhibit A to the Complaint is a copy of the W Colocation Services Agreement (Texas) entered into on October

16, 2019 between Plaintiffs and Whinstone without subsequent amendments.  The W Colocation

Services Agreement (Texas) with amendments is referred to herein as the "Agreement."

2.      Whinstone denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 2 of the Complaint.

3.      Whinstone admits the allegations in paragraph 3 of the Complaint.

4.      Whinstone admits the allegations in paragraph 4 of the Complaint.

5.      Paragraph 5 of the Complaint contains legal conclusions to which no response is

required.  To the extent a response is required, Whinstone admits that venue is proper in the

County of New York.

6.      Whinstone denies the allegations in paragraph 6 of the Complaint and refers to the

Agreement for its terms, except Whinstone admits that this Court has jurisdiction over this

matter.  To the extent the allegations in paragraph 6 contain legal conclusions, no response is

required.

7.      Whinstone denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 7 of the Complaint.

8.      Whinstone denies the allegations in paragraph 8 of the Complaint, except admits

that Whinstone operates data centers, including a data center in Rockdale, Texas, that are

intended for cryptocurrency mining, that it offers its facilities to customers conducting bitcoin

mining, and that Whinstone was acquired by and became a wholly owned subsidiary of Riot

Blockchain, Inc., a Nevada corporation, as of May 26, 2021.

9.      Whinstone denies the allegations in paragraph 9 of the Complaint, except admits

that bitcoin mining involves the running of algorithms in return for which bitcoins can be

received.

10.     Whinstone denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint, except admits that Whinstone offers services to its customers pursuant to, among other things, various colocation agreements, one example of which was the Agreement with Plaintiffs.

11.     Whinstone denies the allegations in paragraph 11 of the Complaint, except admits that Bitcoin is a large and growing business, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11, and refers to publications by CoinMarketCap for their contents.

12.     Whinstone denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint.

13.     Whinstone denies the allegations in paragraph 13 of the Complaint, including the allegation that Aroosh Thillainathan was an officer or representative of Whinstone in June 2018, except that Whinstone (i) denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 concerning Mr. Thillainathan's attendance at any conference or contemporaneous discussions with GMO, and (ii) admits that Whinstone had discussions and meetings with Plaintiffs prior to November 2018 concerning a business relationship.

14.     Whinstone denies the allegations in paragraph 14 of the Complaint, except admits that Exhibit B to the Complaint is a copy of the W Colocation Services Agreement (GMO Internet Group) entered into on November 28, 2018 between Whinstone US, LLC (the predecessor-by-conversion of Whinstone US, Inc.) and GMO-I (the "Louisiana Agreement"), and refers to the Louisiana Agreement for its terms.

15.     Whinstone denies the allegations in paragraph 15 of the Complaint and refers to the Louisiana Agreement for its terms, except admits that Whinstone began operations at its Louisiana data center and that disputes relating to the Louisiana Agreement were resolved by the Agreement.

16.     Whinstone denies the allegations in paragraph 16 of the Complaint, except admits that GMO-I made certain demands for payment in reference to the Louisiana Agreement.

17.     Whinstone denies the allegations in paragraph 17 of the Complaint and refers to the Louisiana Agreement for its terms, except admits that Whinstone operates a facility in Rockdale, Texas.

18.     Whinstone denies the allegations in paragraph 18 of the Complaint, except admits that Whinstone entered into the Agreement with Plaintiffs on or about October 16, 2019, and refers to the Agreement for its terms.

19.     Whinstone denies the allegations in paragraph 19 of the Complaint and refers to the Agreement for its terms.

20.     Whinstone denies the allegations in paragraph 20 of the Complaint and refers to the Agreement for its terms.

21.     Whinstone denies the allegations in paragraph 21 of the Complaint.

22.     Whinstone denies the allegations in paragraph 22 of the Complaint and refers to the Agreement for its terms.

23.     Whinstone denies the allegations in paragraph 23 of the Complaint and refers to the Agreement for its terms.

24.     Whinstone denies the allegations in paragraph 24 of the Complaint, except admits that it paid to Plaintiffs the Initial Deposit and Loss of Profit by Power Suspension under the Agreement in the amount of approximately $7.9 million in July 2020.

25.     Whinstone denies the allegations in paragraph 25 of the Complaint.

26.     Whinstone denies the allegations in paragraph 26 of the Complaint, except admits that the parties had communications concerning the hosting fee amount.

27.     Whinstone denies the allegations in paragraph 27 of the Complaint.

28.     Whinstone denies the allegations in paragraph 28 of the Complaint.

29.     Whinstone denies the allegations in paragraph 29 of the Complaint.

30.     Whinstone denies the allegations in paragraph 30 of the Complaint.

31.     Whinstone denies the allegations in paragraph 31 of the Complaint and refers to the Agreement for its terms.

32.     Whinstone denies the allegations in paragraph 32 of the Complaint and refers to the referenced Form 10-K for its contents, except admits that, during Winter Storm Uri, the electricity supply decreased, and that Whinstone, at its power supplier's request pursuant to ERCOT load response instructions, interrupted the supply of electricity to its customers (including GMO), equally, and authorized its power supplier to redirect power for sale by Whinstone's power supplier on the ERCOT marketplace.

33.     Whinstone denies the allegations in paragraph 33 of the Complaint and refers to the referenced Form 10-K for its contents.

