```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
      ------------------------------:

GMO GAMECENTER USA, INC.,         : Case No.: 22-cv-5974

et al.,                           :

                   Plaintiffs,:

      v.                          :

WHINSTONE US, INC. ,              : New York, New York

                     Defendant. : October 4, 2023

      ------------------------------:



           TRANSCRIPT OF STATUS CONFERENCE HEARING

        BEFORE THE HONORABLE KATHARINE H. PARKER

             UNITED STATES MAGISTRATE JUDGE




   APPEARANCES:

   For Plaintiff:          HAYNES AND BOONE LLP
                           BY:  Leslie C. Thorne, Esq.
                                Michael Freyberg, Esq.
                           30 Rockefeller Plaza
                           New York, New York 10012

   For Defendant:          DEBEVOISE & PLIMPTON LLP
                           BY:  Brandon R. Fetzer, Esq.
                                Jillian Tancil, Esq.
                           66 Hudson Boulevard
                           New York, New York 10001



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.


     AMM TRANSCRIPTION SERVICE - 631.334.1445
```

1            THE DEPUTY CLERK:  Calling case
2     22-cv-5974; GMO Game Center versus Whinstone US
3     Corp.
4            Beginning with counsel for the plaintiff,
5     please make your appearance for the record.
6            MS. THORNE:  Leslie Thorne and Mike
7     Freyberg for plaintiffs.  And Mr. Freyberg is going
8     to be handling today's conference.
9            THE COURT:  Great.
10           THE DEPUTY CLERK:  And counsel for the
11    defendant, please make your appearance.
12           MR. FETZER:  Brandon Fetzer and Jillian
13    Tancil from Debevoise on behalf of Whinstone.
14           THE COURT:  Hi.  Okay.  Thanks for coming
15    in.
16           So I wanted to get a report on where you
17    are on discovery.  Why don't we hear first from
18    plaintiff.
19           MR. FREYBURG:  Sure, Your Honor.  So I
20    can, sort of, just run down the list of tasks --
21           THE COURT:  Perfect.
22           MR. FREYBURG:  -- that we've completed
23    since the last conference.
24           So both parties have served third-party
25    subpoenas, document subpoenas.  GMO has served -- or

                AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1    I should say it issued service six -- for six

2    different third parties, and I believe Whinstone has

3    issued subpoenas for two, but they can correct me if

4    I'm wrong on that.

5              The parties filed the ESI protocol, which

6    the Court approved this morning, and GMO

7    anticipates, actually, producing another set of

8    documents, over 1,000 documents sometime today.

9    That hasn't been done yet, but we do anticipate that

10   that will be done at some point today.

11             And then, finally, the last thing on my

12   list is with regard to GMO's fourth amended

13   complaint.  This is something we raised, I believe,

14   at the last conference.  And as of yesterday, the

15   parties are in agreement on that, actually.

16             THE COURT:  Oh, good.

17             MR. FREYBURG:  And so we sent our draft

18   that we would like to file to Whinstone's counsel.

19   They have consented to our filing it, obviously,

20   reserving all rights with regard to --

21             THE COURT:  Defense's --

22             MR. FREYBURG:  -- how they respond to --

23   that's right -- defendants -- how defendants will

24   respond to that.  And, yeah, we're also agreeing to

25   give them 30 days to respond to that --
```

```
 1                  THE COURT:  Okay.

 2                  MR. FREYBURG:  -- to that as well.

 3                  THE COURT:  Okay.

 4                  MR. FREYBURG:  And we wanted to ask

 5      Your Honor how exactly mechanically we should --

 6      should we file, like, an unopposed motion for leave

 7      or should we file, like, a stipulation?  Or what's

 8      your preference on that?

 9                  THE COURT:  So I think technically you

10      should file it as a motion to file and indicate that

11      it is unopposed --

12                  MR. FREYBURG:  Yep.  Okay.

13                  THE COURT:  -- by defendant, and then

14      that can be granted.

15                  MR. FREYBURG:  Perfect.  Okay.

16                  THE COURT:  I think that's the best way

17      to go about it.

18                  MR. FREYBURG:  Okay.  So we will -- we'll

19      draft that and get that on file probably within the

20      next few days.

21                  THE COURT:  Okay.  Great.

22                  So in terms of the -- I know you said

23      that you're producing about 1,000 documents today.

