# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC., <br><br>      *Plaintiffs*, <br><br> - against - <br><br> WHINSTONE US, INC., <br><br>      *Defendant.* | Civil Action No. 1:22-cv-05974-JPC |
| WHINSTONE US, INC., <br><br>      *Counterclaim Plaintiff*, <br><br> - against - <br><br> GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC., <br><br>      *Counterclaim Defendants*. | **FOURTH AMENDED COMPLAINT** |

Plaintiffs GMO Gamecenter USA, Inc. and GMO Internet Group, Inc. (collectively, "GMO" or "Plaintiffs") file their Fourth Amended Complaint against the Defendant Whinstone US, Inc. ("Whinstone" or "Defendant" and collectively with GMO, the "Parties"), and in support thereof GMO states and alleges as follows:

### NATURE OF THE ACTION

1.  This is an action for a breach of contract of a W Colocation Services Agreement (Texas) entered into on October 16, 2019, between Plaintiffs and Defendant (with all addenda and amendments, the "Texas Agreement," attached hereto as Exhibit A).

## PARTIES

2.  Plaintiff GMO Gamecenter USA, Inc. is a corporation duly organized and existing under, and by virtue of, the laws of the State of California, with its principal place of business in Tokyo, Japan.

3.  Plaintiff GMO Internet Group, Inc. ("GMO-I") is a corporation duly organized and existing under, and by virtue of, the laws of Tokyo, Japan, with its principal place of business at Cerulean Tower, 26-1, Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan.

4.  Defendant Whinstone US, Inc. is a corporation duly organized and existing under, and by virtue of, the laws of the State of Delaware, with its principal place of business at 2721 Charles Martin Hall Road, Rockdale, Texas 76567.

## JURISDICTION AND VENUE

5.  The Texas Agreement states, "This Agreement shall be governed by laws of the State of New York and the Parties hereby submit to the exclusive jurisdiction of the New York courts." Venue is proper in this District under the Agreement's forum selection clause and because this action was removed from the New York Supreme Court, New York County pursuant to 28 U.S.C. §§ 1441 and 1446.

6.  Whinstone is a citizen of Texas, while GMO Gamecenter USA, Inc. and GMO-I are citizens of Japan and/or California. The amount in controversy far exceeds $75,000. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(3).

## FACTUAL BACKGROUND

**A.   The Parties' Relationship**

7.  GMO comprehensively develops world-class Internet services. GMO-I launched its Internet operation in 1995 when Japan was still at the dawn of the Internet. Through its project

companies—including GMO Gamecenter USA, Inc.—it now offers diverse services, including Internet infrastructure, online advertising and media, Internet finance, cryptocurrency mining and trading, and game development, spanning 59 locations in 20 countries.

8. Whinstone operates data centers for large-scale cryptocurrency mining and high-speed video rendering. At these locations, it offers space and other services to multiple companies conducting bitcoin mining—including GMO—through colocation agreements. Whinstone operates North America's largest bitcoin mining and hosting facility in Rockdale, Texas.

9. In April 2021, upon information and belief, Whinstone was acquired by Riot Platforms, Inc. ("Riot"), a publicly traded bitcoin mining and hosting company, for 11.8 million shares of Riot common stock and $80 million in cash.

10. By way of background, bitcoin mining is the process of creating new bitcoin using computing systems that compete to solve mathematical problems. This process also verifies and validates the information regarding the bitcoin transactions on the bitcoin network and, by doing so, prevents double-spending. "Mining" of bitcoins is accomplished using energy-intensive, powerful computers and sophisticated equipment located in data centers to solve complex cryptographic hash puzzles to verify transactions that are then updated on the decentralized blockchain ledger. In return for solving these puzzles, verified miners are rewarded with newly minted bitcoin (subject to a fixed cap on total bitcoins that may be minted), and they receive fees from any transaction contained in each block of transactions (which fees, in turn, ensure that miners have the incentive to mine and validate bitcoin transactions and keep the network going).

