**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC., | |
| *Plaintiffs,* | |
| - against - | |
| WHINSTONE US, INC., | Case No. 22-cv-5974-JPC-KHP |
| *Defendant.* | |
| WHINSTONE US, INC., | **ANSWER TO FOURTH AMENDED COMPLAINT AND COUNTERCLAIMS** |
| *Counterclaim Plaintiff,* | |
| - against - | |
| GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC., | |
| *Counterclaim Defendants.* | |

Defendant Whinstone US, Inc., by and through undersigned counsel, for its Answer to

the Fourth Amended Complaint (the "Complaint") and Counterclaims against Defendants GMO

Gamecenter USA, Inc. ("GMO USA") and GMO Internet Group, Inc. ("GMO-I" and together

with GMO USA, "GMO" or "Plaintiffs"), alleges as follows:

1.     Whinstone denies the allegations in paragraph 1 of the Complaint, except admits

that Plaintiffs purport to allege a claim for breach of contract and admits that Exhibit A to the

Complaint is a copy of the W Colocation Services Agreement (Texas) entered into on October

16, 2019 between Plaintiffs and Whinstone without subsequent amendments.  The W Colocation

Services Agreement (Texas) with amendments is referred to herein as the "Agreement."

2.      Whinstone denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 2 of the Complaint.

3.      Whinstone denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 3 of the Complaint.

4.      Whinstone admits the allegations in paragraph 4 of the Complaint.

5.      Paragraph 5 of the Complaint contains legal conclusions to which no response is

required.  To the extent a response is required, Whinstone admits that venue is proper in the

Southern District of New York.

6.      Whinstone denies the allegations in paragraph 6 of the Complaint and refers to the

Agreement for its terms, except Whinstone admits that this Court has jurisdiction over this

matter.  To the extent the allegations in paragraph 6 contain legal conclusions, no response is

required.

7.      Whinstone denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 7 of the Complaint.

8.      Whinstone denies the allegations in paragraph 8 of the Complaint, except admits

that Whinstone operates data centers, including a data center in Rockdale, Texas, that are

intended for cryptocurrency mining and that it offers its facilities to customers conducting

bitcoin mining.

9.      Whinstone denies the allegations in paragraph 9 of the Complaint, except admits

that it was acquired by and became a wholly owned subsidiary of Riot Blockchain, Inc., now

2

Riot Platforms, Inc., as of May 26, 2021, and refers to the agreement concerning the acquisition for its terms.

10.     Whinstone denies the allegations in paragraph 10 of the Complaint, except admits that bitcoin mining involves the running of algorithms in return for which bitcoins can be received.

11.     Paragraph 11 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies knowledge or information sufficient to form a belief as to the truth of the allegations, except admits that Whinstone offers services to its customers pursuant to, among other things, various colocation agreements, one example of which was the Agreement with Plaintiffs.

12.     Whinstone denies the allegations in paragraph 12 of the Complaint, except admits that bitcoin is a large and growing business, denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12, and refers to the publications by CoinMarketCap for their contents.

13.     Whinstone denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint.

14.     Whinstone denies the allegations in paragraph 14 of the Complaint, including the allegation that Aroosh Thillainathan was an officer or representative of Whinstone in June 2018, except that Whinstone (i) denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 concerning Mr. Thillainathan's attendance at any conference or contemporaneous discussions with GMO, and (ii) admits that Whinstone had discussions and meetings with Plaintiffs prior to November 2018 concerning a business relationship.

15.     Paragraph 15 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations, except admits that Exhibit B to the Complaint is a copy of the W Colocation Services Agreement (GMO Internet Group) entered into on November 28, 2018 between Whinstone US, LLC (the predecessor-by-conversion of Whinstone US, Inc.) and GMO-I (the "Louisiana Agreement"), and refers to the Louisiana Agreement for its terms.

16.     Paragraph 16 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Louisiana Agreement for its terms.

17.     Paragraph 17 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

18.     Whinstone denies the allegations in paragraph 18 of the Complaint and refers to the Louisiana Agreement for its terms, except admits that Whinstone operates a facility in Rockdale, Texas.

19.     Paragraph 19 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations, except admits that Whinstone entered into the Agreement with Plaintiffs on or about October 16, 2019, and refers to the Agreement for its terms.

20.     Paragraph 20 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

21.     Paragraph 21 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

22.     Whinstone denies the allegations in paragraph 22 of the Complaint.

23.     Paragraph 23 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

24.     Paragraph 24 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

25.     Paragraph 25 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

26.     Whinstone denies the allegations in paragraph 26 of the Complaint, except admits that it paid to Plaintiffs the Initial Deposit and Loss of Profit by Power Suspension under the Agreement in the amount of approximately $7.9 million in July 2020.

