UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

GMO GAMECENTER USA, INC. and GMO
INTERNET, INC.,

                                        Plaintiffs,

                                                                    **22-CV-5974 (JPC) (KHP)**

                            -against-

                                                                    **OPINION & ORDER ON REQUEST**
                                                                    **TO VACATE LETTERS ROGATORY**

  WHINSTONE US, CORPORATION,

                                        Defendant.

---------------------------------------------------------------X

**Katharine H. Parker, United States Magistrate Judge:**

        This action, brought by GMO Gamecenter USA, Inc. and GMO Internet Group, Inc.

(collectively, "GMO") against Whinstone US, Inc. ("Whinstone"), arises out of a contract

pursuant to which Whinstone provided space and services for GMO's cryptocurrency mining

operations and an alleged breach of that agreement.  That agreement is referred to by the

parties as a colocation agreement.  Currently before the Court is non-party Northern Data AG's

("Northern Data") Motion to Vacate the Court's Order on Motion for Issuance of Letters

Rogatory.  (ECF No. 150.)  Rule 60 provides for relieve from a judgement or order to correct

clerical mistakes, oversights or omissions.  Fed. R. Civ. P. 60(a).  However, the motion filed by

Northern Data does not invoke Rule 60 – instead it invokes Rules 26, 30, 31, and 34 and is more

in the nature of a motion for a protective order.  Thus, the Court construes this as a motion for

a protective order under Rule 26(c), which allows "any person from whom discovery is sought"

to obtain relief to guard against "annoyance, embarrassment, oppression or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

**BACKGROUND**

GMO is a global company that offers various services including internet infrastructure, online advertising and media, internet finance, cryptocurrency mining and trading, and game development.  Whinstone operates data centers intended for large-scale cryptocurrency mining and high-speed video rendering, including North America's largest bitcoin mining and hosting facility in Texas.  Whinstone is owned by Riot Blockchain, Inc. ("Riot"), a publicly-traded bitcoin mining and hosting company.  In 2021, after the events at issue in this litigation, Riot acquired Whinstone from non-party Northern Data, a German company that develops and operates high-performance computing infrastructure solutions.  Aroosh Thillainathan, CEO of Northern Data, was President of Whinstone at the time GMO and Whinstone entered into the colocation agreement at issue.

In November 2018, Whinstone and GMO entered into the W Colocation Services Agreement (the "Louisiana Agreement"), pursuant to which Whinstone agreed to construct a data center in Louisiana that would begin operations in January 2019.  GMO paid $5.8 million as an initial deposit and, once it began using the data center, paid a fee for space in the data center, power to operate its mining machines, internet connection, networking and cooling services, a license to use certain IP addresses, and various other services related to security and maintenance of equipment.  The Louisiana data center opened in March 2019 – later than expected – and with a smaller capacity than anticipated and insufficient power to operate the bitcoin mining machines.  In July 2019, the Louisiana data center had to suspend operations

because of insufficient power.  As a result, GMO demanded a return of its initial deposit and other damages flowing from the breach of the agreement.

At the time of the breach of the Louisiana Agreement, Whinstone was building a new data center in Texas.  It offered GMO favorable terms for a new colocation agreement at its facility in Texas, which GMO accepted (the "Texas Agreement").  The Texas Agreement contained provisions intended to resolve disputes stemming from the Louisiana Agreement and provisions for providing power and services for GMO's bitcoin mining machines going forward, which would be relocated to Texas.  GMO paid a fee to Whinstone under the Texas Agreement and also provided a $33.6 million loan to fund construction at the Texas data center. Whinstone agreed to indemnify GMO the amount of $2,029,402.56 for a portion of its lost profits arising out of the power shortages in Louisiana and to lower its initial hosting fee in Texas for a period of time to be agreed upon by the parties.  The parties contemplated a good faith negotiation of the hosting fees in Texas because they did not agree on the amount of the alleged loss of profit from the power shortage in Louisiana.

There were delays in constructing and commencing full operations at the Texas data facility and, thus, delays to GMO being able to operate its bitcoin mining machines there.  GMO attributes these delays to Whinstone's project mismanagement and lack of budget control. GMO also claims Whinstone gave priority to other customers, offering them more favorable terms than offered to Whinstone.  Additionally, there were problems supplying sufficient power in Texas.  Under the Texas Agreement, Whinstone was to provide 40 megawatts ("MW") of power as of February 29, 2020, 80 MW of power as of April 30, 2020, and 120 MW of power as of May 31, 2020; however, as of June 2, 2020, Whinstone was only able to supply GMO with 60

MW of power.  GMO alleges that Whinstone chose to provide power to other customers whose business was more profitable to Whinstone and in breach of the Texas Agreement.

