UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                       :

GMO GAMECENTER USA, INC. and GMO INTERNET :
GROUP, INC.,

                          Plaintiffs,         :

           -v-                            :

WHINSTONE US, INC.,                       :

                       Defendant.       :
                                                    :                 22 Civ. 5974 (JPC) (KHP)
------------------------------------------------------------------------X
                                                     :                            ORDER
WHINSTONE US, INC.,                       :

                       Counterclaim Plaintiff,    :

           -v-                            :

GMO GAMECENTER USA, INC. and GMO        :
INTERNET GROUP, INC.,                  :

                       Counterclaim Defendants.    :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       At a conference on August 7, 2024, United States Magistrate Judge Katherine H. Parker

orally ruled on several discovery disputes between the parties. Dkts. 170, 171, 172 ("Tr.").

Plaintiffs and Counterclaim-Defendants GMO Gamecenter USA, Inc. and GMO Internet Group,

Inc. (collectively, "GMO") objected to two of those rulings: (1) denying GMO's request that

Defendant and Counterclaim-Plaintiff Whinstone US, Inc. ("Whinstone") produce documents

referencing GMO and its hosting agreement with Whinstone (the "Texas Agreement") not by

name, but as part of a group of hosting customers and contracts; and (2) requiring GMO to narrow

its third-party discovery requests, pursuant to a letters rogatory, directed toward third parties Aroosh Thillainathan and his company, Northern Data AG ("Northern Data").  Dkt. 181 ("Objs.") at 1, 6 n.4.  For the reasons that follow, the Court sustains in part and overrules in part GMO's Objections.

## I.  Background

In October 2019, GMO and Whinstone entered into the Texas Agreement—a colocation services agreement pursuant to which Whinstone was to provide a facility that would house and operate GMO's bitcoin mining machines.  Dkt. 106 ("Fourth Am. Compl.") ¶¶ 1, 11, 19; Dkt. 113 at 1-8 ("Answer") ¶¶ 1, 11, 19; Dkt. 106-1 ("Texas Agreement").  In April 2021, Riot Platforms, Inc. ("Riot") acquired Whinstone from Northern Data.  Fourth Am. Compl. ¶ 9; Answer ¶ 9; Objs. at 11.  Prior to that acquisition, Thillainathan—who founded Northern Data and Whinstone—was Whinstone's CEO and its chief negotiator and signor of the Texas Agreement.  Objs. at 11.

GMO commenced this breach of contract action against Whinstone on June 10, 2022, alleging that Whinstone had breached the Texas Agreement.  Dkt. 1.  Whinstone has filed counterclaims against GMO, similarly alleging a breach of the Texas Agreement.  Dkt. 12; Dkt. 113 at 9-27.  Some time later, on June 29, 2023, Whinstone allegedly sent GMO a "Notice of Termination" purporting to terminate the Texas Agreement based on GMO's supposed breaches.  Fourth Am. Compl. ¶ 39(c).

The Court referred this case to Judge Parker for general pretrial supervision, including scheduling, discovery, and non-dispositive pretrial motions.  Dkt. 13.  On July 23, 2024, GMO requested a court conference to address several disagreements related to the scope of permissible discovery.  Dkt. 160 ("GMO Letter").  Whinstone filed a response letter, Dkt. 165 ("Whinstone Letter"), and Judge Parker held a conference on August 7, 2024, Dkt. 170.

At that conference, Judge Parker ruled on several discovery disputes.  Two of those rulings are relevant to this Order.  First, Judge Parker denied GMO's request for "[d]ocuments and communications referencing GMO and/or the Texas Agreement not by name, but as part of a larger group or business strategy," GMO Letter at 2, because those documents were not relevant to this action, Tr. at 8:17-11:10.  Second, Judge Parker required GMO to narrow its third-party discovery requests directed toward Thillainathan and Northern Data—which were pursuant to a letters rogatory given their location in Germany—because those requests were improperly phrased or overly broad.  *Id.* at 20:15-35:25; *see* Dkts. 143, 144.[1]  On August 21, 2024, GMO objected to these two rulings pursuant to Federal Rule of Civil Procedure 72(a).  Objs. at 1.  Whinstone opposed GMO's objections on September 4, 2024, Dkt. 185 ("Opp."), and GMO filed its reply on September 12, 2024, Dkt. 195 ("Reply").

## II.  Legal Standard

Under 28 U.S.C. § 636(b)(1)(A), a district judge may "designate a magistrate judge to hear and determine any [non-dispositive] pretrial matter," save for certain specifically enumerated exceptions.  Magistrate judges have "broad discretion in resolving non-dispositive disputes." *Marotte v. City of New York*, No. 16 Civ. 8953 (GHW), 2017 WL 11105223, at *1 (S.D.N.Y. Oct. 6, 2017) (internal quotation marks omitted).  "Matters concerning discovery generally are considered 'nondispositive' of the litigation." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990).

