**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
GMO GAMECENTER USA, INC. and GMO
INTERNET, INC.,

                                    Plaintiffs/
                            Counterclaim-defendants,

                    -against-

 WHINSTONE US, CORPORATION,

                                    Defendant/
                            Counterclaim-plaintiff.
----------------------------------------------------------------X

**22-CV-5974 (JPC) (KHP)**

**<u>OPINION AND ORDER ON
MOTION TO COMPEL
WHINSTONE AND RIOT TO
PRODUCE DOCUMENTS
WITHHELD AS PRIVILEGED</u>**

**KATHARINE H. PARKER, United States Magistrate Judge:**

This case concerns an alleged breach of a contract for services (among related claims) in connection with Whinstone's construction and operation of a bitcoin mining data center maintained in Texas.  Plaintiffs/Counterclaim-defendants GMO Gamecenter US, Inc. and GMO Internet, Inc. (together, "GMO") move to compel production of documents withheld by Whinstone US, Corp. ("Whinstone") and Riot Blockchain, Inc. ("Riot")—Whinstone's parent company—as privileged.  For the reasons that follow, GMO's motion is **granted in part** and **denied in part.**

<u>Relevant Background</u>

The Court summarizes only the relevant facts to the instant motion.  GMO is a global company that offers various services including internet infrastructure, online advertising and media, internet finance, cryptocurrency mining and trading, and game development. Whinstone operates data centers intended for large-scale cryptocurrency mining and high-

1

speed video rendering, including North America's largest bitcoin mining and hosting facility in Texas.  Whinstone is currently owned by Riot, a publicly-traded bitcoin mining and hosting company.

In November 2018, Whinstone and GMO entered into the W Colocation Services Agreement (the "Louisiana Agreement"), pursuant to which Whinstone agreed to construct a data center in Louisiana that would begin operations in January 2019.  GMO paid $5.8 million as an initial deposit and, once it began using the data center, paid a fee for space in the data center, power to operate its mining machines, internet connection, networking and cooling services, a license to use certain IP addresses, and various other services related to security and maintenance of equipment.  The Louisiana data center opened in March 2019 – later than expected – and with a smaller capacity than anticipated and insufficient power to operate the bitcoin mining machines.  In July 2019, the Louisiana data center had to suspend operations because of insufficient power.  As a result, GMO demanded a return of its initial deposit and other damages flowing from the breach of the agreement.

At the time of the breach of the Louisiana Agreement, Whinstone was building a new data center in Texas.  It offered GMO favorable terms for a new colocation agreement at its facility in Texas, which GMO accepted (the "Texas Agreement").  The Texas Agreement contained provisions intended to resolve disputes stemming from the Louisiana Agreement and provisions for providing power and services for GMO's bitcoin mining machines going forward, which would be relocated to Texas.  GMO paid a fee to Whinstone under the Texas Agreement and also provided a $33.6 million loan to fund construction at the Texas data center.

Eventually, the Texas data center was constructed and GMO placed certain miners into Building A at the center.  The claims in this action arose thereafter and relate principally to breaches of the Texas agreement.  GMO claims that Whinstone breached its obligations under the Texas agreement, including with respect to the provision of power to Building A and maintenance of the building, leading to its miners not generating the income GMO expected.  GMO also asserts other breaches, related to the sharing of profit from the sale of power.  Whinstone denies this and contends GMO failed to adhere to its obligations under that agreement.

At the time the Texas Agreement was signed, Northern Data, a German company that develops and operates high-performance computing infrastructure solutions, owned Whinstone.  In late 2020, Riot started discussing the acquisition of Whinstone from Northern Data.  Outside advisors assisted Riot with the Whinstone acquisition.  Riot retained XMS Capital Partners, LLC ("XMS") as its financial advisor and retained Sidley Austin LLP ("Sidley") as a legal advisor.  Riot also retained Ernst & Young ("EY") as its tax and accounting advisor.  Similarly, Whinstone hired Greenhill & Co. ("Greenhill") to serve as financial advisor and Sullivan & Cromwell LLP ("S&C") as legal advisor.  Whinstone consulted with its auditor, Mazars USA LLP ("Mazars") regarding tax and accounting issues.

On May 26, 2021, Riot closed on the acquisition of Whinstone.  Subsequent to the acquisition, Riot provided legal services to Whinstone pursuant to a Shared Services Agreement.

The Stock Purchase Agreement ("SPA") between Northern Data, Riot, and Whinstone provided a period subsequent to closing of the acquisition during which Riot could review the purchase price for Whinstone and inform Northern Data of any objections.  *See* SPA § 2.3 (Apr. 8,

3

2021), https://perma.cc/TN8Q-P4B4.  The agreement provided for a period of 75 days after the closing for Riot to prepare a proposed final closing statement regarding the price and deliver it to Northern Data. *Id.*  Upon delivery of the proposed final closing statement, Northern Data had 60 days to review and object.  The SPA contemplated a period of good faith negotiations on differences regarding the final closing price calculations and, if the parties could not resolve the differences through negotiations, submitting them to an independent accounting firm that would resolve the disputes, not as an arbitrator but as an accounting expert, within 45 days after submission of the dispute to it.  The independent accountant's determination was to be final and binding as to the purchase price absent "manifest error."

At some point, Riot concluded that Northern Data incorrectly calculated Whinstone's working capital, inflating the dollar amount Riot paid to acquire it.  Sidley engaged a litigation support group at EY to provide forensic accounting services in connection with evaluating the claim.  Riot and Whinstone do not provide the date when Sidley engaged a litigation support group at EY to provide such serves or the date when they anticipated litigation as opposed to simply following the contractual process for making post-closing price adjustments.[1]

However, the litigation between Riot and Northern Data is a matter of public record.  On September 7, 2022, Riot filed a complaint against Northern Data in Delaware Chancery Court alleging that it had tried for more than a year post-closing to try to resolve a dispute over the

---

[1] Whinstone and Riot appear to be deliberately vague in the affidavits they submit as to when litigation with Northern Data was anticipated and when Sidley retained EY in connection with anticipated litigation.  As discussed in greater detail, *infra*, based on the facts, it appears the earliest anticipation of litigation with Northern Data was June 2022, when it appeared Northern Data was not following the SPA procedures for getting to a final, binding post-closing price adjustment. *See* Riot-ND Complaint ¶¶ 29-43.  Whinstone/Riot fail to provide sufficient facts to demonstrate litigation was anticipated regarding post-closing price adjustments prior to this time when the parties were simply following the procedures set forth in the SPA to get to a final price.

purchase price (to the tune of $30 million) in accordance with the SPA provisions but that Northern Data refused to submit the dispute to the independent accounting expert in bad faith. *Riot Blockchain, Inc. v. Northern Data AG*, No. 2022-0792, 2022 WL 4131802 (Del. Ch. Sept. 7, 2022) ("Riot-ND Complaint").  The Riot-ND Complaint states that Riot delivered its proposed final closing statement on August 6, 2021, that Northern Data formally objected on September 30, 2021. *Id.* ¶ 5.  Riot told the Delaware court that, on or about April 12, 2022, it received notice of a potential claim against Whinstone by GMO – the instant action.[2] *Id.* ¶ 29.  The notice indicated that GMO was seeking at least $84 million. *Id.*  Riot amended its proposed final closing statement to account for this claim and tried to engage Northern Data in negotiations. *Id.* ¶¶ 29-43.  According to Riot, Northern Data refused to engage in good faith negotiations or submit the dispute to an independent accounting expert for final and binding resolution, leading it to file the complaint in Delaware.  Ultimately, on March 22, 2023, the case in Chancery Court was resolved through a settlement requiring the parties to submit the dispute to the independent accounting expert. *Northern Data Ag v. Riot Platforms, Inc.*, No. 2023-065, 2025 WL 1569602, at *5-6 (Del. Ch. Ct. June 2, 2025).

