UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

GMO GAMECENTER USA, INC. and GMO INTERNET GROUP, INC.,

Plaintiffs,

-v-

WHINSTONE US, INC. and RIOT PLATFORMS, INC.,

Defendants.

-------------------------------------------------------------------X

22 Civ. 5974 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

In 2018, GMO Internet, Inc. ("GMO-I"), a Japanese internet conglomerate that had recently entered into the Bitcoin mining business, hired an American start-up called Whinstone US, LLC ("Whinstone")[1] to build and operate a mining facility in Louisiana for its U.S.-based subsidiary, GMO Gamecenter USA, Inc. ("GMO USA"; together with GMO-I, "GMO"). That Louisiana facility shut down after only eight months, but instead of parting ways, the two companies sought to salvage their business relationship. GMO agreed to fund Whinstone's construction of a new facility in Rockdale, Texas (the "Rockdale Facility"), and in return, Whinstone agreed to host GMO's specialized Bitcoin mining computers, called miners, at a fixed price for ten years, to repay GMO's investment, and to compensate GMO for the profits it had lost in Louisiana. This renewed deal (the "Texas Agreement") is the subject of the present lawsuit.

Whinstone's Rockdale Facility opened in June 2020, but although it was at the time the largest Bitcoin mining site in North America, GMO's miners were confined to a single building and denied power on several occasions. Additionally, the Texas Agreement had required the

---

[1] The Court uses "Whinstone" to refer to Whinstone US, LLC as well as its successor entity, Whinstone US, Inc.

parties to renegotiate the terms of their relationship after Whinstone repaid its debts to GMO, but the parties struggled to agree on an amended contract. In May 2021, Riot Blockchain, Inc. ("Riot"),[2] acquired Whinstone, and the relationship with GMO continued to sour. The beginning of the end came in the spring of 2022, when Whinstone removed thousands of GMO's miners to make room for another customer. GMO sued, and a year later Whinstone terminated the Texas Agreement, citing GMO's failure to negotiate in good faith and failure to use the power Whinstone had allotted it.

In this action, GMO asserts a single claim for breach of the Texas Agreement against Whinstone and, for the first time in their Fifth Amended Complaint, against Riot as well. Earlier in the litigation, Whinstone answered and counterclaimed alleging breach of contract and unjust enrichment, and seeking a declaration that its termination of the Texas Agreement was lawful. Three years of discovery between GMO and Whinstone concluded in December 2025, and a bench trial on all remaining claims is scheduled to commence on January 5, 2027.

This Opinion and Order resolves five sets of motions: (1) Riot's motion to dismiss the claims asserted against it in GMO's Fifth Amended Complaint; (2) Whinstone's objection to a discovery order issued by the Honorable Katharine H. Parker, which required Whinstone to produce certain financial analyses and related documents; (3) three motions to exclude expert testimony; (4) GMO's and Whinstone's motions for summary judgment; and (5) numerous requests to seal portions of the record on those motions. For the reasons that follow, the Court grants Riot's motion to dismiss, overrules Whinstone's objection to Judge Parker's discovery order, and denies without prejudice the three motions to exclude expert testimony, which may be renewed at the upcoming bench trial. The Court also grants in part and denies in part GMO's and

---

[2] The Court uses "Riot" to refer to Riot Blockchain, Inc. as well as its successor entity, Riot Platforms, Inc.

Whinstone's motions for summary judgment. In short, GMO is entitled to summary judgment on Whinstone's counterclaims, on most of Whinstone's affirmative defenses, and as to liability on its own claims for breach of Whinstone's obligations to supply a specified power draw, to ensure service uptime, to negotiate a reduced hosting fee in good faith, and to obtain GMO's consent before removing its miners. Meanwhile, Whinstone is entitled to summary judgment on GMO's invoice overcharge and installation environment claims. Many other issues, including the amount of GMO's damages, must await trial. Finally, the Court grants in part and denies in part the requests to seal.

## I. Background

### A. Facts[3]

The events underlying this case span five years. GMO and Whinstone contracted in Louisiana in November 2018; that project failed within eight months; the parties signed the Texas Agreement, dated October 2019, in January 2020; Whinstone's Rockdale Facility opened in June 2020; Whinstone repaid its debts to GMO in March 2021, and Riot acquired Whinstone two

[3] The facts in this Section, to the extent they bear on GMO's and Whinstone's motions for summary judgment, are drawn primarily from the parties' statements and counterstatements of material facts submitted pursuant to Local Civil Rule 56.1, Dkt. 565 ("GMO 56.1 Stmt."); Dkt. 604 ("Whinstone 56.1 Counter Stmt."); Dkt. 605 (Riot's counterstatement pursuant to Rule 56.1); Dkt. 557 ("Whinstone 56.1 Stmt."); Dkt. 609 ("GMO 56.1 Counter Stmt."); Dkt. 623 ("GMO 56.1 Reply Stmt."), and from the exhibits attached to the parties' declarations, including the Texas Agreement, Dkt. 545 ("Thorne Decl."), Exh. 1 ("Texas Agreement"), and the Louisiana Agreement, Thorne Decl., Exh. 2 ("Louisiana Agreement"). Where a fact is drawn from one party's statement and the opposing party has not disputed it or merely disputes the characterization of it, the Court cites the statement and, where applicable, the corresponding response. Where the parties disagree, the Court so notes and describes the competing evidence. Because Riot's motion to dismiss is decided on the pleadings, the Court also notes the allegations of the Fifth Amended Complaint, Dkt. 494 ("Fifth Am. Compl."), that bear on that motion when they arise in the following narrative. Those allegations are accepted as true for purposes of the motion to dismiss only. *See Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 141 (2d Cir. 2011). Unless an exhibit is independently page-numbered, page citations are to the ECF-generated page number of the filing. Several of the parties' submissions were filed in both public and sealed versions; the Court cites the sealed versions, which are complete, and addresses the parties' sealing requests below.

months later; the parties negotiated an amendment to the Texas Agreement, unsuccessfully, from April 2021 through March 2022; Whinstone removed thousands of GMO's miners from service in March and April 2022; GMO sued in June 2022; Whinstone terminated the Texas Agreement in June 2023; and GMO left the Rockdale Facility in October 2023. The Court describes these events in turn.

### 1. The Parties and Bitcoin Mining

GMO Gamecenter USA, Inc., referred to herein as GMO USA, is a California corporation with its principal place of business in Tokyo, Japan. GMO 56.1 Stmt. ¶¶ 1-2; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 1-2. GMO Internet Group, Inc., formerly known as GMO Internet, Inc. and referred to herein as GMO-I, is a Japanese public corporation headquartered in Tokyo that offers a variety of internet-based services and, for a period of years, engaged in Bitcoin mining. GMO 56.1 Stmt. ¶¶ 3-5; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 3-5. GMO entered the Bitcoin mining business in 2017, first in Iceland and then, on a test basis, in Norway. GMO 56.1 Stmt. ¶¶ 13-16; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 13-16. In the fourth quarter of 2018, GMO recorded what it labeled an "extraordinary loss" on its in-house mining business and on a separate business developing and selling mining machines. Whinstone 56.1 Stmt. ¶ 4.[4]

Whinstone US, Inc., formerly Whinstone US, LLC and referred to herein as Whinstone, is a Delaware corporation that operates data centers for large-scale cryptocurrency mining, including the Rockdale Facility in Rockdale, Texas. GMO 56.1 Stmt. ¶¶ 6, 19; *accord* Whinstone 56.1

[4] GMO disputes the significance of these losses, explaining that disclosure of an "extraordinary loss" is a feature of Japanese accounting principles and that the loss reflected a strategic impairment rather than a failed business. GMO 56.1 Counter Stmt. ¶ 4. Any disagreement in this regard is not material to the pending motions.

Counter Stmt. ¶¶ 6, 19; Dkt. 505 at 1-15 ("Answer") ¶ 9.[5] Whinstone was founded in 2018 by three Louisiana entrepreneurs, Chad Harris ("Harris"), his son Ashton Harris, and Lyle Theriot, together with two German businessmen, Aroosh Thillainathan and Andreas Lange. Whinstone 56.1 Counter Stmt. ¶ 494; GMO 56.1 Reply Stmt. ¶ 494. None of Whinstone's Louisiana principals had prior experience in Bitcoin mining or data center construction. GMO 56.1 Stmt. ¶ 20; *accord* Whinstone 56.1 Counter Stmt. ¶ 20. Since May 26, 2021, Whinstone has been a wholly owned subsidiary of Riot, a Nevada corporation and publicly traded Bitcoin mining company. GMO 56.1 Stmt. ¶¶ 7-9; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 7-9; Fifth Am. Compl. ¶ 10.

A brief description of Bitcoin mining frames the parties' dispute. Bitcoin mining is the process of creating new Bitcoin using computing systems that compete to solve mathematical problems; the miner that solves a problem first is rewarded with newly minted Bitcoin and with the fees attached to the transactions it validates. GMO 56.1 Stmt. ¶¶ 10-12; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 10-12. The specialized computers that perform this work, known as "miners," consume large amounts of electricity, and a mining company's odds of earning rewards rise with its "hash rate," the total computing power it devotes to the task. GMO 56.1 Stmt. ¶ 11; *accord* Whinstone 56.1 Counter Stmt. ¶ 11. Because electricity is an important operating cost, miners seek out locations with cheap power, and because newer machines are more efficient than older ones, the age and condition of a fleet drive its profitability. *See* Whinstone 56.1 Stmt. ¶¶ 45-48; GMO 56.1 Counter Stmt. ¶¶ 45-48; Whinstone 56.1 Counter Stmt. ¶ 147. Companies that own miners but not facilities often contract with a "host" under a colocation agreement, whereby the

[5] "Answer" refers to Whinstone's Answer to the Fifth Amended Complaint at Docket Number 505. Whinstone's counterclaims, which are contained in the same document and separately numbered, are cited herein as "Counterclaims."

host provides space, power, cooling, internet connectivity, and security in exchange for a fee. GMO 56.1 Stmt. ¶ 25; Whinstone 56.1 Counter Stmt. ¶ 25.

**2. The Louisiana Agreement**

The parties' relationship began in 2018, when Whinstone's Ashton Harris and Theriot showcased a Whinstone-designed method for housing and cooling miners at a conference in Tbilisi, Georgia. GMO 56.1 Stmt. ¶ 21; *accord* Whinstone 56.1 Counter Stmt. ¶ 21. GMO, which was looking for a location with favorable electricity costs, was impressed with that design and with the price of power Whinstone said it could offer. GMO 56.1 Stmt. ¶¶ 22-23; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 22-23. On November 28, 2018, GMO-I and Whinstone US, LLC entered into a W Colocation Services Agreement, together with an order form and an amendment (collectively, the "Louisiana Agreement"). GMO 56.1 Stmt. ¶ 24; *accord* Whinstone 56.1 Counter Stmt. ¶ 24; *see* Louisiana Agreement at 3-40. GMO was Whinstone's first and only hosting customer in Louisiana. GMO 56.1 Stmt. ¶ 30; *accord* Whinstone 56.1 Counter Stmt. ¶ 30.

Under the Louisiana Agreement, Whinstone promised to bring "100 MW live by January 5, 2019 and another 100[]MW live by June 2019," for an initial term of 120 months and with a "service uptime of 99%." Louisiana Agreement at 33-34; GMO 56.1 Stmt. ¶¶ 26-27 (alteration adopted). GMO would pay $0.0285 per kilowatt-hour ("kWh") for power, a price that "shall not be increased for 10 years," and would be billed "based on usage of power with a minimum consumption of 40 MW from January 5, 2019, and 80 MW from February 1, 2019." Louisiana Agreement at 35-36; GMO 56.1 Stmt. ¶¶ 28-29; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 28-29. GMO also agreed to place a $4,104,000 deposit with Whinstone, to be applied toward energy costs over the first thirty-six months of operations. Louisiana Agreement at 34-35.

The Louisiana project lasted eight months and did not go as planned. GMO shipped 44,193 Bitmain Antminer S9 miners to Louisiana by March 2019 and another 22,500 by August 2019, but

Whinstone did not provide sufficient space to install them. GMO 56.1 Stmt. ¶¶ 35-36.[6] GMO began mining on March 5, 2019, but Whinstone was never able to secure a power agreement with Entergy Louisiana and never provided GMO with more than five megawatts ("MW") of power. GMO 56.1 Stmt. ¶¶ 37-39; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 37-39. The parties agreed to look for another location, and operations in Louisiana were suspended on July 27, 2019. GMO 56.1 Stmt. ¶¶ 41, 43; Whinstone 56.1 Counter Stmt. ¶¶ 41, 43. Whinstone, with GMO's approval, selected a greenfield site in Rockdale, Texas, adjacent to an existing substation that could supply the power Whinstone had been unable to procure in Louisiana. GMO 56.1 Stmt. ¶ 42; Whinstone 56.1 Counter Stmt. ¶ 42.

### 3. The Texas Agreement

GMO's Board of Directors considered whether to proceed with Whinstone at a meeting in September 2019 and, over the opposition of several directors, approved a new agreement. GMO 56.1 Stmt. ¶¶ 49-50; Whinstone 56.1 Counter Stmt. ¶¶ 49-50; GMO 56.1 Reply Stmt. ¶ 513. GMO USA, GMO-I, and Whinstone thereafter executed the Texas Agreement, which is dated October 16, 2019, but was finalized in December 2019 and fully executed on January 15, 2020. *See* GMO 56.1 Stmt. ¶ 51; Whinstone 56.1 Stmt. ¶¶ 10-12; GMO 56.1 Counter Stmt. ¶¶ 10-12, 165. Hiroya Tsukahara and Satoshi Makita negotiated the Agreement for GMO; Thillainathan and Harris negotiated for Whinstone. Whinstone 56.1 Stmt. ¶ 9; GMO 56.1 Counter Stmt. ¶¶ 9, 146-153. The Texas Agreement is governed by New York law. Texas Agreement § 18.1.

The Texas Agreement's sole recital described its purpose. It recorded that the Louisiana Agreement "resulted in a delay and suspension of the provision of . . . data center services," that Whinstone "wishes to construct a data center in the state of Texas and provide the Customer with

---

[6] Whinstone disputes the implication that the machines GMO shipped were in working order. Whinstone 56.1 Counter Stmt. ¶ 36.

the data center services," and that Whinstone's shareholders would pledge their stock as security for "(i) the repayment by Whinstone of the deposit paid by GMO-I to Whinstone in connection with the Original Agreements and the investment by the Customer regarding this Agreement and (ii) the indemnification by Whinstone for the loss of profit of GMO-I regarding the Original Agreements." Texas Agreement at 3; GMO 56.1 Stmt. ¶ 52; *accord* Whinstone 56.1 Counter Stmt. ¶ 52.[7] Because the parties' motions turn on the Texas Agreement's terms, the Court describes the relevant provisions in some detail.

**a. Construction, Power, and Services**

Section 2.1 required Whinstone to "complete the construction of the Data Center which has a capacity to provide the Customer with the Services[8] set out in this Agreement within 20 weeks of the construction start date, at the earliest by December 31, 2019," and to "proceed the construction to start mining of the Customer as schedule of 4.3.1." Texas Agreement § 2.1. Section 2.2 permitted GMO, "at its sole discretion and in accordance with Whinstone's request," to bear construction costs on Whinstone's behalf by paying third parties directly; such costs, defined as the "Initial Investment Costs," were to include deposits for power and for the real estate lease, construction costs, and the cost of preparing substations and power facilities. *Id.* §§ 2.2-2.3. Whinstone was obligated to repay the Initial Investment Costs. *Id.* § 2.4.

Section 3.1.1 described the "installation environment" Whinstone would provide: "the Licensed Area in two buildings, rack systems, electricity supply (including [power distribution

[7] The Texas Agreement defined the "Original Agreements" as the Louisiana Agreement, including its order form and its amendment, and the "Customer" as GMO USA. Texas Agreement at 3, 5. It provided that the Original Agreements "are hereby terminated and fully replaced by this Agreement, and neither Party has any right or claim under the Original Agreements other than those set out in this Agreement." *Id.* § 16.4.

[8] The Texas Agreement defined "Services" as "the colocation services at the Data Center," *i.e.*, the Rockdale Facility. Texas Agreement at 4-5.

units]), transforming equipment, evaporative-cooling, smoke detection, IP Connection Service and physical security." *Id.* § 3.1.1. The "Licensed Area" was defined as "the floor area for the Customer Equipment being 1 square feet per 1.6KW of power." *Id.* at 4. Section 3.1.3 provided that "[w]ith written prior consent of the Customer, Whinstone may relocate the Customer Equipment within the Data Center or to another facility operated by Whinstone." *Id.* § 3.1.3.

Section 4.3, titled "Specified Power Draw," is central to this case. It provided:

> 4.3.1 Whinstone shall provide the Customer with power as provided in the schedule below (the "Specified Power Draw"). The Customer will be charged for power usage at 0.0285 USD/kWh.
>
> > (i) as of February 29, 2020: 40 MW
> >
> > (ii) as of April 30, 2020: 80 MW
> >
> > (iii) as of May 31, 2020: 120MW
> >
> > (iv) In avoidance of doubt, Electricity contract shall dictate ramp up schedule (Exhibit 2).

*Id.* § 4.3.1. No Exhibit 2 is attached to the Agreement, and "Electricity contract" is not a defined term. GMO 56.1 Stmt. ¶¶ 64-65; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 64-65. Section 4.3.2 froze the price: it "shall not be increased for 10 years from the RFU Date[9] for any reason other than changes in or the establishment of regulations, orders or policies, under federal law and state law by the state or federal government, legislature or court or any other public authority, or any adverse change outside the control of Whinstone." Texas Agreement § 4.3.2. Should such a change occur, "Whinstone and the Customer shall decide fairly by agreement the effect of to whom can be passed on." *Id.* Section 4.3.3 addressed minimum usage: until Whinstone repaid the

[9] "RFU Date" refers to "the date on which the Services are ready for use." Texas Agreement § 7.3.

Original Deposit,[10] the Loss of Profit by Power Suspension,[11] and the Initial Investment Costs, "the Customer shall be charged for the power which the Customer actually used"; once those sums were repaid, "the Customer shall enter into discussions in good faith about agreeing a minimum commitment for power usage as was contained in the Louisiana Agreement." *Id.* § 4.3.3. The Texas Agreement itself contained no minimum usage requirement. GMO 56.1 Stmt. ¶ 66; *accord* Whinstone 56.1 Counter Stmt. ¶ 66.

Two further provisions of Section 4.3 concern the resale of power. Section 4.3.7 permitted GMO to "sell the power that can be used pursuant to this Agreement to any third party." Texas Agreement § 4.3.7. Section 4.3.8 provided:

> Whinstone shall get prior consent of the Customer to power down miners, except for LRS [*i.e.*, load response services]. In the event that power down, the Customer and Whinstone will share as fair the benefit of selling power deducted loss of profit should getting from performing miners. For the avoidance of doubt, in the event that there is some loss from selling power, the Parties should share as prescribed above as well.

*Id.* § 4.3.8. The drafting history of this provision is in the record. Thillainathan's September 24, 2019 revision to GMO's draft added a provision under which the parties would "mutually agree to power down miners during power spikes in the Texas Ercot [*i.e.*, the Electric Reliability Council of Texas] Grid" and "agree to a (50% Customer / 50% Whinstone)" split of the resulting revenue, with Whinstone's share going "to pay down all debt owed to the Customer." GMO 56.1 Counter Stmt. ¶¶ 146-149. According to Makita, Whinstone then explained that because the benefits of selling power often take the form of bill credits, it preferred language that obligated the parties to

---

[10] "Original Deposit" refers to "the deposit in the amount of $5,810,720.61 that GMO-I paid to Whinstone in connection with the Original Agreements." Texas Agreement § 16.1.

[11] "Loss of Profit by Power Suspension" refers to GMO's "loss of profit in an amount of $2,029,402.56 arising out of the suspension of the provision of power by Whinstone, set out in the Original Agreements, from July 27, 2019 to the date when the Data Center starts operation of 5MW." Texas Agreement § 16.2.

share the benefits and losses of power sales but left open the manner of payment, and it assured GMO that GMO would first recover the profits it lost while its miners were off and that the parties would then share any benefit equally. *Id.* ¶¶ 154-155. GMO's November 25, 2019 draft substituted the "share as fair" language that appeared in the executed Agreement, and after Whinstone unsuccessfully proposed a clause entitling it to power down GMO's equipment on the power provider's demand without liability, the parties agreed on the final text, which excepted "LRS" (load response services) from the consent requirement. *Id.* ¶¶ 158-164. Tsukahara testified that "share as fair would be when all the debt is paid back, then after that we would be able to talk about fair share." Whinstone 56.1 Stmt. ¶ 29; *accord* GMO 56.1 Counter Stmt. ¶ 29.

Section 5 addressed operations. Whinstone reserved the right to vary the Services' technical specifications for operational reasons, but only "without detracting from, reducing or impairing the overall quality or performance of the Services." Texas Agreement §§ 5.1-5.2. And under Section 5.4, "Whinstone will ensure a service uptime of 99% (per annum starting from the RFU Date) for the provision of the Services, including regular networking, internet-connection, and cooling services, set forth in this Agreement." *Id.* § 5.4. Section 7.10 provided that GMO "shall not be required to pay charges for any period during which Whinstone fails to provide the Services due to any reason." *Id.* § 7.10. Section 14 permitted Whinstone to suspend the Services only in enumerated circumstances, including maintenance "with the prior written consent of the Customer," nonpayment, compliance with a governmental order, an emergency, or "where Whinstone has reason to terminate this Agreement in accordance with its terms." *Id.* § 14.1.

Section 9 governed liability. Section 9.1 made Whinstone "liable for an amount decided based on reasonable evidence" for, among other things, "loss of revenue, loss of profit, loss of goodwill, . . . loss of business, loss of contracts," and "any direct, indirect, special or consequential loss or damage." *Id.* § 9.1. Section 9.3 provided that "Whinstone shall not be liable for any claim

arising under this Agreement unless the Customer gives Whinstone written notice of the claim within twelve months of becoming aware of the circumstances giving rise to the claim." *Id.* § 9.3. Under Section 13, any notice "shall be in writing and in English and signed by or on behalf of the Party giving it and shall be served by hand delivering it or sending it by courier (with signature required)" to Whinstone's Metairie, Louisiana address, "[m]arked for the attention of: Lyle Theriot," and "shall not be validly served if sent by email." *Id.* §§ 13.1-13.4.

**b. Repayment, Renegotiation, Term, and Amendment**

Section 16, titled "Repayment and Indemnification," resolved the parties' Louisiana dispute. Whinstone acknowledged that it "shall refund to GMO-I the deposit in the amount of $5,810,720.61 that GMO-I paid to Whinstone in connection with the Original Agreements," *i.e.*, the Original Deposit mentioned earlier. Texas Agreement § 16.1. Whinstone further acknowledged "that it is liable for and shall indemnify GMO-I for its loss of profit in an amount of $2,029,402.56 arising out of the suspension of the provision of power by Whinstone . . . from July 27, 2019 to the date when the Data Center starts operation of 5MW," *i.e.*, the Loss of Profit by Power Suspension, "which constitutes a breach of the Original Agreements." *Id.* § 16.2.

Section 16.3 addressed a third category of loss, arising from the power shortage that preceded the July 2019 suspension:

> Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW other than the amount of the Loss of Profit by Power Suspension ("Loss Of Profit By Power Shortage"), which constitutes a breach of the Original Agreements. The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit By Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties.

*Id.* § 16.3. Unlike the Original Deposit and the Loss of Profit by Power Suspension, the Loss of Profit by Power Shortage was not quantified. This is because the loss was defined to run until the

Rockdale Facility "starts operation of 5MW," a date that had not occurred when the Texas Agreement was signed. GMO 56.1 Stmt. ¶ 80. *But see* Whinstone 56.1 Counter Stmt. ¶ 80 (responding that this "does not establish that the parties could not have agreed upon a formula or methodology for calculating the liability even if the final amount could not be reduced to a sum certain at the time of signing"). GMO's Hirofumi Yamashita testified that the parties determined "that it might be difficult to conclude the agreement if [the amount] was specified," and so agreed that "the specified monetary amount" would "not [be] in the agreement in exchange to have future electric costs be reduced." Whinstone 56.1 Stmt. ¶ 24; GMO 56.1 Counter Stmt. ¶¶ 24, 119. Thillainathan likewise stated that no figure was included because "of its complexity and because it was simply not quantifiable at the time." GMO 56.1 Counter Stmt. ¶ 117. Whinstone's witnesses testified that GMO never provided the information needed to calculate the loss. Whinstone 56.1 Counter Stmt. ¶ 80; Whinstone 56.1 Stmt. ¶¶ 25-27.

Section 16.5 set out the mechanism of repayment. Whinstone was to repay the Original Deposit and the Initial Investment Costs, and to indemnify GMO for the Loss of Profit by Power Suspension, "by paying on a monthly basis to the Customer and GMO-I the amount of all of Whinstone's profits derived" from GMO under the Texas Agreement and from Whinstone's other Texas hosting customers, over thirty-six months beginning in June 2020. Texas Agreement §§ 16.5-16.5.1. To secure these obligations, GMO and Whinstone executed a Pledge and Security Agreement, also dated October 16, 2019, under which GMO received a security interest in all of Whinstone's stock and in the buildings at the Rockdale Facility. GMO 56.1 Stmt. ¶¶ 90-91; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 90-91. The secured debts, consisting of the Original Deposit, the Loss of Profit by Power Suspension, and the Initial Investment Costs (together, the "Pledge Debts"), ultimately totaled approximately $42.7 million, of which the Initial Investment Costs alone exceeded $30 million. GMO 56.1 Stmt. ¶¶ 59-60, 92-94; *accord* Whinstone 56.1 Counter

Stmt. ¶¶ 59-60, 92-94. Harris has acknowledged the importance of GMO's role in Whinstone's growth. GMO 56.1 Stmt. ¶ 89; Whinstone 56.1 Counter Stmt. ¶ 89.

Section 20.6 obligated the parties to renegotiate once these debts were repaid: "when the Original Deposit, the Loss of Profit by Power Suspension and the Initial Investment Cost have been repaid, the Parties will enter into discussions in good faith to renegotiate this Agreement based on the hosting agreement usually offered by Whinstone for colocation services." Texas Agreement § 20.6. Whinstone's evidence is that Section 20.6 was added at the same time the parties extended the price freeze in Section 4.3.2 from five years to ten years, Whinstone 56.1 Counter Stmt. ¶ 503, which GMO disputes, GMO 56.1 Reply Stmt. ¶ 503.

Section 15.1 provided for an initial term of thirty-six months, automatically extended for successive twelve-month periods, "provided, however, that this Agreement will automatically terminate on 31 December 2029 for as long as all Secured Indebtedness listed in the PLEDGE AND SECURITY AGREEMENT are settled in full." Texas Agreement § 15.1. GMO, but not Whinstone, could terminate after the thirty-six-month initial term without penalty on 120 days' written notice. *Id.* Under Section 15.2.1, either party (the "Non-Defaulting Party") could terminate "with immediate effect by written notice" if the other (the "Defaulting Party") "commits a material breach of any of its material obligations under this Agreement . . . and if the breach is capable of remedy, fails to remedy it during the period of 30 days starting on the date of receipt of notice from the Non-Defaulting Party specifying the breach and requiring it to be remedied." *Id.* § 15.2.1. Upon termination, GMO was required to surrender the Licensed Area and to remain liable for charges until it did so. *Id.* §§ 15.6-15.7.

Finally, the Agreement contained a no-waiver clause, under which "[n]o failure or delay of either Party in exercising its rights hereunder . . . shall be deemed to be a waiver or release of such rights" and any waiver "must be specifically granted in writing," Texas Agreement § 19.1,

and a no-oral-modification clause, which required that any amendment be "reduced to writing and executed by authorized representatives of Whinstone and the Customer," *id.* § 19.4. The parties executed one written amendment, dated November 21, 2020, which accounted for certain of Whinstone's repayments. GMO 56.1 Stmt. ¶ 84; *accord* Whinstone 56.1 Counter Stmt. ¶ 84. They never executed another. GMO 56.1 Counter Stmt. ¶ 200.

**4. Construction of the Rockdale Facility and the TXU Agreement**

Construction began in or about November 2019, while the Texas Agreement was still being finalized. The Rockdale Facility sits on property owned by Alcoa USA Corp., which Whinstone leased for a ten-year term, with GMO guaranteeing Whinstone's performance under the ground lease up to $8,875,000, the total base rent due over the lease term. GMO 56.1 Stmt. ¶¶ 99-102; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 99-102. Under Theriot's management, Whinstone engaged contractors to clear the site, to build the first two data center buildings ("Building A" and "Building B"), to construct an electrical substation, and to install low-voltage electrical equipment. GMO 56.1 Stmt. ¶¶ 103-109. Whinstone disputes the characterization that Theriot managed the construction, and points to evidence that GMO was closely involved in the design and construction of the facility, including its cooling system, electrical layout, and electricity procurement, and that GMO approved the transformer configuration for Building A. Whinstone 56.1 Counter Stmt. ¶¶ 103-109, 141, 499-501.

GMO also funded the facility, as the Texas Agreement contemplated. Whinstone's cash position was precarious: Harris wrote in September and October 2020 that Whinstone's parent at the time, Northern Data AG, "will not be supporting Whinstone"; that Whinstone "did not meet the credit requirements" of its power supplier and faced weekly margin calls; and that "[a]s the cashflow with Whinstone has not become stable," it was necessary for Northern Data to make Whinstone's payment to GMO. GMO 56.1 Counter Stmt. ¶¶ 321-323. GMO's Initial Investment

Costs included more than $28 million in construction-related funds, a $1.2 million deposit to the local utility, and a $5.26 million deposit to Whinstone's power supplier. GMO 56.1 Stmt. ¶¶ 59-60; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 59-60.