34.     Whinstone denies the allegations in paragraph 34 of the Complaint and refers to the referenced Form 8-K for its contents.

35.     Whinstone denies the allegations in paragraph 35 of the Complaint and refers to the Agreement for its terms.

36.     Whinstone denies the allegations in paragraph 36 of the Complaint and refers to the Agreement for its terms.

37.     In response to paragraph 37 of the Complaint, Whinstone repeats and realleges its answers to the foregoing paragraphs as if fully set forth herein.

38.     Whinstone denies the allegations in paragraph 38 of the Complaint, except admits that the Agreement was enforceable until its termination on June 29, 2023.

39.     Whinstone denies the allegations in paragraph 39 of the Complaint.

40.     Whinstone denies the allegations in paragraph 40 of the Complaint.

41.     Whinstone denies the allegations in paragraph 41 of the Complaint.

## AFFIRMATIVE DEFENSES

Whinstone, without assuming the burden of proof concerning matters upon which Plaintiffs bear such burden, for its affirmative defenses alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claim is precluded by their own material breaches of the Agreement, including, without limitation:  (i) Plaintiffs' failure to negotiate in good faith the terms of a new colocation agreement based on the hosting agreement usually offered by Whinstone for colocation services pursuant to Section 20.6 of the Agreement; (ii) Plaintiffs' failure to make use of available power at levels contemplated under Section 4.3 of the Agreement, including their failure to negotiate in good faith and agree and pay for the minimum power draw to which they committed under Section 4.3.3; and (iii) Plaintiffs' failure to pay the increased costs of Whinstone's electricity supply resulting from Electric Reliability Council of Texas ("ERCOT")-mandated surcharges imposed by Whinstone's utility provider pursuant to power provider regulations promulgated by

the Texas Public Utility Commission (the "PUC") in response to Texas House Bill 4492, which became effective as of May 30, 2021.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claim for damages relating to their alleged Loss of Profit by Power Shortage is also barred by their material breaches of the Agreement (§ 16.3).  The parties agreed to the terms of Section 16.3 of the Agreement because at the time of the Agreement, Plaintiffs had alleged a Loss of Profit by Power Shortage, but had not identified the amount of this alleged loss nor provided any backup information supporting the alleged loss.  In order to move forward with the Agreement, the parties agreed to defer agreement on the amount of any Loss of Profit by Power Shortage.  As a result, Section 16.3 anticipated and required that Plaintiffs, acting in good faith, would thereafter identify the amount of their alleged loss and provide the supporting backup materials reasonably necessary for Whinstone to evaluate the loss claim, following which the parties would reasonably agree on the amount and duration of a reduced hosting fee to cover the alleged loss, if any.  Plaintiffs breached this duty after the Agreement was signed by failing to identify the amount of its alleged loss until April 2021, and even in the April 2021 proposal, have failed to provide any explanation of how the amount of such alleged loss was calculated or any supporting backup materials reasonably necessary for Whinstone to evaluate the loss claim. This failure prevented Whinstone from reasonably determining the amount of the reduced hosting fee and amount of time that the reduced hosting fee should be charged, if any.  Plaintiffs' breach therefore prevented Whinstone's performance and bars any claim by Plaintiffs for failure to provide a reduced hosting fee.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs are barred from recovery of the claimed amount of $35 million in Loss of Profit by Power Shortage because they previously represented to Whinstone that the maximum amount

of any Loss of Profit by Power Shortage was no more than $3 million.  In April 2021, more than 18 months after the Agreement was signed, and after the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost had been repaid to Plaintiffs in full, GMO proposed that Whinstone repay the alleged Loss of Profit by Power Shortage by reducing Whinstone's hosting fee by 0.0075 USD/kWh (from 0.0285 to 0.0210 USD/kWh) for a period of one year.  Based on GMO's average power usage, that fee reduction would have resulted in a Loss of Profit by Power Shortage amount of no more than approximately $3 million.  Although GMO never provided any basis or back-up documentation for the approximately $3 million amount of the alleged "loss," they are now barred and foreclosed from seeking an undocumented claim for damages amount more than 10 times higher than the Loss of Profit by Power Shortage amount first claimed by GMO in April 2021.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate their alleged damages, including by failing to use even the minimum power draw to which they agreed under Section 4.3 of the Agreement, failing to identify the amount of their alleged Loss of Profit by Power Shortage and include an explanation of the calculated amount and supporting backup materials reasonably necessary for Whinstone to evaluate the loss claim so that Whinstone could address this obligation, and failing to engage substantively with Whinstone in attempts to resolve this matter.

Plaintiffs also failed to mitigate their damages by failing to maintain, repair and upgrade their equipment to current standards, which would have avoided the removal of non-operable equipment and instead permitted them to use the power made available to them.

## FIFTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs suffered damages, which Whinstone denies, such damages arise from Plaintiffs' own actions and breaches.  For example, Plaintiffs failed to maintain and repair

their equipment and continued to keep in place and use outdated and non-functioning equipment, requiring Whinstone to attempt to service malfunctioning machines without the requisite parts – ultimately forcing Whinstone to disconnect broken-down machines and consolidate GMO's functioning machines in GMO's Licensed Area.  Further, despite the availability of additional capacity, Plaintiffs have failed and refused to supply additional, functioning and/or upgraded equipment or replacement parts to make use of the available power.  Plaintiffs have further failed to mitigate their alleged losses, and in fact increased their alleged losses, by refusing to accept or negotiate in good faith over favorable terms Whinstone offered in March 2022, which would have resulted in the use of upgraded equipment funded by Whinstone that would have created greater revenues to Plaintiffs than were possible using their existing older, degrading, and often non-functioning equipment.

### SIXTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs allege Whinstone breached Section 3.1.3 of the Agreement by removing equipment, this provision applied only to operating equipment and not the non-operating equipment that Whinstone removed, so no breach has occurred.  Further, Section 14 imposes no duty on Whinstone related to the removal of Plaintiffs' equipment as Plaintiffs allege.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims fail because Whinstone's actions have caused no damages to Plaintiffs. Plaintiffs suffered no damages from Whinstone's removal of Plaintiffs' equipment because the equipment was non-operable and therefore was not generating any revenues that Plaintiffs could lose.  Plaintiffs' claim that Whinstone breached the Agreement by charging Plaintiffs for the ERCOT surcharges fails because Plaintiffs in fact did not pay these charges, so they cannot have suffered any damages.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claim that Whinstone did not compensate Plaintiffs for benefits Whinstone received from powering down its facility and authorizing its power supplier to redirect Whinstone's allotted power back into the ERCOT grid during Winter Storm Uri pursuant to instructions from ERCOT fails because Whinstone in fact ratably shared the power credits it received from powering down during Winter Storm Uri with Plaintiffs by applying credits to Plaintiffs' cost of power for the months of May through December 2021, pursuant to the parties' communications in May 2021 regarding same.

## NINTH AFFIRMATIVE DEFENSE

Whinstone is entitled to a set-off against Plaintiffs' alleged damages for damages Whinstone incurred as a result of Plaintiffs' material breaches of the Agreement as detailed above.

## TENTH AFFIRMATIVE DEFENSE

As to each cause of action, Plaintiffs fail to state a claim upon which relief may be granted.

WHEREFORE, Whinstone prays that this Court:

    A.    Enter judgment dismissing the Complaint, and each purported Count alleged therein, with prejudice and deny all relief sought therein; and

    B.    Award to Whinstone its attorneys' fees, costs and disbursements herein, together with such other and further relief as this Court deems just, proper, and equitable.

## <u>COUNTERCLAIMS</u>

Whinstone US, Inc., a Delaware corporation ("Whinstone"), for its Counterclaims against GMO Gamecenter USA, Inc. and GMO Internet Group, Inc. (collectively, "GMO"), alleges as follows:

1.      Whinstone brings these Counterclaims for breach of the W Colocation Services Agreement (Texas) entered into on October 16, 2019 between itself and GMO, as amended on November 21, 2020 and terminated on June 29, 2023 (the "Agreement"), unjust enrichment, and for declaratory judgment.

## PARTIES

2.      Counterclaim-plaintiff Whinstone US, Inc. ("Whinstone") is a Delaware corporation with its principal place of business in Rockdale, Texas.

3.      Counterclaim-defendant GMO Gamecenter USA, Inc. is a California corporation with its principal place of business in Tokyo, Japan.

4.      Counterclaim-defendant GMO Internet, Inc. ("GMO-I"; together with GMO Gamecenter USA, Inc., "GMO") is a corporation organized and existing under the laws of Tokyo, Japan, with its principal place of business in Tokyo, Japan.

## JURISDICTION AND VENUE

5.      The Agreement provides that "the Parties hereby submit to the exclusive jurisdiction of the New York courts."  Thus, this Court has personal jurisdiction over the parties in this case.

6.      Further, Whinstone is a citizen of Texas, while GMO Gamecenter USA, Inc. and GMO-I are citizens of Japan and/or California.  The amount in controversy far exceeds $75,000. Accordingly, this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(3).

7.      Venue is proper in this District under the Agreement's forum selection clause and because this action was removed from the New York Supreme Court, New York County, pursuant to 28 U.S.C. §§ 1441 and 1446.

## FACTS COMMON TO ALL COUNTS

8.     In 2018, GMO, which is in the business of bitcoin mining, approached Whinstone
to provide colocation and hosting services for GMO's bitcoin mining operations.

9.     The parties entered into a W Colocation Services Agreement, dated effective as of
November 28, 2018 (the "Louisiana Agreement"), pursuant to which Whinstone agreed to
provide certain colocation and hosting services to GMO for bitcoin mining operations in
Louisiana.

10.     Due to certain delays relating to the Louisiana facility, Whinstone agreed to
develop a new data center in Texas (the "Texas Facility") and provide GMO colocation and
hosting services there, and GMO agreed to advance certain funding in connection with the
construction of the Texas Facility.

11.     Effective October 16, 2019, the parties entered into a new W Colocation Services
Agreement (Texas), which superseded and replaced the Louisiana Agreement.  Under this
agreement, the parties agreed that, in addition to providing hosting and colocation services,
Whinstone would pay certain amounts to GMO arising out of the Louisiana Agreement and the
Texas Facility, namely:  (1) a deposit of $5,810,720 paid by GMO under the Louisiana
Agreement (the "Original Deposit"); (2) GMO's loss of profits due to the suspension of power
available to GMO in the amount of $2,029,402 ("Loss of Profit by Power Suspension"); (3)
GMO's investment cost for the construction of the Texas Facility in the approximate amount of
$25 million (the "Initial Investment Cost"); and (4) GMO's alleged loss of profit based on lack
of power access under the Louisiana Agreement between January 5, 2019 and the date the Texas
Facility would go online (the "Loss of Profit by Power Shortage").