24      What does the remainder look like?  I saw in the ESI

25      protocol, you've identified your custodians.  I
```

1   assume that those are the custodians you're pulling

2   from right now as part of this production, rolling

3   production.

4           MR. FREYBURG:  Yes.  Yep, that's correct.

5   So I think collections for the most part are

6   complete.  So it's really just about getting

7   documents reviewed and then out at this point.

8           We've been going back and forth on search

9   terms to apply to the documents that have been

10  collected to generate a review set.  And we, I

11  believe, are pretty close to finalizing that.  For

12  search terms to apply to Whinstone's documents, I'd

13  say we're near final.  And definitely, within the

14  next day or so, I think we can come to some

15  agreement on that.

16          With GMO's documents, there may be a bit

17  more back and forth to do, but I think we anticipate

18  getting that done at some point this week.  This,

19  obviously, also all plays into the amendment to the

20  case schedule, which I believe at the last

21  conference we brought up.  And I think both parties

22  are definitely in agreement that the case schedule

23  is going to have to be amended.  We would like to

24  get that finalized by sometime this week, just so we

25  know, you know, the path going forward a little bit

1  better.

2          THE COURT:  Okay.  So right now we have

3  the close of fact discovery at the end of October,

4  which clearly you're not going to meet --

5          MR. FREYBURG:  Correct.

6          THE COURT:  -- and the close of expert

7  discovery at February, mid-February.

8          So tell me what is left in terms of the

9  document production, which obviously you want to get

10  out for, you know, most of the depositions.  I also

11  want to know whether you can accelerate production

12  of documents for certain witnesses; in other words,

13  so that you can, sort of, keep the case moving

14  along.

15          MR. FREYBURG:  Yeah, so I think, you

16  know, sort of, in order, the priority will be

17  nailing down at least a preliminary set of search

18  terms, just so we can get reviewing and then get

19  more documents out after that.  The documents we

20  plan on producing today are not contingent on those

21  search terms.  There were documents GMO and us

22  identified as not needing to be -- you know, have

23  search terms applied to in order to produce them.

24          So those will be out, and then it will

25  just be about getting final on the search-term

1    agreement, and then getting that review set.  We

2    definitely -- I think both parties anticipate

3    producing a lot of documents for this case, and we

4    definitely want to keep that moving and accelerated

5    in any way we can, so that will probably mean, you

6    know, production in waves as they become available.

7              THE COURT:  Right.  So when do you

8    anticipate substantial completion of the document

9    production?

10             MR. FREYBURG:  Yeah, so we were going to

11   propose -- and this isn't something we've yet

12   proposed to Whinstone's counsel yet, but we were

13   going to propose a general case deadline extension

14   of three to four months.  And so I think that, you

15   know, puts the fact-discovery deadline -- right now

16   it's at late October, so that would -- November,

17   December, January --

18             THE COURT:  Probably January?

19             MR. FREYBURG:  Like, January, February;

20   something like that.  And so I think at that point

21   we would, you know, aim to have all documents

22   produced at that point.

23             THE COURT:  Right, but you -- but my

24   earlier question was really aimed at not only do you

25   need to produce all the documents, but you've got to

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    depose some witnesses.

2         MR. FREYBURG:  Oh, absolutely.

3         THE COURT:  So when would you anticipate

4    starting depositions in this time -- extended time

5    frame?

6         MR. FREYBURG:  Yeah, I think we would

7    probably, at least, like to have one more production

8    of documents before depositions occur, but I think

9    that can probably happen within the first month --

10   or the next month or so, just so we have some

11   documents to use in those depositions and to

12   actually inform who we're going to need to depose as

13   far as third parties and things like that.

14        And, yeah, I know you mentioned third

15   parties.  We obviously have document subpoenas out

16   to them, so I think the need to depose some of them

17   will probably depend on what we receive in return to

18   those document subpoenas and also on party discovery

19   that takes place.  But I think we do have a pretty

20   good sense of who we're going to depose as far as

21   parties and non-parties.  Some of it, again, will

22   depend on what documents we receive, but...

23        THE COURT:  And are the non-parties

24   causing any issues with -- are they raising any

25   objections?  Do you anticipate motions to compel?

1          MR. FREYBURG:  None so far, although the

2     subpoenas were just issued, so it's a little bit

3     TBD.  Obviously, as issues arise, you know, we'll

4     address those.  And I don't -- I don't know, also,

5     if the parties will have any issues with any

6     third-party subpoenas that have gone out, too, so

7     we'll have to address that as well.  But I'd say

8     it's a little too early to tell, just given that

9     they went out over the last couple days.

10          THE COURT:  Okay.  All right.  Fine.

11          So from defendant's perspective, tell me

12     what you anticipate and when you anticipate being

13     able to depose folks.

14          MR. FETZER:  Yeah, sure.  I think -- I

15     agree with everything that Mr. Freyberg said.  I --

16     I'm thinking we might need a little longer than they

17     just estimated to pull it all off.  Just in terms of

18     volume, I think we're -- Whinstone may end up

19     reviewing something between 50 and 100,000

20     documents, and GMO something, perhaps, a little bit

21     greater than that.  Maybe a few more custodians.

22     And with the holidays and -- I think we -- I think

23     three to four months is probably a little tight.

24     Something a little bit longer than that, I think, we

25     could probably do.