11. Colocation agreements are contracts whereby the host (here, Whinstone) provides a state-of-the-art facility to house and operate data mining equipment or other Internet equipment, such as a website hosting service, of the customer (here, GMO) that will be operated on a full-time

basis (i.e., 24 hours per day, 365/366 days per year, subject to very limited force majeure and other contractually delineated circumstances permitting curtailment). The host facility provides power, air conditioning, security, and Internet access, among other services, with the objective of persuading an equipment owner to entrust its equipment to the care of the host, even while the equipment works under remote software management by the owner. While the owner may manage the equipment remotely using software, physical inspection and services for caretaking and repair of the equipment is also necessary and provided either by the host upon request or by the owner pursuant to contractually agreed access to the site to safekeep the facility and other owners' equipment. Importantly, the host does not own the equipment and has no right to physically access or remove the equipment unless expressly authorized by the owner.

12. Bitcoin mining is big business. According to CoinMarketCap, the value of all the bitcoins in the world was over $1.03 trillion in late 2021. While the value of bitcoins fluctuates, a single bitcoin was worth $28,875.30 on May 14, 2022. Thousands of companies accept bitcoin as payment and a growing number of Wall Street firms (including J.P Morgan, Morgan Stanley, and others) are expanding their footprint in the cryptocurrency sector.

13. GMO has been involved in bitcoin mining since 2017, when it began operations in Iceland. In 2018, GMO expanded into Norway and was looking for other opportunities around the globe, including in the United States, Canada, Uzbekistan, and Laos.

14. In June 2018, Whinstone's then-President Aroosh Thillainathan attended the GMO Internet Mining Roadshow in Germany. Mr. Thillainathan subsequently made a proposal to a member of GMO's mining business project team that GMO use space in a mining data center

Whinstone planned to build in Louisiana. Excited about the opportunity to expand operations, GMO management agreed after a series of site visits, due diligence, and technical discussions with members of the mining business project team.

**B.     The Louisiana Agreement**

15.     After months of negotiation, Whinstone affiliate Whinstone US, LLC and GMO-I formalized their agreement in November 2018 through the W Colocation Services Agreement (GMO Internet Group) (including all addenda and amendments, the "Louisiana Agreement," attached hereto as Exhibit B), pursuant to which, among other things:

- GMO-I provided a $5.8 million initial deposit (the "Initial Deposit") to Whinstone to cover data center construction costs and working capital;

- Whinstone agreed to construct a data center in Louisiana that would begin operations in January 2019; and

- Post-construction, in exchange for payment of a fee, Whinstone would provide (1) certain space in the data center for GMO-I bitcoin mining equipment, (2) sufficient power at specified levels to allow for operation of the mining machines, (3) Internet connection, networking, and cooling services, (4) a license to use certain IP addresses, and (5) various other services, including security and certain maintenance of the equipment when requested by GMO-I.

The Louisiana Agreement also included, among other things, various termination and damages provisions.

16.     Despite Whinstone US, LLC's obligation under the Louisiana Agreement to begin operations in January 2019, the Louisiana data center actually began operations in March 2019 with capacity for only 385 units of mining machines, as opposed to the 66,693 machines GMO

anticipated pursuant to the terms of the Louisiana Agreement. Further, Whinstone US, LLC failed to secure a contract for power supply with the power company, resulting in a situation where only 5 megawatts (MW) of power were supplied to the data center—far below what was required under the Louisiana Agreement. These failures severely restricted GMO-I's ability to mine bitcoin, resulting in significant lost profits to GMO-I. Eventually, the Louisiana data center was forced to suspend operations in July 2019 because there was simply not sufficient power to sustain operations. This failure constituted a breach of the Louisiana Agreement by Whinstone US, LLC, which Whinstone US, LLC and Whinstone acknowledged.

17. As a result of Whinstone US, LLC's failures, GMO-I demanded that Whinstone and Whinstone US, LLC return its Initial Deposit and make it whole for the lost profits it had suffered and was continuing to suffer.