27.     Paragraph 27 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

28.     Whinstone denies the allegations in paragraph 28 of the Complaint, except admits that the parties had communications concerning the hosting fee amount.

29.     Whinstone denies the allegations in paragraph 29 of the Complaint.

30.     Paragraph 30 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

31.     Paragraph 31 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

32.     Paragraph 32 of the Complaint states legal conclusions to which no response is required.   To the extent a response is required, Whinstone denies the allegations.

33.     Paragraph 33 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

34.     Whinstone denies the allegations in paragraph 34 of the Complaint and refers to the referenced Form 10-K for its contents, except admits that, during Winter Storm Uri, the electricity supply decreased, and that Whinstone, at its power supplier's request pursuant to ERCOT load response instructions, interrupted the supply of electricity to its customers (including GMO), equally, and authorized its power supplier to redirect power for sale by Whinstone's power supplier on the ERCOT marketplace.

35.     Whinstone denies the allegations in paragraph 35 of the Complaint and refers to the referenced Form 10-K for its contents.

36.     Whinstone denies the allegations in paragraph 36 of the Complaint and refers to the referenced Form 8-K for its contents.

37.     Whinstone denies the allegations in paragraph 37 of the Complaint and refers to the referenced "SEC disclosures" for the content therein.

38.     Paragraph 38 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

39.     Paragraph 39 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations and refers to the Agreement for its terms.

40.     In response to paragraph 40 of the Complaint, Whinstone repeats and realleges its answers to the foregoing paragraphs as if fully set forth herein.

41.     Paragraph 41 of the Complaint states legal conclusions to which no response is required.

42.     Paragraph 42 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

43.     Paragraph 43 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

44.     Paragraph 44 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whinstone denies the allegations.

## ADDITIONAL DEFENSES

As additional defenses, Whinstone alleges, asserts, and states the following, which apply to each and every cause of action asserted in the Complaint to which such defense may be applicable.  By virtue of alleging these further defenses, Whinstone does not assume any burden of proof, persuasion, or production not otherwise legally assigned to it.  Whinstone asserts and expressly reserves all rights to assert any and all other defenses as appropriate, including as may be revealed during the course of discovery.

## FIRST DEFENSE

The Complaint fails to state any claim upon which relief can be granted.

**SECOND DEFENSE**

Plaintiffs' claim is barred in whole or in part by their own material breaches of the Agreement.

**THIRD DEFENSE**

Plaintiffs' claim is barred in whole or in part by the doctrines of waiver, laches, unclean hands, and/or estoppel.

**FOURTH DEFENSE**

Plaintiffs' claim fails in whole or in part because Whinstone's actions have caused no damages to Plaintiffs.

**FIFTH DEFENSE**

Plaintiffs' claim is barred in whole or in part because Plaintiffs failed to mitigate damages.

**SIXTH DEFENSE**

Plaintiffs' claim is barred in whole or in part because, to the extent Plaintiffs suffered damages, which Whinstone denies, such damages arise from Plaintiffs' own actions and breaches.

**SEVENTH DEFENSE**

Whinstone is entitled to a set-off against Plaintiffs' alleged damages for damages Whinstone incurred as a result of Plaintiffs' material breaches of the Agreement.

**EIGHTH DEFENSE**

Plaintiffs' claim fails because the Agreement was not an enforceable contract in whole or in part.

**NINTH DEFENSE**

Plaintiffs claim fails in whole or in part because it is barred by the terms of the Agreement.

## COUNTERCLAIMS

Whinstone US, Inc., a Delaware corporation ("Whinstone"), for its Counterclaims against GMO Gamecenter USA, Inc. and GMO Internet Group, Inc. (collectively, "GMO"), alleges as follows:

1.      Whinstone brings these Counterclaims for breach of the W Colocation Services Agreement (Texas) entered into on October 16, 2019 between itself and GMO, as amended on November 21, 2020 and terminated on June 29, 2023 (the "Agreement"), unjust enrichment, and for declaratory judgment.

### PARTIES

2.      Whinstone is a Delaware corporation with its principal place of business in Rockdale, Texas.

3.      Counterclaim-defendant GMO Gamecenter USA, Inc. is a California corporation with its principal place of business in Tokyo, Japan.

4.      Counterclaim-defendant GMO Internet Group ("GMO-I"), Inc. is a corporation organized and existing under the laws of Tokyo, Japan, with its principal place of business in Tokyo, Japan.

### JURISDICTION AND VENUE

5.      The Agreement provides that "the Parties hereby submit to the exclusive jurisdiction of the New York courts."  Thus, this Court has personal jurisdiction over the parties in this case.

6.      Further, Whinstone is a citizen of Texas, while GMO Gamecenter USA, Inc. and GMO-I are citizens of Japan and/or California.  The amount in controversy far exceeds $75,000. Accordingly, this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(3).