On July 1, 2020, Whinstone paid GMO approximately $7.9 million in respect of the initial deposit and the Loss of Profit by Power Suspension stemming from its breach of the Louisiana Agreement.  At that point, it still owed GMO damages from the Loss of Profit by Power Shortage, which it was paying off by offering lower hosting fees at the Texas data center.  The parties attempted to resolve their dispute about the remaining amount due, which GMO asserts was in excess of $35 million, by negotiating a further reduced hosting fee at the Texas data center.  These negotiations did not result in any new agreement.  GMO contends the negotiations stopped upon Riot's acquisition of Whinstone in May 2021.  This suit ensued because GMO contends that Whinstone failed to negotiate new terms for lower hosting fees and to make GMO whole for lost profits it suffered after June 2, 2020 as a result of Whinstone's continuing breaches (i.e., failure to provide sufficient power so that GMO's mining machines could operate productively).

In February 2021, Texas experienced extreme weather that resulted in prolonged freezing temperatures and a power shortage that impacted the whole state.  Thus, the state of Texas asked Whinstone to stop supplying power to its customers and sell back power it had purchased from Texas so that Texas could supply its residents with sufficient power.  Whinstone agreed, which resulted in a cessation of power to GMO and cessation of GMO's bitcoin mining activity.  GMO asserts that Whinstone failed to obtain its consent to power down its mining machines in advance of the power shutdown associated with the winter storm and that the

Texas Agreement requires Whinstone to share the profits it received from the sale of power back to Texas with it.

Finally, GMO alleges that Whinstone committed other breaches of the Texas Agreement including improperly removing some of GMO's mining machines from a data center, causing GMO to lose $16,000/day in profits; and improperly invoicing GMO more for power when the agreement provides that there would be no increase price for power for 10 years.

Whinstone has asserted a counterclaim against GMO contending that GMO failed to reasonably negotiate the amount and repayment of its alleged loss of profit from power shortage under the Louisiana agreement and by failing to negotiate in good faith for a new colocation agreement in Texas based on the standard hosting agreement being offered by Whinstone to other customers.   Whinstone also claims that GMO has never provided sufficient evidence of its losses to substantiate its negotiating position.  As a result, Whinstone asserts it has been providing services to GMO at or below costs, resulting in losses and in contravention of the Texas Agreement.  Whinstone also asserts that GMO has failed to utilize its allowed power in breach of its obligations under the Agreement, causing further losses to Whinstone. One of the reasons for this, according to Whinstone, is that GMO has not updated its mining machines which are inefficient and not able to utilize the power negotiated for under the agreement.  As a result, Whinstone also questions the amount of profits that GMO actually lost, contending that Whinstone's machines were not capable of generating the profit GMO says it would have realized but for insufficient power and services.  Whinstone also contends that GMO breached the Texas Agreement by failing to pay increased hosting fees resulting from increases to the cost of electricity in Texas.

The parties fiercely dispute the meaning of several provisions in the Texas Agreement and facts surrounding the alleged breaches of the agreement by each other.  Discovery is ongoing.  To date, the parties have exchanged document requests and responses and some documents.  However, some disputes have arisen regarding the completeness of the document production and, in particular, the scope of Whinstone's production.  The also have engaged in some third-party discovery.  Depositions have yet to be taken.

Both parties seek certain information from non-parties Northern Data and Thillainathan, its CEO.  GMO served a motion for issuance of letters rogatory to obtain documents and both parties seek issuance of an LOR to obtain Thillainathan's deposition testimony on certain subjects.  The Court issued the letters rogatory at both parties' request.  Northern Data and Thillainathan objected to the letters rogatory and sought to have them vacated or modified on the grounds they seek information and testimony beyond what is permitted under Federal Rule of Civil Procedure 26(b)(1), that is, information that is not relevant and unduly burdensome for Northern Data and Thillainathan to provide.  Both asserted they are willing to produce information in response to properly tailored written questions but that the parties should be required to exhaust other methods of discovery before seeking information from non-parties.

After reviewing the submissions of the parties in response to Northern Data's and Thillainathan's motion, the Court directed the parties to narrow their respective documents requests and deposition questions.  The parties have done so.  Northern Data and Thillainathan filed a response stating they are willing to provide the more narrowly-tailored deposition questions requested by Whinstone by providing written answers to questions in lieu of live deposition testimony.  Northern Data and Thillainathan objected to GMO's more narrowly-

tailored document requests on the grounds that they are still overbroad and burdensome and also objected to any deposition of Thillainathan on the ground that he is a CEO and that his deposition should not be allowed under the so-called apex doctrine. At a conference on August 7, 2024, the Court discussed Northern Data and Thillainathan's continued concerns over the phrasing of the deposition questions and document requests and gave GMO additional time to submit further narrowed requests. GMO submitted those narrowed requests on August 9, 2024.