---

[1] On May 28, 2024, Northern Data and Thillainathan moved to vacate orders that Judge Parker issued on April 30, 2024, Dkts. 143, 144, which granted the issuance of a letters rogatory. Dkt. 150.  Two days after the August 7 conference, GMO submitted narrowed requests directed at Northern Data and Thillainathan. Dkt. 174.  On August 14, 2024, Judge Parker denied the motion to vacate and found the narrowed requests to be relevant and appropriate over objections from Northern Data and Thillainathan, Dkt. 177.  Despite this approval, GMO continues to object to Judge Parker's August 7 ruling requiring it to narrow its requests.

Under Federal Rule of Civil Procedure 72(a), a party may file objections to a non-dispositive order made by a magistrate judge, and the "district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). "A magistrate [judge]'s ruling is contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure, and is clearly erroneous if the district court is left with the definite and firm conviction that a mistake has been committed." *Stollman v. Williams*, No. 20 Civ. 8937 (JPC) (JW), 2022 WL 1772552, at *4 (S.D.N.Y. June 1, 2022) (alteration in original) (quoting *Thai Lao Lignite (Thai.) Co. v. Gov't of Lao People's Dem. Rep.*, 924 F. Supp. 2d 508, 512 (S.D.N.Y. 2013)). "The party seeking to overturn a magistrate judge's decision thus carries a heavy burden." *U2 Home Ent., Inc. v. Hong Wei Int'l Trading Inc.*, No. 04 Civ. 6189 (JFK), 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007).

### III.  Discussion

**A.    Hosting Agreements**

GMO's first objection relates to its request for documents "referencing GMO and/or the Texas Agreement not by name, but as part of a larger group or business strategy." GMO Letter at 2. According to GMO, "Whinstone's reviewers were instructed that certain documents . . . were not responsive unless they specifically mentioned (i) GMO or (ii) the contract between Whinstone and GMO . . . by name." *Id.* GMO claims that this limitation meant that not all relevant documents were produced. It contends that Whinstone treated all third-party bitcoin miners "as a group"—referring to them collectively as "legacy" miners—and made a business decision to terminate all legacy hosting agreements to "make more money" by using its own mining equipment instead of renting out the space. Tr. at 9:16-10:14. To the extent GMO was among such legacy miners that were terminated, GMO argues that such information is relevant to the parties' dispute because the

4

Texas Agreement requires Whinstone to act in good faith, and Whinstone's decision to breach the contract solely for its own profit would have violated that requirement. *Id.* at 10:10-11:2. GMO proposed that Whinstone "have substantive discussions with relevant Whinstone and Riot personnel to determine what sorts of discussions of these issues might have taken place, between whom, and how those communications were made so the Parties can determine the best way to effectively search for these communications." GMO Letter at 2.

Whinstone opposed GMO's request, noting that it ran GMO's originally requested search terms seven months earlier, reviewed the returned documents, and produced the responsive ones to GMO. Whinstone Letter at 2. Now, Whinstone says, GMO "demands an ill-defined internal investigation that Whinstone could not effectively carry out" instead of "proposing any new search terms." *Id.* After hearing GMO's arguments, Judge Parker concluded that the documents that GMO sought were not relevant, noting her view that GMO's argument was "a real stretch" and "really far afield of relevance." Tr. at 11:3-8.

In denying GMO's request, Judge Parker questioned the relevance of GMO "knowing [Whinstone's] entire business strategy" to the dispute over the meaning of the Texas Agreement. Tr. at 11:5-10. That much certainly is correct. The problem, however, is that GMO seeks much narrower discovery here, as it has better explained in its briefing before this Court. GMO clarified the limited scope of materials it seeks:

> [A]s GMO's filings make clear, GMO in fact seeks documents referencing GMO or the Texas Agreement as part of a group of Whinstone's hosting customers or contracts it sought to terminate. With this request, GMO does not seek documents concerning Whinstone's other customers or Whinstone's business strategy that are unrelated to or do not reference GMO or the Texas Agreement.[2]

---

[2] These requests therefore would not reach "documents and communications concerning Whinstone's dealings with other users of the Texas data center," to the extent they "have no bearing on GMO's claims under the Texas Agreement," which appears to be Whinstone's concern. Opp. at 7.

Reply at 2 (internal citations omitted).  Under GMO's theory, such information regarding Whinstone's termination of the Texas Agreement with GMO, regardless of whether GMO or the Texas Agreement is expressly mentioned in the materials, is relevant to this action.