Four issues were submitted to the independent accounting expert, though none concerned adjustments related to the instant dispute.  All were resolved in favor of Riot. Thereafter, in 2023, Northern Data sued Riot in Delaware Chancery Court contending the accounting expert failed to adhere to generally accepted accounting principles ("GAAP") with regard to two issues and that two other issues were indemnity claims that should have been

---

[2] The Complaint in this action was filed on June 13, 2022 in New York State Supreme Court and then removed to this Court.  ECF No. 1.

accounted for differently.[3] *Id.* at *1.  The Delaware court recently ruled in favor of Riot on the GAAP issues and in favor of Northern Data on the indemnity issues. *Id.* at *19.

Additionally, on or about June 29, 2023, Riot and/or Whinstone terminated the Texas Agreement, causing GMO to amend its complaint in this action to add claims related to the termination of the agreement and to significantly increase its damages demand. ECF No. 106.

In the instant motion, GMO challenges Whinstone's and Riot's assertions of privilege over a number of relevant and responsive documents.  GMO largely asserts these documents constitute business and factual information which is not privileged or that privilege was waived due to the inclusion of third parties in communications, including investment bankers, financial advisors and accountants engaged in connection with Riot's purchase of Whinstone and post-closing price adjustment dispute.  Whinstone and Riot counter that the documents it have withheld are all protected by the attorney-client privilege and/or work-product doctrine.  The timing of the various litigations referenced above is relevant to a consideration of work product, as some of the documents on the log were withheld by Riot/Whinstone on the ground that they were made in anticipation of litigation with Northern Data over the adjustment of the purchase price of Riot's acquisition of Whinstone or in anticipation of or because of litigation with GMO.  With respect to the latter, Riot/Whinstone have withheld virtually all documents concerning the

---

[3] Rhodium and Whinstone/Riot have been embroiled in various litigation and/or arbitration proceedings since in or about May 2023.  Rhodium, like GMO, used Whinstone's facilities for cryptomining and has contended that Riot unlawfully tried to cut off power to its machines and evict it from the Texas facility.  Additionally, another entity called SBI Crypto Co., Ltd. filed a complaint against Whinstone in April 2023 in connection with claims associated with alleged poor conditions/lack of sufficient power at the Texas facility – similar claims as made by GMO in this litigation. Commitments and Contingencies Disclosure, 3-months ended Mar. 31, 2023, https://perma.cc/WC69-G7SH.

termination of the Texas Agreement, which occurred during the course of this litigation, on the ground that it was driven and decided by lawyers.

The Court finds that some of the documents were properly withheld, whereas others were not and must be produced or produced in part.

### Legal Standards

Motions to compel are "entrusted to the sound discretion of the district court," *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000), *cert. denied*, 531 U.S. 1015, and "[a] trial court enjoys wide discretion in its handling of pre-trial discovery," *In re Finch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (citations and quotation marks omitted).  Although GMO brings this motion, the party asserting the privilege – here, Whinstone/Riot – bears the burden of showing that a given document is privileged.  *Walsh v. CSG Partners, LLC*, 544 F.Supp.3d 389, 393 (S.D.N.Y. 2021).

### 1.  *Attorney-client Privilege*

The Court begins with a general note about the applicable choice of law in this case.  The law of the forum state—here, New York—generally governs a determination of attorney-client privilege where this court's subject matter jurisdiction is based upon diversity. Fed. R. Evid. 501; *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 102 (S.D.N.Y. 2007); *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 20-cv-7472 (GHW), 2025 WL 1434375, at *4 (S.D.N.Y. May 17, 2025); *see also Dixon v. 80 Pine Street Corp.*, 516 F.2d 1278, 1280 (2d Cir. 1975).  The Court's subject matter jurisdiction in this case is based upon diversity of citizenship, so New York law applies.  Here, the parties do not argue that there are any differences between New York and federal attorney-client privilege and, in fact, cite exclusively to federal caselaw in their papers.

Failing to brief the choice-of-law question, while exclusively citing to federal law, constitutes implied consent. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (noting parties which cited New York cases but did not brief the choice-of-law issue impliedly consented to New York privilege law) (citing *Tehran-Berkeley Civil & Environmental Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (noting that where parties' briefs assume the application of a given forum's law, the Court may infer implied consent)).  Thus, the Court takes it as implied that the parties consent to the application of federal attorney-client privilege doctrine.  Regardless, and in any event, "it has long been recognized that New York law on attorney-client privilege is generally similar to accepted federal doctrine." *WCA Holdings*, 2025 WL 1434375, at *4 (citing *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 490 (S.D.N.Y. 2019)) (internal quotation marks omitted).  Therefore, the Court also assumes there are no applicable differences between New York and federal doctrine for the purposes of this motion and cites principally federal caselaw (but also some New York caselaw as necessary to demonstrate doctrinal similarities).

The attorney-client privilege protects communications between client and counsel made for the purpose of obtaining or providing legal advice that were intended to be and in fact kept confidential. *In re County of Erie*, 473 F.3d 413, 418-419 (2d Cir. 2007); *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996); *accord HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 70 (S.D.N.Y. 2009) (citing New York law).  The privilege is intended to encourage full and frank communications between a client and counsel, which in turn promotes an understanding of and compliance with the law and the administration of justice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege is narrowly construed, however,

because it renders relevant information undiscoverable. *Fisher v. United States*, 425 U.S. 391, 403 (1976); *In re County of Erie*, 473 F.3d at 418.

While in-house lawyers commonly provide legal advice protected by the privilege, they also sometimes provide business advice which is unprotected. *In re County of Erie*, 473 F.3d at 418, 420; *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036-37 (2d Cir. 1984). When determining the predominant purpose of a communication between a company's employees and its in-house lawyers, a court must assess the communication "dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting legal authorities and advice that can be given by a non-lawyer." *In re County of Erie*, 473 F.3d at 420-421; *WCA Holdings III, LLC,* 2025 WL 1434375, at *4 (S.D.N.Y. May 17, 2025). The determination "also may be informed by the overall needs and objectives that animate the client's request for advice." *In re County of Erie*, 473 F.3d at 421. Importantly, the fact that a lawyer may highlight collateral non-legal risks and costs relating to "expense, politics, insurance, commerce, morals and appearances" or report "what other persons are doing or thinking about the matter" in the course of rendering legal advice does not compromise the privilege so long as the predominant purpose of the communication was to render legal advice. *Id.* at 420.