That power supplier is TXU Energy Retail Company, LLC ("TXU"), a retail electric provider, with which Whinstone contracted in May 2020 through its power consultant, Priority Power Management, LLC (the "TXU Agreement"). GMO 56.1 Stmt. ¶¶ 95-97; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 95-97. At the time the Texas Agreement was executed, then, Whinstone had not yet secured a power supply. GMO 56.1 Stmt. ¶ 97; Whinstone 56.1 Counter Stmt. ¶ 97; GMO 56.1 Counter Stmt. ¶ 168. Under the TXU Agreement, Whinstone purchased a fixed block of electricity each month at a fixed price, beginning at 40 MW per hour in June 2020 and increasing over time to 130 MW per hour through April 2030. GMO 56.1 Stmt. ¶ 113; *accord* Whinstone 56.1 Counter Stmt. ¶ 113. If the facility used more than the block in a given hour, Whinstone paid for the excess at the prevailing market price; if it used less, Whinstone received a credit at the market price. Whinstone 56.1 Stmt. ¶¶ 33-34; *accord* GMO 56.1 Counter Stmt. ¶¶ 33-34. Whinstone's contract price under the TXU Agreement, $0.0285 per kWh plus a fixed adder of $0.00435, exceeded the $0.0285 per kWh that GMO paid Whinstone, although the credits Whinstone received for unused power reduced its effective cost. GMO 56.1 Counter Stmt. ¶¶ 35, 40-41, 210. TXU required a $7.5 million security deposit for the 130 MW block; on or about May 15, 2020, GMO paid a prorated portion of that deposit, $5.26 million, corresponding to 92 MW of power. GMO 56.1 Stmt. ¶ 98; *accord* Whinstone 56.1 Counter Stmt. ¶ 98. Whinstone later repaid that deposit to GMO. GMO 56.1 Counter Stmt. ¶ 256.

Whinstone energized Building A on or about June 2, 2020, and GMO began mining there shortly thereafter. GMO 56.1 Stmt. ¶ 114; Whinstone 56.1 Stmt. ¶ 49.[12] After the machines it had used in Iceland arrived in the fall of 2020, GMO had more than 82,000 miners on site, more than ninety percent of them Antminer S9 models. *See* GMO 56.1 Stmt. ¶¶ 45-48, 135; Whinstone 56.1 Stmt. ¶¶ 49, 54; GMO 56.1 Counter Stmt. ¶¶ 49, 54.

**5. Building A's Capacity and the Second Building**

Building A is a 65-foot by 1,050-foot structure with roughly 60,000 square feet of usable space. GMO 56.1 Stmt. ¶¶ 122-123; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 122-123. It is serviced by thirty medium-voltage transformers, each rated at 2.5 or 2.6 MW, installed at even intervals around the building's exterior. GMO 56.1 Stmt. ¶¶ 110, 120; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 110, 120. Each transformer serves three "walls," or racks of miners, for a total of ninety walls, and each wall was designed to hold 672 S9 miners, so that the building was designed to hold 60,480 S9 miners. GMO 56.1 Stmt. ¶¶ 121, 129-133; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 121, 133. Air enters the building through intake louvers on its long sides, passes through the miners, and exits through a "dog house" on the roof; the building has no exhaust fans and relies on the fans in the miners themselves to move air through it. GMO 56.1 Stmt. ¶¶ 124-126, 137.[13] Building B is "almost identical" in dimension and design and is served by the same number and type of transformers. GMO 56.1 Stmt. ¶¶ 111-112; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 111-112.

---

[12] GMO contends that only about 20 MW was available at that time, which Whinstone disputes. GMO 56.1 Stmt. ¶ 114; Whinstone 56.1 Counter Stmt. ¶ 114. GMO and Whinstone agree that the Rockdale Facility "start[ed] operation of 5MW," the trigger date for the Loss of Profit by Power Shortage under Section 16.3, on June 2, 2020. Counterclaims ¶¶ 14, 22; Dkt. 512 (GMO's answer to Counterclaims) ¶¶ 14, 22.

[13] Whinstone disputes that the absence of exhaust fans reflected only its own "engineering recommendations," and instead attributes the design to a collaborative process with GMO. Whinstone 56.1 Counter Stmt. ¶ 137.

Two facts about Building A's electrical capacity are undisputed. First, Building A was not designed to provide the 120 MW specified in Section 4.3.1 of the Texas Agreement; as Harris put it, "[n]o building was 120 Megawatts." GMO 56.1 Stmt. ¶ 138; *accord* Whinstone 56.1 Counter Stmt. ¶ 138. Second, the building's medium-voltage transformers were rated to supply approximately 75 MW in the aggregate. GMO 56.1 Stmt. ¶ 139; *accord* Whinstone 56.1 Counter Stmt. ¶ 139. How much of that rated capacity was usable is disputed. GMO's evidence is that transformers cannot safely be run continuously at full rated capacity, that Whinstone's own witnesses acknowledged the equipment would "fail if you push them too hard," that a Riot internal presentation listed Building A's power capacity as 56 MW, and that Whinstone's contract with a later tenant described 24,000 square feet of Building A as having 20 MW of capacity, which extrapolates to 50 MW for the whole building. GMO 56.1 Stmt. ¶¶ 140-145. GMO's engineering expert, Phil Isaak, opined that airflow constraints limited Building A's functional capacity to roughly 40,000 S9 miners or about 50 MW. *Id.* ¶ 144. Whinstone responds that its personnel ran the transformers at 2.2 to 2.3 MW each and could get "[v]ery close" to 75 MW, that the 56 MW figure reflects a hypothetical refurbishment scenario, and that GMO itself repeatedly described Building A as having 75 to 80 MW available. Whinstone 56.1 Counter Stmt. ¶¶ 141, 143-144, 526-531, 535.

Actual usage is not disputed. Between November 10, 2020 and April 5, 2022, when GMO was the only tenant in Building A, GMO's daily average consumption on days with positive consumption was 51.5 MW; between April 6, 2022 and October 11, 2023, when GMO shared the building with a second tenant, the daily average was 30.1 MW. GMO 56.1 Stmt. ¶¶ 148-149; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 148-149. When Riot mined in Building A from June 18, 2024 to December 30, 2024, its daily average was 45.8 MW, and it has never used more than 52 MW. GMO 56.1 Stmt. ¶¶ 150, 461; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 150, 461. The

tenants of Building B, which shares Building A's electrical infrastructure, have never averaged more than 60.1 MW per day. GMO 56.1 Stmt. ¶ 151. Whinstone attributes GMO's usage to the condition of GMO's fleet rather than to the building: by August 2020, GMO's lead engineer reported that about twenty percent of its miners were "in some trouble"; by September 2020, the engineer reported forty percent; and in January 2021, a consultant GMO had retained to repair its machines reported that more than 20,000 of GMO's 52,938 connected units were "either not performing at all or not performing correctly," that GMO was "under utilizing the entire building by a factor of more than 50%," and that a full complement of working S9s would draw "~ 59 MW of the available ~ 75 MW in this building." Whinstone 56.1 Stmt. ¶¶ 50-58; Whinstone 56.1 Counter Stmt. ¶ 141. GMO responds that the same consultant attributed power interruptions to overloaded transformers and told GMO that running the transformers at 75 MW would be unsafe. GMO 56.1 Counter Stmt. ¶ 58.

Whinstone only ever provided GMO space in Building A. GMO 56.1 Stmt. ¶ 115; Whinstone 56.1 Counter Stmt. ¶¶ 115, 508-511; GMO 56.1 Reply Stmt. ¶ 506. The parties dispute why that was the case. Whinstone points to a December 2019 email exchange in which, it says, GMO indicated it would not use Building B "due to budget issues," to Harris's statement to GMO that he would offer Building B to other clients, and to Harris's testimony that GMO reiterated in April 2020 that it lacked the equipment to use a second building. Whinstone 56.1 Counter Stmt. ¶¶ 115, 506-511. GMO responds that the "budget issues" language came from Whinstone, not GMO; that on February 11, 2020, GMO wrote to Whinstone that "[o]ur request [to use Building B] has not changed from the beginning" and that GMO "need[s] to turn on all our miners and reserve the capacity of 120 MW in total as in the colocation agreement"; and that Harris himself testified that, as of February 2020, GMO "still want[ed] 120 megawatts." GMO 56.1 Reply Stmt. ¶¶ 508-511. It is undisputed that GMO requested additional space on multiple occasions after

Building A opened. In February 2021, GMO requested access to 110 MW, to which Whinstone responded by demanding $10 million. GMO 56.1 Stmt. ¶ 116; Whinstone 56.1 Counter Stmt. ¶ 116; GMO 56.1 Counter Stmt. ¶ 308. And in July 2021, Harris wrote to a Riot executive that "GMO is never going to give up Building A," that "GMO is exercising their option to increase capacity to 110 MW," and that Whinstone had quoted a capital cost of $408,000 per megawatt for a 30 MW expansion "to try and deter them." GMO 56.1 Stmt. ¶ 253; Whinstone 56.1 Counter Stmt. ¶¶ 117, 253.[14]

**6. Conditions in Building A**

GMO's claims for breaches of Sections 4.3.1 and 5.4 rest on the frequency with which its miners lost power, cooling, or network connectivity during the roughly forty months, from June 2020 to October 2023, that GMO operated in Building A. Whinstone was responsible for providing and maintaining Building A's electrical components, its network, and its evaporative cooling walls. GMO 56.1 Stmt. ¶¶ 152, 195, 204; Whinstone 56.1 Counter Stmt. ¶¶ 152, 195, 204. A stable electricity supply is essential to Bitcoin mining, though the parties dispute whether power interruptions can damage miners or merely cause them to shut down. *See* GMO 56.1 Stmt. ¶¶ 153-154; Whinstone 56.1 Counter Stmt. ¶¶ 153-154.

Whinstone produced hourly meter data for Building A beginning November 10, 2020. GMO 56.1 Stmt. ¶ 163. According to that data, from November 10, 2020 through April 5, 2022, Building A consumed no electricity at all during 5.1 percent of days and 6.7 percent of hours; from April 6, 2022 through October 11, 2023, those figures rose to 9.4 percent of days and fourteen percent of hours. *Id.* ¶¶ 157-162. GMO's experts, analyzing the meter data together with GMO's machine-level data, calculated that before April 6, 2022, at least one wall of GMO's miners was

---

[14] Harris testified that the quoted figure reflected the actual cost of extending power from the substation to a new building and that Whinstone would have built the expansion had GMO paid for it. Whinstone 56.1 Counter Stmt. ¶ 117.

offline in more than half of all half-hour intervals, and that afterward the figure exceeded two-thirds. *Id.* ¶¶ 174-179. Specific outages are documented: a thirty-two-hour outage on July 31, 2020 and a 120-hour outage beginning August 26, 2020, both attributed to substation problems; a 161.5-hour outage beginning September 16, 2020; a nine-day outage from August 5 to August 14, 2021, attributed to a failed wire termination; and an eleven-day outage from March 3 to March 14, 2022, attributed to "an electrical issue that caused the breaker to open." *Id.* ¶¶ 164-173; Whinstone 56.1 Counter Stmt. ¶¶ 164-165, 171-173. GMO alerted Whinstone in October 2020 that it had "already exceeded the limit of SLA[15]," and Whinstone later agreed to a $700,000 credit "for violation of the SLA for the year of 2020." GMO 56.1 Counter Stmt. ¶ 174; GMO 56.1 Stmt. ¶ 167; Whinstone 56.1 Counter Stmt. ¶ 167.

Whinstone does not dispute the meter data but disputes what the data show. It contends that zero consumption does not mean that power was unavailable; that many of the interruptions reflected curtailments under Texas power-market programs in which GMO knew Whinstone would participate; that others reflected Winter Storm Uri, an act of God; and that still others reflected maintenance performed at GMO's request. Whinstone 56.1 Counter Stmt. ¶¶ 155-157, 176, 540-552. Two features of the Texas market are relevant. Under "ancillary services" programs, including load response, large consumers sell the grid operator, the Electric Reliability Council of Texas ("ERCOT"), the right to reduce their consumption when needed to stabilize the grid. *Id.* ¶ 548. Under the "Four Coincident Peaks" program, a consumer's annual transmission charges are set by its share of statewide demand during four summer peak intervals, creating an incentive to power down during those intervals. *Id.* ¶ 549. Whinstone's evidence is that its participation in these programs was discussed with GMO before the Texas Agreement was signed

[15] The term "SLA" is not defined in the Texas Agreement, nor by the parties, but the Court assumes it refers to Service Level Agreement.

as a key component of its strategy to lower the price of power, that GMO's internal materials described ancillary services as "critical," and that GMO never objected to curtailments for those purposes. *Id.* ¶¶ 547, 550-552. GMO's evidence is that Building A was curtailed during 10.5 percent of all hours between November 2020 and October 2023, that Whinstone's curtailments often coincided with high electricity prices rather than grid emergencies, and that Whinstone earned an average of $117,040 per month by offering Building A into the ancillary services market. GMO 56.1 Stmt. ¶¶ 181-184. GMO's experts calculated that, even excluding the Winter Storm Uri curtailment, Whinstone did not achieve 99 percent uptime in Building A. *Id.* ¶ 192. Whinstone disputes that conclusion as resting on GMO's contested interpretation of "service uptime," and Harris testified that "an occurrence beyond [Whinstone's] control" did not count against the 99 percent commitment. Whinstone 56.1 Counter Stmt. ¶¶ 192, 538-539.

Cooling and dust are also in dispute. Ambient temperatures in Building A exceeded 95 degrees Fahrenheit on about a quarter of the days GMO operated there, and Whinstone did not target any particular temperature range. GMO 56.1 Stmt. ¶ 199; Whinstone 56.1 Counter Stmt. ¶ 199. The evaporative cooling walls were not operable until August 2020, at least two months after GMO began mining, and thereafter leaked or required maintenance on a number of occasions. GMO 56.1 Stmt. ¶¶ 205-207; Whinstone 56.1 Counter Stmt. ¶¶ 205, 207. A second tenant, Bitmain, complained to Whinstone in 2022 that Building A was "too hot," that it "consistently ha[d] 400 to 500 machines offline," and that melting power cords posed a fire risk. GMO 56.1 Stmt. ¶ 209; Whinstone 56.1 Counter Stmt. ¶ 209. GMO, Bitmain, and Whinstone's own rebuttal expert also observed adverse dust conditions in Building A. GMO 56.1 Stmt. ¶¶ 212-215. Whinstone responds that the Texas Agreement specified no temperature range or dust standard, that GMO asked to begin mining before the cooling walls were installed, that Whinstone cleaned the facility every six hours, and that dust becomes a problem only when miners are not maintained.

Whinstone 56.1 Counter Stmt. ¶¶ 199, 205, 210-213. Riot, which now mines in Building A with newer machines, has since changed the building's insulation, added air filtration, installed new power distribution units, removed the evaporative cooling walls, and spaced its miners farther apart. GMO 56.1 Stmt. ¶¶ 455-458; Whinstone 56.1 Counter Stmt. ¶¶ 455-458.

**7. Winter Storm Uri and Whinstone's Power Sales**

In February 2021, eight months after Building A opened, Winter Storm Uri brought unprecedented cold to Texas, power generation shortages, and mandatory rolling blackouts ordered by ERCOT. Whinstone 56.1 Counter Stmt. ¶ 544. Wholesale electricity prices reached roughly $9,000 per megawatt-hour for more than three days. GMO 56.1 Stmt. ¶ 185; *accord* Whinstone 56.1 Counter Stmt. ¶ 185. Power to Building A was curtailed beginning February 13, 2021, as prices rose, and was not restored until prices normalized on February 19. GMO 56.1 Stmt. ¶ 188; *accord* Whinstone 56.1 Counter Stmt. ¶ 188. The parties dispute whether the curtailment was voluntary. GMO's evidence, including a summary prepared by Riot's auditor, is that "[d]ue to the extreme market price of electricity during this time, Whinstone stopped supplying power to its customers and instead sold power back to the grid." GMO 56.1 Stmt. ¶¶ 189-190; *see* Whinstone 56.1 Counter Stmt. ¶ 189. Whinstone's evidence is that power to the Rockdale Facility was cut to stabilize the grid, that the facility was covered in ice, and that Whinstone did not "sell" power but received credits under the TXU Agreement for power it had purchased and did not use. Whinstone 56.1 Counter Stmt. ¶¶ 186, 190, 545-546. Either way, it is undisputed that Whinstone realized more than $111 million in connection with the storm. GMO 56.1 Stmt. ¶ 187; *accord* Whinstone 56.1 Counter Stmt. ¶ 187. Under an April 7, 2021 letter agreement among Whinstone, TXU, and Priority Power, Whinstone became entitled to approximately $125.1 million, paid as $29 million in cash in April 2021, more than $59 million in bill credits applied between February 2022 and January 2023, and more than $26 million in additional credits, most of which were

applied in early 2023. GMO 56.1 Counter Stmt. ¶¶ 177-196; Whinstone 56.1 Stmt. ¶ 42. In May 2021, Harris wrote to Whinstone's auditor that "Section 4.3.8 defines a fair profit sharing for power selling" and that GMO's claim would be "at a minimum of a percentage of 88.46 mm." GMO 56.1 Stmt. ¶ 191; Whinstone 56.1 Counter Stmt. ¶ 191 (not disputing the content of the email); GMO 56.1 Counter Stmt. ¶ 206.

Winter Storm Uri was not the only occasion on which Whinstone received credits for unused power. Whinstone's monthly TXU invoices, copies of which it provided to GMO on request through early 2021, reflected such credits. The November 2020 invoice, for example, showed a credit of more than $1 million for 27 million kWh of unused electricity. Whinstone 56.1 Stmt. ¶¶ 38-41; GMO 56.1 Counter Stmt. ¶¶ 38-41. Beginning April 1, 2021, Harris informed GMO that the TXU invoices "will no longer be provided." GMO 56.1 Counter Stmt. ¶¶ 215-216. GMO's expert calculated that Whinstone received benefits from under-usage credits, curtailment, or forward sales of power in each year from 2020 through 2023, including approximately $17 million for forward sales of power for July through September 2023. *Id.* ¶¶ 214, 264; GMO 56.1 Stmt. ¶ 447; *accord* Whinstone 56.1 Counter Stmt. ¶ 447. GMO learned the full size of the Winter Storm Uri entitlement only from Riot's June 2021 Form 10-Q, which GMO's personnel circulated internally on August 28, 2021. Whinstone 56.1 Stmt. ¶¶ 42-44; *accord* GMO 56.1 Counter Stmt. ¶¶ 42-44.

Whether Whinstone shared any of these benefits with GMO is disputed. In March 2021, in the course of the negotiations described below, GMO raised the storm with Harris, who represented that Whinstone was unsure how much Whinstone would receive from its power sales. GMO 56.1 Counter Stmt. ¶¶ 175-176; Dkt. 607-8 (Makita declaration) ¶¶ 13-14; Dkt. 607-39 (email exchange between Makita and Harris). Whinstone offered to cancel GMO's February 2021 invoice, in the amount of $770,928.08, and to account for GMO's share of the storm proceeds in

the reduced power price the parties were then negotiating. GMO 56.1 Counter Stmt. ¶¶ 197-198. That credit was applied across GMO's invoices from May through December 2021 with notations such as "Credit for Winter Storm and SLA 1 of 8" and "Winter Storm/SLA/Fee reduction." *Id.* ¶¶ 202-203. Whinstone previously pleaded, as an affirmative defense to the Third Amended Complaint, that it "ratably shared the power credits it received from powering down during Winter Storm Uri with Plaintiffs by applying credits to Plaintiffs' cost of power for the months of May through December 2021, pursuant to the parties' communications in May 2021," Dkt. 34 at 10; *see* GMO 56.1 Counter Stmt. ¶ 338, and now contends that the parties thereby "settled any disputes related to Winter Storm Uri," Whinstone 56.1 Counter Stmt. ¶ 191. GMO's position is that no calculation was performed, that the credit was simply the amount of one month's bill, that no writing memorializes its purpose, and that GMO accepted it on the understanding that the storm proceeds were not yet quantified and would be accounted for in the price reduction that never materialized. GMO 56.1 Counter Stmt. ¶¶ 198-201, 204.

**8. Riot's Acquisition of Whinstone**

Riot executives first visited Rockdale in the fall of 2020. GMO 56.1 Stmt. ¶ 216; *accord* Whinstone 56.1 Counter Stmt. ¶ 216. Riot was then interested in self-mining at least 100 MW of additional capacity and considered acquiring Whinstone to that end; its corporate representative testified that "the acquisition was virtually totally motivated by the unused power there." GMO 56.1 Stmt. ¶ 217; *accord* Whinstone 56.1 Counter Stmt. ¶ 217. The same witness testified that Riot conducted financial due diligence, was aware of the general terms of Whinstone's hosting contracts, and "overlooked" them as "the cost of buying [the] site." GMO 56.1 Stmt. ¶ 218; Whinstone 56.1 Counter Stmt. ¶ 218. On April 8, 2021, Riot entered into a stock purchase agreement with Whinstone's then-parent, Northern Data AG, and on May 26, 2021, Riot closed the acquisition for 11.8 million shares of Riot common stock and $80 million in cash. GMO 56.1

Stmt. ¶¶ 219-220; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 219-220; GMO 56.1 Counter Stmt. ¶ 126. Two months before closing, Riot's Chief Executive Officer ("CEO"), Jason Les, wrote in a text message to Harris that Thillainathan had raised the possibility of GMO "getting concerned we were going to kick them out," and that "I hadn't even thought of that because I would never break that kind of agreement or understanding with someone, whether it was in writing or not." Dkt. 563-140 at CH_0001036.

The Fifth Amended Complaint alleges that Riot acquired Whinstone to gain access to the Rockdale Facility's low-cost power contract and to use the facility for its own mining, and that it viewed Whinstone's "legacy" hosting customers as "nothing but impediments." Fifth Am. Compl. ¶¶ 41-42. GMO alleges that, since the acquisition, Riot and Whinstone have "operate[d] as one singular entity." *Id.* ¶ 65. According to the Fifth Amended Complaint, "[e]very Whinstone executive became a Riot executive"; Whinstone's employees began using Riot email addresses, wearing Riot uniforms, and reporting to Riot executives who "ran the day-to-day functions at the Rockdale facility"; Riot provides Whinstone's accounting, tax, payroll, and legal services; and the two companies share document repositories, financials, and counsel. *Id.* ¶ 66. As alleged, Whinstone's board consists of Riot's CEO, general counsel, and former chief operating and financial officers; it meets only in conjunction with Riot's board and "serves no function." *Id.* ¶¶ 67-68. Most of Whinstone's bank accounts, including its main account, allegedly have been closed, and "money now flows between the entities at Riot's whim." *Id.* ¶¶ 69, 80. Riot allegedly controls Whinstone's decisions "regarding whether to enter into or terminate hosting agreements, including the Texas Agreement, as well as when to curtail or sell power," and its CEO was "the only person with authority to approve an amendment of the Texas Agreement." *Id.* ¶¶ 70, 81. Whinstone admits that Riot provides it services under a Shared Services Agreement executed in September 2022; that Riot is involved in certain Whinstone decisions under that agreement; that

Whinstone personnel use Riot email accounts; that certain Whinstone managers have also held positions at Riot; and that Riot's CEO (Les), Riot's general counsel (William Jackman), Riot's former Chief Operating Officer (Megan Brooks-Anderson), and Riot's former Chief Financial Officer (Jeffrey McGonegal) joined Whinstone's board, but otherwise denies these allegations. Answer ¶¶ 66-67, 76.

### 9. Repayment of the Pledge Debts and the Amendment Negotiations

Three events overlapped in the spring of 2021: Riot's acquisition of Whinstone, described above; Whinstone's repayment of the Pledge Debts in late March 2021; and the start of negotiations over an amendment to the Texas Agreement, which Section 20.6 required once the debts were repaid. Those negotiations proceeded in two phases, first between Harris and Makita from April through June 2021, and then, after Riot rejected the deal Harris had negotiated, between GMO's and Riot's executives and counsel from the summer of 2021 through March 2022.

*The Pledge Debts Repayment.* In March 2021, Whinstone and GMO agreed on the amount of the Pledge Debts, and Whinstone sought a payoff letter releasing the pledge. GMO 56.1 Stmt. ¶¶ 225-227; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 225-227. On March 26, 2021, three days before repayment, GMO proposed terms to address the open items in Sections 4.3.3 and 16.3, including a request that Whinstone "[p]rovide electricity to GMO by cost (w/o profit) with clear evidence[] each month" and an offer to commit to a 44 MW minimum, which GMO described as eighty percent of its peak historical usage. GMO 56.1 Stmt. ¶ 228; *accord* Whinstone 56.1 Counter Stmt. ¶ 228. That day, Harris messaged a GMO employee that he needed the payoff letter and that "I promise GMO I will negotiate 16.3 and we can leave the existing agreement in place," adding, "You have my word I'll negotiate 16.3 but it can't be part of the pledge or Northern Data is going to make me take this to a judge." GMO 56.1 Counter Stmt. ¶ 121. On March 27, Harris wrote to GMO that "Whinstone agrees that once we receive the payoff letter for 30,615,751.42 that states

upon the full payment of the debt, the pledge is released that we can solve the section [] 16.3, the SLA, and have the lease guarantee removed," and that "Satoshi [Makita] and I agreed in principal [sic] to a format of lowering the price for power cost and together, we will work to solve this and reach a fair agreement that we mutually agree." GMO 56.1 Stmt. ¶¶ 229-230; Whinstone 56.1 Counter Stmt. ¶¶ 229-230. On or about March 29, 2021, Whinstone wired GMO $30,615,751.42, completing repayment of the Original Deposit, the Loss of Profit by Power Suspension, and the Initial Investment Costs. GMO 56.1 Stmt. ¶ 226; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 226, 553; GMO 56.1 Reply Stmt. ¶ 553. Repayment triggered the parties' obligations under Sections 4.3.3 and 20.6 to negotiate a minimum usage commitment and a renegotiated agreement. GMO 56.1 Stmt. ¶ 224; *accord* Whinstone 56.1 Counter Stmt. ¶ 224.

*The Harris-Makita Negotiations.* On April 30, 2021, Makita sent Harris a draft amendment (the "April Draft") that proposed, among other things, lowering GMO's power price from $0.0285 to $0.0210 per kWh "or less," granting GMO an option to expand to 110 MW, and committing GMO to a 44 MW monthly minimum. GMO 56.1 Stmt. ¶¶ 231-234; Whinstone 56.1 Counter Stmt. ¶¶ 232-234. The parties exchanged drafts through May and June, each of which provided for the reduced price. GMO 56.1 Stmt. ¶¶ 235-236; Whinstone 56.1 Counter Stmt. ¶¶ 235-236. On May 21, 2021, Harris wrote to Whinstone's outside accountants that "Section 16.3 has undefined amount of money that could be owed, therefore we starting [sic] working on the amendment"; that "during the entire process, I made Riot aware that GMO would have to be given such concessions"; and that "GMO was told that when the original document was executed prior to coming to Rockdale, Texas[,] Whinstone would make them whole for the losses, it is clearly defined." GMO 56.1 Counter Stmt. ¶ 132. On June 17, 2021, Makita sent Harris what GMO calls the "June Amendment," writing, "If ok, please sign it and send back to us." GMO 56.1 Stmt. ¶¶ 237-238; *accord* Whinstone 56.1 Counter Stmt. ¶ 238. The June Amendment provided that

GMO's hosting fee would be reduced from 0.0285 USD per kWh to 0.0210 USD per kWh or less (the amount of costs provided by the power company) beginning June 1, 2021; committed GMO to a 44 MW minimum; obligated Whinstone, on GMO's request, to expand the facility to provide up to 110 MW; addressed the sharing of ancillary services and power-sale revenue; and released Whinstone "from all claims of lost profit, damages, power shortages, and all past claims." GMO 56.1 Stmt. ¶ 241; GMO 56.1 Counter Stmt. ¶¶ 134-137. The parties dispute how long the price reduction was to last: GMO contends it ran for the remainder of the Texas Agreement's term, while Harris testified that it would last one year. GMO 56.1 Stmt. ¶ 241; Whinstone 56.1 Counter Stmt. ¶ 241. They also dispute whether an agreement was actually reached. Makita testified that GMO's internal figure for the Loss of Profit by Power Shortage "originally was 18 million, and then after discussions with Chad [Harris]" "probably was 15 million," but that Whinstone's number "was totally different" and GMO's management rejected the compromise. Whinstone 56.1 Stmt. ¶ 26; GMO 56.1 Counter Stmt. ¶ 26.

The same day he received the June Amendment, Harris forwarded it to Riot's senior executives, McGonegal, Les, and Brooks-Anderson, asking them to "[t]ake a look at the amendment and provide some guidance." GMO 56.1 Stmt. ¶ 239; Whinstone 56.1 Counter Stmt. ¶ 239. His cover note explained that "[i]n the previous agreements section[] 16.3 was the remaining issue that had an uncapped amount owed. I believe item 6"—the release—"resolves this matter." GMO 56.1 Stmt. ¶ 240; *accord* Whinstone 56.1 Counter Stmt. ¶ 240. McGonegal asked whether a release GMO had signed in connection with the acquisition "should be considered in this draft"; Harris replied that "GMO did sign the release there was another section 16.3 that didn't have a dollar amount assigned." GMO 56.1 Stmt. ¶ 244; Whinstone 56.1 Counter Stmt. ¶ 245. Riot did not approve the June Amendment. According to McGonegal, Riot received the agreement that Harris negotiated but did not like it, in part because "it didn't even attempt to

comply with" Section 20.6. Dkt. 563-169 (McGonegal deposition transcript) at 278:17-279:4; *see* GMO 56.1 Stmt. ¶ 242; Whinstone 56.1 Counter Stmt. ¶ 242. Harris testified that he told Riot, "when you bought this company, I asked you to do one thing: Hands off GMO," and that Riot responded, "We'll take the negotiations from here." GMO 56.1 Stmt. ¶¶ 246-247; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 246-247. GMO contends that Riot thereafter took over the negotiations; Whinstone contends that Harris remained involved. GMO 56.1 Stmt. ¶ 248; Whinstone 56.1 Counter Stmt. ¶ 248. The Fifth Amended Complaint alleges that Whinstone never signed the June Amendment "because Riot executives would not agree to the negotiated solution." Fifth Am. Compl. ¶ 37.