12.     Because the parties could not agree on the amount, if any, of the Loss of Profit by
Power Shortage, the parties agreed, under Section 16.3 of the Agreement, that, once the Texas

Facility was operational, the parties would negotiate in good faith to identify the amount of any Loss of Profit by Power Shortage and establish the means by which such amount would be repaid. This amount, once agreed upon, was to be paid through a reduction in the base fee due from GMO under the Agreement, in an amount and for a time period to be reasonably agreed upon by the parties.

13.     Further, Section 20.6 of the Agreement provided that when Whinstone had repaid the Original Deposit, the Loss of Profit by Power Suspension, and the Initial Investment Cost, the parties would then renegotiate the terms of the Agreement in good faith based on the hosting agreement usually offered by Whinstone for colocation services.

14.     The Texas Facility was available for GMO's use as of June 2, 2020.

15.     Whinstone had repaid the Original Deposit and the Loss of Profit by Power Suspension by July 1, 2020, which the parties acknowledged and agreed in their November 21, 2020 Amendment of the W Colocation Services Agreement (Texas).

16.     On or about March 29, 2021, Whinstone paid GMO the balance of the Initial Investment Cost.

17.     As alleged in more detail below, however, GMO breached its duties under Section 16.3 by failing to reasonably negotiate the amount and repayment of GMO's alleged Loss of Profit by Power Shortage under the Louisiana Agreement. Indeed, GMO failed even to identify the amount of its alleged Loss of Profit by Power Shortage, let alone do so in a manner that included an explanation of the calculated amount and supporting backup materials reasonably necessary for Whinstone to evaluate the loss claim so that Whinstone reasonably could address this obligation. Instead, GMO identified wildly different amounts ranging from $3 million to

$35 million, with no information how these vastly different amounts were calculated, and with no supporting documentation.

18.     GMO also breached its obligation under Section 20.6 by failing and refusing to negotiate in good faith for a new colocation agreement based on the standard hosting agreement being offered by Whinstone to other customers for colocation services once "the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid."  Instead, GMO – despite the clear and unambiguous language of Section 20.6 – used the Loss of Profit by Power Shortage as a roadblock to further negotiations and even then did so without identifying the amount of the alleged Loss of Profit by Power Shortage or otherwise providing supporting documentation to allow Whinstone to identify such amount.

**GMO's Failure to Substantiate and Negotiate a Reasonable Loss of Profit by Power Shortage Amount**

19.     At the time the Agreement was executed, GMO alleged a Loss of Profit by Power Shortage, which comprised a "loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension."

20.     At the time of execution of the Agreement, GMO had not identified the amount of this alleged loss, nor any backup information supporting the alleged loss.  As a result, the parties agreed in Section 16.3 of the Agreement to address this alleged claim as follows:  "The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit by Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties."

21.     The terms of Section 16.3 further anticipated and required that GMO, acting in good faith, would thereafter identify the amount of its alleged loss, how it calculated this amount, and provide the supporting backup materials reasonably necessary for Whinstone to evaluate the loss claim, following which the parties would then reasonably agree on the amount of any reduced hosting fee and the time the reduced hosting fee would be used.

22.     The Texas Facility started operation of more than 5 MW on June 2, 2020.  Thus, under Section 16.3, any Loss of Profit by Power Shortage would reflect GMO's alleged loss of profits for the period from January 15, 2019 through June 1, 2020, less the approximately $2 million paid for the Loss of Profit by Power Suspension.  Despite this defined time period and GMO's insistence that the Loss of Profit by Power Shortage exists, GMO has never provided a calculation or any back-up documentation to support its claim.

23.     GMO's first proposal concerning the Loss of Profit by Power Shortage came in April 2021, when GMO proposed an amendment to the Agreement addressing, among other things, this term.  In verbal and written communications concerning the proposal, GMO explained that it proposed to reduce the hosting fee from .0285 USD/kWh to .0210 USD/kWh for a period of 12 months to cover the Loss of Profit by Power Shortage.  Based on GMO's average power usage, this proposal would have resulted in a total reduction in hosting fees of approximately $3 million – an admission by GMO that the Loss of Profit by Power Shortage was no more than this amount.  However, even then, GMO failed to identify how it calculated this alleged loss, nor did it provide Whinstone with any supporting documentation.

24.     In subsequent negotiations concerning revised terms of a colocation agreement, GMO never sought a greater reduction in hosting fees in connection with the Loss of Profit by Power Shortage.

25.     Indeed, GMO barely mentioned any details of the Loss of Profit by Power Shortage in subsequent negotiations and never demanded payment of any amount of Loss of Profit by Power Shortage until April 2022, when – incredibly – it claimed that the Loss of Profit by Power Shortage amount was approximately $35 million, or more than 10 times higher than the $3 million approximate amount that GMO had identified and proposed a year earlier in April 2021.  Whinstone disputed this amount and demanded that GMO provide supporting documentation for its claimed loss; however, once again, GMO provided no explanation of how it calculated the loss now to be $35 million and provided no supporting documentation.

26.     Despite repeated demands, GMO has failed and refused to provide an explanation or rational basis for its calculation of the claimed losses or any supporting documentation.

27.     GMO's outrageous and wildly varied demands, together with its failure to identify how the amounts were calculated or provide any supporting documentation, further demonstrate its failure to negotiate in good faith as required by the Agreement.