```
 1              THE COURT:  How many witnesses are you
 2    anticipating deposing?
 3              MR. FETZER:  So we just don't know.  I
 4    can't say right at this moment.  We, I think, to
 5    this point, have only gotten 100,000 documents.
 6    We'll get another 1,000 documents today.
 7              THE COURT:  Well, you know a little bit
 8    because you have some initial disclosures.
 9              MR. FETZER:  Sure.
10              THE COURT:  I mean, there were people who
11    came to the settlement conference who are people
12    with knowledge.
13              MR. FETZER:  Yep.  I would assume
14    something in the eight-to-ten range.
15              THE COURT:  Okay.  So in total, are the
16    parties thinking this is a case that will require,
17    like, maybe 16 -- or up six -- between 16 and 20
18    depositions total between the --
19              MR. FETZER:  Yes.
20              MR. FREYBURG:  That's probably about
21    right.
22              THE COURT:  Okay.  So the early -- the
23    first quarter of 2024 will be very busy then.
24              And are all the depositions going to take
25    place in the U.S. or by video?  Is that what you're
```

```
 1    planning now?  Are any going to take place in Japan?
 2    What's going to happen?
 3              MR. FREYBURG:  So we haven't quite
 4    discussed the mechanics of each deposition.  I
 5    think, from our client's perspective, we're probably
 6    happy to do some of those by video, if it speeds
 7    things up, especially.  But, yeah, that's definitely
 8    something we have to discuss.  I think for the U.S.
 9    Depositions, we would probably prefer doing them in
10    person, but for the international ones, we
11    understand that those can be challenging, and so
12    video might make more sense for those.
13              THE COURT:  Okay.
14              MR. FETZER:  Yeah, we'll have to give
15    that some thought.  I assume we'll have to have
16    translators involved.  And, you know, there are some
17    disadvantages to doing that remotely.
18              THE COURT:  Right.  With a translator.
19              MR. FETZER:  Yeah, yeah.  I think that
20    might just become a little bit too complicated.
21              THE COURT:  Yeah.
22              MR. FETZER:  We'll, of course -- we'll,
23    of course, you know, try to work it out.
24              THE COURT:  Yeah.
25              MR. FETZER:  But I'm thinking we probably
```

1    want to do them in person if we can.

2              THE COURT:  All right.  So I think you

3    ought to be thinking about those deposition dates.

4    I know it's early days still, but you ought to be

5    thinking about, sort of, plotting out when you're

6    going to do that.  And I would ask you to meet and

7    confer and try to cooperate on dates if there's

8    going to be -- if there's going to be travel, that

9    you try to work together to get dates that make

10   sense.

11             And because of the holidays, I think

12   counsel are going to need to -- because, Counsel,

13   I'm assuming this is not your only case that you're

14   working on, that you have other client demands, so

15   you ought to be thinking about what dates you can,

16   kind of, hold as potential deposition weeks, for

17   example, in different locations so that you can get

18   people thinking ahead because people are working out

19   on their calendars, you know, three months in

20   advance anyway.  So you should start having some of

21   those conversations with the understanding that

22   maybe some dates have to be pushed, but that you're

23   working towards that; okay?

24             MR. FETZER:  Understood.

25             THE COURT:  And from your subpoenas that

1   you served, have you heard any objections yet?  Are
2   you expecting any issues with them?
3             MR. FETZER:  No objections yet.  They
4   were just served, I think, Friday and Monday, so
5   it's a little early.  We gave folks a little bit
6   more time than the Federal Rules permit just to
7   be -- you know, they're third parties; to try to
8   avoid disrupting their operations.
9             We should know -- I think we set
10  October 19th as the date that they should object or
11  get back to us in some way, so we should know by
12  then or in advance of then.
13            THE COURT:  Okay.  And do you anticipate
14  any privilege issues?
15            MR. FETZER:  In terms of third-party
16  subpoenas, or...
17            THE COURT:  In terms of general.
18            MR. FETZER:  I'm not aware of anything
19  that's coming to mind right now.
20            THE COURT:  Okay.
21            MR. FREYBURG:  Yeah.  No, neither are we.
22  Yeah, nothing specific, no.
23            THE COURT:  That's good.  Okay.
24            So what -- so it sounds like you're
25  cooperating.  I'd like to have another conference,

1    say, in -- before Thanksgiving so I can hear what's

2    happening with the subpoenaed parties.  If there are

3    any issues, I want you to bring those forward right

4    away, because if there needs to be any kind of

5    motion to compel, we'd have to get the third parties

6    to come in and deal with that right away.

7              So, Chris, do we have a date in November

8    for a conference?

9              THE DEPUTY CLERK:  Judge, how about

10   4 o'clock on November 16th?

11             THE COURT:  Yeah, 4 o'clock, November

12   16th.  It's a Thursday.

13             MS. THORNE:  That works for GMO,

14   Your Honor.

15             THE COURT:  Okay.  Now, I know I've asked

16   this before.  Are the parties in a position to

17   further discuss settlement?  Any updates on that

18   front?

19             MR. FREYBURG:  I think at this time,

20   probably, yeah, off the table.

21             THE COURT:  Not so much.  Okay.

22             Well, I'll keep asking you just in case

23   you can resolve it.  Most cases do resolve by

24   settlement.

25             Are there any other items that

              AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   plaintiff's counsel would like to raise?
 2                MR. FREYBURG:  Yeah.  Just one item.
 3                I think in discussing search terms with
 4   Whinstone's counsel, there are probably certain
 5   categories of documents that they are going to
 6   object to producing that we feel are relevant.  And
 7   so I think when we come to an agreement on search
 8   terms, we'll probably put those to the side for now
 9   just to keep things moving, but we did want to ask
10   the Court how -- if there's any way, as far as
11   mechanically, how you'd like us to deal with that
12   dispute.
13                THE COURT:  Yeah.  How -- can you just
14   list what the categories are.
15                MR. FREYBURG:  Yeah.  No problem.
16                So one category is documents concerning
17   the Texas Data Center as a whole, rather than just
18   the buildings where GMO places their machines or
19   otherwise uses or potentially uses.  So
20   specifically --
21                THE COURT:  Because there were two
22   buildings, right, that --
23                MR. FREYBURG:  There was --
24                THE COURT:  There was the B building and
25   then there was one other building?
```