18. At the same time, Whinstone had been struggling to secure funding to get a new data center in Midland, Texas constructed. When that project fell apart, Whinstone pursued development of a data center project in Rockdale, but again failed to raise the necessary funds. To proceed with the Rockdale project, Whinstone desperately needed to secure GMO as a customer at that facility. So, as an incentive to (1) defer payment of the millions of dollars it already owed GMO, (2) secure a contract with GMO, and (3) convince GMO to loan it additional money to fund construction costs, Whinstone offered GMO favorable terms for a new colocation arrangement at the Rockdale data center. GMO agreed and the Rockdale data center is now the single-largest bitcoin mining facility in the United States.

**C.     The Texas Agreement**

19. To address both (1) the amounts Whinstone US, LLC and Whinstone owed to GMO-I stemming from the failed Louisiana data center, and (2) the agreement for the planned

Rockdale data center, the Parties executed the Texas Agreement on or about October 16, 2019. Under the Texas Agreement, Whinstone agreed to build a center located in Rockdale, Texas, and provide the same type of services to GMO as were supposed to be provided at the Louisiana data center. *See* Texas Agreement at §§ 2-6. In exchange, GMO provided a fee and entrusted to Whinstone over $19.5 million worth of bitcoin mining equipment. *Id.* at § 7. GMO also agreed to provide a $33.6 million loan to Whinstone to fund construction costs.

20. To address the harm done to GMO-I through Whinstone US, LLC's and Whinstone's failure to perform under the Louisiana Agreement, the Parties also included several terms (1) acknowledging Whinstone's breaches and liability and (2) contemplating multiple indemnity payments to be made by Whinstone to GMO-I. These terms included Whinstone's obligation to repay GMO-I's Initial Deposit paid in connection with the Louisiana data center and a duty to reimburse GMO-I for a portion of the lost profit due to the power suspension at the Louisiana data center in "an amount of $2,029,402.56 arising out of the suspension of the provision of power by Whinstone…from July 27, 2019 to the date when the Data Center starts operation of 5MW" (the "Loss of Profit by Power Suspension"). *See* Texas Agreement at §§ 16.1-16.2.

21. Section 16.3 of the Texas Agreement acknowledges Whinstone's additional liabilities stemming from GMO-I's additional lost profits and provides as follows:

> Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension ("Loss of Profit by Power Shortage"), which constitutes a breach of the Original Agreements. The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit by Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties.

D.  **Whinstone Refuses To Indemnify GMO And Causes GMO To Suffer Additional Lost Profits.**

22.  Over the course of 2020 and into 2021, GMO pushed Whinstone to repay the amounts owed, but Whinstone engaged in a pattern of delays.

23.  Not only were some of the payments delayed, but Whinstone also failed to meet the operational deadlines in the Texas Agreement. For instance, despite Whinstone's obligation to begin operations within 20 weeks of the construction start date, *see* Texas Agreement at 2.1, the center did not reach 5MW operations until June 2, 2020, much later than expected. This was largely due to project mismanagement and lack of budget control resulting in significant delays in (1) the construction of the data center building, switch stations, sub-stations, and electrical facilities, and (2) putting the power supply schedule in place. In addition, Whinstone gave priority to other customers, upon information and belief, because those arrangements were more profitable for Whinstone. Subsequently, Whinstone failed to meet contractually dictated milestones, resulting in additional lost profits for GMO given the lack of capacity provided at the Rockdale facility. Specifically, Section 4.3 (Specified Power Draw) provides the following:

> 4.3.1 Whinstone shall provide the Customer with power as provided in the schedule below (the "**Specified Power Draw**"). The Customer will be charged for power usage at 0.0285 USD/kWh.
>
> (i)  as of February 29, 2020 : 40 MW
>
> (ii) as of April 30, 2020 : 80 MW
>
> (iii) as of May 31, 2020 : 120MW