7.     Venue is proper in this District under the Agreement's forum selection clause and because this action was removed from the New York Supreme Court, New York County, pursuant to 28 U.S.C. §§ 1441 and 1446.

## FACTS COMMON TO ALL COUNTS

8.     In 2018, GMO, which is in the business of bitcoin mining, approached Whinstone to provide colocation and hosting services for GMO's bitcoin mining operations.

9.     The parties entered into a W Colocation Services Agreement, dated effective as of November 28, 2018 (the "Louisiana Agreement"), pursuant to which Whinstone agreed to provide certain colocation and hosting services to GMO for bitcoin mining operations in Louisiana.

10.     Due to certain delays relating to the Louisiana facility, Whinstone agreed to develop a new data center in Texas (the "Texas Facility") and provide GMO colocation and hosting services there, and GMO agreed to advance certain funding in connection with the construction of the Texas Facility.

11.     Effective October 16, 2019, the parties entered into a new W Colocation Services Agreement (Texas), which superseded and replaced the Louisiana Agreement.  Under this agreement, the parties agreed that, in addition to providing hosting and colocation services, Whinstone would pay certain amounts to GMO arising out of the Louisiana Agreement and the Texas Facility, namely:  (1) a deposit of $5,810,720 paid by GMO under the Louisiana Agreement (the "Original Deposit"); (2) GMO's loss of profits due to the suspension of power available to GMO in the amount of $2,029,402 ("Loss of Profit by Power Suspension"); (3) GMO's investment cost for the construction of the Texas Facility in the approximate amount of $25 million (the "Initial Investment Cost"); and (4) GMO's alleged loss of profit based on lack

of power access under the Louisiana Agreement between January 5, 2019 and the date the Texas

Facility would go online (the "Loss of Profit by Power Shortage").

12.     Because the parties could not agree on the amount, if any, of the Loss of Profit by

Power Shortage, the parties agreed, under Section 16.3 of the Agreement, that, once the Texas

Facility was operational, the parties would negotiate in good faith to identify the amount of any

Loss of Profit by Power Shortage and establish the means by which such amount would be

repaid.  This amount, once agreed upon, was to be paid through a reduction in the base fee due

from GMO under the Agreement, in an amount and for a time period to be reasonably agreed

upon by the parties.

13.     Further, Section 20.6 of the Agreement provided that when Whinstone had repaid

the Original Deposit, the Loss of Profit by Power Suspension, and the Initial Investment Cost,

the parties would then renegotiate the terms of the Agreement in good faith based on the hosting

agreement usually offered by Whinstone for colocation services.

14.     The Texas Facility was available for GMO's use as of June 2, 2020.

15.     Whinstone repaid the Original Deposit and the Loss of Profit by Power

Suspension by July 1, 2020, which the parties acknowledged and agreed in their November 21,

2020 Amendment of the W Colocation Services Agreement (Texas).

16.     On or about March 29, 2021, Whinstone paid GMO the balance of the Initial

Investment Cost.

17.     As alleged in more detail below, however, GMO breached its duties under Section

16.3 by failing to reasonably negotiate the amount and repayment of GMO's alleged Loss of

Profit by Power Shortage under the Louisiana Agreement.  Indeed, GMO failed even to identify

the amount of its alleged Loss of Profit by Power Shortage, let alone do so in a manner that

included an explanation of the calculated amount and supporting materials reasonably necessary for Whinstone to evaluate the loss claim so that Whinstone could address this obligation. Instead, GMO identified wildly different amounts ranging from $3 million to $35 million, with no information how these vastly different amounts were calculated, and with no supporting documentation.

18.     GMO also breached its obligation under Section 20.6 by failing and refusing to negotiate in good faith for a new colocation agreement based on the standard hosting agreement being offered by Whinstone to other customers for colocation services once "the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid." Instead, GMO – despite the clear and unambiguous language of Section 20.6 – used the Loss of Profit by Power Shortage as a roadblock to further negotiations and even then did so without identifying the amount of the alleged Loss of Profit by Power Shortage or otherwise providing supporting documentation to allow Whinstone to identify such amount.

**GMO's Failure to Substantiate and Negotiate a Reasonable Loss of Profit by Power Shortage Amount**

19.     At the time the Agreement was executed, GMO alleged a Loss of Profit by Power Shortage, which comprised a "loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension."

20.     At the time of execution of the Agreement, GMO had not identified the amount of this alleged loss, nor any backup information supporting the alleged loss. As a result, the parties agreed in Section 16.3 of the Agreement to address this alleged claim as follows: "The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit by Power Shortage by

12

lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties."