## LEGAL STANDARD

Depositions of third parties may be taken in a foreign country under Rule 28. Fed. R. Civ. P. 28(b). See also 28 U.S.C. 1781(b)(2) (authorizes the State Department to accept letters rogatory issued by foreign tribunals, allows for "the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner."). The issuance of letters rogatory (also called letters of request) ("LOR") under the Hague Convention, of which both the United States and Germany are signatories, is one method for seeking such a deposition.[1] *Blagman v. Apple, Inc.*, No. 12 CIV. 5453 ALC JCF, 2014 WL 1285496, at *3 (S.D.N.Y. Mar. 31, 2014) (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 530-531 (1987)); *Villella*, 2018 WL 2958361, at *2; *Joseph v. Gnutti Carlo S.p.A.*, No. 15-CV-8910 (AJN), 2016 WL 4083433, at *1 (S.D.N.Y. July 25, 2016). Documents also may be

---

[1] Other methods include "on notice, before a person authorized to administer oaths either by federal law or by the law in the place of examination" or "before a person commissioned by the court to administer any necessary oath and take testimony." Fed. R. Civ. P. 28(b)(1). The term "letters rogatory" is used interchangeably with "letters of request."

sought through an LOR.  *Lantheus Medical Imaging, Inc. v. Zurich American Ins. Co.*, 841 F. Supp.2d 769, 775-76 (S.D.N.Y. 2012); *Netherby Ltd. v. Jones Apparel Group, Inc.*, 04 Civ. 7028, 2005 WL 1214345 (S.D.N.Y. May 18, 2005).  The decision whether to issue an LOR is within the discretion of the court. *Villella*, 2018 WL 2958361, at *2; *Blagman*, 2014 WL 1285496, at *4.

"Where U.S. courts issue and then transmit letters rogatory directly to foreign courts for enforcement, courts in the receiving country enforce the letters rogatory pursuant to domestic statute or common law, or through bilateral treaties with the United States." *Lantheus Medical Imaging, Inc.*, 841 F. Supp.2d at 777; *see generally* Restatement (Third) of the Foreign Relations Law of the United States (1987) ("Restatement") § 473 Reporters' Note 1.  "Both the issuance and enforcement of letters rogatory by U.S. and foreign courts 'rest entirely upon the comity of courts toward each other, and customarily embody a promise of reciprocity.'" *Lantheus Medical Imaging, Inc.*, 841 F. Supp.2d at 777 (quoting 22 C.F.R. § 92.54.).  "The request for assistance from one court to another is made and 'usually granted, by reason of the comity existing between nations in ordinary peaceful times.'" *Lantheus Medical Imaging, Inc.*, 841 F. Supp.2d at 777 (cleaned up).  The Court may issue an LOR "(A) on appropriate terms after an application and notice of it; and (B) without a showing that taking the deposition in another manner is impracticable or inconvenient."  Fed. R. Civ. P. 28(b)(2).

When determining whether to issue an LOR, courts apply the relevance and proportionality principles of Rule 26. *Villella*, 2018 WL 2958361, at *3 (citing *Joseph*, 2016 WL 4083433, at *1); *Blagman*, 2014 WL 1285496, at *4 (citing *Lantheus,* 841 F.Supp.2d at 776). Though the Federal Rules of Civil Procedure are controlling, courts should be mindful of the possible burden placed on foreign judiciary by the issuance of letters rogatory under the Hague

Convention. *See Lantheus*, 841 F. Supp. 2d at 777-78; *Metso Minerals Inc. v. Powerscreen Int'l Distribution Ltd.*, No. CV 06-1446 ADS ETB, 2007 WL 1875560, at *1 (E.D.N.Y. June 25, 2007) (citing *Aérospatiale*, 482 U.S. at 546, 107 S.Ct. 2542).

Under Rule 26, parties may seek discovery as to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance under Rule 26 "is an extremely broad concept." *Joseph*, 2016 WL 4083433, at *1 (quoting *Chen–Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561 (S.D.N.Y.2013)). The party seeking discovery has the burden, but it is not heavy. *Villella*, 2018 WL 2958361, at *3 (citing *Joseph*, 2016 WL 4083433, at *1).

The court must limit discovery when the information sought would be "unreasonably cumulative or duplicative" or when "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C); *Blagman*, 2014 WL 1285496, at *4. Once the requesting party has met its burden, the opposing party must "justify any restrictions on discovery." *Id.* (citation omitted); *accord Joseph*, 2016 WL 4083433, at *1.  A party may obtain a protective order precluding discovery under Rule 26(c) upon a showing of good cause. Fed. R. Civ. P. 26(c)(1).