GMO's requests for documents and communications, as now clarified, is therefore rather narrow.  Its argument for the relevance of these materials relies on two propositions.  First, GMO argues that the presence or absence of good faith on behalf of the parties during the performance and termination of the Texas Agreement is at issue in this case.  And second, the documents that GMO requests are relevant to whether the parties acted in good faith during the performance and ultimate termination of the contract.  The Court agrees on both fronts.

GMO notes that the Texas Agreement requires both parties to act in good faith, at least in performing certain obligations.  *See, e.g.*, Tr. at 10:10-24 ("[T]here's a good faith requirement in the agreement . . . .  [T]here is a provision in the agreement saying [Whinstone] ha[s] to honor their obligations to us in good faith . . . ."); Objs. at 10 ("[T]he Texas Agreement requires Whinstone to consult GMO in good faith."); Texas Agreement §§ 4.3.2-4.3.5 ("The Parties shall consult with each other in good faith . . . .  [T]he Customer shall enter into discussions in good faith . . . .  Whinstone shall consult with the Customer in good faith before the notification.").  In the operative pleadings, each party has alleged that the other breached the Texas Agreement by acting in bad faith.  In the Fourth Amended Complaint, GMO alleges that Whinstone "proposed in bad faith a wholly unacceptable longer-term agreement with terms vastly disadvantageous to GMO and inconsistent with the parameters and express agreements set forth in the Texas Agreement."  Fourth Am. Compl. ¶ 29.  It also alleges that Whinstone's asserted reason for terminating the Texas Agreement—GMO's "failure to negotiate in good faith"—is "entirely meritless," and that GMO was never in breach of the contract.  *Id.* ¶ 39(c).  Whinstone, in its

counterclaims, alleges the opposite—that GMO breached the Texas Agreement when it "failed and refused to negotiate in good faith for a new colocation services agreement," and "also refused to negotiate in good faith to determine the amount of the Loss of Profit by Power Shortage." Dkt. 113 at 23 ¶ 74. Thus, the underlying contract and the parties' pleadings place at issue the presence or absence of bad faith on behalf of both GMO and Whinstone.

The documents and communications that GMO seeks are relevant to whether Whinstone acted in bad faith. Under Federal Rule of Civil Procedure 26(b)(1), a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." "[A]lthough not unlimited, relevance, for the purposes of discovery, is an extremely broad concept." *Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2023 WL 3090950, at *3 (S.D.N.Y. Apr. 26, 2023) (internal quotation marks omitted). That being said, however, courts are encouraged "'to be more aggressive in identifying and discouraging discovery overuse' by emphasizing the need to analyze proportionality before ordering production of relevant information." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (quoting Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment).

GMO argues that "Whinstone has a demonstrated tendency to refer to GMO or the Texas Agreement as part of a group of 'hosting customers,' 'legacy customers,' 'hosting contracts,' 'legacy contracts,' or some combination of these or similar terms." Objs. at 8-9. If this is true, under Whinstone's apparent current stance with respect to its discovery obligations—*i.e.*, that it need only produce documents or communications that explicitly mention GMO or the Texas Agreement—Whinstone could withhold documents and communications that discuss the termination of legacy contracts, including the Texas Agreement with GMO, just because the

7

materials do not mention GMO or the Texas Agreement explicitly.  *See* Reply at 5.  GMO further

argues that Whinstone made a business decision to terminate all legacy contracts *en masse*, without

regard to whether it was entitled to terminate the individual contracts.  Objs. at 4-5, 8-11.  Although

Whinstone's stated reason for terminating the Texas Agreement was GMO's alleged material

breach, GMO argues that this reason was mere pretext for a bad-faith decision to back out of the

contract for monetary gain.  *Id.* at 5.  The materials sought thus may shed light on Whinstone's

motive behind terminating the Texas Agreement.  And motive is squarely relevant to the parties'

cross-allegations of bad faith.  *See, e.g.*, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,

487 F.3d 89, 100 n.8 (2d Cir. 2007) ("The question here is not whether [the defendant] breached

the express terms of the contract, but whether [it] acted in good faith; that is an issue entirely tied

to motive."); *Polotti v. Flemming*, 277 F.2d 864, 868 (2d Cir. 1960) ("In New York, as elsewhere,

'good faith' connotes an actual state of mind—a state of mind motivated by proper motive.");

*Barbara v. MarineMax, Inc.*, No. 12 Civ. 368 (ARR), 2013 WL 1952308, at *4 (E.D.N.Y. May

10, 2013) ("Because plaintiffs' claim involves an allegation of bad faith, motive may be a relevant

subject of discovery.").