Courts also have applied the privilege to communications among non-lawyer employees of a corporation where the purpose of the communication was to provide information to counsel or aid counsel in providing legal advice. *Upjohn Co.*, 449 U.S. at 394; *People's United Bank v. PeoplesBank*, No. 08-cv-1858 (PCD), 2009 WL 10689492, at *2 (D. Conn. Dec. 28, 2009); *see also Cuno, Inc. v. Pall Corp.,* 121 F.R.D. 198, 203 (E.D.N.Y. 1988) (attorney-client privilege

protects the giving of information from an employee to a superior for transmission to lawyer if made for the purpose of securing legal advice, requested by corporate superior, provided within the scope of the employees' corporate duties and confidentiality maintained).

Generally, attorney-client privilege is waived "if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication over which the privilege is claimed." *Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 102 (S.D.N.Y. 2000) (quoting *United States v. Int'l Bhd. of Teamsters,* 961 F. Supp. 665, 673 (S.D.N.Y. 1997) ); *see also Gruss v. Zwirn*, No. 09-cv-6441 (PGG) (MHD), 2013 WL 3481350, at *11 (S.D.N.Y. July 10, 2013) (citing *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) ); *In re Visa Check/MasterMoney Antitrust Litig.*, 190 F.R.D. 309, 314 (E.D.N.Y. 2000). The scope of waiver of attorney-client privilege is determined based on the "fairness doctrine" as described by the Second Circuit in *In re von Bulow.* 828 F.2d 94, 101 (2d Cir. 1987); *see also People v. Bierenbaum*, 748 N.Y.S.2d 563 (N.Y. App. Div. 1st Dep't 2002) (citing *von Bulow*); *Farrow v. Allen*, 608 N.Y.S.2d 1 (N.Y. App. Div. 1st Dep't 1993) (same).

However, there are exceptions to waiver. For example, "an agent, such as a financial advisor, may have communications with an attorney that 'are covered by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer.'" *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, 01-CV-8854 (LTS) (THK), 2006 WL 1004472, at *3 (S.D.N.Y. April 18, 2006); *see also United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) ("[T]he inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and

client.").  This exception is derived from *United States v. Kovel*, 296 F.2d 918, 920-23 (2d Cir.

1961), and its progeny, and is commonly called the "translator exception." *See also People v.*

*Osorio*, 549 N.E.2d 1183 (N.Y. 1989) ("[C]ommunications made to counsel through a hired

interpreter, or one serving as an agent of either attorney or client to facilitate communication,

generally will be privileged.") (citing *Kovel*). "The scope of this exception is not to be defined by

a third party's employment or function, but the party asserting the agency exception must

show: (1) a reasonable expectation of confidentiality under the circumstances, and (2) that

disclosure to the third party was *necessary* for the client to obtain informed legal advice."

*Homeward Residential, Inc. v. Sand Canyon Corp.*, 12-cv-7319 (JFK) (JLC), 2017 WL 4676806, at

*5 (internal quotation marks omitted) (emphasis added).

As an example, the court in *Ackert*, 169 F.3d 136, found that attorney communications

with an investment banker were not privileged even though the banker may have provided

information that helped the attorney to better advise his client because the attorney was not

relying on the banker to actually translate or interpret information given to the attorney by the

client.  *Id.* at 139-40.  Notably, the court stated that the mere fact that the information provided

by the third party was important to the attorneys' ability to represent the client did not render

the communication privileged; rather, the communication had to be necessary to render the

advice. *Id*. at 139.

In another more recent example, a court held that communications between a lawyer

and a financial advisor were not privileged. *Walsh*, 544 F.Supp.3d 389.  There, the financial

advisor/investment bank solicited financing, modeled debt repayment terms, prepared tax and

cash flow models, coordinated due diligence, assisted with a closing and advised on a

transaction.  The court reasoned that the financial advisor provided information and advice that the corporate client did not have and did not serve to improve comprehension between the company and its counsel.  Further, there was no evidence that the financial advisor provided advice in connection with litigation. *Id.* at 393.  In contrast, where an investment bank provided advice to a company's attorneys to help them determine what was "material" from a business perspective and thus likewise material for purposes of required legal disclosures, the communications were found privileged under the translator exception. *Calvin Klein Trademark Trust v. Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000).

One other exception to waiver recognized by some courts is the "functional equivalent" doctrine.  This theory recognizes that an independent contractor of a client may be a de facto employee of the employee for purposes of privilege.  Under this exception, courts must assess "whether the consultant had primary responsibility for a key corporate job," the closeness and longevity of the relationship between the consultant and the company's management and/or leadership on matters critical to the company's position in litigation, and whether the consultant has information not possessed by others at the company, whether the consultant served as the company's representative to third parties, and whether the consultant sought legal advice from corporate counsel to guide his/her work for the company, among other factors. *Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co., Ltd*., 232 F.R.D. 103, 113 (S.D.N.Y. 2005); *Walsh*, 544 F. Supp. 3d at 392; *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation*, 352 F. Supp.3d 207, 213 (E.D.N.Y. 2019).  This exception is limited.  Indeed, one court has observed that if this doctrine "were extended to every situation where a financial consultant worked exhaustively to guide a company through a restructuring

deal, the exception would swallow the basic rule ... that there is no privilege protecting communications between clients and their accountants." *Exp.-Imp. Bank*, 232 F.R.D. at 114.

### 2. Attorney Work Product Doctrine

In contrast to the law governing privilege, "[f]ederal law governs the applicability of the work product doctrine in all actions in federal court." *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 393 (S.D.N.Y. 2015) (citation omitted). Pursuant to Rule 26(b)(3) of the Federal Rules of Civil Procedure, documents and tangible things prepared by a party or its representative in anticipation of litigation are protected under the work product doctrine. *See* Fed. R. Civ. P. 26(b)(3)(A); *Welland v. Trainer,* No. 00-cv-0738 (JSM), 2001 WL 1154666, at *2 (S.D.N.Y. Oct. 1, 2001) (if document "was prepared 'because of existing or expected litigation'" it is eligible for work product protection) (quoting *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir. 1998)).

The work-product doctrine exists to promote our adversarial system of jurisprudence and permit attorneys to work "with a certain degree of privacy free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. at 510-511; *see also AT&T*, 642 F.2d at 1299 (work product doctrine exists to "promote the adversary system by safeguarding the fruits of an attorney's trial preparation from the discovery attempts of an opponent."). Work product includes (1) opinion work product, consisting of the mental impressions, conclusions, opinions, and legal theories of an attorney or other representative of a party which receives heightened protection; and (2) fact work product, consisting of factual material and subject to disclosure upon a showing of substantial need and an inability to obtain the equivalent without undue hardship. *Upjohn Co.,* 449 U.S. at 400; *Hickman*, 329 U.S. at 511;

*In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183-84 (2d Cir. 2007); *Adlman*, 134 F.3d at 1204.

The key factor in determining applicability of this doctrine is whether the documents or things were prepared "with an eye toward" or "in anticipation of" or "because of the prospect of litigation." *Hickman*, 329 U.S. at 510-11; *Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir. 2015). Unlike the rule for invoking attorney-client privilege, the predominant purpose of the work product need not be to assist with litigation to be protected; rather, the work product need only have been prepared or obtained because of the prospect of litigation. *Adlman*, 134 F.3d at 1202; *In re Symbol Techs., Inc. Sec. Litig.*, 2017 WL 1233842, at *8. In this regard, the Second Circuit has noted that the rule encompasses documents prepared to assist in the making of a business decision "expected to result in . . . litigation." *Adlman*, 134 F.3d at 1199.

So, for example, if a company is contemplating a corporate transaction and requests an attorney's assessment of potential litigation and its likely outcome to aid in its business decision about the transaction, the attorney's strategies and assessments would be opinion work product protected under the work product doctrine. *Id*. at 1199-1200. Similarly, if a business prepares financial statements to assist its executives, prospective investors and business partners in evaluating future courses of action and the business's auditor requests an opinion by the business's attorneys estimating the likelihood of success in projected litigation for which it is maintaining reserve funds, the attorney's analysis is protected opinion work product. *Id*.

As these examples illustrate, the mental impressions of attorneys are given broad protection under the work product doctrine provided there is some anticipated litigation or prospect of litigation. By contrast, the doctrine does not protect documents created "in the

ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Id*. at 1202. Thus, where the withheld document is not a mental impression of an attorney, a court must determine if the materials would have been prepared in essentially similar form irrespective of the litigation; if the answer to this question is "yes," the document is not work product. *See Schaeffler*, 806 F.3d at 43 (citing *Adlman*, 134 F.3d at 1202); *In re Symbol* <u>Techs.</u>, 2017 WL 1233842, at *8; Clarke *v. J.P. Morgan Chase & Co.*, No. 08-cv-2400 (CM) (DF), 2009 WL 970940, at *7 (S.D.N.Y. Apr. 10, 2009).

And unlike the attorney-client privilege, work-product protection is not waived merely because the material is disclosed to a third party. *See, e.g.*, *Adlman,* 134 F.3d at 1200 n.4 (work product may be shown to others "simply because there [is] some good reason to show it" without waiving the protection).  Protection is waived only when work product is disclosed to a third party in a manner that is inconsistent with the purpose of the protection. *See In re Steinhardt Partners, L.P.*, 9 F.3d at 235; *In re Symbol Techs.*, 2017 WL 1233842, at *9 (disclosure that substantially increases the opportunities for potential adversaries to obtain the information results in a waiver of work product protection); *In re Visa Check/MasterMoney Antitrust Litig.,* 190 F.R.D. at 314 (purpose of work product doctrine is "to keep counsel's work from his opponent in the litigation so that it will not be used against him").

However, as noted above, the court may order production of fact work product upon a showing of "substantial need" by the party seeking the documents.  *U.S. Securities and Exchange Commission v. Collector's Coffee Inc.*, 337 F.R.D. 70, 78 (S.D.N.Y. 2020).  To show this, the party seeking the documents must demonstrate the documents are "essential to the preparation" of the case.  *Hickman*, 329 U.S. at 511.  Said another way, the documents must be

"crucial to the determination of whether the [party] could be held liable for the acts alleged, or carries great probative value on contested issues." *Gucci Am., Inc. v. Guess?, Inc*., 271 F.R.D. 58, 74-75 (S.D.N.Y. 2010). Mere relevance is insufficient to establish substantial need. *U.S. Sec. and Exch. Comm'n*, 337 F.R.D. at 79. Similarly, a desire to use documents for impeachment purposes alone does not establish substantial need. *Id*. There must be a more concrete reason articulated by the party seeking the documents to show substantial need such as that a document would fill in an important gap in crucial facts or conflict with evidence expected at trial. *Id*.

### 3. Scope of Waiver

Under Federal Rule of Evidence 502(a), when disclosure of work product or privileged information is made in a federal proceeding, waiver is generally limited to the precise communication or information disclosed. Fed. R. Evid. 502(a); Fed. R. Evid. 502 Advisory Committee's Note (revd. 11/28/2007). But the waiver will extend to all undisclosed communications and information if (1) the disclosure was voluntary or intentional, (2) the disclosed and undisclosed information concerns the same subject matter, and (3) in fairness ought to be considered together. Fed. R. Evid. 502(a); *In re Symbol Techs., Inc. Sec. Litig.*, 2017 WL 1233842, at *9 (citations omitted); *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 304 F.R.D. 369, 371-72 (S.D.N.Y. 2015).

### 4. Privilege Log

A party may waive protection by failing to identify in its privilege log the particular privilege it is relying on when withholding a document from production. *Monterey Bay Military Housing, LLC v. Ambac Assurance Corp*., 19 Civ. 9193, 2023 WL 315072, at *10 (S.D.N.Y. Jan. 19,

2023) (collecting cases).  Some courts are more flexible than others when evaluating this waiver, looking at the nature of the violation, evidence of disregarding the Local Rule's requirements for privilege logs, and prejudice to other parties.  *Id*. (collecting cases).

## Discussion

The Court begins with an initial note about Whinstone's efforts to show that it anticipated litigation.  It then turns to an analysis of the documents submitted in camera.

### A.  *Whinstone's Anticipation of Litigation with Northern Data*

As an initial matter, the Court finds that Whinstone has failed to prove when it anticipated litigation with Northern Data regarding the working capital adjustment – an issue that affects the Court's analysis of whether certain documents are protected by the work product doctrine.

Whinstone offers nothing except generalized, blanket assertions regarding the working capital adjustment, seeming to suggest that merely because there was a dispute about the acquisition price, litigation was therefore inevitable.   This assertion is not persuasive.  The SPA—which Whinstone did not offer the Court on this motion and was located by GMO through public Securities and Exchange Commission filings— contains a dispute resolution process regarding the purchase price that was wholly apart from any litigation process.  This procedure easily could have resulted in a resolution which would have made any contemplated litigation unnecessary.  Presumably, there would be little reason to supply such a procedure in the SPA otherwise.  It is far more likely that the parties hoped that process would resolve the dispute without any litigation.  Whinstone details virtually nothing of these procedures in its motion papers.

But the Court can "take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Carruthers v. Flaum*, 388 F. Supp. 2d 360, 370 (S.D.N.Y. 2005) (internal quotation marks omitted) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Courts may also "take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." *Id.* (internal quotation marks omitted) (citing *Harris v. New York State Dep't of Health*, 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002).

Court documents clarify the timing of "ongoing litigation" with Northern Data referenced in Mr. McGonegal's declaration. (ECF No. 294 ¶ 8.) Upon searching for Delaware Chancery Court filings between Riot and Northern Data, it became apparent that the litigation commenced nearly sixteen months *after* the closing date of the acquisition. Reference to the face of the documents submitted in camera and the SPA make clear that for much of those sixteen months, Riot and Northern Data were not engaged in the litigation process at all but were attempting to resolve their dispute through an established procedure in the SPA which was a binding accounting reconciliation process designed to obviate litigation.

Accordingly, absent stronger proof by Whinstone (and Riot) that they *actually* anticipated litigation almost immediately upon closing of the acquisition, the Court will not credit the assertion that documents related to the working capital adjustment process are all subject to work product protection. Rather, the Riot-ND Complaint and the Delaware Court's now released summary judgment opinion show that the price adjustment process was reaching an exhaustion point no earlier than June 2022. Thus, Whinstone and Riot fail to show that

documents preceding June 1, 2022 related to the working capital adjustment were created in anticipation of litigation. The fact that the litigation first commenced in September 2022 supports this conclusion. Documents prepared after June 1, 2022 related to the working capital adjustment, however, are potentially protected under the work product doctrine.

By contrast, Whinstone has adequately shown that its discussion to terminate the GMO agreement began with the legal team, given the ongoing litigation between the parties in January 2023. Thus, there is no timeline issue with respect to when litigation with GMO was anticipated.

### B. In Camera Analysis

The Court now turns to its analysis of the documents submitted for in camera review. Because the Court has reviewed only a sample of documents, its holdings herein should be applied to duplicates and near duplicate documents. Similarly, its holdings about when anticipation was anticipated should be applied to all documents on the privilege log. Whinstone/Riot also should apply other principles stated herein in a re-review of withheld documents, which the Court anticipates will result in a supplemental production of documents initially withheld as privileged.

Additionally, before turning to specific documents, the Court notes its determinations herein are necessarily document-specific.[4] It also notes that Whinstone was overinclusive in withholding documents insofar as it withheld business and profitability analyses that were not

---

[4] The Court concludes there was no broad subject-matter waiver of the attorney-client privilege as to any subject in dispute for the same reasons that these determinations were document-specific. In total, only a handful of the documents contained a waiver, and the Court sees no reason why considering undisclosed documents relating to the same subject matter would be fair.

shown to have been prepared for the primary purpose of requesting or conveying legal advice[5] or in anticipation of litigation or, in some cases, prepared differently because of litigation (i.e., the document would have been prepared in the same way regardless of litigation).  One email submitted by Whinstone—WUS 256—contained only a screenshot of a section from a signed agreement *to which GMO was a party*.  The Court is aware of no legal basis to withhold this document, and Whinstone offered none.  These practices frustrated the parties' ability to obtain discovery to which they were entitled and wasted the parties' and the Court's time.  They also understandably invited a response from GMO that discounted the validity of Whinstone's assertions even as to documents to which the assertions properly apply.

The Court now addresses three categories of documents:  (1) non-privileged documents or documents to which privilege or work product protection has been waived, all of which must be produced; (2) partially privileged and partially non-privileged documents, which must be produced in redacted form such that only privileged/work product portions are redacted; and (3) documents properly withheld as privileged/work product.

### 1.  Documents to be Produced Unredacted

**CAT 48, WUS 373.**  These documents are transmittal sheets only and thus are not privileged or protected by work product.  There is no legal advice communicated and no fact or opinion work product contained in the emails.  *See Travelers Indem. Co. v. Northrop Grumman Corp.*, 12-cv-3040 (KBF), 2013 WL 1087234, at *3 (S.D.N.Y. March 12, 2013).

---

[5] *See Hurst v. F.W. Woolworth Co.*, 95-cv-6584 (CSH), 1997 WL 104965, at *2 (SDNY 1997); *In re Minebea Co., Ltd.*, 143 F.R.D. 494, 502 (S.D.N.Y. 1992); *United States v. Mt. Sinai Hosp.*, 185 F. Supp. 3d 383, 390 (S.D.N.Y. 2016); *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 201 (E.D.N.Y. 1988); *see also Cicel (Beijing) Science & Technology Co., Ltd. v. Misonix, Inc.*, 331 F.R.D. 218, 226 (E.D.N.Y. 2019) (applying New York law).

**CAT 20, 51, 52; WUS 26, 27, 256, 348, 349, 374, 516; RIOT 136, 140.**  These documents represent business emails and attachments regarding business discussions which do not request or transmit any legal advice.  Some of the email communications may involve communications with attorneys, but the emails and attachments are primarily of a business nature and are not entitled to work product protection (to the extent claimed) because they would have been prepared/had irrespective of any anticipated litigation.  These documents must be produced in full.

The Court also specifically addresses additional arguments made by the parties:

- CAT 20:  This document was withheld on the basis of attorney-client privilege and the work-product doctrine.  Whinstone argues it should not be produced because it attached an analysis using counsel's response from CAT 16.  However, the information contained in CAT 20 does not correspond to the legal advice offered in CAT 16.  Rather, it corresponds to a portion of CAT 21 which will be produced.  (As explained later in this opinion, CAT 21 will be produced redacting the legal advice portion, which corresponds to CAT 16).  Furthermore, there is nothing in the email constituting fact or opinion work product.  Rather, the email contains business analyses that would have been prepared regardless of any anticipated or pending litigation.  Thus, CAT 20 should be produced unredacted.

- CAT 51 & 52:  This email and attachment were withheld on the basis of attorney-client privilege and the work-product doctrine.  Whinstone argues they should not be produced because they reflect Whinstone's contemplation of "the legal implications of terminating the [GMO] contract."  If that were so, it is not evident

21

from the face of the document, and Whinstone's briefing makes it no clearer.

Indeed, the Court's evaluation of these documents strongly suggest that

Whinstone seeks to shield its business and profitability assessments of the

termination decision under the cloak of privilege. With respect to CAT 51, no

legal advice is requested or transmitted. Indeed, the only attorney on the thread

is copied and never says anything. Whinstone cannot claim privilege over

documents merely by copying counsel. *In re Signet Jewelers Limited Securities*

*Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y. 2019); *accord ACE Securities Corp. v. DB*

*Structured Products, Inc.*, 40 N.Y.S.3d 723, 733 (Sup. Ct. N.Y. Cnty. 2016) (citing

*Fed. Hous. Fin. Auth. v. HSBC N. Am. Holdings, Inc.*, 11-cv-6189 (DLC), 2014 WL

1327952, at *3 (S.D.N.Y. April 3, 2014)). Furthermore, there is no apparent work

product of the attorneys. Rather, the analysis discussed and contained in CAT 52

appears to be entirely a business and profitability analysis assessing the various

scenarios relating to terminating or not terminating the GMO contract.

Accordingly, both documents must be produced.

- <u>WUS 256:</u> This document was withheld under the attorney-client privilege.

  Whinstone argues that "[a]t the time this email was sent, Northern Data was

  negotiating a payment to GMO to release Whinstone from its obligations under

  that agreement," noting the payment was made four days later. This argument is

  unavailing. The timing of the payment by GMO with respect to Section 16.3 of

  the contract provision at issue this case does not make this e-mail privileged.

  The email is contentless apart from containing a screenshot of a provision of a

contract to which GMO was a party and that is at issue in this case. Reference to the Texas Agreement filed to the docket as ECF No. 30-1 confirms that the language is unchanged in the signed Texas Agreement. The email must be produced.

- <u>WUS 348 & 349:</u> These documents were withheld under the attorney-client privilege and work-product doctrine. Whinstone argues these documents should be withheld because Sidley had sought information regarding power curtailments from XMS in order to provide legal advice to Riot in the purchase price dispute. The arguments are unavailing. Whinstone has not met its burden to show that the documents are privileged or protected as work product.

  - o While counsel was copied on WUS 348, the email merely provides a factual update on weather-related customer power credits and does not clearly contain a request for or otherwise relay or transmit legal advice. While the email references the SPA, nothing contained in the email represents attorney opinion work product about its provisions. Moreover, there is no showing this document was prepared in anticipation of litigation. Further, Whinstone has not shown how the email contains fact work product resulting from, e.g., any attorney-led investigation into the credits. Only *Mr. McGonegal's* (a non-lawyer) "beliefs" about the SPA are discussed. Indeed, the email begins with Mr. McGonegal stating *he* "wanted to" provide the update—not that he was

following up on Sidley's request, as Whinstone claims. Thus, WUS 348 must be produced.[6]

o As to WUS 349, no attorneys or legal personnel appear on the email. There is no evidence that the questions discussed in the communication were directed by the legal team. Nor do the participants appear to request or convey legal advice. Furthermore, the attachment is a signed agreement between Rhodium 30 MW LLC, Jordan HPC LLC, and Whinstone that necessarily was shared with the counterparties to the agreement. Whinstone also has not adequately explained how this can be work product, as it appears to relate primarily to business discussions, such as filing taxes and weather event settlements (which at the time were "all complete"), and something that would have been prepared regardless of any anticipated litigation. Thus, the document and attachment must be produced.

- WUS 374: This document was withheld under attorney-client privilege and work-product doctrine. Whinstone argues that the translator exception applies, citing *Cytec Industries v. Allnex (Luxembourg) & Cy S.C.A.*, 14-cv-1561 (PKC), 2016 WL 3542453 (S.D.N.Y. June 23, 2016). However, the contents of this spreadsheet differ substantially from those of the document discussed in *Cytec Industries, Inc.* There, the Court made clear that a similar email chain "was a confidential communication from the client simultaneously sent to the law firm representing

---

[6] The Court was not to its knowledge provided with the attachment to this email and cannot evaluate its contents.

Allnex and to E&Y for the purpose of understanding Allnex's legal rights in the event that the cash left in the business was less than contemplated." *Id.* at *3. Because "[t]he answer could have turned on either contract interpretation or accounting principles or both," the Court upheld the privilege assertion. *See id.* Here, WUS 373 (the email to which WUS 374 was attached) does not evince any legal question at all. Instead, this document and the transmittal sheet show only that Whinstone was sharing its working capital file with both its attorneys and accountants. Thus, there is no showing of attorney-client privilege. Further, as noted above, Whinstone has failed to show litigation was anticipated before June 2022, such that work-product privilege does not apply to these August 2021 emails and attachments. Thus, Whinstone has not met its burden to show that this document is protected, and it must be produced.

- <u>RIOT 136:</u> This document was withheld under the attorney-client privilege and work product doctrine. This email thread is a chain between EY and businesspeople at Riot. The thread is trained on the development of talking points regarding the working capital adjustments that Riot would discuss with Northern Data. However, there is no transmittal of or request for legal advice in the thread. Further, the Court has concluded that Whinstone has failed to show litigation was anticipated prior to June 2022. Thus, these January 2022 communications regarding creation of talking points are not privileged and must be produced. The other emails likewise contain no requests for or transmission of legal advice and are merely transmittal emails and discussions of routine

administrative and logistical matters which are not within the scope of the attorney-client privilege or work product doctrine.

- RIOT 140:  These documents were withheld under the attorney-client privilege and work-product doctrine.  Whinstone argues that they were appropriately withheld because "[a]t the time, Riot was drafting talking points in collaboration with Sidley to respond to Northern Data's objections to Whinstone's proposed purchase price adjustments."  Whinstone also says EY provided an accounting analysis which was incorporated into the draft.  However, Whinstone has not met its burden to show this document's entitlement to protection.  The top email of RIOT 140 from Mr. McGonegal is a transmittal sheet only; the remainder are business discussions regarding revenue analyses and discussions of the mere fact whether certain contracts were signed, which would have been created irrespective of contemplated litigation.  Any assertion this constitutes fact work product is contradicted by the fact that the initial analysis was sent only among businesspeople, with counsel looped into the communications later.  While Mr. Silvertown at EY suggests the creation of "talking points" and Mr. McGonegal references the "other side," this Court has concluded that in the period before June 2022, when these emails were sent, Whinstone has not shown it anticipated litigation.  As a result, RIOT 140 must be produced.

**RIOT 21.**  This document was withheld under the attorney-client privilege and work-product doctrines.  It represents a draft claim notice under an insurance policy of a "Notice of Breach or Potential Breach" and Third-Party Claim.  It appears to have been drafted in April

2022, at a time before the period where Whinstone has proven litigation was anticipated (i.e., June 2022). Furthermore, the fact that it is a claim under an insurance policy demonstrates it was not developed as part of any litigation strategy. Moreover, it is not a confidential communication because the privilege was waived by copying EY. Whinstone has not shown EY was operating as a translator with respect to this document; indeed, on the face of the document, that seems unlikely, and there is no record evidence that EY was retained by counsel to assist with insurance claims and act as a translator. Thus, the document must be produced.

**WUS 215, 325, 350, 567, 568, 723, 841, and 862.** These documents were privileged or protected by the work-product doctrine, but the protection was waived. The Court analyzes each document separately.

- <u>WUS 215:</u> This document was withheld under the attorney-client privilege. This document is an email chain between and among S&C, outside legal counsel, Northern Data, Mazars, and Greenhill concerning the set-up of a virtual data room in connection with due diligence preceding Riot's acquisition of Whinstone. While legal advice is conveyed regarding how to set up and what to include in a virtual data room, privilege is waived because of the presence of third parties Mazars and Greenhill. Neither Mazars nor Greenhill are needed as translators for the provision of legal advice. Additionally, Whinstone does not argue that either entity is the functional equivalent of an employee. Nor is it clear that that doctrine would apply because there is no evidence that Mazars and Greenhill were integrated into the corporate structure and vested with discretion to make

decisions on behalf of Northern Data. *Sec. & Exch. Comm'n v. Rayat*, No. 21-CV-4777 (LJL), 2023 WL 4420325, at *3-6 (S.D.N.Y. July 10, 2023).

- <u>WUS 325:</u>  This document was withheld under the attorney-client privilege. GMO argues the exchange is not privileged because Mazars and Greenhill employees were corresponding on this chain.  The chain starts with a request for information from S&C (outside counsel) made to the client, Greenhill, and Mazars, in service of generating a document for the closing of the Riot acquisition.  The information requested and provided is factual, and Whinstone has failed to demonstrate that Greenhill's response was in the nature of a translator response necessary for the lawyer to provide legal advice.  Moreover, including Mazars in the chain would have waived privilege even if Greenhill were a translator, since Whinstone has failed to show Mazars was a translator or functional equivalent.  Thus, privilege is waived.

- <u>WUS 350 & 862:</u>  WUS 350 was withheld under the attorney-client privilege, while WUS 862 was withheld under both the attorney-client privilege and work-product doctrine.  These documents (reflecting parallel email chains) contain a request for legal advice intermingled among business information and communications.  Whinstone argues these must be shielded from disclosure for substantially the same reasons given with respect to WUS 348 & 349.  The arguments are equally unavailing, but the analysis differs in key respects. Notably, the request for legal advice is contained at paragraphs C and D of Mr. McGonegal's June 11, 2021 email sent at 5:43 p.m., and the response from

counsel is contained in Mr. Michaels's email of June 14, 2021, at 10:56 a.m.  A

third party, XMS, was copied on the emails.  It is clear from the email that XMS

was not needed to translate information provided to Sidley because the client

provided an explanation and was simply asking for an interpretation of the SPA –

something the attorney was equipped to do without input from XMS.  In other

words, XMS was not needed to translate information provided to the attorney in

order for the attorney to provide legal advice.  Thus, privilege was waived by

copying XMS.  The same analysis applies to WUS 862 with respect to the

assertion of attorney-client privilege.

- o As to the claim for work-product concerning WUS 862, the work product

  doctrine does not apply because there has been no showing that this

  communication was had "with an eye toward" or "in anticipation of" or

  "because of the prospect of litigation."  Rather, as discussed, the SPA

  provided for a post-closing price adjustment period and this email

  concerned computations of price adjustments pursuant to the contractual

  process.  The time period of this communication is relevant to the

  determination because it occurred just weeks after the closing of Riot's

  acquisition of Whinstone and in the 75-day period when Riot was

  preparing its proposed final closing statement and before it

  communicated with Northern Data about price adjustments.  Further, the

  SPA contemplated that pricing adjustments would be resolved, if there

  were objections, through a period of negotiation and, if needed,

resolution by an expert accountant.  McGonegal states in the email that

the adjustment would be communicated and that he expected the issue

to be resolved "over the next 7-10 months," which is consistent with how

the SPA contemplated adjustments to be made – that is, without litigation

and at worst decided by an independent expert accountant. While

McGonegal does ask whether the adjustment could create an issue that

could result in Northern Data potentially looking to Whinstone to initiate

an action, that question in and of itself does not mean that litigation was

anticipated.  Rather, the question is in the nature of obtaining advice

about compliance with terms of the contract while working out a price

adjustment and was necessarily pre-anticipation of litigation.  In other

words, it is simply a request for legal advice concerning a business matter

when no litigation was actually anticipated or pending.  But, as noted

above, privilege was waived.  Thus, both documents must be produced.

- <u>WUS 567 & 568:</u>  These documents were withheld under the attorney-client

  privilege and work-product doctrine.  However, the documents must be

  produced, as Whinstone has not shown it anticipated litigation at the time, and

  any confidentiality as to the communication was waived.  As to WUS 567, this

  email thread contains a request for legal advice and transmittal of legal advice in

  Mr. McGonegal's email of March 11, 2022, at 9:56 a.m. and Mr. Michaels's reply

  of March 11, 2022, at 9:33 a.m.  The advice concerns how to communicate with

  Northern Data regarding its objections to the proposed final closing statement

and when to submit the dispute to the independent accountant for resolution. The emails make clear that Riot and Northern Data have not yet begun to negotiate in good faith and there is no indication that Northern Data has indicated it will not follow the SPA procedures. Thus, Whinstone/Riot have not demonstrated that litigation was anticipated at this point regarding purchase price adjustments. Whinstone/Riot also have not demonstrated that the EY people copied on the email were forensic accountants hired by Sidley as opposed to accountants that were simply assisting with computation of post-closing pricing adjustments. EY and Riot are drafting a communication about the price resolution but there is no indication that EY is necessary as a translator to Sidley. Thus, privilege is waived by EY's inclusion in the email chain. A similar analysis applies to WUS 568, though the Court adds that the draft, initially prepared by Mr. McGonegal, a businessperson, represents EY's comments on responses to Northern Data's objections. The comments by EY deal expressly with business strategy rather than with legal advice or attorney opinion or fact work product. There is no translation occurring for the attorneys. Further, consistent with this Court's view that Whinstone has not proven it anticipated litigation in advance of June 2022, this April 2022 document has not been shown to be protected as work product. Thus, the document must be produced.

- <u>WUS 723:</u> This document was withheld under the attorney-client privilege. This email contains a request for information made by counsel to Whinstone and Greenhill and includes a response from Mr. Harris and Greenhill. The information

requested and provided is factual and the information provided by Greenhill is not needed for translation of client information to counsel. Thus, the inclusion of Greenhill waives any privilege. These emails should be produced.

- <u>WUS 841:</u> This document was withheld under the attorney-client privilege. This document contains legal advice, but the privilege was waived by copying third parties because the legal advice provided was outside the scope of the engagement of the third-party agent and it does not appear that the third-party agent was necessary to assist the lawyer in rendering legal advice, and thus the *Kovel* exception does not apply.

### 2. *Documents to be Produced in Redacted Form*

**RIOT 26, 51, 137, 141; WUS 49, 223, 577, and 870; and CAT 21, 46, 49, and 54.** These documents contain some privileged/work product content and shall be produced in redacted form. The Court specifically addresses the redacted content:

- <u>RIOT 26:</u> This document was withheld under the attorney-client privilege and work-product doctrine. Mr. Jackman is copied on this email in his capacity as in-house counsel. The emails are in service of drafting work product and contain material which was intended to be input into work-product in connection with this litigation. However, the three emails sent on May 6, 2022, are in the nature of transmittal and are not privileged or otherwise protected. Apart from those three emails, the thread should be redacted, and the three transmittal emails (which contain no request for or transmittal of legal advice) should be produced.

- <u>RIOT 51:</u>  This document was withheld under the attorney-client privilege.  This document represents an email chain initiated by businesspeople at Riot requesting legal advice from inhouse counsel regarding a hosting agreement.  The email chain that ensues occurs entirely among inhouse counsel and businesspeople, and thus no waiver occurred.  The draft document attached to the chain includes counsel's advice and is privileged, as are the communications at the beginning of the chain through the March 31, 2022 email sent at 9:24 p.m. from Jason Les.  These emails can be redacted. The other emails in the thread concern business discussions concerning computation of the net revenue share of fees for the Whinstone hosting of Riot's miners and methods for computing revenue and are not conveying or transmitting legal advice. These emails should be produced.  Thus, the document should be produced in redacted form.

- <u>RIOT 137 & 141:</u>  These documents were withheld under the attorney-client privilege and the work-product doctrine.  The documents detail draft discussion points relating to the working capital adjustments.  However, the drafts are not work product because Whinstone and Riot have not shown that they anticipated litigation at the time of these documents/communications were created.  The vast majority of the documents also contain no requests for legal advice.  However, page eight of WUS 141 contains a request for legal advice at paragraph four, beginning "INTERNAL NOTE."  The same is true of page eleven, at Open Item B, beginning "INTERNAL NOTE."  These two portions can be redacted.  The remainder should be produced.  The other "Open Items" in RIOT 137 (on pages

5-6, 7, and 8) may also be redacted because they reflect requests for legal advice. There is no third party copied and no waiver issue.

- <u>WUS 49, 870:</u>  These documents were withheld under the attorney-client privilege.  These documents are identical copies representing chiefly a business communication between businesspeople.  However, there are two lines—highlighted in the in-camera submissions—where the businesspeople discuss legal strategies and contemplate requests for legal advice.  These two lines were rightly redacted in the version that was produced.  There is no waiver issue because no third party was included.

- <u>WUS 223:</u>  This document was withheld under the attorney-client privilege.  This document concerns pre-closing communications between and among Whinstone, Northern Data, and S&C with no third party copied where S&C is seeking information from its client in connection with legal advice it is providing. There is no waiver of privilege as to the first seven emails.  Earlier emails on the chain also relate to collection of information for due diligence and are shared with Greenhill.  Greenhill is not needed for translation to S&C and thus privilege is waived as to these emails.  And, as with WUS 215, the functional equivalent doctrine is not argued and does not apply.

- <u>WUS 577:</u> This document was withheld under the attorney-client privilege.  This document represents email communications initiated by counsel to discuss a request made by GMO.  While the first email in the chain is from GMO, the subsequent emails are wholly internal between businesspeople and in-house

counsel to facilitate providing legal advice regarding GMO's request. No waiver occurred. Thus, the document is privileged. The document is properly produced redacting all but the initial email from GMO.

- <u>CAT 21 & 49:</u> These documents were withheld under the attorney-client privilege and work-product doctrine. These documents represent slide decks and contain attorney work product on three slides each. The privileged content reflects legal advice regarding legal risks of terminating the GMO contract whereas the remainder of the slides reflect business considerations in terminating the GMO contract. While the termination of the GMO contract was done while this litigation was pending and Whinstone/Riot did anticipate litigation, the business analysis would have been done regardless of litigation and therefore cannot be shielded by the work product privilege. Indeed, the explanation provided by Whinstone/Riot for supporting application of work product and attorney-client privilege makes clear that only certain portions were legal analysis and work product. These should therefore be produced with the privileged portions redacted. The privileged portions on CAT 21 are on the bottom of side 2 and slides 5 and 12. The privileged portions on CAT 49 are on the bottom of slide 2 and slides 6 and 14.

- <u>CAT 46 & 54:</u> These documents were withheld under the attorney-client privilege and work-product doctrine. These documents represent email communications which include provision of legal advice and transmit attorney work product to the client. The communications in the nature of legal advice and discussions

regarding development of draft documents are privileged.  In CAT 46, the

privileged discussion runs from Mr. Wooding's email of June 28, 2023, at 7:40

p.m. through Mr. Yee's June 29, 2023 email at 6:59 a.m.  In CAT 54, the privileged

discussion runs from Mr. Wooding's June 28, 2023 email at 4:40 p.m. until Mr.

Wooding's Wednesday, June 28, 2023 email at 7:08 p.m.  These portions of the

email threads should be redacted.  The remainders of these threads are not

privileged because they do not request or convey legal advice and are of the

nature that the analysis would have been done regardless of litigation and were

properly produced in redacted form.  There are no waiver issues.

### 3.  Documents Properly Withheld

**CAT 16 and 58; RIOT 19, 118, 149, 238, and 243; and WUS 30, 31, 104, 355, 359, 377, 378, 421, 524, 525, 549, 593, 722, 831, 837, 850, 900, and 981.**  These documents represent confidential attorney-client email communications and attachments sent between businesspeople and counsel regarding the provision legal advice.  No waiver occurred.  To the extent GMO argues that these documents represent business communications, the Court finds this argument unavailing upon in camera review of the documents.  Further, to the extent third parties received these communications, it was in the capacity as translators.  The documents are privileged.

The Court addresses some specific arguments of the parties:

- <u>CAT 16:</u>  This document was withheld under the attorney-client privilege and work-product doctrine.  The first email in the threat makes clear that in-house business and legal personnel are preparing something for outside counsel in

connection with outside counsel's damages analysis.  Therefore, the entirety of the thread reflects the gathering and preparation of information in order to obtain legal advice. While the decision being contemplated in this document may have been a business decision, the advice sought clearly regarded the legal dimension of that decision, and it is clear confidence was expected.  The Court does not reach the work-product claim, finding the attorney-client privilege claim sufficient to withhold the document, particularly insofar as this was internal and there is no waiver issue.

- <u>CAT 58:</u>  This document was withheld as attorney-client privileged and under the work-product doctrine.  GMO argues that because it is a communication between business personnel regarding a business decision (i.e., terminating the Texas Agreement), it is not privileged or entitled to work product protection.  The document shows something substantially different from GMO's assertions. Indeed, GMO is correct that the email represents a parallel thread to CAT 54; however, unlike CAT 54, the only discussion relates to comments on attorney work product.  The entire exchange, therefore, may be withheld.  There is no issue of waiver.

- <u>WUS 31:</u>  This document was withheld under attorney-client privilege.  WUS 31 is attorney-client privileged.  It represents a hosting agreement term sheet transmitted only between in-house counsel and businesspeople at Riot and conveyed for purposes of counsel drafting a contract.  The document is properly withheld as privileged.

- <u>WUS 831:</u>  This document was withheld under the attorney-client privilege and work-product doctrine.  GMO argues the document is not privileged because it pertains to the capacity of the Rockdale facility.  However, the Court disagrees upon reviewing the document in camera.  The document represents an email communication containing a request for information made by counsel to the client and responsive information provided by the client for purposes of obtaining legal advice in connection with the closing.  Thus, the document is privileged.

### 4. *Substantial Need for Work Product*

GMO argues it has a substantial need for the materials protected as work product. While courts allow work product to be produced where a party shows "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means," *von Kahle v. Cargill, Inc.*, 599 F. Supp. 3d 181, 186 (S.D.N.Y. 2022) (citing Fed. R. Civ. P. 26(b)(A)(ii)), GMO has a large trove of information with which it can prosecute its case.  Its assertions that it has "a limited number of documents concerning termination, but . . . also has no testimony" are not persuasive.  GMO has failed to show the level of undue hardship required to demonstrate its substantial need to overcome the protection.

### 5. *Fees*

In consideration of the mixed result, the Court concludes that Whinstone's objections to the disclosure were "substantially justified," and thus the Court does not award fees for this motion to either party. Fed. R. Civ. P. 37(a)(5)(A)(ii).

## Conclusion

For the foregoing reasons, GMO's motion to compel is **granted in part**. Whinstone shall produce the documents as required by this Opinion and Order within two weeks. Furthermore, Whinstone shall re-review its other withheld documents to see if the principles articulated in this Opinion require production of additional documents (in whole or in part) that have been withheld as privileged.

**SO ORDERED.**

Dated: May 30, 2025
New York, NY

Katharine H. Parker
United States Magistrate Judge

39