*The Negotiations Under Riot.* While Harris and Makita were negotiating the June Amendment, Les was developing a different proposal under which GMO would remove its fleet of S9 miners from Building A, Bitmain would install newer machines in its place, and GMO would receive a share of Bitmain's hash rate. GMO 56.1 Stmt. ¶ 249. Harris conveyed that proposal to Makita on June 22, 2021, and GMO responded by asking for an update on the June Amendment. *Id.* ¶¶ 250-251. Through the summer and fall of 2021, Makita repeatedly asked Riot for a draft of the amended hosting agreement. On September 11, Brooks-Anderson, then Riot's Chief Operating Officer, wrote to Makita that "[w]e want to reinforce our support of Whinstone and the GMO relationship – now also a relationship with Riot Blockchain!"; that Riot's general counsel, Jackman, would "help throughout the new agreement process"; and that "[o]ur team is currently focused on the new hosting agreement." *Id.* ¶ 255; *accord* Whinstone 56.1 Counter Stmt. ¶ 255. Makita followed up seven times over the next sixteen days, at one point offering to remain in Texas to facilitate discussions and at another point writing that "we are thinking that Riot is not responding in a good faith." GMO 56.1 Stmt. ¶¶ 257-270. Riot's representatives assured Makita that a draft was coming "this week" and, on September 29, again proposed a hash rate share

arrangement, which Makita again rejected. *Id.* ¶¶ 272-277; Whinstone 56.1 Counter Stmt. ¶¶ 272-277. On October 6, having received no draft, Makita wrote, "Without a proper reason and timeline, for us, especially for our management team, you would seem not taking this topic seriously," and GMO retained outside counsel to handle the negotiations. GMO 56.1 Stmt. ¶¶ 283-285. On November 11, 2021, in an email exchange with Jackman about GMO's request for a proposal, Harris wrote: "[d]rag it out my man… drag it out!!! Great job!" GMO 56.1 Counter Stmt. ¶ 143.[16]

Riot sent GMO's counsel a draft agreement on November 5, 2021 (the "November 5 Draft"), which contained no business terms. GMO 56.1 Stmt. ¶¶ 287-288; Whinstone 56.1 Counter Stmt. ¶¶ 287-288. Among other provisions, the November 5 Draft would have permitted Whinstone to relocate GMO's equipment without consent, disclaimed any "specified power draw," permitted Whinstone to curtail GMO's power for demand-response programs at its discretion and without compensation, excluded such curtailments from the calculation of downtime, capped Whinstone's liability at six months of fees while leaving GMO's liability unlimited, and eliminated GMO's right to recover lost profits. GMO 56.1 Stmt. ¶¶ 290-305; Whinstone 56.1 Counter Stmt. ¶¶ 291-300. Riot sent a draft with proposed business terms on December 9, 2021 (the "December 9 Draft"). GMO 56.1 Stmt. ¶ 312; Whinstone 56.1 Counter Stmt. ¶ 312. The December 9 Draft limited GMO to 40,320 square feet of Building A and 23,000 S9 miners; reduced the uptime commitment to 97 percent; required a base hosting fee of $1,670,552.10 per month, calculated by assuming that all 23,000 miners ran continuously at $0.075 per kWh; and required a security deposit of $10,023,312.60. GMO 56.1 Stmt. ¶¶ 315-327; Whinstone 56.1 Counter Stmt. ¶¶ 315-327. The proposed rate was more than two and a half times the price fixed in the Texas Agreement, and Riot's corporate representative confirmed that the increase was not attributable to any

[16] Whinstone's position is that the email record reflects ongoing work on a complex draft rather than a refusal to negotiate. Whinstone 56.1 Counter Stmt. ¶¶ 258, 264, 271, 279, 284.

regulatory change of the kind described in Section 4.3.2 but was intended to bring the contract "to market terms." GMO 56.1 Stmt. ¶¶ 322, 330; Whinstone 56.1 Counter Stmt. ¶¶ 322, 330. Whinstone's evidence is that $0.075 per kWh approximated the average industrial price of electricity in Texas at the time. Whinstone 56.1 Counter Stmt. ¶ 562.

Riot's internal modeling from the same period is in the record. A November 2021 analysis prepared with Riot's financial advisor projected that GMO would earn approximately $45 million in mining profit over five years running 40,000 S9 miners at $0.0285 per kWh, that GMO would lose approximately $59 million over the same period at $0.075 per kWh, and that Riot could generate approximately $470 million in revenue over those years by self-mining in Building A with 23,000 newer machines. GMO 56.1 Stmt. ¶¶ 344-353; Whinstone 56.1 Counter Stmt. ¶¶ 346, 349. The document concluded: "Recommendation: Riot standing offer rate for immediate capacity in Building A is 7.5c/kWh all-in." GMO 56.1 Stmt. ¶ 354; *accord* Whinstone 56.1 Counter Stmt. ¶ 354.[17]

GMO's counsel responded on December 23, 2021 with a counterproposal that, among other things, would have priced power at Whinstone's actual cost, capped at $0.0285 per kWh. GMO 56.1 Stmt. ¶¶ 331-332; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 331-332. Whinstone characterizes GMO's counterproposal as demanding power at cost, all of Whinstone's revenue from ERCOT market programs, all profits from power credits with Whinstone bearing any losses, and on-site maintenance at cost, terms that Whinstone says no rational host would accept. Whinstone 56.1 Counter Stmt. ¶¶ 564-567; *see* Dkt. 602 ("Whinstone MSJ Opp.") at 49. On December 28, Jackman rejected the counterproposal as "a non-starter for Whinstone." GMO 56.1 Stmt. ¶ 335; *accord* Whinstone 56.1 Counter Stmt. ¶ 335. On January 14, 2022, GMO's counsel

[17] Whinstone disputes GMO's characterization of this document as a "model addressing GMO's mining," and notes that it was marked as a draft for internal use. Whinstone 56.1 Counter Stmt. ¶¶ 344, 354, 368.

wrote that Whinstone's proposal did not satisfy its obligation to negotiate in good faith and suggested that the parties first "reach agreement on the amount of [Whinstone's] obligations for Loss of Profit by Power Shortage under 16.3 of the existing agreement." GMO 56.1 Stmt. ¶ 336; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 336, 569. Discussions continued through counsel in January and February 2022 without agreement. GMO 56.1 Stmt. ¶ 337; *accord* Whinstone 56.1 Counter Stmt. ¶ 337. On March 7, 2022, Jackman sent a revised hash rate share proposal under which Riot would replace GMO's fleet with newer machines and pay GMO a share of the resulting Bitcoin, targeting $15.3 million in operating profit to GMO over twenty-four months, which Riot described as $2.5 million more than GMO would otherwise earn. GMO 56.1 Stmt. ¶¶ 338-339; Whinstone 56.1 Counter Stmt. ¶¶ 338-339. GMO did not accept that proposal, and no amendment was ever signed. GMO 56.1 Stmt. ¶ 340; *accord* Whinstone 56.1 Counter Stmt. ¶ 340.

*Whinstone's Other Hosting Agreements.* Because Section 20.6 called for renegotiation "based on the hosting agreement usually offered by Whinstone," the record on Whinstone's other hosting agreements bears mention. Whinstone's corporate representative testified that "each customer had unique desires or needs or capabilities" and that "each contract was kind of modified" accordingly. GMO 56.1 Stmt. ¶ 462; *accord* Whinstone 56.1 Counter Stmt. ¶ 462. Whinstone's agreements with SBI Crypto Co., Ltd. ("SBI") in 2019 provided for hosting fees of $0.0375 and then $0.033 per kWh, an eighty-percent minimum usage commitment, and uptime of 98.35 percent. GMO 56.1 Stmt. ¶¶ 464-465. Its 2020 agreements with various Rhodium entities provided for ten-year terms at the lesser of $0.01705 per kWh or Whinstone's cost of power, uptime commitments of 96.35 to 97 percent, and, in some cases, a share of the customer's earnings or of profits from power sales. *Id.* ¶¶ 466-470. Its January 1, 2022 agreement with Riot provided for a fixed monthly fee, a fifteen-percent share of Riot's gross mining profits, and 95 percent uptime. *Id.* ¶ 471. And its March 2022 agreement with Bitmain provided for a one-year term, a

fixed monthly fee, and 90 percent uptime. *Id.* ¶ 472. Whinstone does not dispute the general terms of these agreements, although it notes that GMO's own expert agreed that the $0.0285 rate in the Texas Agreement was "well below the electricity price that one would get in a Bitcoin hosting agreement usually offered" in 2021 and 2022. Whinstone 56.1 Counter Stmt. ¶¶ 464-472, 502.

**10. The Surcharges**

As the amendment negotiations were collapsing, Whinstone raised GMO's price. Beginning with the invoice dated February 28, 2022, Whinstone added a surcharge to GMO's monthly bills, raising GMO's effective price from $0.0285 to $0.03 per kWh. GMO 56.1 Stmt. ¶¶ 360, 362; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 360, 362. Whinstone alleges that the surcharge passed through a $0.0015 per kWh increase in its own cost of power effective August 1, 2021, which its supplier imposed under regulations promulgated after the Texas legislature enacted House Bill 4492 to securitize the costs of Winter Storm Uri; that the supplier first invoiced the surcharge in January 2022; that Whinstone notified GMO of its intent to pass the cost through in late 2021 and early 2022; and that GMO neither objected nor sought to discuss the matter until the first invoice, in the amount of $275,147.40, arrived. Counterclaims ¶¶ 52-56. GMO points to evidence suggesting that Whinstone did not discuss the surcharge with GMO before adding it to the invoices and testimony from Riot's corporate representative that none of the events identified in Section 4.3.2 occurred during the life of the Texas Agreement. GMO 56.1 Stmt. ¶¶ 359, 361. GMO objected in writing on April 12, 2022, invoking the ten-year price freeze and Section 4.3.2's requirement that any pass-through be "decide[d] fairly by agreement," and asked for supporting documentation. *Id.* ¶¶ 362-363; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 362-363. Whinstone responded on June 13, 2022 by demanding payment of the "adjusted base hosting fee" without providing the requested documentation. GMO 56.1 Stmt. ¶ 364; *accord* Whinstone 56.1 Counter

Stmt. ¶¶ 364-365. GMO never paid the surcharges. GMO 56.1 Stmt. ¶ 451; *accord* Whinstone 56.1 Counter Stmt. ¶ 451.

**11. The Removal of GMO's Miners and the Parties' Exchange of Notices**

GMO's evidence is that Riot had discussed giving space in Building A to Bitmain, the manufacturer of the S9 miner, since mid-2021; Whinstone does not dispute that the discussions occurred, only when they began. GMO 56.1 Stmt. ¶¶ 367, 370; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 367, 370. Effective March 24, 2022, less than three weeks after Riot's final amendment proposal, Whinstone entered into a hosting agreement with Bitmain for a "Licensed Area" in Building A with "20 megawatts (MW) of electrical capacity." GMO 56.1 Stmt. ¶ 377; *accord* Whinstone 56.1 Counter Stmt. ¶ 377. At the time, GMO was using approximately 50 to 55 MW in Building A. GMO 56.1 Stmt. ¶ 372; *accord* Whinstone 56.1 Counter Stmt. ¶ 372.

On or about March 28, 2022, at the direction of David Schatz,[18] Whinstone's crews began taking GMO's miners down from their walls. GMO 56.1 Stmt. ¶¶ 378-380; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 378-380. Whinstone tracked the work on a project board it labeled "Miner Project." GMO 56.1 Stmt. ¶ 387; *accord* Whinstone 56.1 Counter Stmt. ¶ 387. GMO's engineers in Japan, seeing entire walls go offline, asked Whinstone's operations director, Heath Davidson, why "all S9 and walls on T18 are moved out." GMO 56.1 Stmt. ¶ 381. Davidson responded that Whinstone was "in the process of maintenance for T18." *Id.* ¶ 385; *accord* Whinstone 56.1 Counter Stmt. ¶ 385. Davidson later testified that this "is what I was told to say" and that "I was told to tell [GMO] that we were doing maintenance." GMO 56.1 Stmt. ¶¶ 384, 386. On March 31, 2022, Makita wrote in an email to Whinstone, "I had a report from my team that WH/Riot had removed our running machines from shelves without our permission," the removal was "affecting

[18] It appears that Schatz was Whinstone's Vice President of Operations at the time. *See, e.g.*, Dkt. 563-10 at 1 (July 15, 2022 email from Schatz to Makita).

at least 36PH of our Hashrate," and Whinstone should "restore those machines as soon as possible." Dkt. 563-19 at WUS0011481; *accord* GMO 56.1 Stmt. ¶¶ 390-392; Whinstone 56.1 Counter Stmt. ¶¶ 390-392. That day, Harris instructed a Riot employee to "try to add [GMO's] machines back to shelves where miners aren't running" because Makita was "having a nervous break down"; the employee replied that he would "get miner maintenance to start identifying the bad machines and replacing them." GMO 56.1 Stmt. ¶ 393; *accord* Whinstone 56.1 Counter Stmt. ¶ 393. On April 6, 2022, Les, Harris, and other Riot executives met with Bitmain, which asked that "Riot negotiate with GMO and remove its machines from GMO as soon as possible." GMO 56.1 Stmt. ¶¶ 396-401; Whinstone 56.1 Counter Stmt. ¶¶ 396-401. Whinstone installed approximately 5,000 Bitmain miners in Building A in April 2022 and completed its work taking certain of GMO's miners down from the walls on or about April 30, 2022. GMO 56.1 Stmt. ¶¶ 405-406; Whinstone 56.1 Counter Stmt. ¶¶ 405-406. GMO never consented to the removal in writing or otherwise. GMO 56.1 Stmt. ¶ 403.

The parties characterize these events very differently. According to GMO, Whinstone removed approximately 17,000 of its miners from thirty-three of Building A's ninety walls, those miners never came back online, GMO's aggregate hash rate dropped permanently, and the walls that were cleared had been hashing at rates comparable to those that were not removed. GMO 56.1 Stmt. ¶¶ 389, 394-395, 409-417. According to Whinstone, it undertook a "consolidation" of GMO's fleet because GMO's broken machines were "wasting the places," disrupting airflow, and "holding [the] building hostage"; Harris told Makita in advance that Whinstone would consolidate; crews took down one wall at a time, tested each miner, and restacked the working ones on consolidated walls; and Whinstone's personnel did return functioning miners to service. Whinstone 56.1 Counter Stmt. ¶¶ 378, 382-384, 570-578. Harris acknowledged that he could not say whether every working miner was returned to a wall: "It was an – an interesting time." Dkt.

606-5 ("Harris Dep. Tr.") at 243:9-16. Whinstone contends that GMO retained possession of all of its miners. Whinstone 56.1 Counter Stmt. ¶ 580. In April 2022, GMO's board approved a test purchase of newer miners for the Rockdale Facility, but GMO abandoned the purchase after the removal because, as Yamashita testified, GMO was "not able to have trust" that its machines would remain in place. GMO 56.1 Counter Stmt. ¶¶ 272-277.

While the removal was underway, on April 12, 2022, GMO hand-delivered to Whinstone, addressed to Theriot among others, a letter "furnished on behalf of GMO as notice pursuant to Article 13 of the 2019 Texas Agreement." Whinstone 56.1 Stmt. ¶ 66; *accord* GMO 56.1 Counter Stmt. ¶ 66. The letter identified three claims: the "removal of GMO's mining machines"; the "supplemental invoices" charging "an increase in power price" in violation of Section 4.3.2; and "indemnification due to power shortages under the Louisiana Agreement and the current 2019 Texas Agreement." Whinstone 56.1 Stmt. ¶ 66; GMO 56.1 Stmt. ¶ 420; *accord* Whinstone 56.1 Counter Stmt. ¶ 420. It is undisputed that GMO gave no other written notice in compliance with Sections 9.3 and 13 before filing suit. *See* Dkt. 558 ("Whinstone MSJ Br.") at 10-11; *see* Dkt. 600 ("GMO MSJ Opp.") at 9-16.

Whinstone responded on June 13, 2022, demanding payment of the surcharges. *See* Dkt. 563-89. Whinstone asserted that GMO had "repeatedly and persistently failed to negotiate or otherwise discuss in good faith the terms of a revised hosting agreement" and had "failed to utilize its allotted power capacity," and it warned that if GMO did not "undertake[] curative actions" by July 14, 2022, "Whinstone will take all steps necessary to protect and enforce its rights." GMO 56.1 Stmt. ¶¶ 421-422; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 421-422. GMO commenced this action the same day. GMO 56.1 Stmt. ¶ 418; *accord* Whinstone 56.1 Counter Stmt. ¶ 418; *see* Dkt. 1-1.

**12. Termination**

Whinstone did not act on its June 2022 default notice for another year, during which time GMO continued to mine in Building A and this litigation proceeded. Whinstone has represented that discussions about terminating the Texas Agreement began with its legal team in early 2023, following a failed mediation before Judge Parker in February 2023. Dkt. 432 ("Objection") at 5; GMO 56.1 Stmt. ¶ 423. On February 14, 2023, Les wrote to Riot colleagues: "Turning Building A into a profit-generator would have a pretty big positive impact on our financials. To fit newer generation miners (S19 or M50s+), the S9-era infrastructure would need to be upgraded. . . . The question I would have . . . is are we better off getting to the point of an empty building and upgrading the building all at once? Or can we incrementally upgrade racks/systems as we go along and get to the same result in the end." GMO 56.1 Stmt. ¶ 425; *accord* Whinstone 56.1 Counter Stmt. ¶ 425.

Between February and June 2023, Gordon Zhang of Riot's corporate development group, working with in-house counsel, prepared a series of financial analyses of the consequences of termination. GMO 56.1 Stmt. ¶ 424; Whinstone 56.1 Counter Stmt. ¶ 424. Those analyses, which Whinstone withheld as privileged until Judge Parker ordered their production, compared the potential termination costs with "Riot's potential profit from use of additional space and power." GMO 56.1 Stmt. ¶ 437.[19] Assuming a Bitcoin price of $60,000, Riot calculated that it would earn between $178.8 million and $391.8 million from self-mining in Building A, depending on how long refurbishment took, and that GMO would earn between $30.9 million and $431 million over the remaining term of the Texas Agreement, depending on whether it upgraded its fleet. GMO

[19] Whinstone has objected to any use of these documents pending resolution of its objection to Judge Parker's discovery order, which the Court addresses at *infra* II.B. Whinstone 56.1 Counter Stmt. ¶¶ 429-441, 444. Because the Court overrules the objection, it describes the documents here. Their contents, as quoted in GMO's Rule 56.1 statement, are not otherwise disputed. GMO 56.1 Stmt. ¶¶ 429-441, 444; *see* Whinstone 56.1 Counter Stmt. ¶¶ 429-441, 444.

56.1 Stmt. ¶¶ 429-431; GMO 56.1 Counter Stmt. ¶¶ 258-259. The analyses assumed that Building A's power capacity was 56 MW and that Riot's own usage would not exceed 50.4 MW. GMO 56.1 Stmt. ¶ 433. In June 2023, the head of Riot's power strategy team, Kevin Haugen, prepared a "GMO timing analysis" to determine when it was "best to turn GMO off," and Riot considered whether it could earn more by terminating GMO and selling GMO's power block forward than by continuing to host GMO. *Id.* ¶¶ 434-436. Zhang asked whether there was "a sweet spot to power down," observing that "[a]s long as under power contract and having to sell power 24/7, good to have GMO as the rates are less than the power curtailment credits + sales." *Id.* ¶ 436. Riot's GMO termination analysis concluded: "After analyzing GMO's potential damages compared to Riot's potential profit from use of additional space and power . . . , we recommend terminating GMO's hosting agreement effective immediately." Dkt. 611-52 at RIOT0029954; GMO 56.1 Stmt. ¶ 438; GMO 56.1 Counter Stmt. ¶ 261. The presentation explained that Riot was "unable to fully utilize the 395MW" of power it had contracted for "until Building G [was] ready," that Riot could "subsidize its loss through forward sales" in the interim, and that "once Building G is ready for full power, Riot will be able to profit from re-routing GMO's power in Building A to Building G." GMO 56.1 Stmt. ¶¶ 439-441.

On June 27, 2023, Riot's senior executives and in-house counsel, including Les, Riot's executive chairman, its chief financial officer, and Jackman, held a "GMO Termination Call." GMO 56.1 Stmt. ¶¶ 442-443; *accord* Whinstone 56.1 Counter Stmt. ¶ 443. Zhang's notes record: "[I]f we did terminate GMO, we can forward sell a power block equal to GMO's current power usage which are currently at attractive terms for July and August." GMO 56.1 Stmt. ¶ 444. Two days later, on June 29, 2023, Whinstone sent GMO a notice, on Whinstone's letterhead and signed

by Alex Travis,[20] stating that GMO had "failed to remedy" the "material breaches" identified in the June 13, 2022 letter and that, "pursuant to Section 15.2, Whinstone hereby terminates the Texas Agreement, effective immediately as of the date of this Notice, June 29, 2023" (the "Termination Notice"). GMO 56.1 Stmt. ¶¶ 445-446; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 445-446; Whinstone 56.1 Stmt. ¶ 77. The Termination Notice identified two breaches: that GMO "repeatedly and persistently failed to negotiate or otherwise discuss in good faith the terms of a revised hosting agreement," and that GMO "failed to use its allotted power capacity." GMO 56.1 Stmt. ¶ 446. It did not cite GMO's nonpayment of the surcharges. *Id.* ¶ 366; *accord* Whinstone 56.1 Counter Stmt. ¶ 366. GMO contends, and Whinstone's interrogatory responses confirm, that Riot made the decision to terminate; Whinstone responds that the notice of termination was Whinstone's. GMO 56.1 Stmt. ¶ 448; GMO 56.1 Reply Stmt. ¶¶ 582-583. Riot thereafter entered into forward sales of power for July, August, and September 2023, for which it was paid approximately $17 million. GMO 56.1 Stmt. ¶ 447; *accord* Whinstone 56.1 Counter Stmt. ¶ 447. In its investor presentation for the second quarter of 2023, Riot listed among its "actions taken . . . to address Legacy Contracts" that it had "[t]erminated hosting agreement with GMO as of June 29, 2023," and in its third-quarter Form 10-Q, Riot described GMO's and another customer's contracts as "Legacy Contracts inherited through the Whinstone acquisition containing below-market terms." GMO 56.1 Stmt. ¶¶ 473-474; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 473-474. GMO alleges that Riot has since terminated all of Whinstone's hosting customers, that Riot is now Whinstone's only hosting "customer" and does not pay Whinstone, and that Riot has thereby "deliberately rendered Whinstone insolvent." Fifth Am. Compl. ¶¶ 84-85. Whinstone admits that

[20] Travis served as Whinstone's general counsel and is described by GMO as Riot's in-house counsel. GMO 56.1 Reply Stmt. ¶ 583; Objection at 5.

Riot is currently its only hosting customer, but otherwise denies these allegations. Answer ¶¶ 73, 84-85.

The Termination Notice gave GMO until July 29, 2023 to remove its equipment. Counterclaims ¶ 59. As described below, GMO obtained an order from this Court requiring Whinstone to keep GMO's miners powered on through September 13, 2023, which the parties later extended by agreement to October 4, 2023. GMO 56.1 Stmt. ¶ 450. GMO paid Whinstone's invoices, other than the surcharges, throughout this period. *Id.* ¶ 451; *accord* Whinstone 56.1 Counter Stmt. ¶ 451. GMO's last day of mining in Building A was October 11, 2023, and its equipment remained on site until October 25, 2023. GMO 56.1 Stmt. ¶ 452; *accord* Whinstone 56.1 Counter Stmt. ¶ 452; Counterclaims ¶ 65. GMO has not mined Bitcoin anywhere since, although it solicited hosting quotes from third parties in 2024, at prices ranging from $0.05 to more than $0.11 per kWh. Whinstone 56.1 Stmt. ¶ 78; GMO 56.1 Counter Stmt. ¶¶ 78, 251-252. Riot spent approximately $10 million refurbishing Building A and, as of June 2025, operated approximately 14,500 of its own miners there. GMO 56.1 Stmt. ¶¶ 455, 459; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 455, 459.

**B. Procedural History**

**1. The Pleadings and Discovery**

GMO commenced this action against Whinstone in the Supreme Court of the State of New York, New York County, on June 13, 2022, the same day it received Whinstone's default notice. Dkt. 1-1; GMO 56.1 Stmt. ¶ 418. Whinstone removed the action to this Court on July 13, 2022, Dkt. 1, and answered and counterclaimed on August 22, 2022, Dkt. 12. The next day, the Court referred the case to Judge Parker for general pretrial supervision. Dkt. 13. Judge Parker held a settlement conference on February 28, 2023, which did not resolve the case. *See* Feb. 28, 2023 Minute Entry.

After Whinstone sent the Termination Notice on June 29, 2023, GMO moved on July 31, 2023 for a temporary restraining order to preserve evidence and the status quo. Dkt. 71. The Court directed Whinstone to refrain from disconnecting or disposing of GMO's machines pending a decision, Dkts. 76, 80, and, following a conference on August 9, 2023, ordered that GMO's machines "remain powered on through September 13, 2023," subject to any curtailment requested or required by ERCOT, with GMO to pay Whinstone "for continuing to host its machines at the same rate as the past several years," Dkt. 85. The parties later agreed to extend that period through October 4, 2023. GMO 56.1 Stmt. ¶ 450.

GMO has amended its complaint five times, most recently by filing the Fifth Amended Complaint on August 26, 2025. Dkts. 16, 26, 30, 106, 494. The Fifth Amended Complaint, which added Riot as a Defendant, asserts a single cause of action for breach of contract against Whinstone and Riot. Fifth Am. Compl. ¶¶ 87-93. It alleges that Whinstone breached the Texas Agreement in eight respects, which the Court refers to as follows:

> (1) by failing to provide GMO access to the power specified in Section 4.3.1 (the "Specified Power Draw Claim"), *id.* ¶¶ 64(b), 91(b);
>
> (2) by failing to ensure the 99 percent service uptime required by Section 5.4 (the "Service Uptime Claim"), *id.* ¶¶ 34, 64(e), 91(b);[21]
>
> (3) by failing to indemnify GMO for the Loss of Profit by Power Shortage under Section 16.3 (the "Louisiana Power Shortage Claim"), *id.* ¶¶ 64(f), 91(a);
>
> (4) by failing to share with GMO the benefits of Whinstone's power sales under Section 4.3.8 (the "Texas Power Sales Claim"), *id.* ¶¶ 64(d), 91(c);

[21] The Fifth Amended Complaint pleads the Specified Power Draw Claim and Service Uptime Claim together as a failure "to pay the damages owed under Section 9.1 of the Texas Agreement as a result of Whinstone's failure to meet its obligations to provide power." Fifth Am. Compl. ¶ 91(b). Whinstone accordingly refers to these claims as the "Texas Lack of Capacity" and "Texas Service Uptime" claims under Section 9.1. Whinstone MSJ Br. at 38. Because the alleged breaches are of Sections 4.3.1 and 5.4, with Section 9.1 supplying the measure of liability, the Court refers to them by the provisions allegedly breached.

(5) by failing to provide an installation environment in two buildings as required by Section 3.1.1 (the "Installation Environment Claim"), *id.* ¶¶ 64(a), 91(d);

(6) by removing GMO's miners without its consent in violation of Sections 3.1.3 and 14 (the "Miner Removal Claim"), *id.* ¶¶ 64(g), 91(e);

(7) by unilaterally raising GMO's power price in violation of Section 4.3.2 (the "Invoice Overcharge Claim"), *id.* ¶¶ 64(c), 91(f); and

(8) by terminating the Texas Agreement without a valid basis under Section 15.2 (the "Early Termination Claim"), *id.* ¶¶ 62-64, 91(g).

GMO seeks "all actual and consequential damages flowing" from these breaches, "including as permitted under Section 9.1 of the Texas Agreement," together with interest. *Id.* at 27. Through expert discovery, GMO has quantified those damages at between approximately $335 million and $346 million, on the assumption that it was entitled to 92 MW of power, and between approximately $440 million and $453 million, on the assumption that it was entitled to 120 MW. Whinstone 56.1 Stmt. ¶¶ 85-86; *accord* GMO 56.1 Counter Stmt. ¶¶ 85-86. The two largest components are the Early Termination Claim, for which GMO seeks between $147.8 million and $158.1 million (assuming 92 MW) or between $192.8 million and $206.3 million (assuming 120 MW), and the Texas Power Sales Claim, for which it seeks $117.3 million (assuming 92 MW) or $151.8 million (assuming 120 MW). Whinstone 56.1 Stmt. ¶¶ 87, 101-103; *accord* GMO 56.1 Counter Stmt. ¶¶ 87, 101-103. GMO seeks approximately $43.2 million on the Louisiana Power Shortage Claim, between $27.4 million (assuming 92 MW) and $53.4 million (assuming 120 MW) on the Specified Power Draw Claim, $10.5 million on the Service Uptime Claim, and $1.2 million on the Miner Removal Claim; it has not separately quantified damages for the Invoice Overcharge or Installation Environment Claims. GMO 56.1 Counter Stmt. ¶ 90; GMO 56.1 Stmt. ¶¶ 118, 194, 342, 419; Whinstone 56.1 Stmt. ¶¶ 113-114.

Whinstone answered the Fifth Amended Complaint on September 9, 2025. Dkt. 505. Its Answer asserts eleven affirmative defenses: failure to state a claim; GMO's own material breaches; waiver, laches, unclean hands, and estoppel; the absence of damages; failure to mitigate; that any

damages arise from GMO's own conduct; set-off; the unenforceability of the Texas Agreement in whole or in part; that the claims are barred by the Texas Agreement's terms; accord and satisfaction; and election of remedies. Answer at 13-15. It does not plead that GMO failed to satisfy any condition precedent. *See id.*; GMO 56.1 Counter Stmt. ¶ 348. Whinstone also asserts three counterclaims. The first, for breach of contract, alleges that GMO (a) failed to negotiate in good faith under Sections 16.3 and 20.6 of the Texas Agreement, by making "wildly different" and unsubstantiated demands for the Loss of Profit by Power Shortage, ranging from about $3 million in 2021 to $35 million in 2022, and by rejecting Whinstone's proposals for a market-rate agreement; (b) failed to discuss a minimum usage commitment under Section 4.3.3 and never used more than 50 MW of the capacity Whinstone made available; and (c) refused to pay the surcharges. Counterclaims ¶¶ 17-57, 68-78. The second counterclaim, for unjust enrichment, seeks the revenue GMO earned by mining, and the full cost of the power GMO used, during the court-ordered preservation period following termination. *Id.* ¶¶ 79-83. The third seeks a declaration that Whinstone's termination was lawful or, alternatively, a determination of the amounts GMO should have paid under the Agreement and of "the reasonable amount of the Loss of Profit by Power Shortage." *Id.* ¶¶ 84-89. Whinstone has not offered expert testimony on its own damages, but its supplemental initial disclosures claim at least $22 million, representing the difference between GMO's $0.0285 rate and the "standard hosting rate of 0.075 USD/kWh that is usually offered to Whinstone customers"; at least $25 million, representing the difference between GMO's actual usage and "a minimum power usage commitment of 80 MW/month"; and at least $1 million in unpaid surcharges. GMO 56.1 Stmt. ¶¶ 477-481; *accord* Whinstone 56.1 Counter Stmt. ¶¶ 477-481. GMO answered the counterclaims on September 30, 2025. Dkt. 512.

Discovery, supervised by Judge Parker, was extensive and contentious. Judge Parker extended the discovery schedule several times and resolved numerous disputes, including over

letters rogatory, privilege, and the scope of depositions. *See, e.g.*, Dkts. 60, 105, 137, 177, 191, 259, 369, 420, 475, 482. Fact discovery closed on April 21, 2025, subject to limited exceptions, Dkt. 259, and expert discovery closed on December 11, 2025, Dkt. 518.

**2. The Privilege Dispute**

On February 26, 2025, GMO moved to compel the production of documents that Whinstone and Riot had withheld as privileged or as attorney work product, including documents concerning the decision to terminate the Texas Agreement. Dkts. 281, 283. Whinstone opposed, submitting a declaration of Patrick Wooding, a member of its in-house legal team, describing the circumstances in which the termination documents were created. Dkts. 292, 295. Judge Parker reviewed a sample of the withheld documents *in camera* and, in an Opinion and Order dated May 30, 2025 and filed on June 25, 2025, granted the motion in part. Dkt. 420 ("Privilege Order").

As relevant here, Judge Parker found that Whinstone "has adequately shown that its discussion to terminate the GMO agreement began with the legal team, given the ongoing litigation between the parties in January 2023," so that "there is no timeline issue with respect to when litigation with GMO was anticipated." *Id.* at 19. She nonetheless concluded that Whinstone had been "overinclusive in withholding documents insofar as it withheld business and profitability analyses that were not shown to have been prepared for the primary purpose of requesting or conveying legal advice or in anticipation of litigation." *Id.* at 19-20. Applying those principles to the termination documents, Judge Parker held that an email thread in which Zhang, in Riot's corporate development group, sought in-house counsel's guidance on a cost-benefit analysis, designated CAT 16, was privileged in its entirety because it "reflects the gathering and preparation of information in order to obtain legal advice." *Id.* at 36-37. She likewise upheld Whinstone's redactions of email threads, designated CAT 46 and CAT 54, that "include provision of legal

advice and transmit attorney work product to the client," and permitted Whinstone to withhold a parallel thread, CAT 58, that consists of "comments on attorney work product." *Id.* at 35-37.

Judge Parker reached a different conclusion as to the cost-benefit analyses themselves. She held that two versions of the slide deck, CAT 21 (the May 2023 "GMO Hosting Cost-Benefit Analysis") and CAT 49 (the June 2023 "GMO Termination Analysis Follow-Up"), must be produced with the privileged portions redacted, because although three slides in each "reflect[] legal advice regarding legal risks of terminating the GMO contract," "the remainder of the slides reflect business considerations in terminating the GMO contract," and "the business analysis would have been done regardless of litigation and therefore cannot be shielded by the work product privilege." *Id.* at 35. She ordered the transmittal emails for those decks, CAT 20 and CAT 48, produced in full, finding that CAT 20 "contains business analyses that would have been prepared regardless of any anticipated or pending litigation." *Id.* at 20-21. And she ordered production of a June 23, 2023 email exchange and attachment, CAT 51 and CAT 52, in which Zhang and Haugen, the head of Riot's power strategy team, discussed inputs to the analysis, because "no legal advice is requested or transmitted," "the only attorney on the thread is copied and never says anything," and the attachment "appears to be entirely a business and profitability analysis assessing the various scenarios relating to terminating or not terminating the GMO contract." *Id.* at 21-22.

On July 10, 2025, Whinstone filed an objection to the Privilege Order under Federal Rule of Civil Procedure 72(a), limited to Judge Parker's rulings on CAT 20, CAT 21, CAT 49, CAT 51, and CAT 52. Objection at 1. Whinstone contends that these documents are opinion work product because they were prepared at the direction of counsel, in the course of an active lawsuit, to evaluate the damages GMO might claim if the Texas Agreement were terminated, and that they are independently protected by the attorney-client privilege because the information they contain was gathered so that counsel could render legal advice. *Id.* at 12-22. Whinstone belatedly sought

a stay of production pending its objection, which Judge Parker denied on July 18, 2025 as untimely and because Whinstone had "not shown likelihood of success on the objection." Dkt. 457. The documents were then produced. GMO opposed the objection on August 5, 2025, Dkt. 472 ("Objection Opp."), arguing that the analyses are business documents of a kind Riot prepared in the ordinary course before, during, and after the litigation, and Whinstone replied on August 18, 2025, Dkt. 484 ("Objection Reply").

**3. Riot's Motion to Dismiss**

The Fifth Amended Complaint seeks to hold Riot liable for Whinstone's breaches on two theories. The first is that Whinstone is Riot's alter ego. Fifth Am. Compl. ¶ 92. In support, GMO relies on the allegations of domination described above, *see supra* I.A.8, and further alleges that Riot has "deliberately rendered Whinstone insolvent": Whinstone's debt to Riot for undocumented "advances" grew from $13 million in June 2021 to $238 million fourteen months later, "largely in service of construction to fuel Riot's self-mining"; Whinstone's only revenue stream was its hosting customers, all of whom Riot terminated; Riot, now Whinstone's only hosting "customer," does not pay Whinstone; and Riot claims Whinstone's power credits and contracts as its own in its public disclosures. Fifth Am. Compl. ¶¶ 73-78, 84-86. The second theory is that Riot "manifested its intent to be bound by the Texas Agreement and assumed the Texas Agreement through its conduct," including by taking over the amendment negotiations, by terminating the Agreement "for its own benefit," and by "publicly announcing that it assumed the Texas Agreement upon its acquisition of Whinstone." *Id.* ¶ 89. The cited announcement is a statement by a Riot executive on Riot's May 1, 2025 earnings call, made in the course of describing Riot's settlement with Rhodium, that "Riot assume[d] certain legacy Whinstone hosting agreements . . . as part of Riot's acquisition of Whinstone U.S. in May 2021." *Id.* ¶ 44; *see* GMO 56.1 Stmt. ¶ 223; Whinstone 56.1 Counter Stmt. ¶¶ 223, 589.

In granting GMO leave to add Riot as a Defendant, Judge Parker stayed discovery on the alter ego theory "until after the anticipated summary judgment motion practice on the underlying contract claims against Whinstone are decided." Dkt. 493 at 8. Riot moved to dismiss the Fifth Amended Complaint under Rule 12(b)(6) on September 29, 2025. Dkts. 509, 510 ("Riot MTD Br."), 511 ("Fetzer Decl."). Riot argues that GMO has not pleaded facts sufficient to pierce Whinstone's corporate veil under Delaware law, because the Fifth Amended Complaint alleges nothing more than a conventional parent-subsidiary relationship and no fraud or injustice worked through the corporate form, and that GMO has not plausibly alleged that Riot manifested an intent to be bound by a contract it never signed or performed. Riot MTD Br. at 7-22. GMO opposed on October 13, 2025, Dkt. 520 ("GMO MTD Opp."), and Riot replied on October 20, 2025, Dkt. 521 ("Riot MTD Reply").

**4. The Motions for Summary Judgment**

With the Court's leave to file briefs of double the ordinary length, Dkt. 535, GMO and Whinstone each moved for summary judgment on January 8, 2026. Dkts. 544, 555.

GMO moves for partial summary judgment on liability, but not damages, for several of the breaches it alleges: the Specified Power Draw, Installation Environment, Service Uptime, Louisiana Power Shortage, Miner Removal, and Early Termination Claims. Dkt. 564 ("GMO MSJ Br.") at 22-38. It does not move on the Texas Power Sales or Invoice Overcharge Claims. GMO also moves for summary judgment on its theory that Riot assumed the Texas Agreement, *id.* at 38-40, and for summary judgment dismissing all three of Whinstone's counterclaims and each of Whinstone's affirmative defenses other than the fifth for failure to mitigate, *id.* at 40-55 & n.20.

Whinstone moves for summary judgment seeking dismissal of seven of GMO's eight claims. Whinstone MSJ Br. at 18-40. It argues that the Early Termination Claim fails because GMO has no admissible evidence of resulting damages and the undisputed evidence shows GMO

would have lost money had the Texas Agreement continued; that the Texas Power Sales and Louisiana Power Shortage Claims fail because Sections 4.3.8 and 16.3 are unenforceable agreements to agree; that the Invoice Overcharge and Installation Environment Claims fail because GMO has offered no evidence of damages; and that the Texas Power Sales, Installation Environment, Specified Power Draw, and Service Uptime Claims are independently barred by GMO's failure to give written notice within twelve months as required by Section 9.3. *Id.* Whinstone does not move on the Miner Removal Claim.

The parties filed their oppositions on February 9 and 10, 2026. GMO MSJ Opp., Whinstone MSJ Opp., Dkt. 603 ("Riot MSJ Opp."). GMO's opposition argues, among other things, that Whinstone waived its notice defense by failing to plead it in any of its five answers, that Whinstone in any event received actual notice of the claims that accrued in 2021 and negotiated with GMO to remedy them, and that Sections 4.3.8 and 16.3 are enforceable preliminary agreements under New York law. GMO MSJ Opp. at 3-35. Riot filed a separate opposition to GMO's motion, arguing that the assumption theory fails for the reasons stated in its motion to dismiss and, alternatively, that factual disputes preclude summary judgment. Riot MSJ Opp. at 6-11. Replies followed on February 23, 2026. Dkts. 620 ("GMO MSJ Reply"), 621 ("GMO Riot Reply"), 624 ("Whinstone MSJ Reply").

**5. The Motions to Exclude and the Sealing Requests**

Three motions to exclude expert testimony under Federal Rule of Evidence 702 accompanied the summary judgment briefing. On January 8, 2026, Whinstone moved to exclude the early termination and power sales damages opinions of GMO's damages expert, Dr. Christine Parlour. Dkts. 547, 548 ("Parlour Mot."). On January 12 and 13, 2026, GMO moved to exclude the opinions of Whinstone's Bitcoin mining industry expert, Michael Maloney, Dkts. 568, 571 ("Maloney Mot."), and the rebuttal opinions of four other Whinstone experts, Dr. John Fessler,

Ryan Rossi, Michael Hostettler, and Kevin Montague, Dkts. 573, 576 ("Rebuttal Experts Mot."). GMO opposed the Parlour motion on February 9, 2026, Dkt. 596 ("Parlour Opp."), and Whinstone replied on February 23, 2026, Dkt. 625 ("Parlour Reply"). Whinstone opposed GMO's motions on March 13, 2026, Dkts. 627 ("Rebuttal Experts Opp."), 629 ("Maloney Opp."), in which Riot joined, Dkt. 631, and GMO replied on March 27, 2026, Dkts. 634 ("Maloney Reply"), 635 ("Rebuttal Experts Reply"). The Court describes the challenged opinions in greater detail below. *See infra* II.C.

In connection with these submissions, the parties and non-parties TXU and Harris filed numerous requests to seal or redact portions of the record. *See, e.g.*, Dkts. 546, 556, 567, 578, 582, 591, 594, 601, 614, 615, 626, 632, 645, 654. At a conference on April 9, 2026, the Court granted Harris's request and directed all parties with pending requests to file consolidated letter-motions justifying each request document by document, with oppositions to follow. Apr. 9, 2026 Minute Entry. GMO, Whinstone and Riot, and TXU filed their consolidated requests on April 23, 2026, Dkts. 648-651; TXU supplemented its request on April 30, 2026, Dkt. 652; and GMO opposed Whinstone's, Riot's, and TXU's requests on May 7, 2026, Dkts. 655, 656.

**6. Trial**

No party has demanded a jury trial. On May 13, 2026, the Court scheduled a bench trial on all remaining claims to begin on January 5, 2027, with a final pretrial conference on December 18, 2026. Dkt. 659. Under the pretrial schedule proposed by the parties and adopted by the Court, motions *in limine* are due November 19, 2026, responses are due December 4, 2026, and the joint pretrial order and accompanying submissions are due December 15, 2026. Dkts. 660, 661. All direct testimony at trial, including expert testimony, will be taken live rather than by affidavit. Dkts. 661, 663.

## II. Discussion

### A. Riot's Motion to Dismiss

#### 1. Legal Standard

To survive a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Accordingly, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Moreover, although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

In deciding a motion to dismiss, a court may consider, in addition to the complaint, "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," as well as documents "integral" to the complaint, meaning documents on which the complaint "relies heavily" for "its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (internal quotation marks omitted). Where such a document contradicts an allegation that purports to describe it, the document controls. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). Here, the Fifth Amended Complaint expressly relies on, and characterizes, the deposition testimony of Riot's corporate representative, McGonegal, Fifth Am. Compl. ¶¶ 79-80, and Riot has submitted relevant excerpts of that testimony in connection with their motion to dismiss, Fetzer Decl., Exh. B ("McGonegal Dep. Tr."); *see* Riot MTD Br. at

2 n.1. The Court therefore considers that testimony in assessing whether the allegations that describe it are plausible.

**2. Analysis**

The Fifth Amended Complaint asserts a single cause of action, for breach of the Texas Agreement, against Whinstone and Riot. Fifth Am. Compl. ¶¶ 87-93. Riot is not a party to that contract. *Id*. ¶¶ 21, 88 (alleging that "[t]he Texas Agreement constitutes an enforceable agreement between GMO and Whinstone"). GMO nevertheless seeks to hold Riot liable on two theories: that Whinstone is Riot's alter ego, *id.* ¶ 92, and that Riot "manifested its intent to be bound by the Texas Agreement and assumed the Texas Agreement through its conduct," *id.* ¶ 89. Neither theory is adequately pleaded.

**a. Alter Ego**

Under New York's choice-of-law rules, which govern in this diversity action, "the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks omitted). Whinstone is a Delaware corporation, Fifth Am. Compl. ¶ 4, so Delaware law governs whether its corporate veil may be pierced. The parties agree on this point. Riot MTD Br. at 7 & n.3; GMO MTD Opp. at 15-16.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted). Delaware courts adhere to that principle with particular firmness. Because "Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal

existence." *Hash Asset Mgmt. Ltd. v. DMA Labs, Inc.*, No. 2025-0374-BWD, slip op. at 16 (Del. Ch. Feb. 9, 2026) (internal quotation marks omitted). "Persuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (citing *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV. A. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). The corporate form may be disregarded "only in the interest of justice, when such matters as fraud, contravention of law or contract, [or] public wrong, or where equitable consideration among members of the corporation require it, are involved." *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968).

Alter ego liability is the most common theory on which courts are asked to pierce the veil. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989) (observing that the "alter ego theory" is "often used interchangeably with such expressions as 'disregarding the corporate entity' and 'piercing the corporate veil'"). In the parent-subsidiary context, the doctrine applies where the two entities "operate[] as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 707 (Del. Ch. 2021) (internal quotation marks omitted). To state a claim, "plaintiffs must allege facts that, if taken as true, demonstrate the [parent's] complete domination and control of the" subsidiary, *Wallace*, 752 A.2d at 1183-84, and the degree of control required is "exclusive domination and control to the point that [the subsidiary] no longer has legal or independent significance of its own," *id.* at 1184 (citation modified). In assessing domination, Delaware courts consider a familiar set of factors: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Manichaean*, 251 A.3d at 706 (internal quotation marks omitted); *accord NetJets Aviation, Inc. v.*

*LHC Commc'ns, LLC*, 537 F.3d 168, 176-77 (2d Cir. 2008) (applying Delaware law). "While these factors are useful, any single one of them is not determinative." *Manichaean*, 251 A.3d at 706-07. "An ultimate decision regarding veil-piercing is largely based on some combination of these factors, in addition to an overall element of injustice or unfairness." *Id.* at 707 (internal quotation marks omitted).

That last consideration of injustice or unfairness is the heart of the inquiry. Piercing the corporate veil under the alter ego theory "requires that the corporate structure cause fraud or similar injustice." *Wallace*, 752 A.2d at 1184 (internal quotation marks omitted). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id.* Thus, "[t]he overarching issue is whether 'the corporate structure [has] cause[d] fraud or similar injustice'—in other words, whether the corporation is 'a sham and exist[s] for no other purpose than as a vehicle for fraud.'" *Hash Asset Mgmt.*, slip op. at 17 (quoting *Wallace*, 752 A.2d at 1184). A plaintiff "need not prove that the corporation was created with fraud or unfairness in mind," because "[i]t is sufficient to prove that it was so used." *NetJets*, 537 F.3d at 177. But the fraud or injustice "must . . . come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim." *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378-LWW, 2023 WL 5688392, at *6 (Del. Ch. Sept. 5, 2023) (internal quotation marks omitted). As the District of Delaware explained in a decision the Delaware courts have repeatedly endorsed, "[a]ny breach of contract and any tort . . . is, in some sense, an injustice," but "[o]bviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *Mobil Oil*, 718 F. Supp. at 268; *see NetJets*, 537 F.3d at 183 (explaining that *Mobil Oil* "stands for

the proposition that the claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit," and that "[t]his proposition has been endorsed by the Delaware courts"). Instead, "[t]he law requires that fraud or injustice be found in the defendants' use of the corporate form," the paradigm being the use of a subsidiary "to operate a sophisticated shell game, shuttling assets between entities in an effort to escape the effect of any potentially adverse judgment." *Mobil Oil*, 718 F. Supp. at 269-70; *see NetJets*, 537 F.3d at 183-84 (finding a triable issue of injustice where the owner withdrew millions of dollars from the entity "at will," mischaracterized the withdrawals to avoid statutory restrictions on distributions, and left the entity "unable to pay its debt" to the plaintiff).

Measured against these principles, the Fifth Amended Complaint does not state a claim to pierce Whinstone's veil. The Court takes the two components of the inquiry in turn, although, as the cases make clear, they overlap.

*Domination.* The bulk of GMO's allegations describe a relationship between a parent and a wholly owned subsidiary that Delaware law regards as ordinary. GMO alleges that Whinstone's executives became executives of Riot; that Whinstone's employees use Riot email addresses, wear Riot uniforms, and share office space at the Rockdale Facility with Riot personnel; that Riot provides Whinstone's accounting, tax, payroll, and legal services; that the companies share document repositories, financial reporting systems, and counsel; that Riot's senior officers sit on Whinstone's board; and that Riot makes the important decisions about Whinstone's hosting business and its power operations. Fifth Am. Compl. ¶¶ 66-71, 81. Whinstone admits several of these facts and attributes them to its Shared Services Agreement with Riot. Answer ¶¶ 66-67, 76. But even accepting the allegations as pleaded, "[a] parent corporation is not liable for the acts of its subsidiary merely because it owns (and votes) a majority of the subsidiary's stock or shares common shareholders, directors or officers with the subsidiary." *Cleveland-Cliffs Burns Harbor*,

2023 WL 5688392, at *6 (internal quotation marks omitted). Nor do "conclusory allegations that the parent's management exclusively dominated and controlled the subsidiary's management suffice to state a claim for veil-piercing." *Id.* at *6 n.79 (internal quotation marks omitted). It is a "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods*, 524 U.S. at 69 (internal quotation marks and alteration omitted). And centralized administrative services, cash management, and parent-level approval of a subsidiary's major decisions are features of the ordinary parent-subsidiary relationship, not evidence that the subsidiary has ceased to exist. *See Fletcher*, 68 F.3d at 1459-60 (holding that a subsidiary's participation in its parent's centralized cash management system, the parent's approval of the subsidiary's major expenditures, and overlapping directors were insufficient, as a matter of law, to establish alter ego status under Delaware law).

Stripped of these allegations, what remains is GMO's contention that Riot took charge of the matters that gave rise to this lawsuit: the amendment negotiations, the removal of GMO's miners, and the decision to terminate the Texas Agreement. Fifth Am. Compl. ¶¶ 43, 51-54, 81-82. Even taken as true, those allegations show that Riot exercised control over its subsidiary's most consequential business decisions. They do not show that Whinstone lacks "legal or independent significance of its own." *Wallace*, 752 A.2d at 1184 (internal quotation marks omitted). To the contrary, GMO's own pleading describes an entity with a business of its own: the Fifth Amended Complaint alleges that Whinstone "operates data centers for large-scale cryptocurrency mining and high-speed video rendering," "operates North America's largest bitcoin mining and hosting facility in Rockdale," and "offers space and other services to multiple companies conducting bitcoin mining—including GMO—through colocation agreements." Fifth Am. Compl. ¶ 9; *see id.* ¶ 73 (alleging that Riot is Whinstone's "hosting customer" under a written

hosting agreement). A subsidiary with its own facility, lease, customers, revenues, bank account, and financial statements is not a facade. *See Cleveland-Cliffs Burns Harbor*, 2023 WL 5688392, at *5-6 (rejecting alter ego allegations where the plaintiff's own complaint described a subsidiary that operated "tubular goods businesses" with its own "manufacturing facilities, employees, products, and customers," because "[t]hese facts not only belie any inference that [the subsidiary] functioned as a single economic entity with [the parent]," but "also make it unreasonable to infer that [the subsidiary is a] sham entit[y]").

This deficiency is apparent on the face of the pleading, and the testimony GMO invokes only confirms the point. *See* Fifth Am. Compl. ¶ 80 (discussing McGonegal's Rule 30(b)(6) deposition testimony).[22] McGonegal testified that Whinstone collects hosting fees and other revenues from its operations, that those receipts "go right into the Whinstone accounts" rather than Riot's, that Whinstone maintains an account at a local bank, and that Whinstone has "full-blown financial statements where all of their activities are recorded." McGonegal Dep. Tr. at 157:5-159:8. He also testified that the closure of Whinstone's original bank account was prompted by the bank, which would no longer serve a cryptocurrency miner, not by Riot. McGonegal Dep. Tr. at 157:24-158:17. GMO's allegation, citing McGonegal's deposition testimony, that "Whinstone's individual bank accounts were closed and money now flows between the entities at Riot's whim," Fifth Am. Compl. ¶ 80(e), thus mischaracterizes the testimony on which it purports to rest.

[22] Although courts typically may not consider documents outside the complaint on a motion to dismiss, courts may consider an external document "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted). GMO expressly relies on "McGonegal's Riot Rule 30(b)(6) deposition" for its central allegations, Fifth Am. Compl. ¶ 80, and repeatedly emphasizes that these statements were made "under oath," GMO MTD Opp. at 4, 25-26. GMO does not dispute that the Court may consider the deposition transcript, although it argues that "competing interpretations of pleadings are inappropriate at the pleading stage." GMO MTD Opp. at 25-26 n.12.

*Injustice.* More fundamentally, the Fifth Amended Complaint does not plausibly allege that Riot has used Whinstone's corporate form to work a fraud or similar injustice on GMO. GMO does not, and could not, allege that Whinstone was formed as a sham. Whinstone was founded in 2018 by individuals unaffiliated with Riot, contracted with GMO in 2018 and again in 2019, and built and operated the Rockdale Facility for a year before Riot acquired it in May 2021. Fifth Am. Compl. ¶¶ 10, 17, 21, 31; *see supra* I.A.1-4. The only injustice GMO alleges is that Riot has "deliberately rendered Whinstone insolvent for the purpose of avoiding its liabilities," so that "there is no prospect of Whinstone being able to . . . meet its obligations to its creditors, such as paying the debt owed to GMO." Fifth Am. Compl. ¶¶ 84-85; *see id.* ¶ 86. The facts pleaded in support of that conclusion are these: Riot draws "excess" funds from Whinstone's accounts; Riot terminated Whinstone's third-party hosting customers and, as Whinstone's only remaining "customer," Riot does not pay Whinstone; Whinstone's intercompany debt to Riot for "advances" grew from $13 million in June 2021 to $238 million fourteen months later, "largely in service of construction to fuel Riot's self-mining"; and Whinstone "needs much more cash for payrolls and other expenses than the revenues it generates." *Id.* ¶¶ 73, 80, 84-85.

These allegations do not describe the diversion of a subsidiary's assets to defeat a creditor. Begin with the alleged siphoning. GMO alleges only that if there was "an excess of funds in Whinstone's accounts, Riot would draw that 'excess' up into its own accounts." *Id.* ¶ 80(d). It does not allege what constitutes an "excess" or identify any obligation that Whinstone has been unable to satisfy because of this siphoning.[23] Moreover, the allegation that Whinstone's

[23] GMO relies on McGonegal's deposition testimony for the proposition that Riot draws "excess" funds from Whinstone. In that testimony, McGonegal was describing the periodic settlement of intercompany accounts: because "Whinstone needs much more cash than it generates because of payrolls and other expenses," Riot periodically provides "Whinstone more," and "if they have an excess down there, [Riot] would draw it up into the Riot accounts," with the hosting fees Riot owes Whinstone "recorded on a monthly basis, but then periodically settled out as needed." McGonegal Dep. Tr. at 159:14-160:2.

intercompany debt to Riot grew to $238 million only confirms the direction of the money flows: Riot has put money into Whinstone, not taken it out. Fifth Am. Compl. ¶ 84. A parent that funds its subsidiary's payroll and operating expenses and periodically nets out the resulting balances is a far cry from a parent draining its subsidiary's coffers. That the funds were used for "construction to fuel Riot's self-mining" at a facility Whinstone owns and operates, *id.*, describes capital investment in the subsidiary's own business, not a transfer of the subsidiary's assets to the parent. The allegation that Riot terminated Whinstone's other hosting customers likewise describes a business strategy, one GMO plainly considers ill-advised and, as to itself, a breach of contract, but not a manipulation of the corporate form. And the allegation that Riot does not "pay" Whinstone for hosting is contradicted by the pleading itself, which acknowledges that Riot's hosting fees are recorded and settled through intercompany accounts, *id.* ¶ 75, and by GMO's acknowledgment that the Riot-Whinstone hosting agreement "requires Riot to make payment" to Whinstone, *id.*

What is missing is any well-pleaded fact suggesting that Whinstone is unable to pay its debts, that it has defaulted on any obligation, or that Riot has moved assets beyond GMO's reach in anticipation of a judgment. GMO alleges that Whinstone "is still unable to pay its bills as they come due," *id.* ¶ 73, but identifies no bill Whinstone has failed to pay. And while GMO cites McGonegal's deposition testimony, *id.* ¶ 80; *see supra* n.22, this testimony cannot save its insufficient allegations because McGonegal testified that Whinstone's cash needs exceed its revenues with Riot covering the difference, McGonegal Dep. Tr. at 159:14-23. Far from supporting GMO's allegations, this testimony thus suggests that Riot pays Whinstone's bills.

The Court of Chancery rejected materially identical allegations in *Nieves v. Insight Building Co.*, No. 2019-0464-SG, 2020 WL 4463425 (Del. Ch. Aug. 4, 2020), where the plaintiffs argued that a subsidiary was undercapitalized and insolvent but did not plead factual allegations "that it has been unable to pay any creditor, that it is insolvent, or that it is unable to pay any debt,"

or otherwise allowing the inference that it "has defaulted on its obligations, that it is unable to operate, that it is a shell entity, or even that it will be unable to satisfy any recovery the Plaintiffs seek," *id.* at *8-9. As that court observed, "[j]udicial disregard for the corporate form is not a remedy available to plaintiffs who merely wish to hold another entity liable in addition to the one with whom they contracted." *Id.* at *8. And even a well-pleaded allegation of insolvency would not suffice on its own, because a subsidiary's inability to pay a judgment is not itself a misuse of the corporate form; it is one circumstance to be weighed in deciding whether the parent has used the form to shield assets from creditors. *See Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005); *Nieves*, 2020 WL 4463425, at *8 (explaining that undercapitalization is a factor in the analysis but that the plaintiff must plead facts showing the entity to be "a vehicle for fraud"). Nothing in the Fifth Amended Complaint suggests such conduct.

GMO's remaining allegations of injustice fare no better. GMO alleges that the Shared Services Agreement and the Riot-Whinstone hosting agreement are "sham" documents because each bears an effective date earlier than the date on which it was signed and because the parties have not adhered to their invoicing and payment mechanics. Fifth Am. Compl. ¶¶ 74-76. An agreement whose effective date precedes its execution is commonplace and is not, without more, a sham. *See, e.g.*, *Int'l Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49, 55 (2d Cir. 1979) (enforcing contract as of its stated effective date although it was formally executed later). Laxity in following the mechanics of intercompany agreements is, at most, a failure to observe formalities, which is one factor in the domination analysis; it says nothing about whether the corporate form has been used to defraud GMO. *See NetJets*, 537 F.3d at 178 (treating a failure to follow formalities in intercompany dealings as bearing on whether the entities are "one in the same" (internal quotation marks omitted)). GMO also alleges that Riot describes Whinstone's power

credits and contracts as its own in public filings. Fifth Am. Compl. ¶¶ 77-78. Consolidated financial reporting is what public companies do with wholly owned subsidiaries, and "loose language" in a parent's disclosures about the parent's relationship with its subsidiary does not establish that the subsidiary is a facade. *Fletcher v. Atex, Inc.*, 861 F. Supp. 242, 247 (S.D.N.Y. 1994), *aff'd*, 68 F.3d 1451 (2d Cir. 1995).

At bottom, GMO's theory is that Riot caused Whinstone to breach the Texas Agreement, and to do so in bad faith, in order to advance Riot's own business. Fifth Am. Compl. ¶¶ 41-42, 82-83, 86. That is a serious allegation, and if proven it very well may support a substantial judgment against Whinstone. But it is the underlying breach, and the underlying breach "does not supply the necessary fraud or injustice." *Mobil Oil*, 718 F. Supp. at 268. A parent that directs its subsidiary to breach a contract has not thereby abused the subsidiary's corporate form; it has caused its subsidiary to incur a liability, which the subsidiary remains obligated to satisfy. GMO has pleaded no facts suggesting that Whinstone will be unable to do so, or that Riot has arranged matters so that it cannot.

GMO's counterarguments do not alter this conclusion. GMO first invokes the "two-pronged test" of *NetJets* and *Fletcher* and argues that it has pleaded "every single one" of the domination factors. GMO MTD Opp. at 16-21. For the reasons explained above, most of its allegations describe features of an ordinary parent-subsidiary relationship, and the allegations of undercapitalization, insolvency, and siphoning are either conclusory or otherwise insufficient. The Court has not, as GMO counsels against, "isolate[d] each allegation in a vacuum," *id.* at 19; it has considered GMO's allegations together and concluded that, in combination, they do not describe a sham entity. GMO next argues that it need only allege "something that is similar in nature to fraud" and that "[a]cts intended to leave a debtor judgment proof are sufficient." *Id.* at 22 (quoting *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010); *Compagnie des Grands*

*Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, No. 18 Civ. 654, 2019 WL 148454, at *5 (D. Del. Jan. 9, 2019)). The Court agrees with the legal proposition. The problem is that GMO has not pleaded acts of that kind. In *Blair* and *Compagnie des Grands Hotels d'Afrique*, as GMO itself describes them, the parents allegedly stripped the subsidiaries of their revenues or assets so that the subsidiaries could not satisfy their obligations to the plaintiffs. *Blair*, 720 F. Supp. 2d at 473; *Compagnie des Grands Hotels d'Afrique*, 2019 WL 148454, at *5; *see* GMO MTD Opp. at 22-23. In *NetJets*, the owner withdrew millions of dollars from the entity for personal use while it defaulted on the plaintiff's invoices. 537 F.3d at 183-84. Each of those cases involved the movement of assets out of the debtor entity in a manner that left the plaintiff unpaid. GMO's pleading alleges that Riot moved hundreds of millions of dollars *into* Whinstone. Finally, GMO argues that veil-piercing claims are "fact-intensive" and that discovery on its alter ego theory has been deferred. GMO MTD Opp. at 15-16. But the plausibility standard applies to alter ego claims as it does to any other, *see Hash Asset Mgmt.*, slip op. at 16-18; *Cleveland-Cliffs Burns Harbor*, 2023 WL 5688392, at *4-6, and GMO drafted the Fifth Amended Complaint after three years of discovery from Whinstone, including the Rule 30(b)(6) testimony from McGonegal on which it relies. That discovery on the alter ego theory was stayed pending summary judgment reflects Judge Parker's case-management judgment about sequencing, Dkt. 493 at 8; it does not relieve GMO of its obligation to plead sufficient facts to state a claim against Riot.

Accordingly, the Fifth Amended Complaint fails to state a claim against Riot on an alter ego theory.

**b. Assumption of the Contract**

GMO's alternative theory is that Riot "assumed" the Texas Agreement and "manifested its intent to be bound" by it. Fifth Am. Compl. ¶ 89. Because that theory concerns the formation of contractual obligations under an agreement governed by New York law, Texas Agreement § 18.1

("This Agreement shall be governed by laws of the State of New York . . . ."), the Court applies New York law, as the parties do, *see* Riot MTD Br. at 19-22; GMO MTD Opp. at 9-15. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)).

Under New York law, "a party who is not a signatory to a contract generally cannot be held liable for breaches of that contract." *Weiss v. All Year Holdings Ltd. (In re All Year Holdings Ltd.)*, 645 B.R. 10, 22 (Bankr. S.D.N.Y. 2022) (internal quotation marks omitted); *see TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998) (referring to "certain limited circumstances" when an intent to arbitrate is imputed to a nonsignatory). That principle applies with full force to a corporate parent. "Under New York law, there are at least three ways in which a corporation can acquire the business of another: The purchaser can buy the seller's capital stock, it can buy the seller's assets, or it can merge with the seller to form a single corporation." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44-45 (2d Cir. 2003). As discussed, Riot acquired Whinstone's stock. Fifth Am. Compl. ¶ 10; *see supra* I.A.8. In that scenario, "the purchaser does not become liable for the seller's debts unless the stringent requirements for piercing the corporate veil are met." *Cargo Partner*, 352 F.3d at 45 (citing *TNS Holdings*, 703 N.E.2d at 751). The acquisition therefore did not, of its own force, make Riot a party to Whinstone's contracts.

A non-signatory may, of course, become bound to an existing contract by later agreeing to assume its obligations. Whether it has done so is governed by ordinary principles of contract formation. "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). That assent may be expressed in words or inferred from conduct, but in either case

the question is whether "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds" reveal an intent to be bound. *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977); *see MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 398 (S.D.N.Y. 2009) (applying that standard to determine whether a non-signatory intended to be bound). Where a non-signatory is said to have assumed a contract through its conduct, the conduct must be such that it "was objectively reasonable for a party to a contract to believe that [the] non-signatory was bound." *All Year Holdings*, 645 B.R. at 25-26. Courts have found assumption where the non-signatory told the counterparty that it was "the real party in interest" and made the payments due under the contract, *Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. All., Inc.*, No. 05 Civ. 7776 (KMK), 2007 WL 1701813, at *5-6 (S.D.N.Y. June 12, 2007), or where the non-signatory executed a collateral agreement with the counterparty undertaking obligations in the transaction, *SHLD, LLC v. Hall*, No. 15 Civ. 6225 (LLS), 2016 WL 659109, at *8 (S.D.N.Y. Feb. 17, 2016). In each instance, the non-signatory made a commitment to the counterparty that the counterparty was entitled to treat as its own bargain. A promise to assume another's contractual obligations, like any other promise, also requires consideration, and a bare acknowledgment of responsibility, unaccompanied by an exchange, does not create an enforceable obligation. *See* N.Y. Gen. Oblig. L. § 5-1105 (permitting enforcement of a promise without consideration only if it is in writing, signed by the promisor, and expressly recites past consideration).

The Fifth Amended Complaint alleges no such commitment. It rests on three sets of factual allegations. Fifth Am. Compl. ¶ 89.

The first is that Riot's executives took over the negotiation of an amendment to the Texas Agreement, rejected the June Amendment that Harris had negotiated, and thereafter proposed terms unfavorable to GMO. *Id.* ¶¶ 43-50, 81-82. Negotiating a replacement for a contract is not

performance of that contract, and it is not a representation that the negotiator has undertaken the obligations of the contract being replaced. The negotiations described in the Fifth Amended Complaint were conducted so that GMO and Whinstone could "renegotiate this Agreement," Texas Agreement § 20.6, and every draft the Fifth Amended Complaint describes contemplated an agreement between GMO and Whinstone, *see* Fifth Am. Compl. ¶¶ 43-47. A parent's participation in negotiations on its subsidiary's behalf is precisely the sort of conduct that, if it sufficed to bind the parent, would "completely swallow the alter ego theory," since "an overlap in ownership and personnel that necessarily results in the parent's involvement in its subsidiary's negotiations would always result in contractual liability for the parent." *In re All Year Holdings Ltd.*, 648 B.R. 434, 449 (S.D.N.Y. 2022). Nor does GMO allege that it understood Riot to have become its counterparty. To the contrary, GMO sued Whinstone alone in June 2022, after the negotiations had failed and with full knowledge of Riot's role in them, and it amended its complaint four times over the next three years without naming Riot. *See supra* I.B.1.

The second is that Riot made the decision to terminate the Texas Agreement. Fifth Am. Compl. ¶¶ 62, 82-83. Directing a subsidiary to terminate its contract is, once again, the exercise of a parent's control over its subsidiary, which is actionable, if at all, through veil piercing. It is not a manifestation of intent to be bound by the contract being terminated. A party that assumes a contract takes on its burdens; a party that ends a contract seeks to be free of them. Moreover, the Termination Notice itself was sent on Whinstone's letterhead and signed on Whinstone's behalf. *See supra* I.A.12.

The third is the statement of a Riot executive, on a May 2025 earnings call, that "Riot assume[d] certain legacy Whinstone hosting agreements . . . as part of Riot's acquisition of Whinstone U.S. in May 2021." Fifth Am. Compl. ¶ 44. GMO characterizes this as an "admission." GMO MTD Opp. at 10-11. The Court does not doubt that GMO may attempt to use

this statement at trial against Whinstone, on issues to which it is relevant. But the executive's statement does not establish an assumption of the Texas Agreement by Riot. The statement was made to investors, not to GMO; it was made in May 2025, nearly two years after the Texas Agreement was terminated and months before GMO first named Riot as a Defendant; it was made in the course of describing the settlement of a different dispute with a different customer; and it does not mention GMO or the Texas Agreement. Fifth Am. Compl. ¶ 44; *see* Riot MTD Br. at 20-21. A description of a corporate acquisition offered to shareholders four years after the fact is not an offer to GMO, and GMO could not have relied on it during the life of the contract. Even accepting that the reference to "legacy Whinstone hosting agreements" was intended to include the Texas Agreement, and even accepting that the speaker used the word "assumed" in its legal sense, the statement describes an event that, according to the speaker, occurred "as part of Riot's acquisition of Whinstone" in May 2021. Fifth Am. Compl. ¶ 44. The Fifth Amended Complaint alleges nothing about that acquisition except that it was an acquisition of Whinstone's stock, *id.* ¶ 10, and, as explained above, the purchase of a corporation's stock does not transfer its contractual obligations to the purchaser, *Cargo Partner*, 352 F.3d at 44-45. A stray remark cannot alter the legal consequences of the transaction it describes. *See Mem'l Sloan Kettering Cancer Ctr. v. Bristol Myers Squibb Co.*, 81 Misc. 3d 1234(A), 2024 WL 273384, at *3 (Sup. Ct. N.Y. Cnty. 2024) (rejecting an assumption theory although the parent had made payments under subsidiary's license and had represented to investors and the Securities and Exchange Commission that the licensed technology was licensed to the parent).

GMO's authorities do not support a different result. Most of them are veil-piercing cases in different dress. *See* GMO MTD Opp. at 13. The New York Supreme Court's Appellate Division, First Department, held in *Horsehead Industries, Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997), that the parent's intent to be bound could be inferred from its

extensive participation in negotiating the shareholder's agreement that allegedly was breached, and the court's inference appeared to rest at least in part on an alter ego theory. *See All Year Holdings*, 645 B.R. at 26 (explaining that *Horsehead Industries* "appears to have been decided on the basis that the plaintiff successfully stated a claim under an alter ego theory"). The statement in *MBIA Insurance Corporation* that a parent's intent to be bound may be inferred "if the subsidiary is controlled by the parent for the parent's own purposes," 706 F. Supp. 2d at 396, derives from *Horsehead Industries* and carries the same limitation, *see* Riot MTD Reply at 11 (collecting cases). *Oy Noresin AB v. ICC Industries, Inc.*, No. 91 Civ. 1005 (KC), 1991 WL 161367, at *1 (S.D.N.Y. Aug. 16, 1991), permitted limited discovery where the parent itself had negotiated the contract, disclosed its subsidiary's role only at the closing, and then advised the counterparty that the parent could not perform. *See id.* ("Such an intent can be inferred from the parent's participation in the negotiation, termination and attempted renegotiation of the contract." (citing *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 652 F.2d 340 (3d Cir. 1981))). And *Publicker Industries*, the source of the relevant language in *Oy Noresin*, involved a parent that negotiated the original contract, paid the counterparty $40,000 toward a settlement, and then filed suit alleging that it had agreed to perform the contract's obligations. *See Publicker Indus.*, 652 F.2d at 341-44. Those cases involve conduct directed to the counterparty, at or before the time of contracting, from which the counterparty could reasonably conclude that the parent was its real counterparty. GMO alleges nothing comparable.

* * *

Because the Fifth Amended Complaint does not plausibly allege facts to find Riot liable on an alter ego theory of liability or to find that Riot assumed the Texas Agreement, Riot's motion to dismiss is granted. And for the same reasons, GMO's motion for summary judgment on its claim that Riot assumed the Texas Agreement, *see* GMO MSJ Br. at 38-40, is denied as well.

**c. Leave to Amend**

Riot asks that the dismissal be with prejudice. Riot MTD Br. at 22. GMO has not requested leave to amend, and the Court sees no basis on which to grant it *sua sponte*. The Fifth Amended Complaint is GMO's sixth pleading; it was drafted after fact discovery had closed and with the benefit of three years of document and deposition discovery from Whinstone, including the testimony of Riot's corporate representative; and GMO has identified no additional fact it could plead that would cure the deficiencies described above. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made."); *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (leave to amend may be denied where amendment would be futile or where the plaintiff has already had an opportunity to replead). The claims against Riot therefore are dismissed with prejudice and without leave to amend.

**B. Whinstone's Objection to the Privilege Order**

Whinstone objects to the portion of Judge Parker's Privilege Order that compelled production of five documents: CAT 20 and CAT 21 (Zhang's "GMO Cost Benefit Analysis" spreadsheet and the version of it reproduced in the "GMO Strategic Options" slide deck), CAT 49 (the later "GMO Terminated" version of the deck), and CAT 51 and CAT 52 (Haugen's power-price analysis). Objection at 1-2; *see supra* I.B.2. Whinstone contends that each document is protected work product and, in the alternative, that each is protected by the attorney-client privilege. Objection at 9-22. Judge Parker rejected both contentions after reviewing the documents *in camera*, the declarations of counsel and of the documents' authors, and the parties' extensive submissions. Privilege Order at 15-37. For the reasons that follow, that ruling was neither clearly erroneous nor contrary to law.

**1. Legal Standard**

Magistrate judges have "broad discretion in resolving non-dispositive disputes." *Marotte v. City of New York*, No. 16 Civ. 8953 (GHW), 2017 WL 11105223, at *1 (S.D.N.Y. Oct. 6, 2017) (internal quotation marks omitted). "Matters concerning discovery generally are considered 'nondispositive' of the litigation." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990). On a non-dispositive order made by a magistrate judge, a district judge must only "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). "A magistrate [judge]'s ruling is contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure, and is clearly erroneous if the district court is left with the definite and firm conviction that a mistake has been committed." *Stollman v. Williams*, No. 20 Civ. 8937 (JPC) (JW), 2022 WL 1772552, at *4 (S.D.N.Y. June 1, 2022) (citation modified). "The party seeking to overturn a magistrate judge's decision thus carries a heavy burden." *U2 Home Ent., Inc. v. Hong Wei Int'l Trading Inc.*, No. 04 Civ. 6189 (JFK), 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007). A magistrate judge's determination that a particular document is or is not privileged, which turns on the application of settled law to the contents of the document and the circumstances of its creation, is entitled to that deference. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 547, 550 (S.D.N.Y. 2013).

The party asserting a privilege or protection "bears the heavy burden of establishing its applicability." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007). The party must establish "those facts that are the essential elements of the privileged relationship" by "competent evidence," not by "mere conclusory or ipse dixit assertions." *von Bulow v. von Bulow*, 811 F.2d 136, 144, 146 (2d Cir. 1987) (internal quotation marks omitted).

Two doctrines are at issue. The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). Its purpose is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)). A document is prepared "in anticipation of litigation" if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* at 1202 (internal quotation marks omitted). Under that "because of" test, a document that analyzes anticipated litigation "does not lose protection . . . merely because it is created in order to assist with a business decision." *Id.* But the test "withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation," because as to such documents "it could not fairly be said that they were created 'because of' actual or impending litigation." *Id.* The question, in short, is "whether [the document] would have been prepared irrespective of the expected litigation." *Id.* at 1204; *see Schaeffler v. United States*, 806 F.3d 34, 43-44 (2d Cir. 2015).

The attorney-client privilege protects "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). Where a communication serves both legal and business purposes, the Second Circuit asks "whether the predominant purpose of the communication is to render or solicit legal advice." *Id.* at 420. Because the privilege "stands in derogation of the public's right to every man's evidence," it "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) (internal quotation marks omitted). Documents that

reflect business analysis are not privileged merely because they were requested by, sent to, or later used by counsel. *See, e.g.*, *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 581 N.E.2d 1055, 1060 (N.Y. 1991) (communication must be "primarily or predominantly of a legal character"); *Cameron v. Winter*, No. 25 Civ. 210 (JAV), 2026 WL 551077, at *1 (S.D.N.Y. Feb. 27, 2026) (same); *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 80 (S.D.N.Y. 2006) ("[A] document will not become privileged simply because an attorney recommended its preparation if it contains merely business-related or technical communications between corporate employees.").

**2. Analysis**

**a. Work Product**

Two findings in the Privilege Order frame the work product question. First, Judge Parker found that Whinstone had "adequately shown that its discussion to terminate the GMO agreement began with the legal team, given the ongoing litigation between the parties in January 2023," so that "there is no timeline issue with respect to when litigation with GMO was anticipated." Privilege Order at 19. Second, after reviewing the documents *in camera*, Judge Parker found that they were either in whole or in part not work product. As to CAT 21 and CAT 49, the slide decks, she found that each "contain[s] attorney work product on three slides," which "reflect[] legal advice regarding legal risks of terminating the GMO contract." *Id.* at 35. Judge Parker further explained that "the remainder of the slides reflect business considerations in terminating the GMO contract," and that "[w]hile the termination of the GMO contract was done while this litigation was pending and Whinstone/Riot did anticipate litigation, the business analysis would have been done regardless of litigation and therefore cannot be shielded by the work product privilege." *Id.* As to CAT 20, the spreadsheet, she found that it "contains business analyses that would have been prepared regardless of any anticipated or pending litigation." *Id.* at 21. And as to CAT 51 and CAT 52, she found that "there is no apparent work product of the attorneys," that the analysis

"appears to be entirely a business and profitability analysis assessing the various scenarios relating to terminating or not terminating the GMO contract," and that her review of the documents "strongly suggest[s] that Whinstone seeks to shield its business and profitability assessments of the termination decision under the cloak of privilege." *Id.* at 22. Whinstone's objection is directed at the second finding, which it characterizes as an erroneous refusal to apply *Adlman*'s "because of" test and as inconsistent with the evidence. Objection at 12-16.

The Court disagrees on both counts. Judge Parker did not apply the "primarily to assist in litigation" test that *Adlman* rejected. *See* Privilege Order at 14 ("[T]he predominant purpose of the work product need not be to assist with litigation to be protected; rather, the work product need only have been prepared or obtained because of the prospect of litigation." (citations omitted)). *But see* Objection at 13-14. After setting out *Aldman*'s "because of" standard, Judge Parker recognized that a document prepared because of anticipated litigation retains protection even if its purpose is to inform a business decision and asked the question *Adlman* requires: whether the documents would have been created in essentially similar form irrespective of the litigation. Privilege Order at 14-15, 20-22, 35. Her answer to that question was a finding of fact and is supported by the record.

With respect to CAT 20, CAT 21, and CAT 49, Whinstone's own account of these documents is that Riot's finance personnel were asked "to determine the net financial impact of terminating the GMO contract," and that the resulting analysis compares what Whinstone would earn by continuing to host GMO with what Riot would earn by devoting GMO's power and space to its own mining. Objection at 4-6; *see supra* I.B.2. That is a business question. It is the question any company would ask before deciding whether to keep or shed a customer, and in fact it is one Riot's finance personnel had asked before. GMO identified in the record a 2021 analysis of the economics of Whinstone's hosting agreements and a 2022 model comparing the value of the

legacy hosting contracts to self-mining, both prepared before any litigation over GMO's termination was anticipated. Objection Opp. at 12-13. Those earlier analyses corroborate Judge Parker's finding that comparing the value of a hosting customer to the value of self-mining was something Riot did in the ordinary course, as one would expect of a company whose stated reason for acquiring Whinstone was "the potential to use the power at the Rockdale data center" for its own mining. Fifth Am. Compl. ¶ 80(a) (citing McGonegal deposition). A financial model that a company builds to decide whether to keep a customer does not become work product because the company expects the customer to sue if it is dropped. *See Adlman*, 134 F.3d at 1202.

Whinstone insists that the January 2023 analysis was different in kind because it was commissioned at the direction of counsel as part of a termination strategy, and because an assessment of the "net financial impact" of termination necessarily accounted for litigation exposure. Objection at 4-6, 13-16. Neither point carries Whinstone's burden. That counsel requested an analysis does not make the analysis work product; the question is whether the document reflects counsel's litigation assessments or instead reflects business information that counsel wanted to know. *Cf. Adlman*, 134 F.3d at 1199-1200 (describing the protected category as documents containing "legal analysis" that "candidly discusses the attorney's litigation strategies, appraisal of likelihood of success, and perhaps the feasibility of reasonable settlement"). Judge Parker examined the documents and found that they fall in the second category except for the three slides in each deck that assess the legal risks of termination, which she permitted Whinstone to redact. Privilege Order at 35. She also observed that "the explanation provided by Whinstone/Riot for supporting application of work product and attorney-client privilege makes clear that only certain portions were legal analysis and work product." *Id.* Whinstone offers no evidence that the underlying financial model would have looked materially different had no litigation been anticipated, and the earlier models suggest it would not have.

The same is true, with greater force, of CAT 51 and CAT 52. Those documents are Haugen's comparison of the price Whinstone paid for power with the price GMO paid under the Texas Agreement. Objection at 6-7. Haugen was the head of Riot's power strategy team, GMO 56.1 Stmt. ¶ 434; Whinstone 56.1 Counter Stmt. ¶ 434, not the company's lawyer, and the documents contain no legal analysis. As Judge Parker found, "no legal advice is requested or transmitted," "the only attorney on the thread is copied and never says anything," and the analysis is "entirely a business and profitability analysis." Privilege Order at 22. Moreover, a routine operational calculation is not transformed into litigation material by copying an attorney on the transmittal email. *See id.* ("Whinstone cannot claim privilege over documents merely by copying counsel." (citing *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y. 2019))).

Whinstone also argues that Judge Parker erred by requiring it to prove a negative, namely that the documents would not have been prepared absent litigation. Objection at 14-15. But that is precisely what *Adlman* requires of the party asserting protection: the "because of" test asks whether the document "would not have been prepared in substantially similar form but for the prospect of that litigation." 134 F.3d at 1195. Whinstone bore the burden on that question. *In re Grand Jury Subpoena*, 510 F.3d at 183. Yet it failed to meet that burden, making no showing that the analyses departed from Riot's ordinary practice or incorporated counsel's litigation assessments. It offered characterizations instead, and Judge Parker's refusal to accept those characterizations after reviewing the documents themselves was not clearly erroneous or contrary to law. *See, e.g.*, *Kaweske v. Banco Bradesco S.A.*, No. 25 Civ. 6588 (JLR) (RFT), 2026 WL 2690639, at *3 (S.D.N.Y. Sept. 14, 2026) ("It is well-settled that a magistrate judge's resolution of a nondispositive matter should be afforded substantial deference and may be overturned only if found to have been an abuse of discretion." (collecting cases)); *Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, No. 90 Civ. 4391 (CSH), 1998 WL 41586, at *1 (S.D.N.Y. Feb. 2, 1998)

(explaining that the "clearly erroneous or contrary to law" standard of review means that "a magistrate judge's resolution of a nondispositive issue should only be reversed upon a finding of abuse of discretion."); *cf. von Bulow*, 811 F.2d at 146 (explaining that a party asserting a privilege carries the burden of establishing "those facts that are the essential elements of the privileged relationship" by "competent evidence," not by "mere conclusory or ipse dixit assertions").

**b. Attorney-Client Privilege**

Whinstone's alternative argument is that the documents are privileged communications because they were prepared at counsel's request and transmitted to counsel to assist in providing legal advice regarding termination. Objection at 17-22. Judge Parker rejected that argument because the documents do not request or convey legal advice, Privilege Order at 21-22, 35, and the Court agrees.

The distinction Judge Parker drew is illustrated by her treatment of a related document that she did protect. CAT 16 is an email thread in which Riot's in-house business and legal personnel gathered information for outside counsel "in connection with outside counsel's damages analysis." Privilege Order at 36. Judge Parker found that thread privileged because "the entirety of the thread reflects the gathering and preparation of information in order to obtain legal advice," and because, "[w]hile the decision being contemplated in this document may have been a business decision, the advice sought clearly regarded the legal dimension of that decision." *Id.* at 36-37. CAT 20, CAT 21, and CAT 49 are different. They are the financial analyses themselves, prepared by business personnel, that compute the value of two business alternatives. Judge Parker specifically found that "the information contained in CAT 20 does not correspond to the legal advice offered in CAT 16," but rather "to a portion of CAT 21 which will be produced." *Id.* at 21. That counsel wanted to see the numbers, and that counsel may have used them in rendering advice, does not make the

provision of those numbers a request for or a rendering of legal advice. *See County of Erie*, 473 F.3d at 420-21; *Rivastigmine*, 237 F.R.D. at 80-81.

Whinstone's reliance on the fact that the termination "plan" was a legal project, Objection at 18-20, misses the mark for a related reason. A company's decision to terminate a contract has both legal and business dimensions. The legal dimension, including counsel's assessment of the company's right to terminate and its exposure if it does, is protected, and Judge Parker protected it. The business dimension, including the company's calculation of what it stands to gain, is not, even if the calculation was performed at counsel's request and even if it informed counsel's advice. Were it otherwise, a company could shield every financial analysis underlying a contested business decision by routing the request through its lawyers. The predominant-purpose test exists to prevent that result. *See County of Erie*, 473 F.3d at 420 (explaining that the test asks "whether the predominant purpose of the communication is to render or solicit legal advice," considered "dynamically and in light of the advice being sought or rendered").

The Objection is therefore overruled, and the Privilege Order is affirmed. Whinstone shall produce CAT 20, CAT 21, CAT 49, CAT 51, and CAT 52, with the redactions Judge Parker authorized, within fourteen days of this Opinion and Order, to the extent it has not already done so.

**C. The Motions to Exclude**

Whinstone and GMO ask the Court to exclude certain proffered expert testimony under Federal Rule of Evidence 702. Because this case will be tried to the Court, and because, as explained below, none of the challenged testimony is necessary to the resolution of the motions for summary judgment, the Court denies the motions without prejudice to renewal at trial.

**1. The Challenged Testimony**

*Dr. Christine Parlour.* GMO's damages expert is Dr. Christine Parlour, a professor of finance at the Haas School of Business at the University of California, Berkeley. Her August 20, 2025 report calculates damages for six of GMO's alleged breaches by comparing GMO's actual mining profits with the profits it would have earned "but for" each breach. *See* Parlour Mot. at 7-8; Parlour Opp. at 3-4. Whinstone challenges two of those six calculations.

The first is Dr. Parlour's "Early Termination" opinion, which quantifies the harm from Whinstone's termination of the Texas Agreement by comparing the cost of the power and hosting services GMO was entitled to receive under the Texas Agreement with the cost of the same services under three colocation proposals GMO received after termination, and treating the present value of the difference over the remaining contract term as the measure of GMO's loss. Parlour Mot. at 8-10; Parlour Opp. at 3-4, 8-12. Dr. Parlour arrives at figures of $147.8 million to $158.1 million if GMO was entitled to 92 MW of power, or $192.8 million to $206.3 million if GMO was entitled to 120 MW. Parlour Opp. at 3-4. Whinstone contends that this opinion is inadmissible because it departs from the "but for" methodology Dr. Parlour applied to GMO's other claims; because it does not ask whether GMO would have been profitable had the contract continued, a question Whinstone's expert answers in the negative; and because it counts the cost of replacement contracts that GMO never entered. Parlour Mot. at 13-19; Parlour Reply at 2-9. GMO responds that the opinion measures the market value of the contract GMO lost, which is a recognized measure of expectation damages, and that Whinstone's objections go to weight. Parlour Opp. at 8-17.

The second challenged opinion from Dr. Parlour concerns the Texas Power Sales Claim. For that claim, GMO's electricity market expert, Dr. Jay Zarnikau, calculated the revenue Whinstone earned from selling or curtailing power that GMO did not consume, and allocated to

GMO a share of that revenue proportionate to the shortfall between the power Whinstone provided and the power GMO contends it was owed. Parlour Mot. at 10-11; Parlour Opp. at 2 n.1, 17-19. Dr. Parlour reduced those figures to present value and reported them as GMO's damages under Section 4.3.8, arriving at $117.3 million to $151.8 million. Parlour Opp. at 4. Whinstone argues that this is not a methodology at all, because Dr. Parlour adopted Dr. Zarnikau's figures without analysis and because Dr. Zarnikau's allocation bears no relation to the "fair" sharing that Section 4.3.8 of the Texas Agreement requires. Parlour Mot. at 19-23. GMO responds that the allocation reflects its reading of Section 4.3.8, that the dispute over the provision's meaning is a question of contract interpretation rather than admissibility, and that the Court, as factfinder, can adjust the allocation if it reads the provision differently. Parlour Opp. at 17-23.

*Michael Maloney.* Whinstone's expert on the Bitcoin mining industry is Michael Maloney, who describes himself as the former operator of one of the largest mining facilities in the world. Maloney Mot. at 2; Maloney Opp. at 2-4. His August 20, 2025 report offers opinions on the evolution of the mining industry and mining hardware and on GMO's operations, including that GMO had a history of failure in mining, that its team lacked experience, that its business model was unsound, that its used and outdated miners limited its profitability, that it failed to maintain its fleet, and that it failed to plan for the purchase of new miners. Maloney Mot. at 2. His November 5, 2025 rebuttal report responds to GMO's experts, Kenyon Hayward and Phil Isaak, and opines, among other things, that GMO underutilized Building A and that the building's conditions were sufficient for GMO to mine. *Id.* GMO moves to exclude both reports on the grounds that Maloney's opinions lack a sufficient factual basis, rest on unreliable analyses, present an improper factual narrative, and would not assist the trier of fact. *Id.* at 3-21. Whinstone responds that Maloney's opinions rest on his industry experience and his review of the record, and that GMO's objections are fodder for cross-examination. Maloney Opp. at 5-25.

*The Rebuttal Experts.* GMO's remaining motion is directed at four of Whinstone's rebuttal experts. Dr. John Fessler, an engineer, responds to Isaak's airflow and static-pressure analysis of Building A and opines, on the basis of experiments using a single miner and power supply unit, that the building could support 60,480 S9 miners rather than the roughly 40,000 that Isaak calculated. Rebuttal Experts Mot. at 2, 6-10. Ryan Rossi, a mining machine repair technician, responds to Isaak's opinion that Whinstone failed to provide adequate power distribution units, on the basis of a test he conducted on 100 of the 5,040 units in the building. *Id.* at 2, 10-13. Michael Hostettler, a construction consultant and attorney, responds to Isaak's opinions on the design and construction of the Rockdale Facility and on industry standards. *Id.* at 2-3, 13-21. And Kevin Montague, a financial analyst, responds to Dr. Parlour's damages analysis; among other things, he opines that GMO would have been unprofitable had the Texas Agreement continued, and he recalculates Dr. Parlour's figures for several claims. *Id.* at 3, 22-25; *see* Whinstone MSJ Br. at 18-24. GMO argues that Dr. Fessler's and Rossi's methodologies are unreliable; that Hostettler's report consists of legal conclusions, factual narrative, and speculation about GMO's intent; and that Montague is unqualified to opine on miner performance and that portions of his report are narrative rather than opinion. Rebuttal Experts Mot. at 4-25. Whinstone defends each expert's qualifications and methods and argues that GMO's objections go to weight. Rebuttal Experts Opp. at 4-28.

**2. Legal Standard**

"Trial courts serve as 'gatekeep[ers],' responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 239 (S.D.N.Y. 2018) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)), *aff'd*, 982 F.3d 113 (2d Cir. 2020). Under Rule 702, the proponent of expert testimony must show by a preponderance

of the evidence that the witness is qualified, that the testimony "is based on sufficient facts or data," that it "is the product of reliable principles and methods," that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case," and that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "It is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). At the same time, the inquiry is "flexible," *Daubert*, 509 U.S. at 594, and "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible," *Amorgianos*, 303 F.3d at 267. Where the objections go to the weight of the testimony rather than its admissibility, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**3. Disposition**

The gatekeeping function that Rule 702 assigns to the trial court exists principally to protect a jury from being misled by unreliable expert testimony. *See Daubert*, 509 U.S. at 595; *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). Where the court is also the factfinder, that concern is diminished, because "the court can hear the evidence and make its reliability determination during, rather than in advance of, trial," and "where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *Salem*, 465 F.3d at 777; *accord United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005). Courts in this District have accordingly recognized that "where a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804 (GEL), 2009 WL

959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009); *see Howard Univ. v. Borders*, No. 20 Civ. 4716 (LJL), 2022 WL 3568477, at *6 (S.D.N.Y. Aug. 17, 2022). This is not to say that Rule 702 applies with less force at a bench trial. A court "still must perform a Rule 702 and *Daubert* analysis before it relies upon expert testimony." *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075 (LJL), 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022). The point is one of timing: a court may hear the testimony, and the cross-examination, before deciding what weight, if any, it deserves.

That is the right course here, for two reasons. First, the challenged testimony does not affect the disposition of the motions for summary judgment. As explained below, GMO's motion is resolved on questions of liability that turn on the contract's terms and on undisputed facts about Whinstone's performance, not on expert testimony about damages or about the causes of GMO's operational difficulties. *See infra* II.D.3. Whinstone's motion, to the extent it is granted, is granted because GMO has offered no evidence of damages at all on two claims, a conclusion that does not depend on the admissibility of any testimony. *See infra* II.D.2.a. And to the extent Whinstone's motion depends on excluding Dr. Parlour's Early Termination opinion and then arguing that GMO has no evidence of damages from termination, that argument fails for a reason independent of Rule 702. The record contains non-expert evidence from which a factfinder could find that termination damaged GMO, including Riot's own projections of the profits GMO stood to earn over the remaining term of the Texas Agreement, the terms of the replacement colocation proposals GMO received, and the undisputed fact that the Agreement gave GMO a fixed price for power that Whinstone itself described as below market. *See infra* II.D.2.b; *cf. SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 740-41 (S.D.N.Y. 2022) (declining to resolve ten *Daubert* motions at summary judgment where the summary-judgment motions could be decided on lay evidence, and denying the *Daubert* motions without prejudice to renewal before trial). The same is true of the Texas

Power Sales Claim, which the Court holds must be tried on the meaning of "fair" in Section 4.3.8 and on the facts bearing on it. *See infra* II.D.2.c.

Second, the objections raised in the three motions are, for the most part, of the kind that cross-examination is designed to test. Whinstone's principal objection to Dr. Parlour's Early Termination opinion is that she measured GMO's loss by the market value of the contract rather than by projecting GMO's future mining profits. *See* Parlour Mot. at 13-20. The Court can decide whether that is the correct measure of damages for the termination of a long-term supply contract at trial with the benefit of the evidence, and whether the three replacement proposals Dr. Parlour used are reliable indicators of market value is a factual question that depends on the terms of those proposals and on the testimony of the witnesses who solicited and received them. GMO objects to Maloney's opinions for relying on too little evidence and too much narrative, *see* Maloney Mot. at 16-19; a bench trial is well suited to sorting the two, and the Court will disregard any improper narrative. GMO's objections to the rebuttal experts, likewise, concern the design of Dr. Fessler's experiments and Rossi's sample, *see* Rebuttal Experts Mot. at 6-12, the connection between Hostettler's expertise and his legal conclusion, *id.* at 15-20, Montague's qualifications to offer certain opinions, *id.* at 22-24, and the boundary between Montague's financial analysis and his characterization of documents, *id.* at 24-25. The Court will be better positioned to draw those lines after hearing the testimony than on the papers.

The Court recognizes that Whinstone's challenge to Dr. Parlour's methodology, if sustained, could substantially affect the damages available on the Early Termination Claim, and that Whinstone urges the Court to resolve the challenge now for that reason. Parlour Mot. at 1-3; Whinstone MSJ Br. at 18-24. But the *Daubert* question and the damages question are entangled with the legal question of the proper measure of damages, and with the factual question, which the Court finds genuinely disputed, of whether GMO would have profited under the Texas Agreement

had it continued. *See infra* II.D.2.c. Those questions will be tried in any event. It would not serve the parties or the Court to resolve the admissibility of Dr. Parlour's conclusions in isolation, on a cold record, months before the testimony will be heard.

Accordingly, the motions to exclude are denied without prejudice. Any party may renew its objections as motions *in limine* on the schedule the Court has set, Dkt. 661, and the Court will rule on them at or after trial.[24]

**D. The Motions for Summary Judgment**

**1. Legal Standard**

A court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, a court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence

[24] To be sure, the parties should not read this disposition as a determination that any of the challenged testimony is in fact reliable. The Court expects that the proponent of each opinion will be prepared to establish its admissibility under Rule 702 before the Court relies on it.

sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (cleaned up). The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (cleaned up).

Generally, a court evaluates each cross-motion for summary judgment independently of the other, considering the facts in the light most favorable to the non-moving party. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). But if a "motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Village of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019). A party may also move for summary judgment on "part of" a claim, Fed. R. Civ. P. 56(a), and GMO has done so, moving on liability alone for several of its claims. To prevail on such a motion, GMO must establish each element of liability, including that Whinstone's breach caused it some injury, but it need not establish the amount of its damages, which remains for trial. *Cf. Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) ("'Certainty,' as it pertains to general damages, refers to the *fact* of damage, not the amount.").

Both agreements at issue are governed by New York law. Texas Agreement § 18.1; Louisiana Agreement § 17.1; *see supra* I.A.2-3. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d

Cir. 2011). Where a contract is unambiguous, its meaning is a question of law for the court, and "the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (internal quotation marks omitted). A contract is ambiguous only if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). Where a contract is ambiguous and the extrinsic evidence of the parties' intent is disputed, the meaning of the contract is a question for the factfinder. *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).

**2. Whinstone's Motion**

Whinstone moves for summary judgment on seven of GMO's eight claims. It argues that the Invoice Overcharge and Installation Environment Claims fail because GMO has presented no evidence of damages; that the Texas Power Sales and Louisiana Power Shortage Claims fail because Sections 4.3.8 and 16.3 of the Texas Agreement are unenforceable agreements to agree; that the Early Termination Claim fails because GMO has no admissible evidence that termination injured it; and that four of the claims are independently barred by GMO's failure to give written notice under Section 9.3. Whinstone MSJ Br. at 18-40. The Court grants the motion as to the Invoice Overcharge and Installation Environment Claims and otherwise denies it.

**a. The Invoice Overcharge and Installation Environment Claims (Sections 4.3.2 and 3.1.1)**

Damages are an element of a claim for breach of contract, and a plaintiff who cannot show that a breach injured it cannot recover. *Fischer & Mandell*, 632 F.3d at 799. GMO does not seriously contend otherwise; it invokes the same principle in seeking dismissal of Whinstone's

counterclaims. GMO MSJ Br. at 48. Two of GMO's claims—the Invoice Overcharge Claim and the Installation Environment Claim—fail for want of any evidence of injury.[25]

The Invoice Overcharge Claim alleges that Whinstone breached Section 4.3.2 when, beginning in February 2022, it added a surcharge to GMO's monthly invoices that raised GMO's price from $0.0285 to $0.03 per kWh. Fifth Am. Compl. ¶ 91(f); *see supra* I.A.10. It is undisputed that GMO never in fact paid the surcharge. GMO 56.1 Stmt. ¶ 451; *accord* Whinstone 56.1 Counter Stmt. ¶ 451. GMO identifies no other loss flowing from the invoices, and Dr. Parlour offers no damages opinion on this claim. *See* Dkt. 559-39 ("Parlour Report") at 9, Fig. 1 (summary chart of damages). GMO's response is that Whinstone's breach was the attempted imposition of the surcharge and that GMO seeks a determination "whether GMO was obligated to pay these invoice surcharges." GMO MSJ Opp. at 51. But an unpaid invoice does not injure the party that declined to pay it, and a request for a determination that a charge was improper is a request for declaratory relief, not damages. GMO will obtain that determination later in this Opinion and Order, because the Court grants GMO summary judgment on Whinstone's counterclaim to collect the surcharges. *See infra* II.D.3.f. It is not entitled to a second judgment for the same conduct on a claim that caused it no loss.

The Installation Environment Claim, added in the Fifth Amended Complaint, alleges that Whinstone breached Section 3.1.1 by failing to provide "the Licensed Area in two buildings" and an installation environment adequate for GMO's equipment. Fifth Am. Compl. ¶ 91(d); Texas Agreement § 3.1.1. Dr. Parlour expressly disclaimed offering any damages opinion on this claim, Parlour Report ¶ 11; Dkt. 559-40 (Parlour deposition transcript) at 59:10-16, and GMO does not contend that it suffered any loss from the absence of a second building distinct from the loss it

[25] Because Whinstone is entitled to summary judgment on these two claims for lack of damages, the Court need not reach its alternative argument that the Installation Environment Claim is barred by Section 9.3 of the Texas Agreement.

attributes to the shortfall in power under Section 4.3.1, GMO MSJ Opp. at 50-51. Nor could it: a second building would have mattered to GMO only as a place to consume the additional power it says it was owed, and the value of that power is the measure of GMO's Specified Power Draw Claim damages. To the extent GMO's theory is that the conditions in Building A damaged its miners, that theory is not tied to any quantified loss in the record either. A claim for which the plaintiff identifies no injury of its own is not a claim on which the plaintiff can recover.[26]

Whinstone's motion for summary judgment on these two claims therefore is granted, and GMO's motion for partial summary judgment on the Installation Environment Claim is denied.

**b. The Texas Power Sales and Louisiana Power Shortage Claims (Sections 4.3.8 and 16.3)**

Whinstone's second argument is that the Texas Power Sales and Louisiana Power Shortage Claims fail as a matter of law because the provisions on which they rest, Sections 4.3.8 and 16.3, are unenforceable "agreements to agree." Whinstone MSJ Br. at 24-27; 32-35. The Court disagrees as to both, though for different reasons.

*Governing Principles.* "Few principles are better settled in the law of contracts than the requirement of definiteness." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989). "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 52 N.Y.2d 105, 109 (N.Y. 1981). But the New York Court of Appeals "has not applied the definiteness doctrine rigidly." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*,

[26] Under New York law, "[n]ominal damages are always available in breach of contract actions." *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993); *see Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015). GMO has not sought nominal damages on either claim, has not invoked that doctrine in opposing Whinstone's motion, and has pursued each claim only as a vehicle for compensatory relief. *See* GMO MSJ Opp. at 50-52. The Court declines to preserve for trial claims on which GMO disclaims any compensable loss, particularly where the conduct underlying each is fully addressed by other rulings in this Opinion and Order.

575 N.E.2d 104, 105 (N.Y. 1991). "Contracting parties are often imprecise in their use of language," and "[a] strict application of the definiteness doctrine could actually defeat the underlying expectations of the contracting parties." *Id.* at 105-06. Accordingly, "[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear," and "[t]he conclusion that a party's promise should be ignored as meaningless 'is at best a last resort.'" *Cobble Hill Nursing Home*, 548 N.E.2d at 206 (quoting *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 133 N.E. 370, 232 N.Y. 112, 114 (N.Y. 1921)). In particular, "a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula." *Id.* "Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage." *Id.* The Second Circuit has applied these principles to enforce a long-term energy contract that left "the practical implementation of certain terms to be resolved in good faith negotiations at a future date," explaining that "[w]here . . . the parties have agreed on all material terms of the contract and clearly manifested their intent to be bound by those terms," the contract will be enforced. *Tractebel Energy Mktg.*, 487 F.3d at 98.

Distinct from a promise whose terms are indefinite is a promise to negotiate. New York recognizes a category of preliminary agreements, often called "Type II" agreements, that "do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (internal quotation marks omitted);

*see Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). Such an agreement is enforceable. It "does not guarantee that the final contract will be concluded if both parties comport with their obligation," but it "does bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (internal quotation marks omitted). The "obligation can come to an end without a breach by either party" when the parties reach a good-faith impasse. *IDT Corp. v. Tyco Grp., S.A.R.L.*, 15 N.E.3d 329, 332 (N.Y. 2014). And its breach supports a claim for damages, although the New York Court of Appeals has held that a party injured by its counterparty's failure to negotiate in good faith may recover only the costs it incurred in reliance on the promise to negotiate, not the profits it would have earned under the contract the parties never reached. *Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356, 1360-62 (N.Y. 1992).

*Section 4.3.8.* Section 4.3.8 of the Texas Agreement provides that "Whinstone shall get prior consent of the Customer to power down miners, except for [load response services]," and that "[i]n the event that power down, the Customer and Whinstone will share as fair the benefit of selling power deducted loss of profit should getting from performing miners." Texas Agreement § 4.3.8. It adds, "[f]or the avoidance of doubt," that "in the event that there is some loss from selling power, the Parties should share as prescribed above as well." *Id.* Whinstone argues that "share as fair" leaves the parties' respective shares to future agreement and that the provision is therefore unenforceable under *Joseph Martin, Jr., Delicatessen*. Whinstone MSJ Br. at 24-27. GMO argues that the provision is an enforceable Type II agreement and that Whinstone breached it by refusing to negotiate. GMO MSJ Opp. at 24-31.

Neither party is entirely correct. Section 4.3.8 does not say that the parties will negotiate, agree, or discuss how to divide the benefit of power sales; it says that they "will share" it. The

drafting is imperfect, but the promise is complete: when Whinstone powers down GMO's miners and sells the resulting power, the benefit of that sale, net of the mining profit GMO lost, is to be divided between them. What the provision leaves open is the proportion. That is an indefinite term, not an agreement to agree, and the question under *Cobble Hill Nursing Home* is whether the proportion "can be determined objectively without the need for new expressions by the parties." 548 N.E.2d at 206. Whinstone has not shown on this record that it cannot. A "fair" share of a joint benefit is the kind of term that courts routinely give content by reference to the parties' respective contributions, to commercial practice, and to the purpose of the provision. *See id.*; *166 Mamaroneck Ave. Corp.*, 575 N.E.2d at 105-06 (enforcing renewal option whose rent was to be fixed by an external process). Here, the provision itself supplies a good deal of that content: it identifies the benefit to be shared (the proceeds of selling power), the deduction to be made (GMO's lost mining profit), and the reciprocal obligation (that losses be shared "as well"). The parties' course of dealing may supply more; Whinstone itself applied Winter Storm Uri credits to GMO's invoices in 2021, *see supra* I.A.7, and the parties' amendment negotiations addressed how power-sale revenues would be divided, *see supra* I.A.9. And Section 4.3.7, which entitles GMO to resell the power available to it under the Texas Agreement, indicates that the parties understood the power Whinstone sold in GMO's stead to be power in which GMO had an economic interest. Texas Agreement § 4.3.7. Whether "fair," so informed, yields a determinable share is a question the Court will resolve at trial. What the Court holds now is that Whinstone has not shown that the promise is unenforceable as a matter of law.

This reading also disposes of Whinstone's alternative argument that, if Section 4.3.8 is a Type II agreement, GMO may recover only reliance damages, of which it has none. Whinstone MSJ Reply at 10-11, 19. *Goodstein Construction* limits the damages recoverable for breach of a promise to negotiate because the injured party never obtained the promise it seeks to enforce. 604

N.E.2d at 1360-61. But as explained, Section 4.3.8 is not a promise to negotiate. It is a promise to share, and if Whinstone breached it, GMO is entitled to the benefit of that bargain, in whatever amount the Court finds a fair share to be. Whinstone's argument that Dr. Parlour's allocation does not reflect a "fair" share, Whinstone MSJ Br. at 26-27, goes to the amount of damages, not to liability, and it is reserved for trial together with Whinstone's motion to exclude her opinion, *see supra* II.C. Accordingly, Whinstone's motion for summary judgment on the Texas Power Sales Claim is denied.

*Section 16.3.* Section 16.3 contains two sentences. In the first, "Whinstone acknowledges that it is liable for and shall indemnify GMO-I for its loss of profit arising out of the shortage in the provision of power by Whinstone, set out in the Original Agreements, from January 5, 2019 to the date when the Data Center starts operation of 5MW," other than the amounts covered by Section 16.2, "which constitutes a breach of the Original Agreements." Texas Agreement § 16.3. In the second, "[t]he Parties agree that Whinstone will indemnify the Customer for the Loss of Profit By Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties." *Id.* Whinstone argues that the second sentence renders the provision an unenforceable agreement to agree on the amount of compensation. Whinstone MSJ Br. at 33-34; Whinstone MSJ Opp. at 44-47. GMO argues that the first sentence is a complete and enforceable acknowledgment of liability, that the second sentence merely prescribes the mechanism of payment and can be severed if unenforceable, and that in any event the second sentence is an enforceable Type II agreement. GMO MSJ Opp. at 18-24; GMO MSJ Reply at 13-15.

The Court agrees with GMO that the two sentences do different work. The first is not an agreement to agree. It is an acknowledgment of liability for an identified breach of an identified contract over an identified period, coupled with an unconditional promise to indemnify GMO for

the resulting loss. Nothing in it is left for future negotiation. Whinstone's obligation to make GMO whole for its Louisiana losses arose when the Texas Agreement was signed, and the amount of that obligation, GMO's "loss of profit" from the Louisiana shortfall, is a sum to be proved with evidence, as damages always are, not a term to be agreed. *See Cobble Hill Nursing Home*, 548 N.E.2d at 206 (explaining that a price term may be sufficiently definite where it can be "ascertained by reference to an extrinsic event"); *Tractebel Energy Mktg.*, 487 F.3d at 109-11 (explaining that under New York law, once the fact of damage is established, the non-breaching party "need only provide a 'stable foundation for a reasonable estimate'" of the amount (quoting *Freund v. Wash. Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974))). Whinstone's own witness did not regard the obligation as illusory; Harris believed the indemnification was worth about $3 million, Harris Dep. Tr. at 145:1-9, and Makita believed it was worth $15 to $18 million, Dkt. 606-11 ("Makita Dep. Tr.") at 97:4-98:25. That the parties did not agree about the amount does not mean they had not agreed to the obligation.

The second sentence is different. It specifies how the indemnification "will" be paid, through a reduction in GMO's hosting fee, and it leaves the amount and duration of that reduction "to be reasonably agreed." A provision that leaves a term "to be agreed" is, in ordinary usage, a promise to negotiate that term; and a promise to negotiate, if the parties intended to be bound by it, is an enforceable Type II obligation to negotiate in good faith. *L-7 Designs*, 647 F.3d at 430; *see Four Seasons Hotels Ltd. v. Vinnik*, 515 N.Y.S.2d 1, 6 (1st Dep't 1987). The parties plainly intended to be bound; the sentence is part of an integrated contract that both parties signed and performed under for years, and its purpose was to implement an obligation Whinstone had just acknowledged. Whinstone's contrary reading would treat the second sentence as allowing a party to nullify the first, such that Whinstone's acknowledgment of liability would be enforceable only if Whinstone later agreed to a price. A contract should not be read to render one of its provisions

meaningless, *see Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007), and it certainly should not be read to render a party's acknowledgment of liability contingent on that party's own future consent.

It thus follows that Whinstone's motion on the Louisiana Power Shortage Claim must be denied. GMO has a viable claim that Whinstone breached the first sentence by never indemnifying it, and a viable claim that Whinstone breached the second by failing to negotiate the price reduction in good faith. The two theories carry different remedies, and the Court addresses the relationship between them, and GMO's own motion on this claim, below. *See infra* II.D.3.c.

**c. The Early Termination Claim (Section 15.2)**

Whinstone argues that the Early Termination Claim fails because GMO has no admissible evidence that termination resulted in an injury. The argument has two steps: first, that Dr. Parlour's Early Termination opinion must be excluded; and second, that without it, GMO cannot rebut Montague's opinion that GMO would have lost money had the Texas Agreement continued through 2030, so that termination in fact caused a benefit rather than an injury. Whinstone MSJ Br. at 18-24; Whinstone MSJ Reply at 2-4.

This argument fails. The record contains evidence, independent of Dr. Parlour, from which a reasonable factfinder could conclude that GMO was injured by the loss of the Texas Agreement. The Agreement gave GMO the right, for ten years from the RFU Date, to purchase up to 120 MW of power at a fixed price of $0.0285 per kWh, and to resell that power to third parties. Texas Agreement §§ 4.3.1, 4.3.2, 4.3.7. Riot's own analyses, prepared as it decided whether to terminate, projected that GMO stood to earn cumulative profits of between $30.9 million and $431 million over the remaining term of the Agreement. GMO 56.1 Stmt. ¶¶ 429-431; *see supra* I.A.12. Riot described the legacy hosting agreements it inherited, including GMO's, as "below-market," and it terminated GMO's in order to devote the power to its own mining. *See supra* I.A.12. And the

colocation proposals GMO received after termination, whatever their reliability as a measure of damages, are evidence that the market price of comparable hosting services exceeded the price GMO had contracted for. *See* Parlour Opp. at 3-4, 8-12. A factfinder could infer from this evidence that a long-term supply contract at a below-market fixed price had value to its holder and that its loss was an injury. Whether GMO's mining operation would have been profitable is one input into the amount of its injury; it is not the only conceivable measure of it, and GMO is entitled to argue at trial that the proper measure of its loss includes the value of the contract itself. *See* *Schonfeld v. Hilliard*, 218 F.3d 164, 176-78 (2d Cir. 2000) (discussing the recovery of the market value of a lost income-producing asset as an alternative to lost profits under New York law). Montague's contrary opinion creates a dispute of fact; it does not resolve one.

Whinstone's motion on the Early Termination Claim is therefore denied.

**d. Notice Under Sections 9.3 and 13.1**

Whinstone's final argument is that four of GMO's claims, for breach of Sections 3.1.1,[27] 4.3.1, 4.3.8, and 5.4, are barred because GMO did not give written notice of them within the time required by Section 9.3 and in the manner required by Section 13.1. Whinstone MSJ Br. at 36-40; Whinstone MSJ Opp. at 37, 44. Section 9.3 provides: "Whinstone shall not be liable for any claim arising under this Agreement unless the Customer gives Whinstone written notice of the claim within twelve months of becoming aware of the circumstances giving rise to the claim." Texas Agreement § 9.3. Section 13.1 provides that "[a]ny notice given or made under this Agreement . . . shall be in writing and in English and signed by or on behalf of the Party giving it and shall be served by hand delivering it or sending it by courier (with signature required)" to the address specified in Section 13.2. *Id.* § 13.1. Whinstone's position is that GMO was "aware" of each of

[27] As discussed, GMO's Installation Environment Claim under Section 3.1.1 fails for the lack of evidence of damages. *See supra* II.D.2.a. The Court therefore does not reach here whether that claim fails for the alternative reason of lack of written notice under Section 9.3.

these claims from the start of its operations in mid-2020, that GMO gave no notice complying with Section 13.1 until well after twelve months had passed, and that Section 9.3 is an express condition that must be literally performed. Whinstone MSJ Br. at 36-40. GMO responds that Whinstone waived the argument by failing to plead it in any of its five answers, and that the argument fails on the merits in any event. GMO MSJ Opp. at 3-17; GMO MSJ Reply at 20-21.

*Whether the Argument Was Preserved.* The Court starts with the threshold question. Section 9.3 was raised for the first time in Whinstone's summary judgment motion, filed nearly four years after this action began. None of Whinstone's five answers mentioned Section 9.3, inadequate notice, or an unsatisfied condition precedent. GMO 56.1 Counter Stmt. ¶¶ 327-348; *see supra* I.B.1. The Fifth Amended Complaint alleges that GMO "has fully performed its obligations under the Texas Agreement," Fifth Am. Compl. ¶ 90, and Whinstone's response to that paragraph denies it generally, Answer ¶ 90, without identifying any condition that GMO failed to perform. Whinstone's ninth affirmative defense in that Answer states that GMO's claims are "barred by the terms of the Agreement," *id.* at 15, and Whinstone now says that this defense encompasses GMO's failure to provide written notice under Section 9.3, Whinstone MSJ Opp. at 58.

Federal Rule of Civil Procedure 9(c) provides that, "when denying that a condition precedent has occurred or been performed, a party must do so with particularity." Fed. R. Civ. P. 9(c). If, as Whinstone contends, Section 9.3 states a condition precedent to its liability, then Rule 9(c) required Whinstone to deny with particularity that the condition had been performed; a general denial and a boilerplate defense do not satisfy that requirement. *See Pike Co. v. Universal Concrete Prods., Inc.*, 616 F. Supp. 3d 253, 259-60 (W.D.N.Y. 2022) (holding that an answer alleging that the counterclaims were "barred as a result of a material breach" did not plead failure of a contractual notice condition with the particularity Rule 9(c) requires). If, as GMO contends,

Section 9.3 operates as a contractual limitations period that cuts off liability for an accrued claim, then it is an affirmative defense that Rule 8(c) required Whinstone to plead. *See* Fed. R. Civ. P. 8(c)(1) (listing "statute of limitations" among affirmative defenses); *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 618-21 (S.D.N.Y. 2024). Either way, Whinstone did not plead it.

The failure to plead an affirmative defense ordinarily results in its forfeiture. *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). But the Second Circuit has held that a district court may entertain an unpleaded defense raised for the first time at summary judgment if "the issue has been fully briefed" and the plaintiff is "not prejudiced," because the purpose of the pleading requirement is notice, not formality. *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003); *see Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). The same is true of a failure to deny with particularity that a condition precedent has been performed. *See Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 149 (S.D.N.Y. 2004) (permitting a party that had not denied the performance of a condition precedent with particularity to raise the issue on summary judgment where "[t]here would be no prejudice to Stryker in allowing Pfizer to assert this point now"). GMO has had a full opportunity to respond, and it has done so at length. GMO contends that it was prejudiced because it took no discovery directed to the defense. GMO MSJ Opp. at 8-9. The Court is not persuaded that the prejudice is substantial. The facts bearing on notice, namely what GMO knew and when, and what it communicated to Whinstone and when, were the subject of extensive discovery on the merits, and GMO has marshaled that evidence in its opposition. The Court will therefore consider the argument. Whinstone's four-year silence is not irrelevant to the merits, however. A party that litigates a contract dispute through five pleadings and years of discovery without once suggesting that the claims were barred at the outset is hard-pressed to complain that it lacked timely notice of them.

*Whether Section 9.3 Bars the Claims.* On the merits, Whinstone's argument depends on three propositions: that Section 9.3 is an express condition requiring literal compliance; that GMO became "aware of the circumstances giving rise to" each claim on a single date in 2020; and that nothing GMO sent Whinstone within a year of GMO becoming aware of its claims qualifies as written notice. The Court rejects the argument because the second proposition is wrong as to much of the Specified Power Draw, Service Uptime, and Texas Power Sales Claims, and for the remaining part of those claims, the record would permit a finding that Whinstone is estopped from invoking the provision.

Begin with the nature of the provision. Under New York law, "[a] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995) (internal quotation marks omitted). "Express conditions must be literally performed, whereas constructive conditions, which ordinarily arise from language of promise, are subject to the precept that substantial compliance is sufficient." *Id.* Because express conditions can produce forfeitures, New York courts apply an "interpretive preference" for reading contract language "as embodying a promise or constructive condition rather than an express condition," an interpretation that "cannot be employed," however, "if 'the occurrence of the event as a condition is expressed in unmistakable language.'" *Id.* (quoting Restatement (Second) of Contracts § 229 cmt. a). The Second Circuit has accordingly declined to read a contractual notice requirement as a condition precedent where it was not "cast in the express language of condition," and has treated such a requirement as a promise reviewed for substantial performance. *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305-07 (2d Cir. 2016).

Section 9.3 uses the word "unless," which the New York Court of Appeals in *Oppenheimer* identified as language of condition. 660 N.E.2d at 418. But it is not a condition to the arising of any duty of Whinstone's. Whinstone's obligations to supply power, to maintain uptime, to provide an installation environment, and to share the benefit of power sales arose from the Agreement itself, and GMO's claims for their breach accrued when the breaches occurred. Section 9.3 does not trigger Whinstone's performance and confers no right to cure. It sits in the article of the Agreement captioned "Liability," beside the provisions limiting Whinstone's liability and requiring it to carry insurance, and its only function is to extinguish liability for a claim that already exists if notice is not given within twelve months. Texas Agreement §§ 9.1-9.5. A provision of that kind is, in substance, a contractual limitations period. New York law enforces such provisions, *John J. Kassner & Co. v. City of New York*, 389 N.E.2d 99, 102-03 (N.Y. 1979), but treats them like other limitations defenses: subject to the requirement of reasonableness, *Exec. Plaza, LLC v. Peerless Ins. Co.*, 5 N.E.3d 989, 991-92 (N.Y. 2014), and to equitable estoppel where the defendant's own conduct induced the plaintiff to refrain from timely asserting its claim, *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006); *Simcuski v. Saeli*, 377 N.E.2d 713, 716-17 (N.Y. 1978). And whatever the label, even an express condition may be excused "by waiver, breach or forfeiture," *Oppenheimer*, 660 N.E.2d at 418, and "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition," *Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 268 N.E.2d 782, 784 (N.Y. 1971); *accord A.H.A. Gen. Constr., Inc. v. N.Y.C. Hous. Auth.*, 699 N.E.2d 368, 374 (N.Y. 1998).

With those principles in mind, the Court turns to the claims.

*Sections 4.3.1 and 5.4.* Whinstone's obligations to provide the Specified Power Draw and to ensure 99 percent service uptime were continuing obligations. Section 4.3.1 required Whinstone

to provide 120 MW "as of" May 31, 2020 and, by necessary implication, to continue providing it for the ten-year term; Section 5.4 required 99 percent uptime "per annum." Texas Agreement §§ 4.3.1, 5.4. Whenever Whinstone failed to provide the contracted power, and each year in which it failed to achieve the contracted uptime, was a separate breach giving rise to a separate claim, with its own twelve-month period under Section 9.3. *Cf. Bulova Watch Co. v. Celotex Corp.*, 389 N.E.2d 130, 132 (N.Y. 1979) (holding that a promise of continuing performance gives rise to a separate cause of action for each breach, each with its own limitations period). Whinstone's contrary reading, under which GMO's "awareness" in mid-2020 that Building A could not supply 120 MW started a single clock for all future shortfalls, would bar claims for breaches that had not yet occurred when the clock expired. New York law does not permit a contractual limitations period to be applied so as to extinguish a claim before it accrues. *Exec. Plaza*, 5 N.E.3d at 991-92.

Under the correct reading, GMO gave timely notice of at least a substantial portion of both claims. The April 12, 2022 letter from GMO's counsel mentioned GMO's "entitle[ment] to indemnification due to power shortages" and Whinstone concedes that the letter also gave notice of the Specified Power Draw Claim, if only by a "vague reference." Whinstone MSJ Opp. at 37 n.150; *see supra* I.A.11. That letter preserved GMO's claims for shortfalls and outages occurring on or after April 12, 2021. And GMO's original complaint, filed in June 2022 and served in the ordinary course, also gave written notice of both claims, preserving, at a minimum, breaches occurring on or after June 2021. *See supra* I.B.1. Whinstone does not deny receiving the April 2022 letter or the original complaint, and it identifies no prejudice from the manner of either's delivery. The substance of Section 9.3, timely written notice of the claim, was satisfied with respect to power draw and service uptime issues occurring on or after April 12, 2021.

Whether GMO's claims for shortfalls and outages before April 12, 2021 are also preserved depends on the estoppel analysis discussed below. But because at least the later portions of both claims are timely on any view, Whinstone's motion for summary judgment dismissing the Specified Power Draw and Service Uptime Claims in their entirety must be denied.

*Section 4.3.8.* The Texas Power Sales Claim is likewise a claim for breach of a continuing obligation: each time Whinstone powered down GMO's miners and sold the power without sharing the benefit, it breached Section 4.3.8 anew. The largest single event, Winter Storm Uri, occurred in February 2021, and GMO raised the sharing of the resulting credits with Whinstone during the amendment negotiations that spring. *See supra* I.A.7, I.A.9. The June 2021 amendment that Harris negotiated would have addressed the credits, and the parties continued to negotiate the issue through the end of 2021. *See supra* I.A.9. And GMO pleaded the Texas Power Sales Claim in its First Amended Complaint, filed on September 12, 2022. Whinstone 56.1 Stmt. ¶¶ 73-74; *accord* GMO 56.1 Counter Stmt. ¶¶ 73-74. Whinstone argues that this was insufficient notice because it was neither hand-delivered nor sent by courier as Section 13.1 requires. Whinstone MSJ Reply at 15. But New York courts do not require strict compliance with the formal requirements of a contractual notice provision where the recipient does not dispute that it actually received the notice and shows no prejudice from the deviation. *See Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392, 395 (2d Dep't 2006); *Suarez v. Ingalls*, 723 N.Y.S.2d 380, 381 (2d Dep't 2001); *Dellicarri v. Hirschfeld*, 619 N.Y.S.2d 816, 817 (3d Dep't 1994); *Baker v. Norman*, 643 N.Y.S.2d 30, 31 (1st Dep't 1996). Whinstone does not deny receiving the amended complaint and identifies no prejudice from the manner of its delivery. This preserved, at a minimum, GMO's Texas Power Sales Claim for breaches occurring on or after September 12, 2021. Whether the portions of GMO's claim predating September 12, 2021 are also preserved depends on the estoppel analysis that follows.

*Estoppel and Prevention.* For the portions of the Specified Power Draw and Service Uptime Claims that predate April 12, 2021, and the portions of the Texas Power Sales Claim that predate September 12, 2021, the question is whether Whinstone may invoke Section 9.3 at all. The Court concludes that a reasonable factfinder could find that it may not, which is sufficient to deny Whinstone's motion.

The record on this point is largely undisputed. Whinstone knew from the start that Building A could not supply 120 MW; Harris testified that "[n]o building was 120 Megawatts." GMO 56.1 Stmt. ¶ 138; Whinstone 56.1 Counter Stmt. ¶ 138; *see supra* I.A.5. GMO told Whinstone in writing in October 2020 that it had "already exceeded the limit of SLA." GMO 56.1 Counter Stmt. ¶ 174. Whinstone responded by asking GMO to identify the contract provision so that the parties could "discuss these matters efficiently," and it later agreed to a $700,000 credit for the 2020 SLA violations. GMO 56.1 Counter Stmt. ¶ 174; GMO 56.1 Stmt. ¶ 167; Whinstone 56.1 Counter Stmt. ¶ 167. When the parties turned to repayment of the Pledge Debts in March 2021, GMO raised the uptime violations, its request for a second building, and the reduction of its power price, and Harris responded not by disputing the claims but by negotiating an amendment that would have resolved them through a price reduction to $0.0210 per kWh. *See supra* I.A.9. Harris sent that amendment to Riot in June 2021. Riot rejected it, took over the negotiations, and, as an internal Riot message from that period put it, set out to "drag it out." GMO 56.1 Counter Stmt. ¶ 143; *see supra* I.A.9. The negotiations continued through the end of 2021 and collapsed in early 2022, at which point GMO's counsel sent the April 2022 letter and GMO filed suit. *See supra* I.A.9-11. These same negotiations addressed the Winter Storm Uri credits, which GMO raised with Whinstone that spring. *See* GMO 56.1 Counter Stmt. ¶¶ 202-205.

On these facts, a factfinder could readily conclude that GMO refrained from giving formal notice of its claims during 2020 and 2021 because Whinstone had acknowledged the shortfalls and

was negotiating a contractual remedy for them, and that Whinstone, having induced that forbearance, cannot now invoke the absence of formal notice to escape liability. That is the paradigm of equitable estoppel in the limitations context. *See Zumpano*, 849 N.E.2d at 929 (explaining that estoppel applies where the defendant's "affirmative wrongdoing" or "specific actions" induced the plaintiff to delay); *Carle Place Union Free Sch. Dist. v. Bat-Jac Constr., Inc.*, 813 N.Y.S.2d 748, 750 (2d Dep't 2006) (finding a triable issue where a factfinder could have concluded that the defendant "lulled" the plaintiff into forgoing timely suit and thereby would have been estopped from asserting the contractual limitations period). It is also the paradigm of prevention: a party that responds to notice of a breach by promising to fix it through negotiation, and then deliberately prolongs the negotiation past the notice deadline, has "frustrated or prevented the occurrence of the condition" it now seeks to enforce. *Kooleraire Serv. & Installation Corp.*, 268 N.E.2d at 784. The Court recognizes that the Texas Agreement contains a no-waiver clause, Texas Agreement § 19.1, and that such clauses are enforced, *see Jefpaul Garage Corp. v. Presbyterian Hosp.*, 462 N.E.2d 1176, 1178 (N.Y. 1984). But estoppel and prevention are not waiver. They do not rest on GMO's intentional relinquishment of a right; they rest on Whinstone's conduct toward GMO and on GMO's reasonable reliance on it, and a no-waiver clause does not license a party to induce its counterparty's forbearance and then profit from it. *See Oppenheimer*, 660 N.E.2d at 418 (explaining that conditions may be excused by "waiver, breach or forfeiture"); Restatement (Second) of Contracts § 245.

Whinstone's authorities do not require a different result. *See* Whinstone MSJ Br. at 30, 37-38; Whinstone MSJ Reply at 12, 15. *Oppenheimer* and *MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009), involved conditions to the formation of a sublease and to the closing of a transaction; *Misty Cleaning Services, Inc. v. Independent Group Home Living Program, Inc.*, 204 N.Y.S.3d 537 (2d Dep't 2024), involved a notice-and-cure provision that

conditioned a party's right to terminate a service agreement for nonperformance; and *East 18th Management Corp. v. CSC ServiceWorks, Inc.*, No. 18 Civ. 4068 (NGG) (RML), 2019 WL 2994447, at *5 (E.D.N.Y. July 9, 2019), also involved a notice-and-cure provision where the plaintiff offered *no* notice before filing suit. None involved a limitations-type provision in a long-term commercial relationship in which the defendant had acknowledged the breaches and negotiated to remedy them. Nor does the New York Court of Appeals' recent decision in *Incorporated Village of Freeport v. Freeport Plaza West, LLC*, 2026 WL 1751284 (June 18, 2026), which strictly enforced a statutory notice-of-claim requirement against a municipality, alter the analysis. That decision rested on the policy of protecting the public fisc, and it reaffirmed that estoppel remains available where a party's own conduct induced the reliance at issue. *Id.* at *3-4. The conduct on which GMO relies here is not Whinstone's participation in this litigation, which *Incorporated Village of Freeport* held insufficient, but its pre-suit acknowledgment of the breaches and its negotiation, and deliberate prolongation, of a contractual remedy for them.

For these reasons, Whinstone's motion for summary judgment on the ground of failure to provide written notice under Section 9.3 is denied. Whether Whinstone is estopped from invoking Section 9.3 as to pre-April 2021 breaches of Sections 4.3.1 and 5.4, or pre-September 2021 breaches of Section 4.3.8, and whether GMO's claims for those breaches are otherwise established, are questions for trial.

* * *

In sum, Whinstone's motion for summary judgment is granted as to the Invoice Overcharge and Installation Environment claims, which are dismissed, and is otherwise denied.

**3. GMO's Motion**

GMO moves for summary judgment on liability for five of its remaining claims, on its assumption theory against Riot, on each of Whinstone's counterclaims, and on each of

Whinstone's affirmative defenses other than failure to mitigate. GMO MSJ Br. at 22-55. The assumption theory has been addressed. *See supra* II.A.2.b. The Court takes up the remaining issues in turn.

**a. The Specified Power Draw Claim (Section 4.3.1)**

Section 4.3.1 required Whinstone to "provide the Customer with power as provided in the schedule below (the 'Specified Power Draw')": 40 MW as of February 29, 2020, 80 MW as of April 30, 2020, and 120 MW as of May 31, 2020. Texas Agreement § 4.3.1; *see supra* I.A.3.a. The obligation was unqualified. It was not conditioned on GMO's payment of any further deposit, on GMO's possession of any number of working miners, or on GMO's actual consumption. In fact, Section 4.3.3 separately provided that GMO would be charged only for the power it "actually used," which confirms that the Specified Power Draw was a measure of the power Whinstone was to make available, not the power GMO was to consume. Texas Agreement § 4.3.3.

The facts bearing on the breach of Section 4.3.1 are not disputed. Whinstone never provided GMO with space in a second building, and Building A, the only building in which GMO ever operated, could not supply 120 MW; Harris testified that "[n]o building was 120 Megawatts." GMO 56.1 Stmt. ¶¶ 138, 150; Whinstone 56.1 Counter Stmt. ¶¶ 138, 150; *see supra* I.A.5. Building A's transformers were rated to supply approximately 75 MW in the aggregate, and Whinstone concedes that they could not safely be run at full rated capacity. GMO 56.1 Stmt. ¶¶ 139-142; Whinstone 56.1 Counter Stmt. ¶¶ 139-142. Whinstone's own account is that its personnel could get "[v]ery close" to 75 MW. Whinstone 56.1 Counter Stmt. ¶ 144. On no view of the evidence, then, did Whinstone ever make 80 MW available to GMO, let alone 120 MW. That is a breach of Section 4.3.1.

Whinstone offers three responses. None creates a genuine dispute as to liability.

First, Whinstone argues that it could not have breached Section 4.3.1 because "power cannot be delivered in boxes to a warehouse like widgets," and GMO never had enough working miners to consume even the power Building A provided. Whinstone MSJ Opp. at 29-33. The argument misreads the contract. Section 4.3.1 obligated Whinstone to *provide* a specified quantity of power, that is, to make it available for GMO's use, and Section 4.3.3 made clear that GMO would pay only for what it used. Whether GMO could have consumed more power than Building A supplied bears on what GMO lost when Whinstone failed to supply it; it does not bear on whether Whinstone supplied it. The condition of GMO's fleet, the extent of its underutilization of Building A, and its decision not to buy new miners are matters that go to the amount of GMO's damages and to Whinstone's mitigation defense—issues which will be resolved at trial. But they do not convert Whinstone's admitted failure to provide the contracted capacity into performance.

Second, Whinstone argues that GMO cannot show injury because Montague opines that GMO was not damaged by the shortfall and because GMO, not being a retail electric provider, could not have resold the power it did not receive. *Id.* at 33-34. The first point is a dispute about the amount of damages, on which GMO has not moved. The second is contradicted by the Texas Agreement, which expressly entitled GMO to "sell the power that can be used pursuant to this Agreement to any third party." Texas Agreement § 4.3.7. Whether GMO would have done so, and at what price, are questions for trial. That GMO was deprived of access to some 45 MW of power at a fixed price that Whinstone itself regarded as below market, *see supra* I.A.12, is sufficient to establish the fact of injury.

Third, Whinstone argues that GMO waived its right to a second building, and thus to any power beyond Building A's capacity, when Makita indicated in December 2019 that GMO would not use Building B "due to budget issues," and Harris responded that Whinstone would offer Building B to other customers. Whinstone MSJ Opp. at 34-36; Whinstone 56.1 Counter Stmt.

¶¶ 506-511. The argument fails. To start, the Agreement provided that "[n]o failure or delay of either Party in exercising its rights hereunder . . . shall be deemed to be a waiver or release of such rights," and that "[a]ny waiver or release must be specifically granted in writing signed by the Party waiving its rights." Texas Agreement § 19.1. Whinstone identifies no writing signed by GMO waiving its rights under Section 4.3.1. Whinstone is correct that a no-waiver clause may itself be waived, *see Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006), but waiver in any form requires "the intentional relinquishment of a known right and should not be lightly presumed," *Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988). The record forecloses that inference. The document on which Whinstone relies is an email from Harris, not from GMO; GMO's contemporaneous response disputed Harris's characterization and stated that "we want to go forward with Building B"; and Makita wrote to Whinstone on February 11, 2020 that "[o]ur request has not changed from the beginning," that GMO "need[ed] to turn on all our miners and reserve the capacity of 120MW in total as in the colocation agreement," and that GMO understood Whinstone had resumed construction of Building B. GMO 56.1 Reply Stmt. ¶¶ 508-511; *see supra* I.A.5. GMO renewed its requests for a second building throughout 2020 and 2021. *See supra* I.A.5, I.A.9. A party that repeatedly and in writing insists on a contractual right has not intentionally abandoned it, regardless of what a counterparty's employee may have inferred from an electronic conversation.

GMO's motion is therefore granted as to liability on the Specified Power Draw Claim. The amount of GMO's damages, including the effect of GMO's own capacity to use the power and any failure to mitigate, is reserved for trial, as is the application of Section 9.3 to shortfalls before April 12, 2021, *see supra* II.D.2.d.

**b. The Service Uptime Claim (Section 5.4)**

Section 5.4 provides that "Whinstone will ensure a service uptime of 99% (per annum starting from the RFU Date) for the provision of the Services, including regular networking, internet-connection, and cooling services, set forth in this Agreement." Texas Agreement § 5.4. The "Services" are the colocation services described in Sections 3 and 4, the most important of which is the provision of power. *Id.* §§ 1.1, 3, 4. Ninety-nine percent uptime per annum permits roughly 87.6 hours of downtime in a year.

The parties dispute the meaning of "service uptime." GMO reads Section 5.4 according to its terms: Whinstone promised that the services, including power, would be available 99 percent of the time, without exception. GMO MSJ Br. at 27-31. Whinstone contends that the provision must be read to exclude interruptions beyond Whinstone's control, interruptions caused by GMO, force majeure events, and curtailments under the ERCOT ancillary services and the "Four Coincident Peaks" programs in which, Whinstone says, GMO knew it would participate. Whinstone MSJ Opp. at 37-44. Some of these exclusions have a textual basis; Section 12.1 excuses failures "due to Force Majeure," and Section 9.2 bars liability for non-provision of services "reasonably attributed to the acts or omissions of the Customer." Texas Agreement §§ 9.2, 12.1. Others, including the exclusion for market-program curtailments, do not appear in the Agreement at all, and Whinstone's proposal in every 2021 amendment draft to add an express exclusion for demand-response curtailments is some evidence that Whinstone understood the existing text not to contain one. GMO 56.1 Stmt. ¶¶ 296, 298, 312, 314, 319; *see Global Reins. Corp. of Am. v. Century Indem. Co.*, 91 N.E.3d 1186, 1193 (N.Y. 2017) (courts "should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" (internal quotation marks omitted)).

The Court need not resolve the full scope of Section 5.4 to decide GMO's motion, because Whinstone breached the provision even on its own reading. The record establishes a series of extended outages in Building A, and Whinstone does not dispute that most were attributable to failures of the equipment Whinstone was responsible for providing: a thirty-two-hour outage on July 31, 2020 and a 120-hour outage beginning August 26, 2020, both caused by substation problems; a 161.5-hour outage beginning September 16, 2020; a nine-day outage in August 2021 caused by a failed wire termination; and an eleven-day outage in March 2022 caused by "an electrical issue that caused the breaker to open." GMO 56.1 Stmt. ¶¶ 164-173; Whinstone 56.1 Counter Stmt. ¶¶ 164-173 (disputing one of the outages); *see supra* I.A.6. None of these was a curtailment under a market program, an act of God, or a maintenance event requested by GMO. In 2020, the three outages totaled more than 313 hours; the 2021 outage alone was roughly 216 hours; and the 2022 outage alone was roughly 264 hours. Each year's total exceeded the 87.6 hours that Section 5.4 permits. Whinstone suggests that these outages might be "reasonably attributed" to GMO under Section 9.2 because faulty miners can trip breakers. Whinstone MSJ Opp. at 41-42. But that suggestion rests on the general observations of Whinstone's mining expert, not on any evidence about what caused a substation to fail or a wire termination to give way. Speculation of that kind does not create a genuine dispute. *Jeffreys*, 426 F.3d at 554. Indeed, Whinstone's own conduct at the time confirms the breach: when GMO complained in October 2020 that Whinstone had "already exceeded the limit of SLA," Whinstone did not dispute it, and Whinstone later agreed to a $700,000 credit "for violation of the SLA for the year of 2020." GMO 56.1 Counter Stmt. ¶ 174; GMO 56.1 Stmt. ¶ 167; Whinstone 56.1 Counter Stmt. ¶ 167.

Whinstone's remaining argument is that the meter data on which GMO relies shows only that no power was consumed, not that none was supplied. Whinstone MSJ Opp. at 42-43. But Whinstone's corporate representative agreed that a reading of zero at the meter means "there's no

power at that location." Dkt. 622-1 (Schatz deposition transcript) at 80:5-14. And regardless, whatever force that argument may have as to the meter data generally, it does not reach the specific outages just described, whose causes are documented in Whinstone's own records. GMO 56.1 Stmt. ¶¶ 164-173; Whinstone 56.1 Counter Stmt. ¶¶ 164-165, 171-173.

GMO's motion is therefore granted to the extent of establishing that Whinstone breached Section 5.4 in each of 2020, 2021, and 2022. The full extent of the breach in each year, the meaning of "service uptime" as applied to curtailments and other categories of interruption, the effect of Winter Storm Uri and of Section 12.1, and the resulting damages are reserved for trial, as is the application of Section 9.3 to outages before April 12, 2021, *see supra* II.D.2.d.

**c. The Louisiana Power Shortage Claim (Section 16.3)**

In the context of Whinstone's summary judgment motion, the Court has held that the first sentence of Section 16.3 is an enforceable acknowledgment of liability and promise to indemnify, and that the second sentence is an enforceable promise to negotiate, in good faith, the amount and duration of a reduction in GMO's hosting fee. *See supra* II.D.2.b. GMO moves for summary judgment on liability on both. GMO MSJ Br. at 31-34.

As to the first sentence, the undisputed facts establish breach. Whinstone acknowledged in the Texas Agreement that it was liable for GMO's loss of profit from the Louisiana power shortage between January 5, 2019 and the date the Rockdale Facility reached five MW, and it promised to indemnify GMO for that loss. Texas Agreement § 16.3. It has never done so. Whinstone does not contend that it paid, credited, or otherwise compensated GMO for the Loss of Profit by Power Shortage; its position is only that the obligation is unenforceable, *see* Whinstone MSJ Opp. at 44-47, which the Court has rejected, *see supra* II.D.2.b. Nor is there any genuine dispute that GMO suffered a loss: the parties' contemporaneous estimates of the indemnification amount ranged from about $3 million to $15 to $18 million, Harris Dep. Tr. at 145:1-9; Makita

Dep. Tr. at 97:4-98:25, and Whinstone's acknowledgment of liability in the Agreement itself is an admission that the shortfall caused GMO loss. The amount of that loss is to be determined at trial.

As to the second sentence, the question is whether Whinstone negotiated the fee reduction in good faith. Good faith is ordinarily a question of fact. *See Tractebel Energy Mktg.*, 487 F.3d at 98-99. But a party that "insist[s] on conditions that do not conform to the preliminary agreement" breaches its obligation to negotiate in good faith as a matter of law, because the obligation is to negotiate "within the agreed framework." *L-7 Designs*, 647 F.3d at 430 (internal quotation marks omitted); *see Teachers Ins. & Annuity Ass'n of Am.*, 670 F. Supp. at 498. The agreed framework here was a reduction in GMO's hosting fee below $0.0285 per kWh. Texas Agreement § 16.3 ("The Parties agree that Whinstone will indemnify the Customer for the Loss of Profit By Power Shortage by lowering the initial hosting fee from 0.0285 USD/kWh to an amount and for a period of time to be reasonably agreed between the Parties."). It is undisputed that Whinstone's chief executive, Harris, attempted to negotiate such a reduction, to $0.0210 per kWh "or less," in the June 2021 amendment; that Riot rejected that amendment; and that every proposal Whinstone thereafter made to GMO would have *increased* GMO's price, in the last instance to roughly three times the contract rate. *See supra* I.A.9. Whinstone does not dispute those facts. It contends instead that its later proposals were made under Section 20.6, which contemplated renegotiation of the Texas Agreement based on the "hosting agreement usually offered" by Whinstone, and not under Section 16.3, and that the two negotiations should not be conflated. Whinstone MSJ Opp. at 46. The distinction does not help Whinstone. Whatever Section 20.6 permitted Whinstone to propose about the terms of a new agreement, Section 16.3 obligated Whinstone to negotiate a reduction in the existing fee to compensate GMO for an acknowledged breach. Whinstone has identified no proposal it ever made toward that end after June 2021; the record shows that it abandoned the reduction Harris had negotiated and never

returned to it. *See supra* I.A.9. A party that agrees to negotiate a price reduction, and then negotiates only price increases, has not negotiated the reduction in good faith. And Whinstone's own contemporaneous account of its strategy, to "drag it out," GMO 56.1 Counter Stmt. ¶ 143, is not the account of a party pursuing an agreement in good faith. Whinstone's assertion that GMO was the party negotiating in bad faith, Whinstone MSJ Opp. at 46-47, concerns the Section 20.6 negotiations and is addressed below; it does not explain Whinstone's abandonment of the Section 16.3 reduction.

GMO's motion is therefore granted as to liability on the Louisiana Power Shortage Claim under both sentences of Section 16.3. The remedies differ. For breach of the first sentence, GMO may recover the loss of profit that the first sentence obligated Whinstone to indemnify, in an amount to be proved at trial. For breach of the second, GMO's recovery would be limited to the costs it incurred in reliance on Whinstone's promise to negotiate. *Goodstein Constr. Corp.*, 604 N.E.2d at 1360-62. GMO has stated that it seeks only the former, GMO MSJ Reply at 15 n.6, and the Court does not understand it to seek a double recovery.

**d. The Miner Removal Claim (Section 3.1.3)**

Section 3.1.3 provided that "[w]ith written prior consent of the Customer, Whinstone may relocate the Customer Equipment within the Data Center or to another facility operated by Whinstone." Texas Agreement § 3.1.3. It is undisputed that, beginning in March and April 2022, Whinstone removed approximately 17,000 of GMO's miners from their positions in Building A; that GMO gave no written consent; and that when GMO asked why the miners on one wall had been "moved out," Whinstone's operations director, Davidson, told GMO that Whinstone was "in the process of maintenance," a statement he later testified he had been instructed to give. GMO 56.1 Stmt. ¶¶ 377-395; Whinstone 56.1 Counter Stmt. ¶¶ 385, 570-580; *see supra* I.A.11. Whinstone "acknowledges that it could have handled the miner 'removal' (consolidation) effort in

April 2022 better, and that it did not get GMO's 'written prior consent.'" Whinstone MSJ Opp. at 47. That is a concession of breach.

Whinstone's only argument against summary judgment is that GMO may not have been injured, because GMO's miners were so inefficient that GMO may have saved money by not running them, as Montague's recalculation of Dr. Parlour's figures suggests. *Id.* at 47-48. But Montague's opinion, as GMO points out, is that GMO's damages from the removal "would be at most $0.8 million," with a lower figure only under an alternative assumption about GMO's operating mode. GMO MSJ Reply at 19-20. A dispute between experts about whether GMO's loss was $1.2 million or $0.8 million or some other figure is a dispute about the amount of damages. And the undisputed facts establish injury independently of either expert: Whinstone removed thousands of GMO's operating miners from service without consent and kept them out of service, and a miner that is not running does not mine. Whinstone's "consolidation" rationale, and its contention that the removed miners were largely non-functional, bear on how much GMO lost. They do not bear on whether Whinstone breached.

GMO's motion is therefore granted as to liability on the Miner Removal Claim.

**e. The Early Termination Claim (Section 15.2)**

Whinstone terminated the Texas Agreement on June 29, 2023, invoking Section 15.2 and asserting that GMO had materially breached its obligation under Section 20.6 to renegotiate the Agreement in good faith. *See supra* I.A.12. GMO moves for summary judgment on liability, arguing that it negotiated in good faith and that Whinstone therefore had no right to terminate. GMO MSJ Br. at 34-38.

The Court agrees with GMO that the propriety of the termination turns on whether GMO breached Section 20.6.[28] Section 20.6 required both parties, once the Pledge Debts were repaid, to "enter into discussions in good faith to renegotiate this Agreement based on the hosting agreement usually offered by Whinstone for colocation services." Texas Agreement § 20.6. That is a Type II obligation. It did not require GMO to agree to any particular terms, and it did not require GMO to accept a price increase; it required GMO to negotiate in good faith toward a replacement agreement within the framework the parties had set. *L-7 Designs*, 647 F.3d at 430.

Much of the record supports GMO. GMO reached agreement with Whinstone's chief executive on the June 2021 amendment; it made proposals and counterproposals through the end of 2021; and it repeatedly pressed Riot to respond, at one point writing that "[s]ince you haven't either responded to us timely nor answered to my question I asked several times, we are thinking that Riot is not responding in good faith," GMO 56.1 Stmt. ¶¶ 257-270; Whinstone 56.1 Counter Stmt. ¶¶ 257-270. *See supra* I.A.9. Riot, for its part, resolved to "drag it out." GMO 56.1 Counter Stmt. ¶ 143. On that record, a factfinder could well conclude that the party that failed to negotiate in good faith was Whinstone, not GMO.

But Whinstone has adduced evidence from which a factfinder could conclude otherwise. Its evidence is that GMO conditioned any renegotiation on a Section 16.3 price reduction that Section 20.6 does not mention; that GMO's chief negotiator testified that a price "at cost" was a "mandatory term" of any new agreement; that GMO also demanded all of Whinstone's ancillary-services revenue, all profits from power credits with no sharing of losses, and on-site maintenance at cost; and that GMO's leadership never intended to operate under a market-rate hosting

[28] The Termination Notice contended that, in addition to violating Section 20.6, GMO "failed to use its allotted power capacity." GMO 56.1 Stmt. ¶ 446; *accord* Whinstone 56.1 Counter Stmt. ¶ 446. Whinstone's counterclaims allege that GMO also breached the Agreement by failing to use a minimum quantity of power and by failing to pay the surcharges. Counterclaims ¶¶ 73-75. For the reasons explained below, none of these theories states a breach. *See infra* II.D.3.f.

agreement and understood that stalling would preserve its below-market price. Whinstone MSJ Opp. at 49-53; Whinstone 56.1 Counter Stmt. ¶¶ 553-569; *see supra* I.A.9. GMO responds, with force, that insisting on a price reduction to which it was entitled under Section 16.3 cannot be bad faith, that Section 4.3.2 froze its price for ten years, and that Whinstone had entered into other hosting agreements at prices below GMO's. GMO MSJ Reply at 15-18; *see supra* I.A.9. Those are powerful arguments, which may prevail at trial. But the obligation under Section 20.6 was to negotiate a replacement for the Agreement "based on the hosting agreement usually offered by Whinstone," and whether GMO's positions in that negotiation were genuine efforts to reach such an agreement or were, as Whinstone contends, designed to ensure that none was reached is a question of GMO's intent. "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith," and "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg.*, 487 F.3d at 98 (internal quotation marks omitted). Sufficient evidence has been adduced to carry this issue to trial.

GMO's motion is therefore denied as to the Early Termination Claim. The claim, together with Whinstone's related defenses, will proceed to trial.

**f. Whinstone's Counterclaims**

Whinstone asserts three counterclaims: breach of contract, unjust enrichment, and a claim for a declaratory judgment. Counterclaims ¶¶ 68-88; *see supra* I.B.1. GMO moves for summary judgment on all three. GMO MSJ Br. at 40-53.

*Breach of Contract.* Whinstone's breach counterclaim rests on three theories: GMO failed to negotiate in good faith under Section 20.6; GMO failed to use a minimum quantity of power;

and GMO failed to pay the surcharges. Counterclaims ¶¶ 71-78. Whinstone's opposition defends only the first. Whinstone MSJ Opp. at 54-56. The Court nonetheless addresses all three.

The second and third theories fail on the terms of the Texas Agreement. Section 4.3.3 provides that, until the Pledge Debts were repaid, GMO "shall be charged for the power which the Customer actually used," and that thereafter GMO "shall enter into discussions in good faith about agreeing a minimum commitment for power usage." Texas Agreement § 4.3.3. The Agreement thus imposed no minimum commitment; it contemplated that one might be negotiated, and none ever was. *See supra* I.A.3.b, I.A.9. A party cannot breach a commitment it never made. As to the surcharges, Section 4.3.2 froze GMO's price for ten years subject to specified exceptions, and provided that, if an exception applied, "Whinstone and the Customer shall decide fairly by agreement the effect of to whom can be passed on." Texas Agreement § 4.3.2. Riot's corporate representative admitted that none of the events identified in Section 4.3.2 occurred during the life of the Agreement, GMO 56.1 Stmt. ¶ 361; Whinstone 56.1 Counter Stmt. ¶ 361, and it is undisputed that Whinstone imposed the surcharge unilaterally rather than by agreement, *see supra* I.A.10. GMO was not obligated to pay it.

The first theory fails for want of damages. Even assuming that GMO breached Section 20.6, which the Court has held is a question for trial, the only injury Whinstone identifies is that GMO's refusal to agree to a new contract "deprived Whinstone of compensation for the power it provided by continuing to pay Whinstone at the extremely low power price in the Texas Agreement," a price "that was supposed to have been renegotiated up to a more 'usual' price." Whinstone MSJ Opp. at 55. That is a claim for the benefit of a bargain the parties never struck, and it is exactly the sort of recovery *Goodstein Construction* forbids. In *Goodstein Construction*, the New York Court of Appeals held that a party injured by the breach of an agreement to negotiate may not recover the profits it would have earned under the contract it hoped to negotiate, because

to award such damages would be "transforming an agreement to negotiate for a contract into the contract itself," and the injured party's recovery is limited to the expenses it incurred in reliance on the promise to negotiate. 604 N.E.2d at 1360-62. Whinstone has not identified any such reliance expense. Whinstone acknowledges that it has not calculated the damages it claims, that it has disclosed no expert on the subject, and that it has not identified what its "usual" hosting terms were. GMO 56.1 Stmt. ¶¶ 477-481; Whinstone 56.1 Counter Stmt. ¶¶ 477-481; *see supra* I.B.1. Whinstone's suggestion that its remedy for GMO's breach was the right to terminate, Whinstone MSJ Opp. at 55, may be true, but a right to terminate is a defense to GMO's Early Termination Claim, not a basis for an affirmative award of damages. Because Whinstone has no evidence of any recoverable damages, GMO is entitled to summary judgment on the breach of contract counterclaim. *See Fischer & Mandell*, 632 F.3d at 799.

*Unjust Enrichment.* Whinstone's unjust enrichment counterclaim seeks the value of GMO's continued operation at the Rockdale Facility after the termination took effect on June 29, 2023. Counterclaims ¶¶ 79-83. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). The Texas Agreement governs the post-termination period. It provided that upon termination, GMO "shall surrender the Licensed Area," and that "until such time as the Licensed Area is surrendered to Whinstone free and clear of all of Customer Equipment," GMO "shall continue to be liable to Whinstone for the Charges and shall in addition be liable for any losses and/or damages which Whinstone may sustain" from the delay. Texas Agreement §§ 15.6, 15.7. Those provisions survive termination. *Id.* § 15.4.1. The parties thus agreed in advance on what GMO would owe if it remained in the facility after termination, and GMO paid the Charges through the date it vacated. *See supra* I.A.12. Whinstone's remedy for any shortfall lies in Section

15.7, not in quasi-contract. Whinstone's response, that it is entitled to disgorge the Bitcoin GMO mined after termination, Whinstone MSJ Opp. at 56, does not engage with the contract and identifies no reason why Section 15.7 does not govern. GMO's motion is granted as to this counterclaim.

*Declaratory Judgment.* Whinstone's third counterclaim seeks a declaration that its termination of the Texas Agreement was proper. Counterclaims ¶¶ 84-87. That question is the mirror image of GMO's Early Termination Claim, which will be tried, and the judgment on that claim will necessarily determine whether Whinstone's termination was proper. A declaratory judgment claim that seeks a declaration of the same rights as will be determined under a coexisting claim for breach serves no useful purpose and should be dismissed. *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249-50 (S.D.N.Y. 2006). Whinstone argues that the declaration would retain independent value if the Court dismissed GMO's Early Termination Claim for want of damages, Whinstone MSJ Opp. at 55-56, but the Court has declined to do so, *see supra* II.D.2.c. GMO's motion is granted as to this counterclaim.

**g. Whinstone's Affirmative Defenses**

GMO moves for summary judgment on each of Whinstone's affirmative defenses other than the fifth, for failure to mitigate. GMO MSJ Br. at 54-55 & n.20. Whinstone objects that GMO has not identified the elements of each defense or the evidence bearing on it. Whinstone MSJ Opp. at 56-57. The objection has some force as to GMO's opening brief, but the defenses were fully joined in the opposition and reply, and most of them are resolved by the Court's rulings above.

*Waiver, Estoppel, Laches, and Unclean Hands (Third Defense).* The only factual basis Whinstone offers for this defense is GMO's asserted waiver of a second building, Whinstone MSJ

Opp. at 57, which the Court has rejected, *see supra* II.D.3.a. Whinstone identifies no facts supporting estoppel, laches, or unclean hands. GMO's motion is granted as to this defense.

*Lack of Damages (Fourth Defense).* This defense is not an affirmative defense at all; it is a denial of an element of GMO's claims. To the extent it is directed at the Invoice Overcharge and Installation Environment Claims, the Court has resolved those claims in Whinstone's favor. As to the remaining claims, the Court has found that GMO has established injury as a matter of law on the Specified Power Draw, Service Uptime, Louisiana Power Shortage, and Miner Removal Claims and has raised a triable issue on the Early Termination and Texas Power Sales Claims. GMO's motion is thus granted as to this defense with respect to the Invoice Overcharge, Installation Environment, Specified Power Draw, Service Uptime, Louisiana Power Shortage, and Miner Removal Claims.

*Unenforceability (Eighth Defense).* The Court has rejected Whinstone's contention that Section 16.3 is unenforceable, so GMO's motion is granted as to this defense insofar as it concerns that provision. *See supra* II.D.2.b. As to Section 4.3.8, however, the Court has held that whether a "fair" share can be given determinable content is reserved to trial. *See id.* GMO's motion is therefore denied insofar as it concerns Section 4.3.8.

*Claims Barred by the Terms of the Texas Agreement (Ninth Defense).* To the extent this defense rests on Section 9.3, the Court has held that this notice provision does not bar the portions of the Texas Power Sales Claim accruing on or after September 11, 2021 or the portions of the Specified Power Draw and Service Uptime Claims accruing on or after April 12, 2021, but that whether Whinstone is estopped from invoking Section 9.3 as to earlier breaches is a question for trial. *See supra* II.D.2.d. To the extent the defense rests on Sections 9.2 and 12.1 as limits on the Service Uptime Claim, those provisions will be applied at trial in determining the extent of the

breach. *See supra* II.D.3.b. GMO's motion thus is granted in part and denied in part as to this defense.

*Accord and Satisfaction (Tenth Defense).* Whinstone contends that GMO's acceptance of the credits Whinstone applied to its invoices in 2021 for Winter Storm Uri and the 2020 SLA violations bars any further recovery for those events. Whinstone MSJ Opp. at 58. An accord and satisfaction requires "a clear manifestation of intent by the parties that the payment was made, and accepted, in full satisfaction of the claim." *TIA Glob. Invs., LLC v. One Astoria Square LLC*, 7 N.Y.S.3d 1, 11 (1st Dep't 2015) (internal quotation marks omitted). Whinstone identifies no writing, and no conduct of GMO's, manifesting such an intent. To the contrary, the credits were applied unilaterally, GMO continued to press its claims, and GMO did not learn the magnitude of the Winter Storm Uri credits Whinstone had received until Riot's public filings disclosed it. *See supra* I.A.7. GMO's motion is granted as to this defense.

*Plaintiffs' Own Breaches (Second, Sixth, and Seventh Defenses).* Whinstone's second defense asserts that GMO's claims are barred by its own material breaches; its sixth asserts that GMO's damages arise from its own conduct; and its seventh claims a set-off for Whinstone's damages. Answer at 14. To the extent the second defense asserts that GMO's breach of Section 20.6 entitled Whinstone to terminate and bars the Early Termination Claim, it presents the same triable question as the claim itself and will be tried with it; GMO's motion is denied to that extent. In all other respects the second defense fails, because the only other breaches Whinstone attributes to GMO, the failure to use a minimum quantity of power and the failure to pay the surcharges, are not breaches. *See supra* II.D.3.f. The sixth defense, insofar as it asserts that GMO's own operational failures caused or enlarged its losses, is a variant of the mitigation and causation issues reserved for trial, and GMO's motion is denied as to it. The seventh defense fails because Whinstone has no recoverable damages to set off. *See supra* II.D.3.f.

*Remaining Defenses (First and Eleventh).* Whinstone has offered no argument or evidence in support of its first defense, failure to state a claim, or its eleventh, election of remedies, *see* Whinstone MSJ Opp. at 56-59, and a defense for which the pleader offers no factual basis is properly dismissed on summary judgment. *See FDIC v. Giammettei*, 34 F.3d 51, 54-55 (2d Cir. 1994). GMO's motion is granted as to those defenses.

**h. Summary**

GMO's motion is granted as to liability on the Specified Power Draw, Service Uptime, Louisiana Power Shortage, and Miner Removal Claims, subject to any limitations described above; is denied as to the Early Termination Claim, the Installation Environment Claim, and the assumption theory; is granted as to each of Whinstone's counterclaims; and is granted as to Whinstone's affirmative defenses except the second, insofar as it asserts that GMO's breach of Section 20.6 justified termination; the fourth as to the Early Termination and Texas Power Sales Claims; the fifth, for failure to mitigate; the sixth, insofar as it concerns causation; the eighth, insofar as it concerns Section 4.3.8, and the ninth, insofar as it concerns Section 9.3 as applied to breaches before September 12, 2021 and Sections 9.2 and 12.1 as applied to the Service Uptime Claim.

**E. The Sealing Requests**

The final matter is the parties' requests to seal. As described above, the summary judgment and expert briefing generated more than a dozen letter motions to seal or redact portions of the record, many of them opposed. At the April 9, 2026 conference, the Court granted non-party Harris's request to redact his personal text messages, Dkt. 591, and directed every party with a pending request to justify it document by document in a consolidated submission. *See supra* I.B.5. Three consolidated submissions followed. GMO seeks to seal a single document. Dkt. 648 ("GMO Sealing Ltr."). Whinstone and Riot, having withdrawn their requests as to dozens of

documents, seek to seal or redact seventy-two, which they organize into five categories. Dkt. 651 ("Defts. Sealing Ltr."). And TXU seeks continued sealing of the documents in Defendants' second category, which concern Whinstone's purchase and sale of electricity. Dkts. 650, 652. Defendants do not oppose GMO's request. Dkt. 644 at 4. GMO opposes most of Defendants' requests and all of TXU's. Dkt. 655 ("GMO Sealing Opp."); Dkt. 656.

The consolidated submissions supersede the earlier letter motions. Any document that was the subject of an earlier request but is not addressed in a consolidated submission is no longer the subject of any request, and the party that filed such document under seal shall file it publicly on the schedule set out below.

**1. Legal Standard**

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Whether a document may be sealed is governed by the three-step framework set out by the Second Circuit in *Lugosch*. First, the Court determines whether the document is a "judicial document," meaning one that is "relevant to the performance of the judicial function and useful in the judicial process." *Id.* (quoting *United States v. Amodeo* ("*Amodeo I*"), 44 F.3d 141, 145 (2d Cir. 1995)). Second, the Court assesses the weight of the presumption of access, which "is governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (quoting *United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1049 (2d Cir. 1995)). Third, the Court balances "competing considerations" against the presumption, including "the privacy interests of those resisting disclosure." *Id.* at 120 (quoting *Amodeo II*, 71 F.3d at 1050).

Documents submitted in connection with a motion for summary judgment are judicial documents to which the presumption applies with full force, *id.* at 121-23, and the First

Amendment independently guarantees access to them, permitting sealing only upon "specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest," *id.* at 120 (internal quotation marks omitted). Documents submitted in connection with discovery requests and other non-dispositive motions are judicial documents as well, although the presumption is weaker. *See Brown v. Maxwell*, 929 F.3d 41, 49-50 (2d Cir. 2019).

Even among documents filed on summary judgment, the weight of the presumption varies with the document's role in the adjudication. Judicial documents fall on "a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Amodeo II*, 71 F.3d at 1049. The presumption is strongest as to the material on which the Court actually relies, because "[a]n adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny." *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982); *see Lugosch*, 435 F.3d at 123. Thus, documents used on summary judgment "should not remain under seal absent the most compelling reasons." *Lugosch*, 435 F.3d at 123 (quoting *Joy*, 692 F.2d at 893). The presumption is weaker as to material that the Court had no need to consider. *See Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2024 WL 4276201, at *3-4 (S.D.N.Y. Sept. 24, 2024).

Courts in this District routinely permit the sealing or redaction of "sources of business information that might harm a litigant's competitive standing," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978), such as non-public pricing terms, cost data, and financial projections, provided the request is narrowly tailored, *see, e.g.*, *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 81 n.1 (S.D.N.Y. 2017); *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 649-50 (S.D.N.Y. 2011). The privacy interests of non-parties "should weigh heavily in a

court's balancing equation." *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987); *accord Amodeo II*, 71 F.3d at 1050-51.

Several other considerations warrant mentioning. A party's designation of a document as confidential under a protective order, or its contractual promise to keep the document confidential, does not itself overcome the presumption. *See Lugosch*, 435 F.3d at 126. "[T]he older the information is, the less appropriate it is to seal that information, particularly when the party does not explain with specificity why, despite the passage of time, the information should still be sealed." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, Nos. 14 Md. 2542 (VSB), 14 Misc. 2542 (VSB), 2023 WL 196134, at *4 (S.D.N.Y. Jan. 17, 2023). Finally, information that is already public cannot be made private again. *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004).

Because the Court's rulings turn largely on which documents it needed to resolve the parties' motions and which it did not, two general rules apply throughout the analysis that follows. First, the Court denies the requests as to documents whose contents it has relied on and described in this Opinion and Order. Sealing those documents would serve little purpose, and the public is entitled to know the basis of the Court's rulings. Second, as to documents the Court did not need to consider, the Court permits the redaction of specific non-public prices, costs, fees, and financial projections that the parties have identified as competitively sensitive, and it permits a document that consists almost entirely of such information, such as a bill, a valuation, or a financial model, to remain sealed in full. The Court does not permit the sealing of the descriptions of events, negotiations, and business decisions that make up the narrative of this case. And a figure that appears in this Opinion and Order may not be redacted anywhere.

**2. Unopposed Requests**

Three sets of requests are unopposed, and the Court grants them.

GMO asks to seal portions of Exhibit 166 to the Declaration of Leslie C. Thorne, Dkt. 563-138, which is the minutes of a GMO board meeting. GMO Sealing Ltr. at 1. The portion of the minutes concerning GMO's mining business, on which GMO relied in its motion, will be public. GMO proposes to redact only the portions concerning its other business lines, which discuss financial, strategic, and legal matters that have nothing to do with this case. *Id.* at 1-2 & Ex. A. Those portions came before the Court "solely to insure their irrelevance," *Amodeo II*, 71 F.3d at 1049, and GMO's narrowly drawn redactions are approved.

Defendants ask to redact bank account numbers from three exhibits, Dkts. 563-33, 563-68, 606-30, which GMO does not oppose. Defts. Sealing Ltr. at 7; GMO Sealing Opp. at 12. That request is granted. GMO also does not oppose the redaction of the portions of a March 2022 business update memorandum prepared by Riot's accountants, Dkt. 563-154, that concern Riot's other business lines. GMO Sealing Opp. at 11-12 & Ex. B. That redaction is approved for the same reason for redacting GMO's other business lines.

Finally, GMO has moved to seal its two letters opposing Defendants' requests, Dkts. 647, 655, because the letters describe the contents of the documents at issue. Dkts. 645, 654. Those motions are granted to the extent, and only to the extent, that the letters describe material that remains sealed under this Opinion and Order, and thus redaction of such material is approved.

### 3. Defendants' Opposed Requests

#### a. Third-Party Contracts and Customer Information

Defendants' first category consists of Whinstone's hosting agreements with Bitmain and with SBI; deposition testimony describing the Bitmain agreement; and operational records and correspondence concerning Bitmain's tenancy in Building A, including the Monday.com "Miner Project" board on which Whinstone tracked the removal of GMO's miners, the minutes of the April 6, 2022 meeting between Riot and Bitmain, and Bitmain's 2022 complaints about conditions

in the building. Defts. Sealing Ltr. at 2-3. Defendants offer two justifications: Whinstone owes confidentiality obligations to Bitmain and SBI, and disclosure would give competitors insight into Whinstone's "standard agreement terms, pricing models, and cost structures." *Id.* at 2.

Neither justification overcomes the presumption of public access. These documents are at the center of the case, and the Court has relied on them. The terms of Whinstone's other hosting agreements bear directly on Section 20.6, which required the parties to renegotiate "based on the hosting agreement usually offered by Whinstone," and the Court has described the pricing, minimum-usage, and uptime terms of the SBI and Bitmain agreements above. *See supra* I.A.9. The Bitmain agreement's allocation of 20 MW of Building A, the Miner Project board, Bitmain's complaints about the building, and the April 6 meeting are parts of the record of the miner removal on which the Court has granted GMO summary judgment. *See supra* I.A.6, I.A.11, II.D.3.d. The public cannot evaluate the Court's rulings without access to their bases. *See Joy*, 692 F.2d at 893. Against that interest, Defendants' confidentiality obligations count for little, *see Lugosch*, 435 F.3d at 126, particularly where, as GMO represents without contradiction, the Bitmain agreement itself contemplates disclosure in litigation and a version of the SBI agreement was publicly filed in Whinstone's litigation with SBI in the Western District of Texas. *See* GMO Sealing Opp. at 3-4; Defts. Sealing Ltr. at 3 n.1. Nor is the claimed competitive harm persuasive. The SBI agreement dates from 2019 and the Bitmain agreement from 2022; both have been terminated; Building A has since been renovated; and Whinstone admits that Riot is now its only hosting customer. *See supra* I.A.12. And neither Bitmain nor SBI has asked the Court to seal anything. The requests in this category are therefore denied, with one exception. Because the Court has not relied on the specific fee figures in the Bitmain agreement, Defendants may redact those figures from the agreement, Dkts. 563-115, 572-21, and from the deposition testimony and correspondence that recite them.

**b. Electricity Pricing, Power Procurement, and Power Sales**

Defendants' second category, which TXU joins, concerns Whinstone's purchase of electricity from TXU and its sale of electricity back to the market. It includes the TXU Agreement and its amendments; the forward sale agreements and the April 2021 letter agreement under which Whinstone received its Winter Storm Uri payments; TXU's monthly bills; spreadsheets of settlement, curtailment, and block-sale data; an invoice from Whinstone's power consultant; the expert report of Dr. Zarnikau; and internal emails and testimony discussing the cost of power. Defts. Sealing Ltr. at 3-5; Dkts. 650, 652. Defendants and TXU contend that this information is competitively sensitive, that its disclosure would undermine Whinstone's bargaining position in the electricity market, and that disclosure would violate Whinstone's obligations to TXU. Defts. Sealing Ltr. at 3.

The Court draws the line between the terms of the TXU Agreement itself and the granular pricing data generated under it. The TXU Agreement and its amendments may not be sealed. GMO represents, and neither Defendants nor TXU disputes, that Defendants' own counsel filed the TXU Agreement and its amendment on the public docket of a bankruptcy proceeding in the Southern District of Texas, and that the agreement's principal terms have been disclosed in Riot's public securities filings. GMO Sealing Opp. at 5 & n.1; *see* Dkt. 656 at 1-2. What is public cannot be resealed. *Gambale*, 377 F.3d at 144. And the Court has relied on the Agreement's structure and pricing, which are essential to the Texas Power Sales Claim and to Whinstone's counterclaims. *See supra* I.A.4, I.A.7. The same is true of Dr. Zarnikau's report, whose analysis of the meter data, Whinstone's curtailments, and Whinstone's power-sale revenues underlies the Texas Power Sales Claim and figures throughout this Opinion and Order. *See supra* I.A.6, I.A.7. Defendants' request to seal the report in its entirety, on the ground that narrower redaction "is not feasible," Defts. Sealing Ltr. at 3-4, is not narrowly tailored. As GMO points out, and Defendants do not dispute,

the report's opening sections are background, it relies on public ERCOT data, and Defendants have withdrawn their request to seal the meter data on which it principally rests. GMO Sealing Opp. at 6. The request to seal the entire report therefore is denied, but Defendants may redact from the report only the specific figures that remain sealed under the following paragraph.

The remaining documents in this category are different. The forward sale agreements, the Winter Storm Uri letter agreement, TXU's bills, the settlement and curtailment spreadsheets, and the Priority Power invoice consist almost entirely of prices, volumes, and credits under a contract with a non-party, TXU, which has appeared to ask that they remain sealed. Dkts. 650, 652. The Court has relied on none of that granular data. The figures on which the Court has relied, including the aggregate amount of the Winter Storm Uri payments, the structure of the TXU block-and-credit mechanism, and the approximate revenue from the 2023 forward sales, appear in Riot's public filings and in this Opinion and Order. *See supra* I.A.4, I.A.7. GMO is right that some of this material is several years old and that Riot discloses its average cost of power to investors. GMO Sealing Opp. at 5. But line-item pricing under a supply contract that runs through 2030 is not the same as a company-wide average, TXU's interest in its own pricing weighs heavily, *N.Y. Times*, 828 F.2d at 116, and nothing in these documents is needed to understand the Court's rulings. The requests to seal them in full are granted. The requests to redact specific cost-of-power, credit, and pricing figures from internal emails and testimony, Defts. Sealing Ltr. at 5, are granted as well, subject to two limits: a figure that this Opinion and Order recites may not be redacted, and, because the TXU Agreement is public, its terms may not be redacted from the testimony and correspondence that discuss them.

**c. The Privilege Documents**

Defendants' third category consists of the termination analyses that are the subject of Whinstone's objection to the Privilege Order, together with the paragraphs of Dr. Parlour's reports

that describe them. Defts. Sealing Ltr. at 5-6. Defendants ask that these documents remain sealed pending resolution of the objection "in order to protect that assertion of privilege," and they offer no other basis for sealing. *Id.* at 5. The Court has now overruled the objection. *See supra* II.B. The only reason offered for sealing has therefore fallen away, and no other is apparent. These analyses, which the Court has quoted at length, are important evidence of why Whinstone terminated the Texas Agreement, and they will be central to the trial of the Early Termination Claim. *See supra* I.A.12, II.D.2.c. The requests in this category are denied. In light of the privilege ruling, however, the Court will not require these documents to be unsealed until the deadline set below, so that Whinstone may seek whatever further relief it believes is available.

**d. Internal Business Documents**

Defendants' fourth category is a miscellany of ten internal documents said to reflect the "strategic planning, financial projections, and internal pricing arrangements" of Whinstone and Riot. Defts. Sealing Ltr. at 6-7. The Court's rulings follow from the principles stated above.

The requests are denied as to four documents on which the Court has relied or which otherwise go to the heart of the case. The Riot-Whinstone hosting agreement, Dkt. 563-96, is one of the agreements "usually offered by Whinstone" whose terms the Court has described, *see supra* I.A.9; both parties to it are litigants; and Defendants do not explain how a competitor could profit from the terms of an intercompany agreement between a parent and its wholly owned subsidiary. Defendants may redact the specific fee figure, which the Court has not recited, but nothing else. The 2021 Riot analysis of the economics of hosting GMO at various prices, Dkt. 598-4, is the document whose projections and "standing offer rate" recommendation the Court has quoted, *see supra* I.A.9, and, as GMO observes, Defendants have not sought to seal the same document where it appears elsewhere in the record, GMO Sealing Opp. at 11 (citing Dkt. 611-64). The June 2021 exchange among Riot executives about Whinstone's legacy hosting customers, Dkt. 563-37, is five

years old, and Defendants, having been told at the April 9 conference that the Court doubted it could be sealed, have offered no explanation of what strategic information it reveals. And the contested sections of the Marcum business update memorandum, Dkt. 563-154, concern the Winter Storm Uri credits, Riot's power sales, its self-mining expansion, and its discussions with Bitmain, which are the subjects of this litigation; the Court has quoted the memorandum's account of the storm above. *See supra* I.A.7. Defendants may redact the unopposed sections of the memorandum, *see supra* II.E.2, and any specific dollar figures in the contested sections that the Court has not recited.

The requests are granted, in whole or in part, as to the remaining six documents. The Court did not rely on Riot's August 2023 "Cashflow Update," Dkts. 563-116, 611-56; its September 2023 "Mining Cost Analysis," Dkt. 563-127; the Grant Thornton valuation materials, Dkt. 563-119; or the August 2024 operations presentation, Dkts. 577-13, 577-14, and each consists largely of financial projections, valuation figures, or operational detail of the kind courts routinely protect. *See In re Digit. Music Antitrust Litig.*, 321 F.R.D. at 81 n.1; *Brunckhorst*, 2024 WL 4276201, at *3. Those four documents may remain sealed. The June 2021 email concerning Riot's plans to move its miners to Rockdale, Dkt. 563-65, and the May 2022 letter from Riot to Northern Data concerning the closing statement for the Whinstone acquisition, Dkt. 611-8, may be filed with the projected profit margins in the former and the specific monetary figures in the latter redacted. The balance of each, which describes plans Riot has announced publicly and a transaction Riot has litigated publicly, GMO Sealing Opp. at 9-10, is not sensitive.

**4. TXU's Requests**

TXU's requests are resolved by the foregoing. TXU is a non-party whose only interest is in its own pricing, and the Court has given that interest substantial weight. Its request is granted as to the forward sale agreements, the Winter Storm Uri letter agreement, its bills, and the

settlement and curtailment data. It is denied as to the TXU Agreement and its amendments, which are already public, and as to the wholesale sealing of Dr. Zarnikau's report and of the internal emails and testimony that discuss the cost of power, which may be redacted only as set out above.

**5. Implementation**

Within twenty-one days of this Opinion and Order, each party shall file on the public docket a version of every brief, declaration, exhibit, and Rule 56.1 statement that it filed under seal in connection with the motions resolved herein, redacted only to the extent this Opinion and Order permits. On the same date, the parties shall file a joint letter listing, by docket number, each filing that has been refiled in redacted form and each sealed filing that may be unsealed in full. Nothing in this Opinion and Order is sealed. The Court has drawn on sealed material only to the extent necessary to explain its rulings, and to that extent the material is public.

## III. Conclusion

For the foregoing reasons, Riot's motion to dismiss the Fifth Amended Complaint is granted, and the claims against Riot are dismissed with prejudice. Whinstone's objection to the Privilege Order is overruled, and Whinstone shall produce the five documents at issue, with the redactions Judge Parker authorized, within fourteen days. The three motions to exclude expert testimony are denied without prejudice to renewal at trial. Whinstone's motion for summary judgment is granted as to GMO's Invoice Overcharge and Installation Environment Claims, which are dismissed, and is otherwise denied. GMO's motion for summary judgment is granted as to liability on its Specified Power Draw, Service Uptime, Louisiana Power Shortage, and Miner Removal Claims, subject to any limitations described in this Opinion and Order; is denied as to its Early Termination Claim, its Installation Environment Claim, and its theory that Riot assumed the Texas Agreement; is granted as to each of Whinstone's counterclaims, which are dismissed; and is granted in part and denied in part as to Whinstone's affirmative defenses as set forth above at

*supra* II.D.3.g. The requests to seal are granted in part and denied in part as set forth at *supra* II.E, and the parties shall file conforming public versions of their sealed submissions within twenty-one days. Because the Court is able to resolve the motions without oral argument, GMO's motion for oral argument is denied as moot. Dkt. 566.

The following issues remain for trial: the amount of GMO's damages on the Specified Power Draw, Service Uptime, Louisiana Power Shortage, and Miner Removal Claims; the full extent of Whinstone's breach of Section 5.4 and the application of Sections 9.2 and 12.1; whether Whinstone is estopped from invoking Section 9.3 as to breaches occurring before GMO's claims accrued; liability and, if appropriate, damages on the Texas Power Sales Claim, including the meaning of a "fair" share under Section 4.3.8; liability and, if appropriate, damages on the Early Termination Claim, including whether GMO breached Section 20.6; and Whinstone's surviving defenses including failure to mitigate and causation. The parties shall proceed in accordance with the pretrial schedule set at Docket Number 661.

The parties shall appear for a status conference on October 14, 2026, at 11:00 a.m. The Court will conduct the conference by teleconference on Webex. At the scheduled time, counsel for all parties should call (855) 244-8681, access code 2302 755 2307.

The Clerk of Court is respectfully directed to terminate Riot Platforms, Inc. as a Defendant and to close Docket Numbers 509, 544, 546, 547, 555, 556, 566, 567, 568, 573, 578, 582, 591, 594, 601, 614, 615, 626, 632, 645, 648, and 654.

SO ORDERED.

Dated: September 30, 2026
New York, New York

JOHN P. CRONAN
United States District Judge