28.     Indeed, other than using the claimed Loss of Profit by Power Shortage as a roadblock to negotiation of a new colocation services agreement, as detailed below, GMO – in bad faith – has wholly failed to comply with its obligation to agree reasonably on an amount and payment schedule for its alleged Loss of Profit by Power Shortage.

**GMO's Failure to Negotiate in Good Faith for a New Agreement**

29.     GMO has also failed to negotiate in good faith for a new colocation services agreement on the basis of the hosting agreement usually offered by Whinstone to other customers for colocation services.

30.     Under Section 20.6 of the Agreement, after Whinstone repaid the Original Deposit, the Loss of Profit by Power Suspension, and the Initial Investment Cost on March 29,

2021, GMO was obligated to renegotiate the terms of the Agreement in good faith "based on the hosting agreement usually offered by Whinstone for colocation services."

31.     As all parties understood when they executed the Agreement, the "hosting agreement usually offered by Whinstone" would increase GMO's costs compared to what it was paying under the existing Agreement.  Whereas, under the existing pricing, Whinstone has been providing colocation services to GMO at or below cost, under a new agreement consistent with Whinstone's usual terms and market rates, GMO's pricing would increase accordingly, and Whinstone would be entitled to earn a profit for its services.

32.     GMO, however, has failed and refused to negotiate in good faith and has consistently rejected terms that are commensurate with the "hosting agreement usually offered by Whinstone for colocation services."

33.     In April 2021, after Whinstone had repaid the Initial Investment Cost, GMO proposed terms to address the Loss of Profit by Power Shortage under Section 16.3 of the Agreement and other amendments to the existing Agreement.

34.     Following the exchange of multiple drafts, as well as telephone and in-person meetings between the parties' authorized representatives, however, GMO disengaged from further negotiations concerning the Loss of Profit by Power Shortage.

35.     Further discussions concerning a new colocation agreement ensued, without progress.  Then, in November 2021, Whinstone provided GMO a copy of its standard form of colocation agreement and solicited comments thereto.

36.     Then, on December 9, 2021, Whinstone followed up with proposed economic terms for a new colocation agreement, which were consistent with the terms offered to all of Whinstone's other hosted mining clients.

37.     On December 23, 2021, GMO responded, ignoring the December 9 proposal and its economic terms in their entirety.  Instead, GMO provided a mark-up of the earlier November form agreement that effectively negated the material terms of Whinstone's usual and customary colocation agreements.  Despite GMO's obligation under Section 20.6 to negotiate an agreement "usually offered by Whinstone," GMO's proposal expressly asserted that Whinstone's usual terms should not be imposed on GMO, providing, specifically, that the terms of Section 16.3 of the Agreement would remain in effect.  GMO, however, failed again to provide an amount or calculation.

38.     GMO's counter-proposal was not consistent with good faith negotiations.  It outright rejected Whinstone's standard terms and conditions for colocation agreements, and it did not engage with the economic terms provided by Whinstone in its December 9, 2021 proposal.  GMO did not engage with Whinstone's proposals because doing so would require GMO to accept – as it had agreed in the Agreement – that it would have to pay a market rate for Whinstone's services.  Therefore, it should be clear that GMO's counter-proposal and its consistent delay in the negotiations were intended to improperly delay the execution of the new colocation agreement and, thus, to preserve GMO's below-market rate, thereby economically benefitting GMO and damaging Whinstone.

39.     In January 2022, GMO informed Whinstone that it would not engage in further negotiations of the required new colocation agreement until the parties first agreed on the Loss of Profit by Power Shortage.  Discussions ensued, but GMO never demanded a specific amount associated with the Loss of Profit by Power Shortage nor offered any basis or supporting documentation to reasonably calculate such an amount.  Indeed, the purported attempt to discuss

the Loss of Profit by Power Shortage appears to have been a further pretext for delaying

negotiation of the substantive terms of a new colocation agreement.

40.     In March 2022, almost one year after Whinstone had begun the negotiations to

enter into its usual colocation agreement as provided in Section 20.6, Whinstone submitted an

alternative arrangement and final proposal, in an attempt to end GMO's one-sided, blackbox

negotiations.  This proposal provided GMO with, in essence, a royalty on certain newer

generation mining equipment that would operate in the capacity allotted to GMO in the Texas

Facility.  This offer would effectively have allowed GMO to upgrade its mining operations to

state-of-the-art miners without GMO having to spend tens of millions of dollars in capital

expenses to acquire competitive mining equipment.  This agreement would have allowed GMO

to effectively replace the computing power its aging miners could have generated with an

equivalent amount of computing power generated by new machines, based on the peak operating

capacity of all of the miners GMO had ever deployed in the Texas Facility, with no accounting

for depreciation of GMO's miners from factory-new condition.  In short, this proposal offered

GMO a colocation agreement more favorable than Whinstone's usual colocation agreement and

with a greater potential return than GMO's rapidly depreciating fleet of aging miners.  GMO

rejected this attractive proposal out of hand and without explanation.

41.     Instead, in April 2022, GMO asserted a claim for "$84 million or more" for

"indemnification due to power shortages" under the Louisiana Agreement and the Agreement.

As now detailed in its Complaint, GMO was attributing approximately $35 million to the Loss of

Profit by Power Shortage amount under Section 16.3 of the Agreement.  This claim – which was

more than 10 times higher than the proposal offered in April 2021 – was, yet again, entirely

arbitrary and presented without support or any substantiation of its calculation.  Thus, it appears to have been intended to scuttle any substantive negotiation for a new colocation agreement.

42.     After nearly a year of attempted good faith negotiations by Whinstone, GMO has repeatedly and persistently failed to negotiate or otherwise discuss in good faith the terms of a renegotiated agreement as required under the Agreement.

43.     Whinstone estimates that, as a result of GMO's failure to negotiate a new colocation services agreement consistent with the terms usually offered to Whinstone's customers, Whinstone has incurred damages of at least $7,177,000 as of August 2022, which amount continues to accrue at a rate of approximately $1,025,000 per month (the actual monthly difference will vary based on GMO's actual power usage each month).

**GMO's Failure to Use the Specified Power Draw**

44.     Adding to this failure to negotiate in good faith, GMO has failed to utilize its allotted power capacity in breach of its obligations under the Agreement, which has caused and continues to cause substantial damages to Whinstone.

45.     Under Section 4.3.1 of the Agreement, Whinstone agreed to provide GMO with a Specified Power Draw of 120 MW at the Texas Facility from May 31, 2020 onward.

46.     Further, under Section 4.3.3, upon Whinstone's payment of the Original Deposit, Loss of Profit by Power Suspension, and Initial Investment Cost, GMO agreed to "enter into discussions in good faith about agreeing to a minimum commitment for power usage as was contained in the Louisiana Agreement."

47.     Under the Louisiana Agreement, GMO had agreed to use and pay for a minimum portion of power that Whinstone was to provide.  Under the Order Form annexed to the Louisiana Agreement, GMO agreed to use and pay for a minimum of 40 MW starting in January 2019, increasing to a minimum of 80 MW in February 2019.  Were similar minimum usage

requirements applied under the Agreement, as was required by Section 4.3.3, GMO would be required to use and pay for a minimum of at least 80 MW.

48.     In August 2020, Whinstone informed GMO that the Texas Facility was ready for use.  However, GMO has never undertaken serious efforts to use the full capacity allotted and indeed has never used more than 50 MW of its allotted capacity.

49.     Further, GMO has consistently supplied outdated equipment that occupies only a fraction of the capacity provided for under the Agreement and even of the reduced capacity of 75 MW now provided based on GMO's decision not to use the space available to it.  Despite Whinstone's repeated requests for GMO to use the available space and capacity, GMO has been unwilling to expend resources to upgrade its equipment or supply additional machines to take advantage of Whinstone's capacity.  Instead, GMO notified Whinstone that it would not be able to source the miners to use the full Specified Power Draw and informed Whinstone – without negotiation or discussion – that it would only utilize 75 MW of capacity.

50.     In fact, GMO has never used the full 75 MW.  Despite this, Whinstone held the full 75 MW of capacity out for GMO's use through March 2022, causing a loss to Whinstone of the colocation fees Whinstone could have earned from the operation of miners in this unused capacity.

51.     In particular, Whinstone held 75 MW of capacity for GMO's use through March 2022, at a net cost to Whinstone of at least $9,827,000.

52.     Further, GMO's failure to agree on and pay for the minimum power usage consistent with the Louisiana Agreement as required by Section 4.3.3 has damaged and continues to damage Whinstone.

53.     Whinstone has been damaged in the amount GMO should have paid for the minimum commitment, in the amount of at least $14,536,000 as of August 2022, and continuing at a rate of approximately $765,000 per month.

**GMO's Failure to Pay an Adjusted Hosting Fee Based on ERCOT Rate Increases**

54.     In 2021, pursuant to new legislation enacted by the Texas legislature (Texas House Bill 4492), the Texas Public Utility Commission, a public agency that oversees the regulation of Texas electricity providers, promulgated regulations through the Electric Reliability Council of Texas ("ERCOT"), the self-regulatory body comprised of utility companies in Texas, relating to the securitization of electricity providers participating in the ERCOT grid system. The regulations require utility companies to implement certain surcharges on their customers in Texas.  As a result of this regulatory change, commencing effective August 1, 2021, Whinstone's cost of electricity supplied to the Texas Facility increased by 0.0015 USD/kWh.  However, Whinstone's electricity provider invoiced this surcharge amount in arrears and did not begin supplying invoices for this surcharge until January 2022, when it assessed the aggregate of the monthly surcharge amounts for August 2021 – January 2022.

55.     Under Section 4.3.2 of the Agreement, changes to the agreed on hosting fee could be made as a result of "changes in or the establishment of regulations, orders or policies, under federal or state law by the state or federal government, legislature or court or any other public authority . . . ." In that instance, the parties "shall decide fairly by agreement the effect of to whom can be passed on" [sic].

56.     In late 2021, Whinstone notified GMO of the change in the cost of power due to the surcharges and its intention to pass those costs on to GMO.  Whinstone again notified GMO of its intentions in early January 2022.  GMO neither objected to nor sought to discuss the matter.

57.     Thus, in January 2022, Whinstone began including the surcharge as a separate monthly invoice to GMO, effectively increasing the price of power charged to GMO from 0.0285 USD/kWh to 0.030 USD/kWh (an increase of just 0.15 cents per kilowatt-hour), with the first such invoice in the amount of $275,147.40, representing GMO's ratable share of the total surcharge assessed by Whinstone's electricity provider for the period from August 2021 to January 2022.

58.     GMO has refused to pay the increased price, imposing the 0.0015 USD/kWh in additional electricity costs on Whinstone, and has failed and refused to negotiate concerning an adjusted price of power, all in violation of the Agreement.

59.     GMO's failure to pay the 0.0015 USD/kWh ERCOT surcharge since its imposition in January 2022 has damaged Whinstone in the amount of $508,762.82 as of August 2022 and continuing at a rate of at least approximately $42,000 per month (the actual surcharge amount varies based on GMO's actual power usage each month).

**Whinstone Terminates the Agreement Due to GMO's Material Breaches**

60.     On June 29, 2023, Whinstone sent GMO notice terminating the Agreement ("Notice of Termination" or "Termination"), effective immediately, pursuant to Section 15.2 of the Agreement in light of GMO's material breaches of the Agreement and its failure to cure those breaches.

61.     Despite the immediate effect of the Termination, Whinstone provided GMO with an additional thirty (30) days, commencing on the date of the Notice of Termination, to preserve all relevant evidence regarding its mining operations at the Texas Facility.  The Notice of Termination required all of GMO's equipment to be removed from the Texas Facility by no later than July 29, 2023, upon which time Whinstone would remove it.

62.     GMO did not respond to the Notice of Termination until July 24, 2023 – nearly 30 days after the Agreement was terminated and a few days before GMO's machines had to be removed from the Texas Facility.  GMO claimed that removing its miners would constitute spoliation of evidence, contradicting earlier representations that it had preserved all relevant evidence and did not require an expert to examine the Texas Facility.

63.     On July 26, 2023, GMO requested that Whinstone delay removal of GMO's machines to facilitate a visit to the Texas Facility by an expert.  Despite GMO's failure to provide any explanation for its delay in responding to the Notice of Termination or to identify any evidence that needed to be preserved, on July 27, 2023, and upon request from GMO, Whinstone agreed to further delay the removal of GMO's machines by four additional days – until August 2 – in order to allow GMO's expert to visit the Texas Facility.

64.     On July 31, 2023, GMO filed an emergency motion seeking an order requiring Whinstone to keep GMO's machines at the Texas Facility until October 27, 2023, or at least until October 1, 2023.

65.     The Court held a hearing on August 9, 2023 to resolve GMO's motion. Following argument on the motion, the Court ordered Whinstone to allow GMO's machines to remain in place and powered on at the Texas Facility through September 13, 2023 at 5:00 p.m., subject to any curtailment requested or required by the Electric Reliability Counsel of Texas ("ERCOT") for evidence preservation purposes (the "Expert Examination Period").  The Court ordered GMO to pay Whinstone for "continuing to host its machines" at the rate set out in the terminated Agreement.  To the extent GMO derived any independent value from its machines remaining in operation at Whinstone's expense, the Court granted permission for Whinstone to amend its answer to assert any counterclaims based on such unjust enrichment.

66.     The rate Whinstone pays for power so that GMO's machines can remain in operation during the Expert Examination Period exceeds the amount GMO is paying for power pursuant to the rate set forth in the terminated Agreement.

67.     GMO has, and will continue to, mine bitcoin for profit while its machines remain powered on at the Texas Facility during the Expert Examination Period.

68.     On September 11, 2023, Whinstone agreed to extend the Expert Examination Period by three (3) weeks, or until October 4, 2023.

**FIRST COUNTERCLAIM**
**(Breach of Contract)**

69.     Whinstone repeats and realleges the foregoing allegations as if fully set forth herein.

70.     The Agreement was a valid and enforceable contract.

71.     Whinstone performed all of its obligations under the Agreement.

72.     GMO materially breached the Agreement through various actions, including, without limitation, the following:

73.     GMO failed and refused to negotiate in good faith for a new colocation services agreement pursuant to Section 20.6.  GMO also refused to negotiate in good faith to determine the amount of the Loss of Profit by Power Shortage.  As a result, GMO caused Whinstone to incur substantial damages by the continuation of the below-market and commercially untenable pricing set forth in the Agreement, which was intended to be replaced promptly with a new agreement on terms commensurate with Whinstone's customary agreement.

74.     GMO also failed to utilize and pay for the amount of power it committed to using under the Agreement.  Following Whinstone's repayment of the balance of the Initial Investment Cost in March 2021, GMO became obligated under Section 4.3.3 of the Agreement to "enter into

discussions in good faith about agreeing to a minimum commitment for power usage as was contained in the Louisiana Agreement." The minimum commitment under the Louisiana Agreement obligated GMO to use at least 80 MW. GMO refused to discuss a similar minimum commitment and instead has never used more than 50 MW of the capacity that Whinstone made available to it.

75.     Further, Whinstone was prevented from offering the unused capacity to other customers at market rates, resulting in a further loss of revenues.

76.     Additionally, GMO breached the Agreement by refusing to pay pro rata for the power surcharge imposed on Whinstone under regulations implemented by ERCOT. Despite multiple notices to GMO that Whinstone intended to pass the surcharge through to GMO on a per-kilowatt-hour basis, GMO never engaged in the discussion required under Section 4.3.2 of the Agreement nor objected until Whinstone invoiced the charges.

77.     As a result of GMO's breach, Whinstone is entitled to damages in the amount of the unpaid surcharges.

78.     As a result of GMO's breaches detailed above, Whinstone has been damaged in an amount estimated as follows:

      a.     GMO's failure to negotiate a new colocation services agreement consistent with the terms usually offered to Whinstone's customers has resulted in a net loss to Whinstone of at least $18,000,000 as of the Agreement's termination in June 2023 and subsequent 30-day period.

      b.     GMO has failed and refused to agree on and pay for a minimum usage commitment as required under Section 4.3.3 of the Agreement and instead has used no more than 50MW of available power since the inception of

the agreement.  Whinstone has been damaged in the amount GMO should

have paid for the minimum commitment in the amount of at least

$22,500,000 as of the Agreement's termination in June 2023 and

subsequent 30-day period.

c.      GMO's failure to pay the 0.0015 USD/kWh ERCOT surcharge since its

imposition in January 2022 (for periods commencing August 1, 2021) has

damaged Whinstone in the amount of at least $970,000 as of the

Agreement's termination in June 2023 and subsequent 30-day period.

79.     Finally, the Agreement (§ 7.9) provided, "In the event of any failure by the

Customer to make full payment to Whinstone of any and all amounts due to Whinstone pursuant

to this Agreement, the Customer shall be responsible for all costs and expenses (including legal

fees) which Whinstone reasonably incurs in collecting such amounts."

80.     Accordingly, Whinstone is entitled to recover from GMO its reasonable attorneys'

fees and costs incurred in connection with the collection of amounts due under the Agreement.

## SECOND COUNTERCLAIM
### (Unjust Enrichment)

81.     Whinstone repeats and realleges the foregoing allegations as if fully set forth

herein.

82.     GMO has been – and continues to be – enriched during the Expert Examination

Period due to the independent financial value it derives from its machines remaining in operation

at the Texas Facility.  By having its machines powered on at the Texas Facility, GMO is

continuing to mine bitcoin.  Further, GMO benefits by paying a lower rate for power, as set forth

in the Agreement, than it would at a comparable facility under current market conditions.  Thus,

GMO is continuing to profit by the terms of the Agreement despite that agreement having been terminated.

83.     GMO is being enriched at Whinstone's expense.  The amount GMO pays for power under the Agreement is lower than the rate Whinstone pays for power.  Further, keeping GMO's machines in place at the Texas Facility inhibits Whinstone from putting the facility to better uses.

84.     It is against equity and good conscience to permit GMO to retain any profits earned during the Expert Examination Period.  Whinstone terminated the Agreement due to GMO's material breaches and provided ample time for GMO to remove its equipment.  Instead of removing its equipment during the time Whinstone provided, GMO sat idle and eventually filed a temporary restraining order requiring Whinstone to keep GMO's equipment in place for more time.

85.     Accordingly, Whinstone is entitled to recover any profits generated by GMO from mining during the Expert Examination Period and the full cost Whinstone pays for power during the Expert Examination Period.

### THIRD COUNTERCLAIM
### (Declaratory Judgment)

86.     Whinstone repeats and realleges the foregoing allegations as if fully set forth herein.

87.     An actual, present, and justiciable controversy has arisen between the parties, and a declaratory judgment will clarify the legal issues of this dispute, finalize the controversy, and offer relief from uncertainty.

88.     A declaratory judgment is necessary to remedy prior breaches that occurred while the Agreement was in place that cannot be remedied solely through retrospective relief.

89.     GMO has materially breached the Agreement as set forth above.  Despite due notice, GMO failed to cure its breaches.  Due to these breaches, Whinstone terminated the Agreement as GMO's continuing breaches threated injury to Whinstone if Whinstone were compelled to continue performing its obligations under the Agreement.

90.     Accordingly, Whinstone is entitled to a declaration that its termination of the Agreement was lawful.

91.     Further, as supplemental relief, Whinstone is entitled to an order requiring GMO to pay Whinstone the amounts that should have been paid to date under the Agreement and a declaration of the reasonable amount of the Loss of Profit by Power Shortage and the reasonable amount of the reduced hosting fee and the amount of time that the reduced hosting fee should have been applied.

WHEREFORE, Whinstone prays that this Court enter judgment:

A.      On Whinstone's first Counterclaim, awarding damages in favor of Whinstone and against GMO in an amount to be determined at trial but not less than $40,000,000 plus prejudgment interest;

B.      On Whinstone's second Counterclaim, awarding damages in favor of Whinstone and against GMO in the amount of any bitcoin mined by GMO during the Expert Examination Period and the full cost of power utilized by GMO during the Expert Examination Period;

C.      On Whinstone's third Counterclaim, declaring that Whinstone was entitled to terminate the Agreement as a result of GMO's material breaches, or, in the alternative, declaring: (i) GMO must pay Whinstone the amounts that should have been paid to date under the Agreement, and (ii) the reasonable amount of the Loss

of Profit by Power Shortage, the reasonable amount of the reduced hosting fee, and the amount of time that the reduced hosting fee should have been applied; and

C.   On all Counterclaims, awarding to Whinstone its attorneys' fees, costs and disbursements herein, together with such other and further relief as this Court deems just, proper, and equitable.

Dated: September 27, 2023                DEBEVOISE & PLIMPTON LLP

/s/ Maeve L. O'Connor
Maeve L. O'Connor
Elliot Greenfield
Brandon Fetzer
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, New York 10001
(212) 909-6000
mloconnor@debevoise.com
egreenfield@debevoise.com
bfetzer@debevoise.com

*Attorneys for Whinstone US, Inc.*