1          MR. FREYBURG:  That's right.

2          So originally we were talking about

3    Building A, where GMO has always operated, so that's

4    undisputed.  We know documents concerning that

5    building should be produced, so we're not fighting

6    on that one.

7          But then there's also Building B, where

8    GMO was looking to move its machines to but never

9    did.  I think that's also undisputed.  And then

10   there's Building X, where GMO's non-operating

11   machines have been stored over time.

12         THE COURT:  Oh, the storage facility.

13         MR. FREYBURG:  Yeah.  It's still in the

14   same facility; it's just a separate building on that

15   facility.

16         And then what we're looking for is

17   documents concerning other buildings aside from

18   those three, so relating to the data center.

19         THE COURT:  What kind of information do

20   you want on those buildings and why?

21         MR. FREYBURG:  So documents concerning

22   Whinstone's operations of the data center as a

23   whole, including with regard to those buildings.  We

24   feel that how Whinstone is operating those buildings

25   has some bearing on how they might operate GMO's

```
 1   buildings as well.  We've alleged facts concerning
 2   issues relating to Whinstone holding up its end of
 3   the bargain with regard to power supply and with
 4   regard to --
 5              THE COURT:  Power supply.
 6              MR. FREYBURG:  -- the conditions of the
 7   data center as well.
 8              Both of these issues are something other
 9   customers at the data center have raised in separate
10   litigations, so we feel that --
11              THE COURT:  What kind of conditions?
12              MR. FREYBURG:  So one has to do --
13              THE COURT:  Like water leakage; that kind
14   of thing?
15              MR. FREYBURG:  Not water leakage, but
16   cooling, which, kind of, relates to water.
17              THE COURT:  Cooling.
18              MR. FREYBURG:  So adequate cooling for
19   the machines, which affects how well they perform.
20   Dust is another one that also affects performance.
21   I think general organization, the machines and how
22   they're moved.  Whinstone had obligations to plug in
23   power to certain types of the machines and literally
24   move, you know, pieces of equipment and cables and
25   things like that at GMO's request.
```

1          And so all of these are issues in this

2   litigation, and they're issues in separate

3   litigations brought by other customers at the same

4   data center who are using different buildings at

5   times.

6          THE COURT:  Does the contract that GMO

7   has concerning its use of the building provide any

8   specifications for cooling, dust, treatment of the

9   machines?

10          MR. FREYBURG:  Yeah.  It explicitly

11   provides that all that has to be done.  As far as

12   more specifics than that, I think it's a bit

13   general, but it's not explicitly -- I don't think,

14   as far as I'm standing here right now, that there's

15   any sort of, like, levels of cooling or dust that

16   have to be maintained in the agreement itself.

17          THE COURT:  So obviously, you need to

18   understand what the conditions were in the buildings

19   where you were or had an option to go, or how

20   they're being stored now as if they're being kept in

21   proper condition.  But why is it relevant if

22   there's -- let's say there's Buildings C, D and E.

23          Why -- if those buildings have different

24   machines and different -- you know, different

25   companies with different contracts, why would that

1   be relevant to the precise issues that your client

2   experienced in Building A?  And why is that

3   proportional to the needs of the case?

4               MR. FREYBURG:  Well -- so if there's --

5   I -- if there's -- if Whinstone is not performing

6   its very similar hosting contracts for their

7   customers at the same facility under the same

8   management, then I would say there's a higher degree

9   of likelihood that it's also happening in the

10  buildings where GMO's machines are kept.

11              Also, these issues --

12              THE COURT:  But you're going to know.

13  Isn't some of this objective?  It was either kept at

14  a certain temperature or it wasn't.  There was

15  either dust or there wasn't.

16              I mean, some of this is -- this is --

17  they either fulfilled it -- the machines require X

18  to be in top performance, and they either kept it at

19  the -- you know, the room at 65 degrees or they

20  didn't, you know.  I mean, what happened in another

21  building, you know --

22              MR. FREYBURG:  I think we have to find

23  that out, Your Honor.  I mean, I think that's,

24  respectfully, the subject of the case and of

25  discovery, is whether they performed and whether

1  they performed with regard to --

2          THE COURT:  Whether they performed as to

3  your contract is what is critical.

4          MR. FREYBURG:  That's correct, but we

5  think that it's relevant if they performed very

6  similar obligations under similar contracts at the

7  same data center has some bearing on whether they

8  did for us as well.

9          THE COURT:  So what element of your

10  causes of action does that go to?

11          MR. FREYBURG:  It goes to -- I mean, our

12  main cause of action is the -- I would say the

13  failure is on Whinstone's part to supply power,

14  right?  That's probably --

15          THE COURT:  Breach of contract.

16          MR. FREYBURG:  Breach of contract,

17  absolutely.

18          THE COURT:  So normally, for a breach of

19  contract, you're not looking at how they dealt with

20  other contracts.

21          MR. FREYBURG:  That's true, Your Honor,

22  and I definitely understand what you're saying.  And

23  I anticipate Whinstone will make very similar

24  arguments.  We still do think there's some bearing

25  because we're dealing with the same data center and

```
1    very, very similar complaints from other customers
2    who are in litigation with Whinstone right now.
3              And some of these customers, for all we
4    know, may have actually been operating in the
5    buildings that GMO was operating.  I think that's
6    something that's also the subject of discovery that
7    we don't --
8              THE COURT:  Well, if something was in
9    your same building, what the conditions are in the
10   building are the conditions, you know, in the
11   building.  So other customers' experience in the
12   same building, A, for example, I can see why that
13   would be relevant.
14             MR. FREYBURG:  Yeah.  And I understand
15   your points there.
16             THE COURT:  Yeah, I mean, because for a
17   breach of contract and the types of breaches that
18   you're saying are objective types of things -- this
19   isn't a tort case.
20             MR. FREYBURG:  Yeah.
21             THE COURT:  And it's not something -- you
22   know, this is not, like, a habit kind of --
23             MR. FREYBURG:  I think one more --
24             THE COURT:  My concern is to get into
25   other cases that in -- then there, it may not be
```

```
1    informative.
2              MR. FREYBURG:  I understand, Your Honor.
3              THE COURT:  So I think what I would just
4    say is think about really tailoring --
5              MR. FREYBURG:  Yeah.
6              THE COURT:  -- what you really need.
7              It's one thing to have a schematic of
8    what all the buildings are there, right?
9              MR. FREYBURG:  Right.  Right.
10             THE COURT:  And have, sort of, a high
11   level of understanding.  Are they all powered the
12   same way?  Are they all --
13             MR. FREYBURG:  Yeah.
14             THE COURT:  -- maintained the same way?
15   That's, sort of, one level.
16             But if you're talking about getting into
17   particulars, you have to think through what's
18   really, really needed and proportional to the needs
19   of the case.
20             Let me hear from defendant.
21             MR. FETZER:  Yeah, Judge, I agree with
22   almost everything you said.  I'll just add a few
23   things.
24             There's confidentiality concerns.  There
25   are other customers using these other buildings.
```

1      The customers are governed by a separate set of

2      contracts that have absolutely nothing to do with

3      this case.

4              GMO is responsible for maintaining the

5      conditions of its machines within the building, and

6      so, you know, whether or not other customers had

7      that same obligation is just completely irrelevant.

8      So if it's dusty in one building, it doesn't

9      necessarily mean that's Whinstone's fault.  It

10     depends on what the contract said and what the

11     customer was responsible for doing.

12             THE COURT:  Well, first of all, customer

13     confidentiality can be taken care of easily.  We

14     don't -- you can have anonymized -- you can have,

15     you know, anonymous customer information.

16             And, you know, dust in a building is dust

17     in a building.  That's not maintenance of a machine.

18     That's the cleanliness or the atmosphere within

19     which the machines are kept or housed.

20             So I can see why some information about

21     the footprint of the -- of your client's facility --

22     and there might be some buildings where -- I don't

23     know if there's some buildings where the power is

24     not, you know, just like in apartment complexes.

25     You might have one building that's, you know,

1    constantly having a problem because it's --

2    there's -- it's older, or for whatever reason, a

3    pipe keeps breaking in that building.

4            There might be some high-level

5    information about the conditions of the building and

6    the -- as compared to other buildings that

7    potentially could be relevant.  I don't know if

8    power is being drawn away from Building A to

9    Building C, I mean, because of however the lines are

10   set up or because of a specific decision made by

11   your client.

12           Those kinds of macro issues might be

13   relevant, I think, to performing the obligation.

14   Or, you know, for example, if there's an allegation

15   that your client favored one customer or another,

16   so -- or more -- you know, gave more power, then

17   that potentially could be relevant, just how it's

18   all hooked in.

19           MR. FETZER:  Sure.  And I hear where

20   you're going with that.  I think as it relates to

21   power in Building A and where that power went, I

22   don't think we have any disagreement with opposing

23   counsel.

24           What I think they're looking for is,

25   though -- if I can infer from the search terms -- is

1    name of customer within 20 words of complaint,

2    right?  Like, name of third-party customer that has

3    nothing to do with this case, nothing to do with the

4    Whinstone and GMO contract.

5              And it also assumes in some way that all

6    the buildings are the same.  Buildings just aren't.

7    And the type of mining in each building isn't the

8    same either.  There's quite a few -- or I don't know

9    if it's quite a few, but there's a few buildings --

10   or I have personally been in at least one building

11   where the type of mining is immersion, where the

12   mines are put in a pool of oil or liquid, and so

13   it's -- there is no apples-to-apples comparison.

14             THE COURT:  Well, so -- but to avoid

15   disputes, you can provide a schematic.  We have

16   these buildings.  This -- you know, these are -- you

17   know, this has immersion machines.  This has this

18   machine.  This has -- you could provide some of that

19   macro information that might obviate the need for

20   search terms.  And if there's a complaint, maybe

21   there's complaints from another customer about the

22   conditions in Building A.  That's one thing.

23             MR. FETZER:  That's fine, yeah.

24             THE COURT:  If there's dust, if there's a

25   leak, if it's hot or whatever, if there's -- that

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    might be relevant to know, right?

2                  MR. FETZER:  Sure.  Building A, we have

3    no issue with.  Whatever we have with GMO's

4    operations, Building A, and whether someone

5    complained if it was dusty in Building A, we have no

6    issue there.  The issue is where it starts to get

7    into other customer contracts and what other

8    customers are saying to Whinstone about Building G,

9    for example, right?  We just don't see that as being

10   relevant.

11                 THE COURT:  Well, it seems to me that it

12   would make sense to provide some high-level

13   information.  There are ten buildings, Buildings A,

14   B, C, D -- whatever they are lettered -- and this

15   one has the immersion machines.  This one has

16   similar kinds or more recent models of the type of

17   mining that your machine has, the -- you know, the

18   power, the -- like, the general wattage -- or

19   however that's measured -- that's allocated to each

20   building.

21                 And I don't know if there's -- different

22   buildings have different specifications, like one

23   building is kept at 65 degrees, one building is kept

24   at 60 degrees.  I have -- you know, maybe there's

25   specifications for buildings that there's -- on a

```
 1     macro level.  And maybe there's, you know, one
 2     person who maintains -- who's responsible for
 3     maintaining Buildings A through C, and one person --
 4     maybe there's some just real basic information like
 5     that, that would then allow you to have a more
 6     meaningful conversation with plaintiff's counsel
 7     about what really is needed, what could be
 8     anonymized, you know; that type of thing.
 9               MR. FETZER:  Okay.  Sure.
10               THE COURT:  So I just ask you-all to
11     really try to narrow down this dispute as to, you
12     know, what's really -- what really is important and
13     not really relevant, but what could be just helpful
14     in --
15               MR. FETZER:  Certainly.
16               THE COURT:  -- you know, some of that
17     information.
18               What are -- are there any other
19     categories of documents that are like this?
20               MR. FREYBURG:  Yes, Your Honor.  We've,
21     kind of, touched on one other, which is documents
22     concerning other customers at the data center.  So
23     I --
24               THE COURT:  Yeah.
25               MR. FREYBURG:  We may have fully
```

```
 1   addressed that.

 2            THE COURT:  Yeah.

 3            MR. FREYBURG:  I think we're making

 4   similar arguments for why those are relevant.

 5            I will just note our complaint does

 6   explicitly allege that other customers are being

 7   prioritized over GMO, and so that's another --

 8            THE COURT:  In terms of power?

 9            MR. FREYBURG:  In terms of power, in

10   terms of services that Whinstone is supposed to

11   provide under these hosting contracts.  And so

12   that's in our complaint.  I think it's in dispute.

13   It would be relevant at that point.

14            THE COURT:  Well, I mean, but you -- it

15   sounds like, for that, it would just be helpful to

16   have some macro information first, like what was the

17   power given to each building over the relevant

18   period and what was the maintenance schedule, for

19   example?  Maybe there's just a general maintenance

20   schedule that --

21            MR. FREYBURG:  Right.

22            THE COURT:  -- for each building.

23   Something general like that so that you can, sort

24   of, see that, and that -- that might be something

25   that could be helpful.
```

```
 1                    MR. FETZER:  Sure.  We're happy to look
 2      into that.  I'm assuming it varies, right?  It
 3      really depends on the contract --
 4                    THE COURT:  Yeah, sure.
 5                    MR. FETZER:  -- and whether or not
 6      Whinstone had any obligation to do anything other
 7      than flip the power on.
 8                    THE COURT:  Sure.  Sure.  I understand.
 9                    But if you have -- in Building A, let's
10      say you have a customer that took over the entire
11      Building C, and they specifically asked for and paid
12      for daily dust -- you know, HEPA filters and
13      whatever they did.  Maybe you could provide some,
14      you know, information like that on an
15      attorney's-eyes-only basis to just -- you know,
16      without -- you could anonymize, potentially, the
17      customer name.
18                    MR. FETZER:  Sure.
19                    THE COURT:  Just not necessarily show the
20      price that was paid, but you could provide a little
21      bit of information so that they understand there was
22      a different -- there might be a reason why a
23      building had different maintenance or different
24      features.
25                    MR. FETZER:  Sure.  Sure.  And we're
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   happy to explore that.
 2              THE COURT:  Yeah.
 3              MR. FETZER:  I hear you to be saying that
 4   we should continue to meet and confer and, kind
 5   of --
 6              THE COURT:  Yes.
 7              MR. FETZER:  -- sort this out so that a
 8   letter doesn't land on the docket.
 9              THE COURT:  Yes.  Right.  Because --
10              MR. FETZER:  Totally understand.
11              THE COURT:  What can happen in cases,
12   especially when there's going to be a lot of
13   discovery, is that counsel don't try hard enough to
14   offer solutions, to offer compromises.  So put
15   yourselves in each other's shoes and say, well,
16   okay, maybe this will resolve this issue.  So that's
17   what I'm asking you to do.
18              MR. FREYBURG:  Sure.
19              MR. FETZER:  What are the other -- any
20   other categories?
21              MR. FREYBURG:  There's just one more, and
22   I think this is also one we'll have to, sort of, dig
23   into the specifics on a bit.  But we did ask for
24   documents concerning a company called Northern
25   Data's dispute with Riot Blockchain, which is
```

1    Whinstone's parent, concerning the sale of Whinstone

2    from Northern Data to Riot.

3            GMO is actually named in the allegations

4    in that case, which has since settled.  And from

5    what I understand from Whinstone's counsel, either

6    no or very little discovery took place in that case

7    before it did.  And we're not necessarily looking

8    for discovery, just exchange in that case in

9    general.

10           We're really looking for things that

11   concern GMO's dispute with Whinstone, this case

12   we're here for, because that claim, actually, that

13   GMO made -- I'm not sure it was litigation quite

14   yet, but when that sale was occurring, the claim

15   that GMO made to Whinstone as a potential -- formed

16   a potential liability for Whinstone, which played

17   into how much Riot was going to pay for Whinstone in

18   that.  And so that's a subject in that dispute, and

19   so what we're looking for are documents that

20   concern, really, GMO's claim and this case --

21           THE COURT:  You mean what was

22   communicated to Riot about that?

23           MR. FREYBURG:  Yeah, potentially.

24           THE COURT:  Or what was provided in due

25   diligence?

AMM TRANSCRIPTION SERVICE - 631.334.1445

1           MR. FREYBURG:  Potentially either/or.

2    Yeah, one thing that comes up is, like you said,

3    communications between those parties concerning

4    GMO's claim and the liability there.  All of that

5    relates to the power --

6           THE COURT:  Like, if there was a value,

7    like, a reserve or something placed on -- for the

8    litigation?

9           MR. FREYBURG:  Yeah.  Like, how they were

10   viewing the merits of GMO's claim and how that

11   played into value for the sale.

12          THE COURT:  Do you have the agreement,

13   the purchase agreement?

14          MR. FREYBURG:  We do have the purchase

15   agreement, yes.  GMO is not in that agreement, of

16   course, but we understand from the litigation

17   documents that were filed, including Northern Data's

18   claim -- I'm sorry -- Riot's claims that the GMO

19   dispute was a major part of that case.

20          The other relevant part of that case

21   deals with power sales and, actually, Whinstone's

22   sharing of power credits.  And so I -- from our

23   understanding of the agreement, Riot -- I'm sorry --

24   Northern Data, as the seller, would be entitled to

25   power credits on an ongoing basis as a result of

1    that sale.  And they were claiming that those power
2    credits were not, in fact, shared with them.
3    That -- that is quite similar to what we're claiming
4    in this case as far as power credits and power sales
5    not being shared with GMO under its agreement with
6    Whinstone.
7              THE COURT:  What is defendant's position
8    on that?
9              MR. FETZER:  Well -- so first, it's a
10   lawsuit between Riot and Northern Data.  Whinstone
11   has nothing to do with it, so it's unclear why
12   they're coming to Whinstone to try to get the
13   documents about a suit that Whinstone is not a part
14   of.
15             And then, second, I don't see the
16   relevance of the dispute between Riot and Northern
17   Data as it relates to the power credits, or whatever
18   else they're looking for, to the breach-of-contract
19   claim that they have asserted in this case.
20             THE COURT:  Because from your position,
21   it's only what power was supplied pursuant to the
22   contract?
23             MR. FETZER:  Right.
24             THE COURT:  Or not supplied?
25             MR. FETZER:  Right, exactly.  There's a

1   contract.  It had certain provisions.  The fight is
2   over whether or not Whinstone and GMO lived up to
3   their obligations under the contract.  Whether
4   there's a contract between third parties, like with
5   the sale of Whinstone and their distribution of
6   proceeds or power credit or whatever, is a totally
7   separate sideshow that just doesn't matter to the
8   Texas agreement that is driving this litigation.
9          THE COURT:  But to the extent that there
10  were statements made about this suit to Riot, or
11  representations made about the view on whether this
12  case had merit, didn't have merit, and why, that
13  might be something that could be relevant.
14         MR. FETZER:  Sure.  And on that point, I
15  don't think we're objecting to GM -- sorry.  We
16  haven't objected to the production of documents from
17  Whinstone concerning the case or claims or the value
18  of those claims.  Some of that is probably
19  privileged, so we'll retract on that ground.  But if
20  there's a document from someone at Whinstone saying
21  to someone at Northern Data, hey, what's up with
22  this litigation?  Like, what's the risk here?  What
23  are we looking at?  How do we value that?  That's
24  not what I understand their requests to be aimed at.
25  And if it were, I don't think that's something that

1    we're objecting to.  What they asked for was just

2    the discovery exchanged in the case between Riot and

3    Northern Data.

4              THE COURT:  All right.  So I think

5    further meet and confer is needed on this issue.

6    And what I would like is a status letter in advance

7    of the November conference, a week in advance,

8    teeing up any issues.  If you anticipate there's

9    going to need to be any kind of motion to compel

10   with any third party, you should let me know as soon

11   as possible, because we could potentially invite a

12   third party to attend that November conference so

13   that gets resolved.  Okay?

14              So don't file any motions.  Just

15   highlight if you think there's a dispute that needs

16   resolution, and I'll try to resolve it at that

17   conference.  And I don't want you to go into a huge

18   back and forth.  Keep the agenda letter to four

19   pages.  I just -- don't turn it into any kind of

20   brief.  I'll take a look at it, and I'll listen to

21   you.  And if I think I need further briefing, we can

22   do that, okay, but don't turn the agenda letters

23   into briefs.  Okay.

24              Anything else from plaintiff's

25   perspective?

1              MR. FREYBURG:  Nothing from us, Your

2    Honor.

3              THE COURT:  Anything else from defense's

4    perspective?

5              MR. FETZER:  Nothing from us.

6              THE COURT:  All right.  Thank you very

7    much.  Then we will adjourn.  And feel free, like I

8    said, to go to 23rd floor.

9

10                        0o0

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      C E R T I F I C A T E

3

4        I, Adrienne M. Mignano, certify that the

5     foregoing transcript of proceedings in the case of

6     GMO Gamecenter USA, Inc. v. Whinstone US, Inc.;

7     Docket #22CV5974 Was prepared using digital

8     transcription software and is a true and accurate

9     record of the proceedings.

10

11

12    Signature   _Adrienne M. Mignano_

13                   ADRIENNE M. MIGNANO, RPR

14

15    Date:        October 5, 2023

16

17

18

19

20

21

22

23

24

25


             AMM TRANSCRIPTION SERVICE - 631.334.1445