24.  But even after June 2, 2020, Whinstone was only able to supply GMO with 60 MW of power, in violation of Section 4.3 of the Texas Agreement. Upon information and belief, Whinstone could supply only this limited amount of power because (1) it chose to provide power

and other electrical equipment to other customers in other data center buildings on a priority basis because it was more profitable for Whinstone; and (2) it mismanaged the Rockdale data center. For instance, in April 2023, Whinstone's transformers and other electricity equipment at the Rockdale data center failed, causing a significant reduction in power supplied to GMO's mining machines. In addition, when GMO visited the Rockdale data center in August 2023, Whinstone/Riot representatives informed GMO that at least three transformers servicing GMO's machines in Building A of the Rockdale data center had recently failed, disrupting the flow of power to GMO's machines (which always operated in Building A) as well as the evaporative cooling walls that helped GMO's machines stay cooler and thus operate more efficiently.

25.   Such failures to provide power by Whinstone also constitute breaches of Section 5.4 of the Texas Agreement, which requires Whinstone to "ensure a service uptime of 99% . . . for the provision of" services, including providing power to GMO's machines, as well as "regular networking, internet-connection, and cooling services[.]" At many points throughout the term of the Texas Agreement, including as recently as GMO's visit to the Rockdale data center in August 2023, Whinstone failed to ensure a service uptime of 99%.

26.   On July 1, 2020, Whinstone finally paid off the Initial Deposit and the Loss of Profit by Power Suspension at an agreed total amount of approximately $7.9 million, of which $2,029,402.56 was attributable to the Loss of Profit by Power Suspension.

27.   Thereafter, GMO initiated attempts to secure payment of the remainder of the lost profits for which Whinstone acknowledged it was liable—*i.e.*, the Loss of Profit by Power Shortage required under Section 16.3—which were in excess of $35 million.

28. But while the Parties exchanged working drafts of an amendment that would lower the hosting fee from $0.0285/kWh to the lowest possible pass-through rate ($0.0210/kWh or less) until the amount was recouped, Whinstone never signed these drafts.

29. Instead, despite GMO's repeated requests to negotiate payment of the Loss of Profit by Power Shortage and a new, longer-term agreement as anticipated in the Texas Agreement, all discussions came to a halt when Riot acquired Whinstone in April 2021. Indeed, the now Riot-controlled Whinstone never made any proposal concerning its indemnity obligations and instead—only after dozens of requests over many months—proposed in bad faith a wholly unacceptable longer-term agreement with terms vastly disadvantageous to GMO and inconsistent with the parameters and express agreements set forth in the Texas Agreement.

30. To date, Whinstone has not indemnified GMO for any amounts attributable to the Loss of Profit by Power Shortage described in Section 16.3 of the Texas Agreement.

31. Nor has Whinstone made GMO whole for the lost profits it suffered after June 2, 2020 as a result of Whinstone's continuing breaches.

32. Under Section 9.1, Whinstone is liable for, among other things, GMO's loss of revenue, loss of profit, and loss of savings stemming from Whinstone's breach. GMO's losses attributable to these additional breaches exceed $50 million.

E. **Whinstone Refuses to Provide GMO Its Share of Profit from Power Sales.**

33. Under Section 4.3.8 of the Texas Agreement, "Whinstone shall get prior consent of the Customer to power down miners, except for LRS. In the event that power down [sic], the Customer and Whinstone will share as fair the benefit of selling power deducted loss of profit should getting [sic] from performing miners."

34. As disclosed in Riot's Form 10-K filing for the fiscal year ended December 31, 2021, the State of Texas experienced an extreme and unprecedented winter weather event in February 2021 ("Winter Storm Uri") that resulted in prolonged freezing temperatures and caused an electricity generation shortage that was severely disruptive to the whole state. While demand for electricity reached extraordinary levels due to Winter Storm Uri, the supply of electricity significantly decreased in part because of the inability of certain power generation facilities to supply electric power to the grid. At the request of the ERCOT (the grid operator serving most of Texas), Whinstone stopped supplying power to its customers and instead sold power back onto the power grid. During this time, GMO was not supplied with power to operate its bitcoin mining machines.

35. Whinstone's sale of power onto the grid resulted in significant profit to Whinstone. Specifically, Riot disclosed the following in its Form 10-K:

> In April 2021, under the provisions of the TXU Power Supply Agreement, and as a result of the weather event, Whinstone entered into a Qualified Scheduling Entity ("QSE") Letter Agreement, which resulted in Whinstone being entitled to receive approximately $125.1 million for its power sales during the February winter storm, all under the terms and conditions of the QSE Letter Agreement. Whinstone received cash of $29.0 million in April 2021 (after deducting $10.0 million in power management fees owed by Whinstone), approximately $59.7 million is scheduled to be credited against future power bills of Whinstone beginning in 2022 and the remaining $26.3 million is contingent upon ERCOT's future remittance.

36. Riot similarly disclosed in its Form 8-K reported on August 16, 2022, that it sold power back into the grid and/or to a third party for a significant profit.

37. According to Riot's recent SEC disclosures, Riot sold power to the ERCOT grid in return for profits totaling $27.3 million in 2022, and $16.5 million in the first half of 2023. Riot

also disclosed that it made an additional $7.8 and $31.7 million by selling power to the ERCOT grid in July and August 2023, respectively.

38. Under Section 4.3.8 of the Colocation Agreement, GMO is entitled to share in Whinstone's multi-million-dollar profits. On multiple occasions, GMO sought information on the profits and other benefits Whinstone enjoyed from selling power. Whinstone never responded. Nor did it ever pay GMO any share of the profits or provide any other benefit as required under the Texas Agreement.

F. **Whinstone Commits Other Breaches—Including Wrongfully Removing GMO Equipment, Overcharging GMO for Power, and Improperly Terminating the Texas Agreement.**

39. Aside from GMO's lost profits attributable to Whinstone's delays in providing the levels of power it was contractually obligated to deliver, Whinstone also committed additional material and ongoing breaches of the Texas Agreement. Specifically:

a. On or about March 29, 2022, Whinstone improperly removed certain of GMO's mining machines in breach of its obligations under Section 3.1.3 of the Texas Agreement (allowing for relocation of equipment only with prior written consent of GMO, which Whinstone neither requested not obtained) and Section 14 of the Texas Agreement (which allows Whinstone to suspend services only under certain circumstances, none of which are applicable). Due to Whinstone's removal of GMO's machines, GMO suffered a decrease of an estimated 20 petahashes in mining capacity, which amounts to at least $16,000 a day in profits. While GMO demanded that the equipment be returned/replaced and sent a formal notice related to such on April 12, 2022, GMO did not receive any response. And upon visiting the Rockdale data center on May 7, 2022, GMO personnel discovered that its

        machines had not been placed back in service but had instead been replaced by Whinstone's machines operating for Whinstone's own benefit. Despite multiple demands that the GMO machines be put back in position, Whinstone refused. In addition, throughout 2023, Whinstone continued to remove GMO's machines and replace them with their own machines, or machines owned by other mining customers.

b.     Whinstone also recently invoiced GMO for an increase in power price from $0.0285/kWh to $0.03/kWh (resulting in an increased cost of approximately $50,000.00 per month), ostensibly because the power price to be paid by Whinstone to its provider, TXU Energy, is set to increase. However, the 2019 Texas Agreement provides that the power price of $0.0285 USD/kWh "shall not be increased for 10 years" and that "the Parties shall consult with each other in good faith on the price" thereafter. *See* Texas Agreement at § 4.3.2. Whinstone's right to pass on increases is strictly limited to changes in regulation and similarly-imposed costs. Despite GMO formally disputing the charges and seeking explanation, no explanation or evidence has been submitted by Whinstone that this power price increase meets that standard. The recent charges therefore constitute a further breach of the 2019 Texas Agreement. Moreover, even if the price increase fell within a permitted exception under Section 4.3.2, Whinstone does not have the right to unilaterally bill GMO for its alleged increased costs. Instead, Section 4.3.2 provides, in such circumstances, that the parties "shall decide fairly by agreement the effect of to whom can be passed on." No such agreement was sought or reached here. Indeed, when GMO sought further information to evaluate the new charges,

  it received no response whatsoever from Whinstone. Thus, the supplemental invoices do not comply with the 2019 Texas Agreement and constitute a further breach.

c. On June 29, 2023, Whinstone sent GMO a "Notice of Termination" purporting to terminate the Texas Agreement based on claims that GMO had failed to cure alleged breaches for failure to negotiate in good faith and failure to use the "Specified Power Draw," which Whinstone had raised for the first time over one year earlier, in a letter dated June 13, 2022 (the "June 2022 Letter"). Whinstone simultaneously and unilaterally disconnected GMO's power at the Rockdale data center. Whinstone's Notice of Termination and power-down of GMO's machines is improper under, among other things, Section 15.2 of the Texas Agreement, which permits a "Non-Defaulting Party" to terminate the Texas Agreement only after the "Defaulting Party's" failure to cure a "material breach" of the Texas Agreement. Whinstone is not a "Non-Defaulting Party," because, among other breaches, Whinstone has persistently failed to provide contractually mandated amounts of power to GMO's mining machines. Furthermore, the breaches alleged by Whinstone in its Notice of Termination and June 2022 Letter are entirely meritless. GMO complied with the Texas Agreement's requirement to negotiate an amended agreement in good faith, and GMO was under no obligation to use the "Specified Power Draw" under the express terms of the Texas Agreement. Whinstone's improper attempt to terminate the Texas Agreement and its disconnection of GMO's miners from power constitute additional breaches of the Texas Agreement, which have caused GMO to suffer additional lost bitcoin mining profit damages in

an amount not less than $271 million, and lost profit sharing damages under Section 4.3.8 of the Texas Agreement in an amount not less than $225 million.

## CAUSE OF ACTION
### (Breach of Contract)

40. GMO incorporates the allegations contained in paragraphs 1 through 36 of this Fourth Amended Complaint as if fully set forth herein.

41. The Texas Agreement constitutes an enforceable agreement between the Parties.

42. GMO has fully performed its obligations under the Texas Agreement, including but not limited to any conditions precedent to Whinstone's performance, or any such obligations of GMO have been excused or waived.

43. Whinstone has breached the Texas Agreement by, among other things:

   a. Failing to pay the indemnification owed under Section 16.3 of the Texas Agreement;

   b. Failing to pay the damages owed under Section 9.1 of the Texas Agreement as a result of Whinstone's failure to meet its obligations to provide power;

   c. Failing to remit to GMO its fair share of profits stemming from the sales of power, pursuant to Section 4.3.8 of the Texas Agreement;

   d. Removing GMO's mining equipment without permission in violation of Texas Agreement, including but not limited to Sections 3.1.3 and 14;

   e. Overcharging GMO in violation of Section 4.3.2 of the Texas Agreement; and

   f. Improperly terminating the Texas Agreement in violation of Section 15.2.

44. GMO has suffered significant damages as a result of Whinstone's breaches.

**WHEREFORE,** GMO demands judgment as follows:

  a. that the Court find Whinstone committed the breaches alleged herein and award GMO all actual and consequential damages flowing therefrom, including as permitted under Section 9.1 of the Texas Agreement;

  b. Pre- and post-judgment interest at the highest lawful rates; and

  c. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 11, 2023

Respectfully submitted,

By: */s/ Leslie C. Thorne*
Leslie C. Thorne
leslie.thorne@haynesboone.com
Alexandra Larkin
alexandra.larkin@haynesboone.com
Jason Jordan
jason.jordan@haynesboone.com
Aishlinn Bottini
aishlinn.bottini@haynesboone.com
Michael Freyberg
michael.freyberg@haynesboone.com

HAYNES AND BOONE, LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Telephone: (212) 659-7300
Facsimile: (212) 918-8989

**ATTORNEYS FOR GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC.**