21.     The terms of Section 16.3 further anticipated and required that GMO, acting in good faith, would thereafter identify the amount of its alleged loss, how it calculated this amount, and provide the supporting materials reasonably necessary for Whinstone to evaluate the loss claim, following which the parties would then reasonably agree on the amount of any reduced hosting fee and the time the reduced hosting fee would be used.

22.     The Texas Facility started operation of more than 5 MW on June 2, 2020.  Thus, under Section 16.3, any Loss of Profit by Power Shortage would reflect GMO's alleged loss of profits for the period from January 15, 2019 through June 1, 2020, less the approximately $2 million paid for the Loss of Profit by Power Suspension.  Despite this defined time period and GMO's insistence that the Loss of Profit by Power Shortage exists, GMO has never provided a calculation or any back-up documentation to support its claim.

23.     GMO's first proposal concerning the Loss of Profit by Power Shortage came in April 2021, when GMO proposed an amendment to the Agreement addressing, among other things, this term.  In verbal and written communications concerning the proposal, GMO explained that it proposed to reduce the hosting fee from 0.0285 USD/kWh to 0.0210 USD/kWh for a period of 12 months to cover the Loss of Profit by Power Shortage.  Based on GMO's average power usage, this proposal would have resulted in a total reduction in hosting fees of approximately $3 million – an admission by GMO that the Loss of Profit by Power Shortage was no more than this amount.  However, even then, GMO failed to identify how it calculated this alleged loss, nor did it provide Whinstone with any supporting documentation.

13

24.     In subsequent negotiations concerning revised terms of a colocation agreement, GMO never sought a greater reduction in hosting fees in connection with the Loss of Profit by Power Shortage.

25.     Indeed, GMO barely mentioned any details of the Loss of Profit by Power Shortage in subsequent negotiations and never demanded payment of any amount of Loss of Profit by Power Shortage until April 2022, when – incredibly – it claimed that the Loss of Profit by Power Shortage amount was approximately $35 million, or more than 10 times higher than the approximately $3 million amount that GMO had identified and proposed a year earlier in April 2021.  Whinstone disputed this amount and demanded that GMO provide supporting documentation for its claimed loss; however, once again, GMO provided no explanation of how it calculated the loss now to be $35 million and provided no supporting documentation.

26.     Despite repeated demands, GMO has failed and refused to provide an explanation or rational basis for its calculation of the claimed losses or any supporting documentation.

27.     GMO's outrageous and wildly varied demands, together with its failure to identify how the amounts were calculated or provide any supporting documentation, further demonstrate its failure to negotiate in good faith as required by the Agreement.

28.     Indeed, other than using the claimed Loss of Profit by Power Shortage as a roadblock to negotiation of a new colocation services agreement, as detailed below, GMO – in bad faith – has wholly failed to comply with its obligation to agree reasonably on an amount and payment schedule for its alleged Loss of Profit by Power Shortage.

**GMO's Failure to Negotiate in Good Faith for a New Agreement**

29.     GMO has also failed to negotiate in good faith for a new colocation services agreement on the basis of the hosting agreement usually offered by Whinstone to other customers for colocation services.

14

30.     Under Section 20.6 of the Agreement, after Whinstone repaid the Original Deposit, the Loss of Profit by Power Suspension, and the Initial Investment Cost on March 29, 2021, GMO was obligated to renegotiate the terms of the Agreement in good faith "based on the hosting agreement usually offered by Whinstone for colocation services."

31.     As all parties understood when they executed the Agreement, the "hosting agreement usually offered by Whinstone" would increase GMO's costs compared to what it was paying under the existing Agreement.  Whereas, under the then-existing pricing, Whinstone was providing colocation services to GMO at or below cost, under a new agreement consistent with Whinstone's usual terms and market rates, GMO's pricing would increase accordingly, and Whinstone would be entitled to earn a profit for its services.

32.     GMO, however, failed and refused to negotiate in good faith and consistently rejected terms that are commensurate with the "hosting agreement usually offered by Whinstone for colocation services."

33.     In April 2021, after Whinstone had repaid the Initial Investment Cost, GMO proposed terms to address the Loss of Profit by Power Shortage under Section 16.3 of the Agreement and other amendments to the existing Agreement.

34.     Following the exchange of multiple drafts, as well as telephone and in-person meetings between the parties' authorized representatives, however, GMO disengaged from further negotiations concerning the Loss of Profit by Power Shortage.

35.     Further discussions concerning a new colocation agreement ensued, without progress.  Then, in November 2021, Whinstone provided GMO a copy of its standard form of colocation agreement and solicited comments thereto.

36.     Then, on December 9, 2021, Whinstone followed up with proposed economic terms for a new colocation agreement, which were consistent with the terms offered to all of Whinstone's other hosted mining clients.

37.     On December 23, 2021, GMO responded, ignoring the December 9 proposal and its economic terms in their entirety.  Instead, GMO provided a mark-up of the earlier November form agreement that effectively negated the material terms of Whinstone's usual and customary colocation agreements.  Despite GMO's obligation under Section 20.6 to negotiate an agreement "usually offered by Whinstone," GMO's proposal expressly asserted that Whinstone's usual terms should not be imposed on GMO, providing, specifically, that the terms of Section 16.3 of the Agreement would remain in effect.  GMO, however, failed again to provide an amount or calculation.

38.     GMO's counter-proposal was not consistent with good faith negotiations.  It outright rejected Whinstone's standard terms and conditions for colocation agreements, and it did not engage with the economic terms provided by Whinstone in its December 9, 2021 proposal.  GMO did not engage with Whinstone's proposals because doing so would require GMO to accept – as it had agreed in the Agreement – that it would have to pay a market rate for Whinstone's services.  Therefore, it should be clear that GMO's counter-proposal and its consistent delay in the negotiations were intended to improperly delay the execution of the new colocation agreement and, thus, to preserve GMO's below-market rate, thereby economically benefitting GMO and damaging Whinstone.

39.     In January 2022, GMO informed Whinstone that it would not engage in further negotiations of the required new colocation agreement until the parties first agreed on the Loss of Profit by Power Shortage.  Discussions ensued, but GMO never demanded a specific amount

associated with the Loss of Profit by Power Shortage nor offered any basis or supporting documentation to reasonably calculate such an amount. Indeed, the purported attempt to discuss the Loss of Profit by Power Shortage appears to have been a further pretext for delaying negotiation of the substantive terms of a new colocation agreement.

40.     In March 2022, almost one year after Whinstone had begun the negotiations to enter into its usual colocation agreement as provided in Section 20.6, Whinstone submitted an alternative arrangement and final proposal, in an attempt to end GMO's one-sided, blackbox negotiations. This proposal provided GMO with, in essence, a royalty on certain newer generation mining equipment that would utilize the capacity allotted to GMO in the Texas Facility. This offer would effectively have allowed GMO to upgrade its mining operations to state-of-the-art miners without GMO having to spend tens of millions of dollars in capital expenses to acquire competitive mining equipment. This agreement would have allowed GMO to effectively replace the computing power its aging miners could have generated with an equivalent amount of computing power generated by new machines, based on the peak operating capacity of all of the miners GMO had ever deployed in the Texas Facility, with no accounting for depreciation of GMO's miners from factory-new condition. In short, this proposal offered GMO a colocation agreement more favorable than Whinstone's usual colocation agreement and with a greater potential return than GMO's rapidly depreciating fleet of aging miners. GMO rejected this attractive proposal out of hand and without explanation.

41.     Instead, in April 2022, GMO asserted a claim for "$84 million or more" for "indemnification due to power shortages" under the Louisiana Agreement and the Agreement. As now detailed in its Complaint, GMO was attributing approximately $35 million to the Loss of Profit by Power Shortage amount under Section 16.3 of the Agreement. This claim – which was

more than 10 times higher than the proposal offered in April 2021 – was, yet again, entirely arbitrary and presented without support or any substantiation of its calculation.  Thus, it appears to have been intended to scuttle any substantive negotiation for a new colocation agreement.

42.     After nearly a year of attempted good faith negotiations by Whinstone, GMO repeatedly and persistently failed to negotiate or otherwise discuss in good faith the terms of a renegotiated agreement as required under the Agreement.

43.     Whinstone estimates that, as a result of GMO's failure to negotiate a new colocation services agreement consistent with the terms usually offered to Whinstone's customers, Whinstone has incurred damages of at least $22,000,000 as of November 2023.

**GMO's Failure to Use the Specified Power Draw**

44.     Adding to this failure to negotiate in good faith, GMO failed to utilize its allotted power capacity in breach of its obligations under the Agreement, which has caused substantial damages to Whinstone.

45.     Under Section 4.3.1 of the Agreement, Whinstone agreed to provide GMO with a Specified Power Draw of 120 MW at the Texas Facility from May 31, 2020 onward.

46.     Further, under Section 4.3.3, upon Whinstone's payment of the Original Deposit, Loss of Profit by Power Suspension, and Initial Investment Cost, GMO agreed to "enter into discussions in good faith about agreeing to a minimum commitment for power usage as was contained in the Louisiana Agreement."

47.     Under the Louisiana Agreement, GMO had agreed to use and pay for a minimum portion of power that Whinstone was to provide.  Under the Order Form annexed to the Louisiana Agreement, GMO agreed to use and pay for a minimum of 40 MW starting in January 2019, increasing to a minimum of 80 MW in February 2019  Were similar minimum usage

requirements applied under the Agreement, as was required by Section 4.3.3, GMO would be required to use and pay for a minimum of at least 80 MW.

48.     In August 2020, Whinstone informed GMO that the Texas Facility was ready for use.  However, GMO never undertook serious efforts to use the full capacity allotted and indeed never used more than 50 MW of its allotted capacity.

49.     Further, GMO consistently supplied outdated equipment that utilized only a fraction of the capacity provided under the Agreement and even of the reduced capacity of 75 MW previously provided based on GMO's decision not to use the space available to it.  Despite Whinstone's repeated requests for GMO to use the available space and capacity, GMO was unwilling to expend resources to upgrade its equipment or supply additional machines to take advantage of Whinstone's capacity.  Instead, GMO notified Whinstone that it could not source the miners to use the full Specified Power Draw and informed Whinstone – without negotiation or discussion – that it would only utilize 75 MW of capacity.

50.     In fact, GMO never used the full 75 MW.  Despite this, Whinstone held the full 75 MW of capacity out for GMO's use through March 2022, causing a loss to Whinstone of the colocation fees Whinstone could have earned from the operation of miners in this unused capacity.

51.     In particular, Whinstone held 75 MW of capacity for GMO's use through March 2022, at a net cost to Whinstone of at least $9,827,000.

52.     Further, GMO's failure to agree on and pay for the minimum power usage consistent with the Louisiana Agreement as required by Section 4.3.3 damaged Whinstone.

53.     Whinstone has been damaged in the amount GMO should have paid for the minimum commitment, in the amount of at least $25,000,000 as of November 2023.

**GMO's Failure to Pay an Adjusted Hosting Fee Based on ERCOT Rate Increases**

54.     In 2021, pursuant to new legislation enacted by the Texas legislature (Texas House Bill 4492), the Texas Public Utility Commission, a public agency that oversees the regulation of Texas electricity providers, promulgated regulations through the Electric Reliability Council of Texas ("ERCOT"), the self-regulatory body comprised of utility companies in Texas, relating to the securitization of electricity providers participating in the ERCOT grid system. The regulations require utility companies to implement certain surcharges on their customers in Texas.  As a result of this regulatory change, commencing effective August 1, 2021, Whinstone's cost of electricity supplied to the Texas Facility increased by 0.0015 USD/kWh.  However, Whinstone's electricity provider invoiced this surcharge amount in arrears and did not begin supplying invoices for this surcharge until January 2022, when it assessed the aggregate of the monthly surcharge amounts for August 2021 to January 2022.

55.     Under Section 4.3.2 of the Agreement, changes to the agreed on hosting fee could be made as a result of "changes in or the establishment of regulations, orders or policies, under federal or state law by the state or federal government, legislature or court or any other public authority . . . ."  In that instance, the parties "shall decide fairly by agreement the effect of to whom can be passed on" [sic].

56.     In late 2021, Whinstone notified GMO of the change in the cost of power due to the surcharges and its intention to pass those costs on to GMO.  Whinstone again notified GMO of its intentions in early January 2022.  GMO neither objected to nor sought to discuss the matter.

57.     Thus, in January 2022, Whinstone began including the surcharge as a separate monthly invoice to GMO, effectively increasing the price of power charged to GMO from 0.0285 USD/kWh to 0.030 USD/kWh (an increase of just 0.15 cents per kilowatt-hour), with the first such invoice in the amount of $275,147.40, representing GMO's ratable share of the total

surcharge assessed by Whinstone's electricity provider for the period from August 2021 to January 2022.

58.      GMO refused to pay the increased price, imposing the 0.0015 USD/kWh in additional electricity costs on Whinstone, and failed and refused to negotiate concerning an adjusted price of power, all in violation of the Agreement.

59.      GMO's failure to pay the 0.0015 USD/kWh ERCOT surcharge since its imposition in January 2022 has damaged Whinstone in the amount of at least $1,000,000 as of November 2023.

**Whinstone Terminates the Agreement Due to GMO's Material Breaches**

60.      On June 29, 2023, Whinstone sent GMO notice terminating the Agreement ("Notice of Termination" or "Termination"), effective immediately, pursuant to Section 15.2 of the Agreement in light of GMO's material breaches of the Agreement and its failure to cure those breaches.

61.      Despite the immediate effect of the Termination, Whinstone provided GMO with an additional thirty (30) days, commencing on the date of the Notice of Termination, to preserve all relevant evidence regarding its mining operations at the Texas Facility.  The Notice of Termination required all of GMO's equipment to be removed from the Texas Facility by no later than July 29, 2023, upon which time Whinstone would remove it.

62.      GMO did not respond to the Notice of Termination until July 24, 2023 – nearly 30 days after the Agreement was terminated and a few days before GMO's machines had to be removed from the Texas Facility.  GMO claimed that removing its miners would constitute spoliation of evidence, contradicting earlier representations that it had preserved all relevant evidence and that it did not require an expert to examine the Texas Facility.

63.     On July 26, 2023, GMO requested that Whinstone delay removal of GMO's machines to facilitate a visit to the Texas Facility by an expert.  Despite GMO's failure to provide any explanation for its delay in responding to the Notice of Termination or to identify any evidence that needed to be preserved, on July 27, 2023, and upon request from GMO, Whinstone agreed to further delay the removal of GMO's machines by four additional days – until August 2 – in order to allow GMO's expert to visit the Texas Facility.

64.     On July 31, 2023, GMO filed an emergency motion seeking an order requiring Whinstone to keep GMO's machines at the Texas Facility until October 27, 2023, or at least until October 1, 2023.

65.     The Court held a hearing on August 9, 2023 to resolve GMO's motion. Following argument on the motion, the Court ordered Whinstone to allow GMO's machines to remain in place and powered on at the Texas Facility through September 13, 2023 at 5:00 p.m., subject to any curtailment requested or required by ERCOT for evidence preservation purposes (the "Expert Examination Period").  The Court ordered GMO to pay Whinstone for "continuing to host its machines" at the rate set out in the terminated Agreement.  To the extent GMO derived any independent value from its machines remaining in operation at Whinstone's expense, the Court granted permission for Whinstone to amend its answer to assert any counterclaims based on such unjust enrichment.

66.     On September 11, 2023, Whinstone agreed to extend the Expert Examination Period by three (3) weeks, or until October 4, 2023.

67.     GMO's machines remained in place for 89 days (until October 25, 2023) following Termination of the Agreement, which prevented Whinstone from using the space for other market-paying customers.

68.     GMO mined bitcoin for profit while its machines were powered on at the Texas Facility during the Expert Examination Period.

69.     Maintaining GMO's machines at the Texas Facility during the Expert Examination Period caused significant financial harm to Whinstone.  The rate Whinstone paid for power so that GMO's machines could remain in operation during the Expert Examination Period exceeded the amount GMO paid for power pursuant to the rate set forth in the terminated Agreement.  Further, GMO restricted Whinstone's ability to mitigate its damages by using the space for other market-paying customers following the Termination.

## FIRST COUNTERCLAIM
### (Breach of Contract)

70.     Whinstone repeats and realleges the foregoing allegations as if fully set forth herein.

71.     The Agreement was a valid and enforceable contract.

72.     Whinstone performed all of its obligations under the Agreement.

73.     GMO materially breached the Agreement through various actions, including, without limitation, the following:

74.     GMO failed and refused to negotiate in good faith for a new colocation services agreement pursuant to Section 20.6.  GMO also refused to negotiate in good faith to determine the amount of the Loss of Profit by Power Shortage.  As a result, GMO caused Whinstone to incur substantial damages by the continuation of the below-market and commercially untenable pricing set forth in the Agreement, which was intended to be replaced promptly with a new agreement on terms commensurate with Whinstone's customary agreement.

75.     GMO also failed to utilize and pay for the amount of power it committed to using under the Agreement.  Following Whinstone's repayment of the balance of the Initial Investment

Cost in March 2021, GMO became obligated under Section 4.3.3 of the Agreement to "enter into discussions in good faith about agreeing to a minimum commitment for power usage as was contained in the Louisiana Agreement."  The minimum commitment under the Louisiana Agreement obligated GMO to use at least 80 MW.  GMO refused to discuss a similar minimum commitment and instead never used more than 50 MW of the capacity that Whinstone made available to it.

76.    Further, Whinstone was prevented from offering the unused capacity to other customers at market rates, resulting in a further loss of revenues.

77.    Additionally, GMO breached the Agreement by refusing to pay pro rata for the power surcharge imposed on Whinstone under regulations implemented by ERCOT.  Despite multiple notices to GMO that Whinstone intended to pass the surcharge through to GMO on a per-kilowatt-hour basis, GMO never engaged in the discussion required under Section 4.3.2 of the Agreement nor objected until Whinstone invoiced the charges.

78.    As a result of GMO's breaches detailed above, Whinstone has been damaged in an amount estimated as follows:

      a.     GMO's failure to negotiate a new colocation services agreement consistent with the terms usually offered to Whinstone's customers has resulted in a net loss to Whinstone of at least $22,000,000 as of November 2023.

      b.     GMO has failed and refused to agree on and pay for a minimum usage commitment as required under Section 4.3.3 of the Agreement and instead has used no more than 50MW of available power since the inception of the Agreement.  Whinstone has been damaged in the amount GMO should

have paid for the minimum commitment in the amount of at least $25,000,000 as of November 2023.

c.      GMO's failure to pay the 0.0015 USD/kWh ERCOT surcharge since its imposition in January 2022 (for periods commencing August 1, 2021) has damaged Whinstone in the amount of at least $1,000,000 as of November 2023.

79.     Finally, the Agreement (§ 7.9) provided, "In the event of any failure by the Customer to make full payment to Whinstone of any and all amounts due to Whinstone pursuant to this Agreement, the Customer shall be responsible for all costs and expenses (including legal fees) which Whinstone reasonably incurs in collecting such amounts."

80.     Accordingly, Whinstone is entitled to recover from GMO its reasonable attorneys' fees and costs incurred in connection with the collection of amounts due under the Agreement.

## SECOND COUNTERCLAIM
### (Unjust Enrichment)

81.     Whinstone repeats and realleges the foregoing allegations as if fully set forth herein.

82.     GMO was enriched during the Expert Examination Period due to the independent financial value it derived from its machines remaining in operation at the Texas Facility.  By having its machines powered on at the Texas Facility, GMO continued to mine bitcoin.  Further, GMO benefitted by paying a lower rate for power, as set forth in the Agreement, than it would at a comparable facility under current market conditions.  Thus, GMO continued to profit by the terms of the Agreement despite that agreement having been terminated.

83.     GMO was enriched at Whinstone's expense.  The amount GMO paid for power under the Agreement was lower than the rate Whinstone pays for power.  Further, keeping

GMO's machines in place at the Texas Facility inhibited Whinstone from putting the facility to better uses.

84.     It is against equity and good conscience to permit GMO to retain any revenue earned during the Expert Examination Period.  Whinstone terminated the Agreement due to GMO's material breaches and provided ample time for GMO to remove its equipment.  Instead of removing its equipment during the time Whinstone provided, GMO sat idle and eventually filed a temporary restraining order requiring Whinstone to keep GMO's equipment in place for more time.

85.     Accordingly, Whinstone is entitled to recover any revenue generated by GMO from mining during the Expert Examination Period and the full cost Whinstone paid for power during the Expert Examination Period.

**THIRD COUNTERCLAIM**
**(Declaratory Judgment)**

86.     Whinstone repeats and realleges the foregoing allegations as if fully set forth herein.

87.     An actual, present, and justiciable controversy has arisen between the parties, and a declaratory judgment will clarify the legal issues of this dispute, finalize the controversy, and offer relief from uncertainty.

88.     A declaratory judgment is necessary to remedy prior breaches that occurred while the Agreement was in place that cannot be remedied solely through retrospective relief.

89.     GMO has materially breached the Agreement as set forth above.  Despite due notice, GMO failed to cure its breaches.  Due to these breaches, Whinstone terminated the Agreement as GMO's continuing breaches threated injury to Whinstone if Whinstone were compelled to continue performing its obligations under the Agreement.

26

90.     Accordingly, Whinstone is entitled to a declaration that its termination of the Agreement was lawful.

91.     Further, as supplemental relief, Whinstone is entitled to an order requiring GMO to pay Whinstone the amounts that should have been paid to date under the Agreement and a declaration of the reasonable amount of the Loss of Profit by Power Shortage and the reasonable amount of the reduced hosting fee and the amount of time that the reduced hosting fee should have been applied.

## DEMAND FOR RELIEF

WHEREFORE, Whinstone prays that this Court:

A.  Enter judgment dismissing the Complaint, and each purported Count alleged therein, with prejudice and deny all relief sought therein;

B.  Enter judgment on Whinstone's first Counterclaim, awarding damages in favor of Whinstone and against GMO in an amount to be determined at trial but not less than $48,000,000 plus prejudgment interest;

C.  Enter judgment on Whinstone's second Counterclaim, awarding damages in favor of Whinstone and against GMO in the amount of any bitcoin mined by GMO during the Expert Examination Period and the full cost of power utilized by GMO during the Expert Examination Period;

D.  Enter judgment on Whinstone's third Counterclaim, declaring that Whinstone was entitled to terminate the Agreement as a result of GMO's material breaches, or, in the alternative, declaring: (i) GMO must pay Whinstone the amounts that should have been paid to date under the Agreement, and (ii) the reasonable amount of the Loss of Profit by Power Shortage, the reasonable amount of the reduced hosting

fee, and the amount of time that the reduced hosting fee should have been applied; and

E.  Award to Whinstone its attorneys' fees, costs and disbursements herein, together with such other and further relief as this Court deems just, proper, and equitable.

Dated: November 22, 2023     DEBEVOISE & PLIMPTON LLP

            */s/ Maeve L. O'Connor*
            Maeve L. O'Connor
            Elliot Greenfield
            Brandon Fetzer
            66 Hudson Blvd.
            New York, New York 10001
            (212) 909-6000
            mloconnor@debevoise.com
            egreenfield@debevoise.com
            bfetzer@debevoise.com

            *Attorneys for Whinstone US, Inc.*