## DISCUSSION

### 1. Deposition of Thillainathan

Although Federal Rule 30(a) specifies that a party may depose "any person" without leave of court or compel a deposition by subpoena under Rule 45 and does not have a specific carve out for top executives, courts nevertheless have developed the so-called apex doctrine when evaluating objections to the deposition of a senior corporate executive.  This doctrine

supplies "an additional layer of protection for senior corporate executives subject to depositions." *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 17 Civ. 6221, 2020 WL 6273396, at *1 (S.D.N.Y. Aug. 28, 2020) (quoting *Scott v. Chipotle Mexican Grill Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015)).  A rationale for this doctrine is proportionality, which evaluates, among other things, the burden on the noticed or subpoenaed party.  Fed. R. Civ. . 26(b)(1).  Under this doctrine, absent a showing that the executive sought to be deposed "has unique evidence, personal knowledge of the claims at issue," and "other witnesses incapable of providing testimony about the conduct alleged," the executive is generally safeguarded from being deposed.  *Id;  see Harapeti v. CBS Television Stations Inc.*, 21 Misc. 680, 2021 WL 3932424 (S.D.N.Y. Sept. 2, 2021) (collecting cases).  Still, high-level executives are not immune from being deposed.  *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001)(granting depositions of high-ranking corporate officers).  Courts will grant apex depositions when the executive has first-hand knowledge of important facts and/or when there are not other, less intrusive means to obtain the information.  Generally, where a party seeks to avoid an apex deposition, it bears the burden of showing good cause for why the deposition should not be allowed.  Fed. R. Civ. P. 26 (c).

In this case, the parties seek the live deposition testimony of Thillainathan because he signed the relevant Texas Agreement and was directly involved in negotiating it.  At the recent case management conference, both parties confirmed that emails show Thillainathan was involved in the back and forth of negotiating and had input into revisions of the agreement.  Thus, he has direct personal knowledge of the facts.  Thillainathan has not provided an affidavit or declaration explaining why it would be burdensome to provide live testimony or identifying

others who were more involved than he was in the negotiation and finalizing of the agreement. Nor has he provided authority for the proposition that he should be relieved from providing live testimony, which is generally a more efficient way to obtain information.  Written answers to questions are often prepared by counsel and may not provide complete answers, whereas parties can ask follow-up and clarifying questions during a deposition to obtain clear and complete answers.  The Court rejects the argument that the parties should first depose all the other deponents before seeking Thillainathan's deposition because there is a lengthy process to scheduling his deposition and waiting any longer will further prolong discovery.  Further, it is clear Thillainathan's deposition testimony will be necessary regardless of the testimony of others given his direct involvement in the negotiations of the Texas Agreement.  Accordingly, the Court denies the motion to the extent it asks that the Court vacate its prior order permitting Thillainathan's deposition.

Because Thillainathan does not object to the substance of Whinstone's questions, he shall answer those questions and any related follow-up questions.  The Court has reviewed GMO's narrowed deposition questions submitted on August 9, 2024 (ECF No. 174-1) and finds that they are relevant to the claims and defenses in this action and proportional to the needs of the case; provided, however, for avoidance of doubt, Thillainathan shall not be required to describe communications protected by the attorney-client privilege in response to question 6(a).  Thillainathan shall be required to answer these questions and any related follow-up questions.

## 2. Document Requests

At the recent case management conference, the parties informed the Court that based on discovery thus far, they know that Thillainathan utilized Whistone, Northern Data and possibly personal email accounts to communicate about GMO and the Texas Agreement. Whinstone also informed the Court that at the time of Riot's acquisition of Whinstone, Northern Data retained control of one of the servers that contained Thillainathan's emails such that Whinstone cannot access or produce all of Thillainathan's relevant emails. Rather, it can only search for those emails by looking at the emails of internal Whinstone custodians with whom Thillainathan may have communicated. Based on this information, it is clear that documents requests are properly directed to Northern Data and Thillainathan because some relevant emails cannot be obtained through party discovery.

Additionally, at the Court's direction in response to the instant motion, GMO has narrowed its document requests. The Court has reviewed the narrowed requests, which seek only communications that include the term "GMO" and are limited in time and limited to one custodian – Thillainathan. Therefore, the Court finds that this request is narrow and finds that it seeks information relevant to the claims and defenses and proportional to the needs of the case.

## CONCLUSION

The motion to vacate and/or for a protective order is granted insofar as the Court hereby narrows the information that can be sought through LORs as set forth herein but is otherwise denied. The parties shall submit a revised Request for International Judicial Assistance Pursuant to the Hague Convention consistent with this Order for the Court'

signature within 14 days of this Opinion and Order.   The Clerk of Court is respectfully directed

to terminate the motion at ECF No. 150.

**SO ORDERED.**

New York, New York
August 14, 2024

Katharine H. Parker
United States Magistrate Judge