GMO's objection is therefore sustained to the extent that this Court concludes that

documents and communications that reference GMO or the Texas Agreement as part of a group

of Whinstone's hosting customers or contracts it sought to terminate are relevant to this action.

This Court will not, however, determine in the first instance to what extent such requests are

"proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), as that question has not been

briefed before the Court nor passed on by Judge Parker.  "The party seeking discovery bears the

burden of demonstrating relevance; once established, the opposing party must justify any

restrictions on discovery."  *Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL

1285496, at *4 (S.D.N.Y. Mar. 31, 2014).  Discovery may be limited where the information sought

is "unreasonably cumulative or duplicative" or where "the burden or expense of the proposed

discovery outweighs its likely benefit."  *Id.* (quoting Fed. R. Civ. P. 26(b)(2)(C)(i), (iii)).  Although

Whinstone claims that the burden associated with production is disproportionate to the needs of

the case, Opp. at 1, it does not explain why the information sought would "be unreasonably

cumulative or duplicative" or why "the burden or expense of the proposed discovery outweighs its

likely benefit."  The Court thus does not make any determination of proportionality, nor does the

Court express a view on the necessity of any narrowing of the request.

**B.      Third-Party Discovery**

GMO also objects to Judge Parker's order that GMO narrow its discovery requests directed

to Northern Data and Thillainathan in the letters rogatory.  At the August 7 conference, Judge

Parker concluded that some of GMO's deposition questions and document requests were

improperly phrased as legal questions inquiring about the meaning and effect of certain contract

provisions, and that some were too open ended and vague.  Tr. at 20:15-35:25.  GMO objects to

that ruling, arguing that the "requests did not seek answers to legal questions," and that the

"requests were sufficiently clear and narrowly tailored."  Objs. at 12.

This second objection is overruled, as GMO has not carried its burden of explaining why

Judge Parker's ruling was clearly erroneous or contrary to law.  At the conference, Judge Parker

explained that some of the proposed deposition questions were problematic because they sought

testimony as to the meaning and effect of certain provisions in the Texas Agreement.  For example,

question seven asked for an opinion about "the meaning and effect of the specific phrase 'share as

fair the benefit of selling power,'" Dkt. 163-1 ("Dep. Req.") at 2, which, as Judge Parker explained,

is "arguably a legal question for the Court to decide," Tr. at 23:23-24.  In objecting to that

conclusion, GMO explains that it merely "intended to solicit Mr. Thillainathan's testimony concerning his understanding of certain key provisions," which is not an answer to a legal question. Objs. at 12. But at the conference, Judge Parker explained that GMO was still able to inquire about what, at the time of the signing, Thillainathan understood a certain provision of the contract required the company to do, or about the business purpose behind the inclusion of a particular section, Tr. at 23:19-24:19; GMO was overreaching only insofar as it sought to ask Thillainathan to opine on what he believed to be the current effect of certain contractual provisions. GMO's proposed questions reached far beyond those proper objectives, and Judge Parker was correct to order GMO to narrow its requests. To the extent that GMO objects because it sought only Thillainathan's understanding regarding certain provisions, GMO is not prevented from seeking that information—Judge Parker's order only required more specificity.

Judge Parker also explained that some of the proposed questions were "extremely open and vague." Tr. at 24:20-21. GMO, for example, sought to ask: "What do you know about GMO's financial support to Whinstone, for example, in the form of loans, its commitments in the Texas Agreement, or any other means . . . to construct and operate the data center described in the Texas Agreement . . . ?", Dep. Req. at 1; *see* Tr. at 24:21-23; "What do you recall regarding the negotiations of [various sections of the Texas Agreement]?", Dep. Req. at 2-4; *see* Tr. at 27:15-16; and "What is your understanding of the impact of Whinstone's contract with TXU [Energy Retail Company LLC] regarding the supply of power to the Texas Data Center . . . ?", Dep. Req. at 4; *see* Tr. at 29:8-11. Judge Parker found these questions to be too open ended and vague—a conclusion with which this Court agrees. In its objections, GMO argues only that these "requests were narrowed to topics that are directly at issue in this case." Objs. at 12-13. Beyond that cursory statement, GMO does not explain how or why Judge Parker's order was clearly erroneous or

contrary to law.  As such, it has not carried its "heavy burden," and the objection is overruled.  *U2*

*Home Ent.*, 2007 WL 2327068, at *1.

## IV.  Conclusion

For the foregoing reasons, GMO's Objections are sustained in part and overruled in part.

The Clerk of Court is respectfully directed to close the motion at Docket Number 181.

SO ORDERED.

Dated: November 18, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge